# ORIGINAL

### IN THE SUPERIOR COURT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, APPELLEE | : SUPERIOR COURT NO. 1451 PGH 1998 |

**VS.**

*1:01CV327*

MARK BAILEY, APPELLANT

### REPRODUCED RECORD OF THE APPELLANT,

### MARK BAILEY

(On appeal from the Order dated July 7, 1998 of the Honorable John B. Leete of the Court of Common Pleas of Potter County, Criminal Division, which denied the Post Sentence Motions of Mark Bailey and affirmed the judgment of sentence dated February 4, 1998. The matter was docketed in the Court of Common Pleas, Potter County, Criminal Division, at docket number 93 of 1997).

FILED
HARRISBURG, PA

MAY 3 1 2001

MARY E. D'A...ZA CLERK
Per _____ Deputy Clerk

Samuel C. Stretton, Esquire
Attorney for Appellant
301 S. High St.
P.O. Box 3231
West Chester, PA  19381
(610) 696-4243
Attorney I.D. No. 18491

## TABLE OF CONTENTS - REPRODUCED RECORD

|      |                                                                         | PAGE  |
|------|-------------------------------------------------------------------------|-------|
| I.   | Notice of Appeal                                                        | A-1   |
| II.  | Docket entries                                                          | A-2   |
| III. | Bill of Information                                                      | A-7   |
| IV.  | Criminal Complaint                                                       | A-9   |
| V.   | Post Sentence Motion                                                     | A-12  |
| VI.  | February 4, 1998 Sentence Order                                          | A-14  |
| VII. | July 7, 1998 Order Denying Post Trial Motion                            | A-16  |
| VIII.| July 8, 1998 Opinion of the Honorable John B. Leete                     | A-17  |
| IX.  | September 16, 1998 Entry of Appearance of Samuel C. Stretton,           | A-22  |
| X.   | Transcript of Mark Bailey's statement to the police that was played during trial | A-24  |
| XI.  | Transcript - trial testimony                                            | A-32  |

FILE COPY

COMMONWEALTH OF
    PENNSYLVANIA

Vs.

MARK BAILEY

:IN THE COURT OF COMMON PLEAS OF
 POTTER COUNTY, PENNSYLVANIA

:No. 93 of 1997

:CRIMINAL DIVISION

:OTN No. E640223-3


## NOTICE OF APPEAL

    Notice is hereby given that MARK BAILEY, defendant above-named, hereby appeals to the Superior Court of Pennsylvania from the Order entered in this matter on the 7th day of July, 1998. This Order has been entered in the docket as evidenced by the attached copy of the docket entry.

                                  Harold B. Fink, Jr., Attorney for Defendant
                                  Harold B. Fink, Jr., P.C.
                                  P. O. Box 403, 32 Main Street
                                  Port Allegany, PA  16743
                                  (814)  642-2595
                                  Supreme Court I.D. No. 10232

Dated: _8/5/98_

A - 1

CR-0000039-97   No. 93 of 1997   OTN E 640223-3

| 4. Final Issuing Authority to be completed by Final Issuing Authority | DISTRICT NO. | 5. Transferred from Initial Issuing Authority | DISTRICT NO. |
|---|---|---|---|
| MICHELLE M. TASILLO | 55 3 01 | | |

| 6. Name and Address (Last Name First) | 7. Date of Transfer | 8. Docket No. of Initial Issuing Authority |
|---|---|---|
| | | CR-0000039-97 |

DEFENDANT

BAILEY, MARK
7 MAIN ST
PO BOX 81
ROULETTE, PA 16746

9. Affiant Who Signed Complaint (Name and Address)
WILLIAM L. DAWSON
PA ST POLICE
RD 1, BOX 259A
COUDERSPORT, PA 16915

| 10. Date of Birth MM DD YY | 11. Sex | 12. Race | 13. Operator License Number | 14. State | 15. O/N | 16. OCA | 17. Badge Number/Officer I.D. |
|---|---|---|---|---|---|---|---|
| 06 24 70 | M | | 23437636 | PA | PAPSP1500 | F2-547516 | 3838 |

| 18. Date of Arrest MM DD YY | 19. Date Complaint Filed or Citation Issued or Filed MM DD YY | 20. Summons Issued MM DD YY | 21. Warrant Issued MM DD YY | 22. Summons Returned MM DD YY | Preliminary Arraignment MM DD YY | 24. Time | 25. Date Waived to Court MM DD YY |
|---|---|---|---|---|---|---|---|
| | 03 19 97 | | 03 19 97 | | 03 19 97 | 10:30 A | |

| 26. Prelim.Hear./Sum.Trial | 27. Address of Preliminary Hearing/Summary Trial | 32. Date Set For Preliminary Hearing MM DD YY | 33. CONT |
|---|---|---|---|
| 04 24 97 | 110 NORTH EAST STREET, COUDERSPORT, PA 16915 | | |

| | 28. Description of Charges | Off. Chg. | 29. Grading | 29. Offense Date MM DD YY | 30. Section and Subsection | 31. Disposition | 32. MM DD YY | 33. C O N T |
|---|---|---|---|---|---|---|---|---|
| A | AGGRAVATED ASSAULT | | F1 | 02 03 96 | CC2702A1 | HDCT | 04 24 97 | |
| B | AGGRAVATED ASSAULT | | F1 | 02 03 96 | CC2702A1 | HDCT | 03 24 97 | A |
| C | AGGRAVATED ASSAULT | | F1 | 02 03 96 | CC2702A1 | HDCT | | |
| D | AGGRAVATED ASSAULT | | F1 | 02 03 96 | CC2702A1 | HDCT | | |
| E | SIMPLE ASSAULT | | M1 | 02 03 96 | CC2701A1 | HDCT | | |
| F | SIMPLE ASSAULT | | M1 | 02 03 96 | CC2701A1 | HDCT | | |

| 34. Advised of His Right to Apply for Assignment of Counsel? | Yes | No | 35. Public Defender Requested by the Defendant? | Yes | No | 36. Application Provided for Appointment of Public Defender? | Yes | No | 37. In cases where as required, I the within named Issuing Authority, did make a reasonable effort to advise the difference between the Defendant and the Complainant on: | Date MM DD YY |
|---|---|---|---|---|---|---|---|---|---|---|
| | X | | | | X | | X | | | |

| 38. Codefendant(s) Name | 39. OTN | 38. Codefendant(s) Name | 39. OTN |
|---|---|---|---|
| a | b | c | d |

| 40. Enter 'C' for Complainant Enter 'D' for Witness for Defendant | 41. Witnesses Names and Addresses and Names and Addresses of persons (not more than 2), Defendant wishes to be Notified for trial | 42. Sworn | 43. Testified | 44. Honored to be Notified |
|---|---|---|---|---|
| C | MOORE, LORIE JEAN | PO BOX 81, ROULETTE, PA 16746 | X | X | X |
| C | DAWSON, TRP WILLIAM | PA STATE POLICE, COUDERSPORT, PA 16915 | X | X | X |
| C | SETZER, CHAD ALAN | RD1 BOX 451, TH.ROULETTE, PA 16746 | X | X | X |

| 45. Commonwealth | LEBER, JEFFREY | Attorney's Name and Address for: E SECOND ST, COUDERSPORT, PA 16915 | 48. I.D. No. |
|---|---|---|---|

46. Complainant

| 47. Defendant | FINK ESQ., H B BOX 403 PORT ALLEGANY, PA 16743 | X Private    Other | 10232 |
|---|---|---|---|

| 49. Date of Decision MM DD YY | 50. Fines | 51. Costs | 52. Judgment of Sentence | |
|---|---|---|---|---|
| | $ .00 | $ .00 | | BAL: $ .00 |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Arraignment

| Bail at Preliminary Arraignment | | | | 56. Date Bail Posted MM DD YY |
|---|---|---|---|---|
| 53. Type | 54. Amount $ | 55. Date Set MM DD YY | **SEE CURRENT BAIL INFORMATION PAGE** | |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Hearing

| Current Bail/Bail at Preliminary Hearing | | | | 60. Date Bail Posted MM DD YY |
|---|---|---|---|---|
| 57. Type | 58. Amount $ | 59. Date Set MM DD YY | **SEE CURRENT BAIL INFORMATION PAGE** | |

| 61. If Committed Date MM DD YY | 62. Code | 63. Place of Commitment | | |
|---|---|---|---|---|
| 03 19 97 | C | POTTER COUNTY JAIL | COUDERSPORT | PA |

COPY: CLERK OF COURTS

| 64. Date Transcript Sent to Court MM DD YY |
|---|
| 04 25 97 |

PRINTED: 4/25/97 14:17:49

Certified this 25th day of APRIL , 1997

My commission expires first Monday of January, 2000.   SEAL

_Michelle M. Tasillo_

I, the above named Issuing Authority certify that this Transcript is a true and correct Transcript of the Docket.

AOPC-501A-94

AND NOW OCT 13 1998
CERTIFIED A TRUE COPY
_Dean M. Dow_
DEAN M. DOW, PROTH.
CLERK-POTTER CO. PA

---

## PRE-TRIAL PROCEEDINGS

DATE OF:  INFORMATION 6-17-97   ARRAIGNMENT ____   WAIVER 4-29-97

DEFENSE COUNSEL   Harold B. Fink   Important Notice 4-29-97

## BAIL DATA

AMOUNT SET: $10,000   COMMITMENT DATE: 03-19-97   DATE RELEASED: 4-25-97

TYPE FURNISHED: % cash $1,000   SURETY: Martha Bailey

DATE BAIL RECEIVED: 4-29-97   DATE BAIL RETURNED: 2-18-98 less pdg.

| | ORDERS (continued) |
|---|---|
| 4-29-97 | Entry of appearance of Harold B. Fink and Important Notice filed. |
| 5-7-97 | Omnibus Pre-Trial Motion filed. |
| 6-18-97 | Subp. issued to Trooper Kenneth Davis on behalf of the Commonwealth |
| 6-23-97 | Amended Omnibus Pre-Trial Motion filed. |
| 6-24-97 | Order filed.  AND NOW, this 17th day of June 1997, the defendant appearing before the Court for hearing on an omnibus pretrial motion and the defendant having made a motion through counsel to continue the hearing so that he can further amend his motion, the defendant's request for a continuance is granted and final hearing on this matter will be held on July 11, 1997 at 9:45 a.m. BY THE COURT:  John B. Leete, P.J. |
| 7-16-97 | Request for Rule For Bill of Particulars filed |
| 7-25-97 | Response to Bill of Particulars filed. |
| 12-24-97 | Order filed.  AND NOW, this 25th day of December 1997, Defendant's Petition for Reduction of Bail is hereby denied without hearing. BY THE COURT:  John B. Leete, P.J. |
| 12-17-97 | Verdict filed. See **COSTS** Instrument. |

**COSTS**

| | | | PAYMENTS | |
|---|---|---|---|---|
| | | DATE | AMOUNT | BALANCE |
| Judgement Fee | $9.50 | | | |
| Court Costs (DJ) | 41.00 | | | |
| Subpoenas (Comwlth) | | | | |
| Witnesses | | | | |
| Clerk | 100.00 | | | |
| Report | $10.00 | | | |
| CVC (Act 139) | 15.00 | | | |
| Crimes Commission | 15.00 | | | |
| Domestic Violence (Act 157) | 10.00 | | | |
| EMS (Act 45) | | | | |
| Act 158 | $5.00 | | | |
| Cat Surcharge | | | | |
| Appeal From DJ | | | | |
| Appeals to App. Court | | | | |
| Postage (Dist. Justice) | | | | |
| Postage (Clerk of Courts) | | | | |
| Subpoenas (Defendant) | | | | |
| JCP — Dist. Justice | | | | |
| JCP — CLERK | | | | |
| FINES: | | | | |
|   County | | | | |
|   State | | | | |
|   Local | | | | |
| TOTAL FINES: | | | | |
| A.R.D.-E.M.S. | | | | |
| A.R.D. | | | | |
| Satisfaction Fee | $6.00 | | | |
| TOTAL DUE | | TO STATE: (Act 204 #8-7-5) | | |

## TRIAL AND PLEA PROCEEDINGS

| | | | |
|---|---|---|---|
| JUDGE: | John B. Leete | COURT STENOGRAPHER: | Ann Marie Jusko |
| DIS. ATTY: | Jeff Leber | DEFENSE ATTORNEY: | Harold B. Fink |

### PLEAS

DATE: _____ GUILTY PLEA: _____ NOLLE POSSE: _____

CHARGE REDUCED TO: _____ ARD: _____

### TRIAL

DATES: 12-17-97    TYPE: Jury    VERDICT: GUILTY Cts. 1-12

### SENTENCE

2-4-98 - As to Ct. 1 AGGRAVATED ASSAULT, Bureau of Corrections for not less than 5 nor more than 10 yrs. As to Ct. 2 AGGRAVATED ASSAULT, Bureau of Corrections for not less than 5 nor more than 10 years. Sentences between ct 1 & 2 Consecutive. As to Cts. 3 & 4 AGGRAVATED ASSAULT each ct. not less than 5 nor more than 10 yrs. Bur. of Corrc. Concurrent . As to Four Cts. involving SIMPLE ASSAULT,No sentence merged into Agg. Asslt. As to Four CTs. of ENDANGERING WELFARE OF CHILDREN imprisonment not less than 6 nor more than 24 mos. on each such ct. concurrent between all counts and concurrent with Ct. 1 & 2. Costs Credit for all time served to date.

DATE APPEAL FILED: 8-6-98    RECORD SENT: _____

APPELLATE NUMBER: _____    COURT: Superior

| 1. Docket Number of Final Issuing Authority | 2. Common Pleas Docket Number | 3. State Identification Number | | |
|---|---|---|---|---|
| CR-0000039-97 | No. ___ of 1997 | | OTN | E 640223-3 |

| 4. Final Issuing Authority/to be completed by Final Issuing Authority | DISTRICT NO. | 5. Transferred from Initial Issuing Authority | DISTRICT NO. |
|---|---|---|---|
| MICHELLE M. TASILLO | 55 3 01 | 6. Date of Transfer | |
| | | 7. Docket No. of Initial Issuing Authority | |
| | | CR-0000039-97 | |

**DEFENDANT**

| 8. Name and Address (Last Name First) | 9. Affiant Who Signed Complaint (Name and Address) |
|---|---|
| BAILEY, MARK<br>7 MAIN ST<br>PO BOX 81<br>ROULETTE, PA 16746 | WILLIAM L. DAWSON<br>PA ST POLICE<br>RD 1, BOX 259A<br>COUDERSPORT, PA 16915 |

| 10. Date of Birth | 11. Sex | 12. Race | 13. Operator License Number | 14. State | 15. ORI | 16. OCA | 17. Badge Number/Officer I.D. |
|---|---|---|---|---|---|---|---|
| MM 06 DD 24 YY 70 | M | | 23437636 | PA | PAPSP1500 | F2-547516 | 3838 |

| 18. Date of Arrest | 19. Date Complaint Filed or Citation Issued or Filed | 20. Summons Date Issued | 21. Warrant | 22. Summons Returned | Preliminary Arraignment | 24. Time | 38. Date Waived to Court |
|---|---|---|---|---|---|---|---|
| MM 03 DD 19 YY 97 | MM 03 DD 19 YY 97 | MM DD YY | MM 03 DD 19 YY 97 | MM DD YY | MM 03 DD 19 YY 97 | 10:30 A | MM DD YY |

| 25. Prelim.Hear./Sum.Trial | 27. Address of Preliminary Hearing/Summary Trial | 32. Date Set For Preliminary Hearing |
|---|---|---|
| 04 24 97 | 110 NORTH EAST STREET, COUDERSPORT, PA 16915 | |

| 28. Description of Charges | OK | Grading | 29. Offense Date MM DD YY | 30. Section and Subsection | 31. Disposition MM DD YY |
|---|---|---|---|---|---|
| 1 G SIMPLE ASSAULT | | M1 | 02 03 96 | CC2701A1 | HDCT 04 24 97 A |
| 2 H SIMPLE ASSAULT | | M1 | 02 03 96 | CC2701A1 | HDCT 03 24 97 A |
| 3 I ENDANGERING WELFARE OF CHILDREN | | F3 | 02 03 96 | CC4304 | HDCT |
| 4 J ENDANGERING WELFARE OF CHILDREN | | F3 | 02 03 96 | CC4304 | HDCT |
| 5 K ENDANGERING WELFARE OF CHILDREN | | F3 | 02 03 96 | CC4304 | HDCT |
| 6 L ENDANGERING WELFARE OF CHILDRE | | F3 | 02 03 96 | CC4304 | HDCT |

| 34. Advised of His Right to Apply for Assignment of Counsel? | Yes X / No | 35. Public Defender Requested by the Defendant? | Yes / No X | 36. Application Provided for Appointment of Public Defender? | Yes X / No | 37. In cases where so required, I the within named Issuing Authority, did make a reasonable effort to settle the difference between the Defendant and the Complainant on: | MM DD YY |
|---|---|---|---|---|---|---|---|

| 38. Codefendant(s) Name | 39. OTN | 38. Codefendant(s) Name | 39. OTN |
|---|---|---|---|
| a. | | c. | |
| b. | | d. | |

| 40. Enter 'C' for witness for Complainant. Enter 'D' for Witness for Defendant | 41. Witnesses Names and Addresses and Names and Addresses of persons (not more than 2), Defendant wishes to be Notified for trial | 42. Sworn | 43. Testified | 44. Request to be notified |
|---|---|---|---|---|
| | | | | |

| 45. Commonwealth | Attorney's Name and Address for: | 48. I.D. No. |
|---|---|---|
| LEBER, JEFFREY | E SECOND ST, COUDERSPORT, PA 16915 | |
| 46. Complainant | | |
| 47. Defendant | FINK ESQ., H B<br>BOX 403<br>PORT ALLEGANY, PA 16743 | X Private / Other  10232 |

| 49. Date of Decision MM DD | 50. Fines Amount $ .00 | 51. Costs $ .00 | 52. Judgment of Sentence | BAL: $ .00 |
|---|---|---|---|---|

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Arraignment

| Bail at Preliminary Arraignment | | | | | 56. Date Bail Posted |
|---|---|---|---|---|---|
| 53. Type | 54. Amount $ | 55. Date Set MM DD YY | **SEE CURRENT BAIL INFORMATION PAGE** | | MM DD YY |

Name and Address of Corporate Surety and Agent or Individual Surety-Preliminary Hearing

| Current Bail/Bail at Preliminary Hearing | | | | | 60. Date Bail Posted |
|---|---|---|---|---|---|
| 57. Type | 58. Amount $ | 59. Date Set MM DD YY | **SEE CURRENT BAIL INFORMATION PAGE** | | MM DD YY |

| 61. If Committed Date | 62. Code | 63. Place of Confinement | | |
|---|---|---|---|---|
| 03 19 97 | C | POTTER COUNTY JAIL | COUDERSPORT | PA |

COPY: CLERK OF COURTS

Certified this 25th day of APRIL, 1997

| 64. Date Transcript Sent to Court | | |
|---|---|---|
| MM 04 | DD 25 | YY 97 |

My commission expires first Monday of January, 2000.    SEAL

*Michelle M Tasillo*

I, the above named Issuing Authority certify that this Transcript is a true and correct Transcript of the Docket

AOPC 501A-94    PRINTED: 4/25/97 14:17:49

---

## PRE-TRIAL PROCEEDINGS

DATE OF: INFORMATION _____ ARRAIGNMENT _____ WAIVER _____

DEFENSE COUNSEL _____

## BAIL DATA

AMOUNT SET: _____ COMMITMENT DATE: _____ DATE RELEASED: _____

TYPE FURNISHED: _____ SURETY: _____

DATE BAIL RECEIVED: _____ DATE BAIL RETURNED: _____

A-4

## ORDERS (continued)

| Date Filed | |
|---|---|
| 8-20-97 | Finding of Fact, Discussion and Order on Defendant's Omnibus Pretrial Motion filed. AND NOW, this 14 day of August 1997, in ~~accordance with the foregoing opinion Defendant's Omnibus Pretrial~~ Motion to Suppress is hereby denied. BY THE COURT: John B. Leete, P.J. |
| 11-10-97 | AND NOW, this cause coming on for trial the following Jurors were ~~selected: Jeanne Chappell, Karen Foust, Judy Crippen, Thomas Coyle,~~ Walter Fleet, Paula Cochran, Norma Cornell, Sally Crain, Joseph Scott, Charles Cooper, Shawn Clark, Honey Dunn. Alternates: ~~Barbara Moag, Joseph Bunnell~~ |
| 11-17-97 | Subp. issued to Chad Setzer, Dr. Robert Supinski, Dr. Marian Asar, Dr. Louise Dallaire, Sgt. Joseph Shirley, Tpr. Kenneth Davis, Laurie Moore, Tammy Baker on behalf of the commonwealth |
| 11-26-97 | Subp. issued to Amy Tuttle on behalf of the Commonwealth. |
| 12-9-97 | Subp. issued to Medical Records Custodian |
| 12-15-97 | Subp. issued to Jenny Murphy and Meryl Storey, R.N. on behalf of the Commonwealth |
| 12-15-97 | Amended Bill of Particulars filed. |
| 12-15-97 | Subp. issued to Dee Carr, RN and Michael Wayne Moore on behalf of the Commonwealth. |
| 12-16-97 | Motion for Continuance filed. |
| 12-24-97 | Petition for Reduction of Bail filed. |

## COSTS

| | | PAYMENTS | | |
|---|---|---|---|---|
| | | DATE | AMOUNT | BALANCE |
| Judgement Fee | $9.00 | | | |
| Court Costs (DJ) | | | | |
| Subpoenas (Comwlth) | | | | |
| Witnesses | | | | |
| Clerk | | | | |
| Report | $10.00 | | | |
| CVC (Act 139) | | | | |
| Crimes Commission | | | | |
| Domestic Violence (Act 157) | | | | |
| EMS (Act 45) | | | | |
| Act 158 | $5.00 | | | |
| Cat Surcharge | | | | |
| Appeal From DJ | | | | |
| Appeals to App. Court | | | | |
| Postage (Dist. Justice) | | | | |
| Postage (Clerk of Courts) | | | | |
| Subpoenas (Defendant) | | | | |
| JCP — Dist. Justice | | | | |
| JCP — CLERK | | | | |
| FINES: | | | | |
| County | | | | |
| State | | | | |
| Local | | | | |
| TOTAL FINES | | | | |
| A.R.D.-E.M.S. | | | | |
| A.R.D. | | | | |
| Satisfaction Fee | $5.00 | | | |
| TOTAL DUE | | TO STATE: (Act 204 #8-7-5) | | |

## TRIAL AND PLEA PROCEEDINGS

JUDGE: _____    COURT STENOGRAPHER: _____

DIS. ATTY: _____    DEFENSE ATTORNEY: _____

### PLEAS

DATE: _____    GUILTY PLEA: _____    NOLLE POSSE: _____

CHARGE REDUCED TO: _____    ARD: _____

### TRIAL

DATES: _____    TYPE: _____    VERDICT: _____

### SENTENCE

DATE APPEAL FILED: _____    RECORD SENT: _____

APPELLATE NUMBER: _____    COURT: _____

No. 93 of 1997
Continued
BAILEY, Mark

12-29-97 - Points for Charge filed.
12-29-97 - Order filed. Probation to prepare a full presentnece report, to incl
          a basic psychological interview to be performed by the Charles Cole
          Memorial Hospital, Dept. of Community Mental Health. As to bail, the
          Commonwealth's motion for modification of bail is granted and the
          defts. bail will be increased to the sum of $25,000 cash. In the eve
          deft. cannot post bail he is remanded to the custody of the Shff.
          Deft. to appear for sentencing on Feb. 4, 1998 at 3:15 p.m.
2-4-98   - Order filed. See Sentence.
2-5-98   - Guideline Sentence Form filed.
2-9-98   - Post-Sentence Motion filed.
4-21-98  - Order filed. AND NOW, this 15th day of April 1998, Counsel will have
          20 days after the completion of the trial transcript and charge of the
          Court to submit briefs as to the outstanding matters raised by the
          defendant's post trial motion and argument held thereon. BY THE COURT
          John B. Leete, P.J.
6-2-98   - Partial Transcript of the Jury Trial held on December 12, 1997 filed.
7-2-98   - Order filed. AND NOW, this 12th day of June 1998, the Court having
          partially completed an Opinion relative to Defendant's outstanding pos
          trial motions, the Court having spoken informally with Defense Counsel
          who agreed that the Court could utilize the extra 30 days for a decisi
          as provided for by law, the Court hereby invokes the extra 30-day peri
          as provided by Rule 1410 B 3 (b) to decide the defendant's outstanding
          post trial motions. An appropriate Order and Opinion will be filed.
          BY THE COURT: John B. Leete, P.J.
7-8-98   - Opinion and Order on Post Trial Motion on Behalf of Defendnat Mark Bai
          filed. AND NOW, this 7 day of July 1998, the Post Trial Motion for a
          New Trial, a Judgment of Acquittal or a Sentence Modification in the
          above captioned matter is hereby denied. BY THE COURT: John B. Leete
          P.J.
8-6-98   - Notice of Appeal (Order entered July 7, 1998), Request for Transcript,
          and Certificate of Service filed.
8-6-98   - Certified copy of Notice of Appeal, Request for Transcript and Certifi
          of Service mailed to Superior Court.
8-24-98  - Transfer Petition filed. From CDCC to SCI-Albion
8-31-98  - Transscript of the Remaining of the Jury Trial held on December 16-17,
          1997 filed.
9-8-98   - Order filed. AND NOW, this 4th day of September 1998, in accordance wi
          Pennsylvania Rule of Appellate Procedure 1925 A, the Court designates
          its Opinion and Order dated July 7, 1998, filed of Record as the reaso
          for the denial of Defendant's Post Sentencing Motion. Reference is als
          made to the transcript filed of Record on June 2, 1998 and August 31,
          1998. BY THE COURT: John B. Leete, P.J.
9-10-98  - Fax Copy of Superior Court No. 01451PGH98 received and filed.
9-10-98  - All papers mailed to Superior Court

A-6

COMMONWEALTH OF PENNSYLVANIA    :    IN THE COURT OF COMMON PLEAS
                                :    OF POTTER COUNTY, PENNSYLVANIA
                                :
vs.                             :    CRIMINAL DIVISION
                                :
MARK BAILEY                     :    NO. 93 OF 1997

THE DISTRICT ATTORNEY of Potter County, Pennsylvania, by this information, charges that on (or about) FEBRUARY 3, 1996 TO SEPTEMBER 23, 1996, at the BOROUGH OF COUDERSPORT and TOWNSHIP OF ROULETTE in the said County of Potter, and within the jurisdiction of this Court, MARK BAILEY did commit the following act(s):

(1) **AGGRAVATED ASSAULT** - Said actor attempted to cause serious bodily injury to another or caused such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life.  BEING CONTRARY TO 18 Pa.C.S.A. §2702(a)(1).              (F1)
(2) **AGGRAVATED ASSAULT** - Said actor attempted to cause serious bodily injury to another or caused such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life.  BEING CONTRARY TO 18 Pa.C.S.A. §2702(a)(1).              (F1)
(3) **AGGRAVATED ASSAULT** - Said actor attempted to cause serious bodily injury to another or caused such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life.  BEING CONTRARY TO 18 Pa.C.S.A. §2702(a)(1).              (F1)
(4) **AGGRAVATED ASSAULT** - Said actor attempted to cause serious bodily injury to another or caused such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life.  BEING CONTRARY TO 18 Pa.C.S.A. §2702(a)(1).              (F1)
(5) **SIMPLE ASSAULT** - Said actor attempted to cause or intentionally, knowingly or recklessly caused bodily injury to another.  BEING CONTRARY TO 18 Pa.C.S.A. §2701(a)(1).                                                  (M1)
(6) **SIMPLE ASSAULT** - Said actor attempted to cause or intentionally, knowingly or recklessly caused bodily injury to another.  BEING CONTRARY TO 18 Pa.C.S.A. §2701(a)(1).                                                  (M1)
(7) **SIMPLE ASSAULT** - Said actor attempted to cause or intentionally, knowingly or recklessly caused bodily injury to another.  BEING CONTRARY TO 18 Pa.C.S.A. §2701(a)(1).                                                  (M1)
(8) **SIMPLE ASSAULT** - Said actor attempted to cause or intentionally, knowingly or recklessly caused bodily injury to another.  BEING CONTRARY TO 18 Pa.C.S.A. §2701(a)(1).                                                  (M1)

Page 1 of 2

A-7



COMMONWEALTH OF PENNSYLVANIA   :   IN THE COURT OF COMMON PLEAS
                               :   OF POTTER COUNTY, PENNSYLVANIA
                               :
vs.                            :   CRIMINAL DIVISION
                               :
MARK BAILEY                    :   NO. 93 OF 1997

**Criminal Information Continued:**


    **(9) ENDANGERING WELFARE OF CHILDREN** - Said actor, supervising the welfare of a child under 18 years of age, knowingly endangered the welfare of the child by violating a duty of care, protection or support.  BEING CONTRARY TO 18 Pa.C.S.A. §4304(a).                                         (F3)

    **(10) ENDANGERING WELFARE OF CHILDREN** - Said actor, supervising the welfare of a child under 18 years of age, knowingly endangered the welfare of the child by violating a duty of care, protection or support.  BEING CONTRARY TO 18 Pa.C.S.A. §4304(a).                                         (F3)

    **(11) ENDANGERING WELFARE OF CHILDREN** - Said actor, supervising the welfare of a child under 18 years of age, knowingly endangered the welfare of the child by violating a duty of care, protection or support.  BEING CONTRARY TO 18 Pa.C.S.A. §4304(a).                                         (F3)

    **(12) ENDANGERING WELFARE OF CHILDREN** - Said actor, supervising the welfare of a child under 18 years of age, knowingly endangered the welfare of the child by violating a duty of care, protection or support.  BEING CONTRARY TO 18 Pa.C.S.A. §4304(a).                                         (F3)


    All of which is against the Act of Assembly and the peace and dignity of the Commonwealth of Pennsylvania.


_____
Attorney for the Commonwealth


Page 2 of 2

A—8

COMMONWEALTH OF PENNSYLVAN

COUNTY OF: __POTTER__

**POLICE CRIMINAL COMPLAINT**

Magisterial District Number: **55-3-01**

District Justice Name: Hon.
**MICHELLE M. TASILLO**
Address: **110 NORTH EAST STREET**
**COUDERSPORT, PA**

Telephone: ( 814 )274-9411        16915

**COMMONWEALTH OF PENNSYLVANIA**

**VS.**

DEFENDANT:

NAME and ADDRESS

Mark Christopher BAILEY
7 Main St.  P.O. Box 81
Roulette, PA.  16746

Docket No.: CR-039-97

Date Filed: March 19, 1997

OTN: E 640223-3

| Defendant's Race/Ethnicity | Defendant's Sex | Defendant's D.O.B. | Defendant's Social Security Number | Defendant's SID |
|---|---|---|---|---|
| ☒ White ☐ Asian ☐ Black ☐ Hispanic ☐ Native American ☐ Unknown | ☐ Female ☒ Male | 06/24/70 | 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 | |

| Defendant's A.K.A. | Defendant's Vehicle Information: Plate Number / State / Registration Sticker(MM/YY) | Defendant's Driver's License Number State |
|---|---|---|
| | | PA  23437636 |

| Complaint/Incident Number | Complaint/Incident Numbers if other Participants | UCR/NIBRS Code |
|---|---|---|
| F2-547516 | | 044 |

District Attorney's Office  ☐ Approved  ☐ Disapproved because:_____
(The district attorney may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth prior to filing. Pa.R.Cr.P. 107.)

_____       _____       _____
(Name of Attorney for Commonwealth - Please Print or Type)       (Signature of Attorney for Commonwealth)       (Date)

I, __Tpr. William L. DAWSON__                                             3838
(Name of Affiant - Please Print or Type)                              (Officer Badge Number/I.D.)

of __Penna. State Police – Coudersport__     __PAPSP1500__     _____
(Identify Department or Agency Represented and Political Subdivision)  (Police Agency ORI Number)   (Originating Agency Case Number (OCA))

do hereby state:  (check the appropriate box)
1. ☒ I accuse the above named defendant who lives at the address set forth above
   ☐ I accuse the defendant whose name is unknown to me but who is described as _____

   ☐ I accuse the defendant whose name and popular designation or nickname is unknown to me and whom I have therefore designated as John Doe
   with violating the penal laws of the Commonwealth of Pennsylvania at __the Borough of Coudersport__
                                                                        (Place-Political Subdivision)
   and in Roulette Township

   in __Potter__                          County on or about __from 02/03/96 to 09/23/96__

   Participants were:  (if there were participants, place their names here, repeating the name of above defendant)
   __MArk Christopher BAILEY__

2.  The acts committed by the accused were:
(Set forth a summary of the facts sufficient to advise the defendant of the nature of the offense charged. A citation to the statute allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section and subsection of the statute or ordinance allegedly violated.)
   (A)  AGGRAVATED ASSAULT    Citation: 18 Pa. C.S.A. 2702(a)(1);  Grade: Felony One;
Penalty: 20 years/$25,000.00
   The defendant did, on or about 02/03/96 to 09/23/96, attempt to cause serious bodily
injury to another, or caused such injury intentionally, knowingly, or recklessly under
circumstances manifesting extreme indifference to the value of human life,  TO WIT: while
living at the residence of Tammy Ann BAKER, P.O. Box 264 (4th St) in the Borough of Coudersport,
Potter Co., Pa. from 02/03/96 to 09/10/96, the accused was responsible for causing two broken
.egs and a broken rib on Rebecca Lynn MOORE who's date of birth is 02/03/96.  Rebecca is the
laughter of Lorie Jean MOORE, the paramour of the accused.  ALso between 09/10/96 and 09/23/96,
while living in Roulette Twp., Potter Co., Pa., the accused caused a third broken leg on
ebecca Lynn MOORE who was eight months old at the time

(Continuation of No. 2)



**POLICE
CRIMINAL COMPLAINT**

Defendant's Name: Mark Christopher BAILEY

Docket Number:   CR 039-97 / OTN: E 640223-3

---

(B) <u>SIMPLE ASSAULT</u>   Citation: 18 PA. C.S.A. 2701 (a)(1); Grade: Misdemeannor One;
Penalty: 5 years/$10,000.00
    The defendant did, on or about 02/03/96 to 09/23/96, attempt to cause or intentionally,
knowingly or recklessly caused bodily injury to another, To WIT:while living at the residence
of Tammy Ann BAKER, P.O. Box 264 (4th St) in the borough of Coudersport, Potter Co., PA. from
02/03/96 to 09/10/96, the accused caused bodily injury to Rebecca Lynn MOORE who's date of
birth is 02/03/96.  Rebecca is the daughter of Lorie Jean MOORE, the paramour of the accused.
Also between 09/10/96 and 09/23/96, while living in Roulette Twp., Potter Co., Pa., the
accused again caused bodily injury to Rebecca Lynn MOORE who was eight months of age at the time.

(C) <u>ENDANGERING WELFARE OF CHILDREN</u>   Citation: 18 PA. C.S.A. 4304; Grade: Felony Three;
Penalty: 7 years/$15,000.00
    The defendant did, on or about 02/03/96 to 09/23/96, being a parent, guardian, or other
person supervising the welfare of a child under 18 years of age, knowingly endanger the
welfare of the child by violating a duty of care, protection or support, TO WIT: on three
occasions between 02/03/96 and 09/10/96, while living at the residence of Tammy Ann BAKER,
P.O. Box 264 (4th St) in the borough of Coudersport, Potter Co., Pa. the accused endangered
the welfare of Rebecca Lynn MOORE, D.O.B. 02/03/96, by causing her to suffer three broken bones
Also between 09/10/96 and 09/23/96, while living in Roulette Twp., Potter County, PA., the
accused again endangered the welfare of Rebecca Lynn MOORE, who was then eight months of age,
by causing her to suffer another broken bone.

all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act
of Assembly, or in violation of

| | Section | Subsection | | PA Statute | counts |
|---|---|---|---|---|---|
| 1. | 2702 | (a)(1) | of the | Pa. Crimes Code | 4 |
| 2. | 2701 | (a)(1) | of the | Pa. Crimes Code | 4 |
| 3. | 4304 | (a) | of the | Pa. Crimes Code | 4 |
| 4. | | | of the | | |

3.  I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have
made. **(In order for a warrant of arrest to issue, the attached affidavit of probable cause must be completed
and sworn to before the issuing authority.)**

4.  I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information
and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 PA. C.S.
§ 4904) relating to unsworn falsification to authorities.

_____ March 19 _____, 19 97 ,   _William P. Dawson_
                                                              (Signature of Affiant)

AND NOW, on this date _____ March 19 _____, 19 97 , I certify that the complaint has been properly
completed and verified. An affidavit of probable cause must be completed in order for a warrant to issue.

 

**POLICE CRIMINAL COMPLAINT**

| Defendant's Name: | Mark Christopher BAILEY |
|---|---|
| Docket Number: | CR 039-97 / OTN: E 640223-3 |

## AFFIDAVIT of PROBABLE CAUSE

On 10/18/96 I received a "Report of Suspected Child Abuse to Law Enforcement Official" report from Potter County Children and Youth Services. Dr. Mariam ASAR, a pediatrician from Coudersport was the reporter to Children and Youth.

Victim Rebecca Ann MOORE, D.O.B. 02/03/96, was taken to the office of Dr. Mariam ASAR in Coudersport, Pa. on 09/24/96, because her right leg was bruised and swollen. After examining Rebecca, Dr. ASAR sent Rebecca on to Charles Cole Memorial Hospital where she was X-rayed and examined by Dr. Robert SUPINSKI.

The X-rays that were taken on 09/24/96 of victim MOORE, showed that the victim was suffering from a fracture of the right distal tibial metaphysis. Further X-rays on that same day revealed that the victim sustained additional fractures in the past which consisted of a fracture of the right tibia, a fracture of the left tibia, and a fracture of a rib. All of the older fractures were in varying states of healing. These X-Rays were also reviewed with radiologists Dr. Louise DALLAIRE and Dr. Dane WALLISCH.

Accused BAILEY, D.O.B. 06/24/70, his girl friend Lorie Jean MOORE, who is the mother of the victim, the victim and two other children of Lorie MOORE'S all lived with Lorie's sister Tammy Ann BAKER, P.O. Box 264 (4th St.) Coudersport, PA. between November of 1995 and September 10, 1996. On September 10, 1996 they moved from the BAKER residence to the village of Roulette where they still reside.

On 02/28/97 accused BAILEY gave a signed statement in which he admits that he could have caused the victim's broken leg in September of 1996. Accused BAILEY was then interviewed by Tpr. Kenneth DAVIS, polygraph operator from PSP Montoursville. As a result of that interview the accused then gave a taped statement in the presence of this officer and Tpr. DAVIS in which he admitted to being responsible for all four broken bones that were suffered by victim MOORE. This tape has been enterd into evidence. The accused also stated that he has a problem with anger control and at one time he was on medication for his temper.

I, ____Tpr. William L. DAWSON_____ , BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_Tpr. William L. Dawson_
(Signature of Affiant)

Sworn to me and subscribed before me this ___19th___ day of ___March___ , 19_97_ .

_03-19-97_ Date _Michelle M. Yasille_ , District Justice

My commission expires first Monday of January, _____    **SEAL**

2000                                    A-11

FILE COPY

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | :IN THE COURT OF COMMON PLEAS OF POTTER COUNTY, PENNSYLVANIA |
| Vs. | :No. 93 of 1997 |
| MARK BAILEY | :CRIMINAL DIVISION |

## POST-SENTENCE MOTION

AND NOW COMES the defendant, through his attorney Harold B. Fink, Jr., P.C., to move Your Honorable Court for a New Trial, or Motion for Judgment of Acquittal, or a Motion to Modify Sentence based on the following:

(1)     Your Honorable Court erred in failing to grant the defendant's Motion to Dismiss the Complaint against the defendant based upon defendant's demurrer to the evidence.

(2)     Your Honorable Court erred in failing to enter a Judgment of Acquittal based upon the defendant's position that there was insufficient evidence outside of the testimony concerning the defendant's admissions and/or confessions to demonstrate to Your Honor that the crimes charged occurred more likely than not, and Your Honorable Court further erred in failing to grant the defendant's Motion to Dismiss based upon the

A-12

defendant's position that under no circumstances could the jury have found, under the evidence presented and outside of the testimony the defendant's admissions and confessions, beyond a reasonable doubt that the crimes charged were committed.

(3)  The sentence in the aggregate of 10 to 20 years was excessive.

RESPECTFULLY SUBMITTED,

Harold B. Fink, Jr., Esquire
Attorney for Defendant/Petitioner

A—13

COMMONWEALTH OF PENNSYLVANIA      :    IN THE COURT OF COMMON PLEAS
                                   :    OF POTTER COUNTY, PENNSYLVANIA

                        VS.        :    NO. 93 OF 1997

MARK BAILEY                        :    CRIMINAL DIVISION

# O R D E R

AND NOW, this 4th day of February 1998, the Defendant appearing before the Court following jury verdicts of guilty to various offenses, the Defendant is sentenced as follows:

As to Count 1, Aggravated Assault, the Defendant is sentenced to imprisonment with the Bureau of Corrections, Commonwealth of Pennsylvania for a term of not less than 5 nor more than 10 years.

As to Count 2, Aggravated Assault, the Defendant is sentenced to a term of imprisonment with the Bureau of Corrections, Commonwealth of Pennsylvania for a term of not less than 5 nor more than 10 years. It is Ordered that the sentences as between Counts 1 and 2 will be deemed consecutive in nature.

As to Counts 3 and 4, Aggravated Assault, the Defendant is sentenced to terms for each count of not less than 5 nor more than years imprisonment with the Bureau of Corrections, said sentences for said counts, however, to run concurrently as between themselves and concurrent to the sentences imposed at Counts 1 and

As to the four counts involving Simple Assault, the Court imposes no sentence, it appearing that the charges in question have merged into Aggravated Assault.

As to the four counts of Endangering the Welfare of Children, it is Ordered that the Defendant be sentenced to a term of

A-14

imprisonment of not less than 6 nor more than 24 months on each such count, concurrent as between all counts and concurrent with the sentences imposed for Counts 1 and 2.

It is further Ordered that the Defendant pay all costs of these proceedings and comply with all available programming for anger and violence management while incarcerated.

.The defendant shall receive credit for all time served to date.

BY THE COURT:

JOHN B. LEETE, PRESIDENT JUDGE
55TH JUDICIAL DISTRICT

cc:    D.A.
       Harold B. Fink, Esq.
       Probation
       Sheriff

2

A-15

COMMONWEALTH OF PENNSYLVANIA    :    IN THE COURT OF COMMON PLEAS
                                          :    OF POTTER COUNTY, PENNSYLVANIA

                v.                     :    No. 93 of 1997

MARK BAILEY                              :    Criminal Division

## O R D E R

AND NOW, this ___7___ day of July 1998, the Post Trial Motion for a New Trial, a Judgment of Acquittal or a Sentence Modification in the above captioned matter is hereby denied.

BY THE COURT:

_____
John B. Leete, President Judge
55th Judicial District

cc:    District Attorney
       Harold B. Fink, Esq.

A-16

COMMONWEALTH OF PENNSYLVANIA  :  IN THE COURT OF COMMON PLEAS
                                                            :  OF POTTER COUNTY, PENNSYLVANIA

                                           v.                       :  No. 93 of 1997

MARK BAILEY                                          :  Criminal Division

JUL 8 1998
AND NOW—
CERTIFIED A TRUE COPY
Dean M. Dow
DEAN M. DOW, PROTH. /
CLERK-POTTER CO. PA

### OPINION AND ORDER ON POST TRIAL
### MOTION ON BEHALF OF DEFENDANT MARK BAILEY

Before the Court is Defendant Bailey's Post Trial Motion for a New Trial, a Judgment of Acquittal or a Sentence Modification. The defendant alleges that there was insufficient evidence outside of the defendant's confessions to establish corpus delicti and that his sentence in the aggregate of 10 to 20 years was excessive.

The corpus delicti rule requires the Commonwealth to meet two distinct burdens. The first burden requires the Commonwealth to convince the Court by a preponderance of the evidence that the evidence independent of the defendant's confession shows a crime has occurred. See Commonwealth v. Ahlborn, 441 Pa. Super. 296, 301, 657 A.2d 518, 521 (1995); Commonwealth v. McMullen, 545 Pa. 361, __, 681 A.2d 717, 722 (1996); Commonwealth v. Byrd, 490 Pa. 544, 556, 417 A.2d 173, 179 (1980). This is required to admit a defendant's confession into evidence. See id. The second burden requires the Commonwealth to convince the jury beyond a reasonable doubt that the evidence independent of the confession shows that a crime has occurred. See Ahlborn, 441 Pa. Super. at 302, 657 A.2d at 521; Commonwealth v. Fried, 382 Pa. Super. 156, __, 555 A.2d 119, 120 (1989). This is to allow the jury to consider the confession as evidence of the defendant's guilt. See id. The Commonwealth is not required to prove the identity of the person responsible for the crime and may use circumstantial evidence to prove corpus delicti. See Commonwealth v. Persichini, 444 Pa. Super. 110, __, 663 A.2d 699, 702 (1995), appeal granted in part, 546 Pa. 595, 687 A.2d 819 (1997).

In this matter, the Commonwealth has clearly met both burdens. It offered three expert witnesses to establish the corpus delicti of the crimes of endangering welfare of children and aggravated assault. All three experts testified that the victim's injuries were highly consistent with child abuse. In support of this conclusion, the witnesses pointed to various factors. Dr. Dellaire, a

A-17

radiologist, and Dr. Supinski, an orthopedic surgeon, both testified as to the number and age of the child's fractures. Supinski testified that the victim had sustained at least six separate fractures at various times throughout a time period greater than four weeks. These fractures included two in the child's right ankle which were less than two weeks old. They also included fractures in both the right and left lower leg which were 3 to 6 weeks old and two fractured ribs which were greater than six weeks old. Dellaire testified that the child suffered at least five fractures. These included one in the child's right ankle, which was less than 2 weeks old, and fractures in the left ankle, right lower leg, right rib and left rib all of which were between one month and two months old in Dellaire's opinion.

Dellaire and Dr. Asar, a pediatrician, testified that the types of fractures led them to the conclusion that the injuries were consistent with child abuse. Both testified generally about their medical training in child abuse and particularly that the child's "corner" fractures in her ankles and rib fractures are taught to be highly consistent with child abuse unless explained otherwise.

Supinski testified as to the most likely causes of the injuries. Supinski first dismissed disease and vitamin deficiency as the likely sources of the fractures. He stated that the fractures of the victim's right ankle were most likely caused by traction, possibly by shaking the child. In Supinski's opinion, the remaining four fractures were most likely caused by direct blows each requiring 10 to 20 pounds of force. He testified that because this amount of force is greater than the muscle strength in the 6th to 7th month of age group, the non-ambulatory child was physically unable to injure herself in this manner. Based upon this, Supinski concluded based upon a reasonable degree of medical certainty that the child "was undergoing abuse and has had multiple injuries inflicted upon it by some other person or persons."

Finally, all three witnesses testified that the history given to the medical personnel was inconsistent with the child's right ankle fracture that prompted the child's mother to take the child to Asar. The explanation given for the fracture was that a sibling had fallen on the child's leg. Supinski testified that this explanation was not consistent with the type of fracture the child sustained. Asar testified that the child's mother gave her the impression that the injury happened the same day she sought medical assistance and that it later became known that the injuries occurred four days earlier.

A — 1a

The corpus delicti requirement for the crime of endangering welfare of children has been met. "A parent, guardian, or other person supervising the welfare of a child under 18 years of age commits an offense if he knowing endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa. Cons. Stat. Ann. § 4304(a) (West Supp. 1998). The doctors' testimony showed that the person responsible for supervising the child either inflicted multiple injuries to the child or neglected the child to the extent that somebody else was able to do so. This is sufficient to convince the Court by a preponderance of the evidence and the jury beyond a reasonable doubt that the injuries resulted from a violation of a duty of care or protection. By violating either of these duties, the supervising adult would be practically certain that his or her conduct was endangering the welfare of the child.

The corpus delicti was also established for aggravated assault. A person is guilty of aggravated assault if he or she "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under conditions manifesting extreme indifference to the value of human life." 18 Pa. Cons. Stat. Ann. § 2702(a)(1) (West Supp. 1998). Serious bodily injury is defined as, "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa. Cons. Stat. Ann. § 2301 (West Supp. 1998). The expert testimony established that the child suffered serious bodily injury. The 4 1/2 to 7 1/2-month-old child sustained at least five fractures over the course of more than four weeks. Two of these fractures were in the child's ribcage close to her lungs. This period of repeated injury to the child's fragile body was sufficient for the Court to conclude by a preponderance of the evidence and the jury to conclude beyond a reasonable doubt that the child faced a substantial risk of death.

The independent evidence also supports the Court's ruling by a preponderance of the evidence and the jury's finding beyond a reasonable doubt that someone at least recklessly caused the serious bodily injury to the child. That Dellaire's and Azar's definitions of child abuse did not exclude accidental and non-criminal causes is not determinative. It is not necessary for the Commonwealth to rule out all possibility that the act occurred by accidental or non-criminal means for the jury to find

A—19

that corpus delicti was established beyond a reasonable doubt. See Ahlborn, 441 Pa. Super. at 303, 657 A.2d at 522. The detailed testimony relating to the child's injuries, along with the inconsistent explanation given about the source of the most recent injury, was more than sufficient for the jury to be convinced beyond a reasonable doubt that the source of the child's injuries was neither accidental nor non-criminal.

The defendant also alleges that his sentence in the aggregate of 10 to 20 years was excessive. The defendant was convicted of four counts of aggravated assault and four counts of endangering welfare of children. For counts 1 and 2 of aggravated assault, the defendant was sentenced to two 5 to 10 year consecutive terms. For counts 3 and 4 of aggravated assault, the defendant was sentenced to two 5 to 10 year terms to run concurrent with each other and with the sentences for counts 1 and 2. For each count of endangering welfare of children, the defendant was sentenced to a term of 6 to 24 months to also run concurrent with counts 1 and 2 of aggravated assault.

The defendant's sentence in the aggregate of 10 to 20 years was not excessive. The sentence was within the guidelines set forth by the Commonwealth of Pennsylvania Commission on Sentencing which suggest a minimum term of 42 to 60 months for aggravated assault where the defendant caused serious bodily injury. 204 Pa. Code. § 303.15-303.16 (1997). Further, because the victim was younger than 13 years old, each count of aggravated assault carried with it a mandatory sentence of at least five years. 42 Pa. Cons. Stat. Ann. § 9718(a)(2) (West. Supp. 1998). Finally, it is well settled that a trial judge has the discretion to determine whether a particular sentence should be consecutive to or concurrent with other sentences being imposed. See Commonwealth v. Hoag, 445 Pa. Super. 455, _, 665 A.2d 1212, 1213-1214 (1995).

Accordingly, the Court enters the following Order:

A-20

COMMONWEALTH OF PENNSYLVANIA  :  IN THE COURT OF COMMON PLEAS
                             :  OF POTTER COUNTY, PENNSYLVANIA

                v.           :  No. 93 of 1997

MARK BAILEY                  :  Criminal Division


ORDER


AND NOW, this ___7___ day of July 1998, the Post Trial Motion for a New Trial, a Judgment of Acquittal or a Sentence Modification in the above captioned matter is hereby denied.


BY THE COURT:

_____

John B. Leete, President Judge

55th Judicial District


cc:    District Attorney
       Harold B. Fink, Esq.


A-21

SAMUEL C. STRETTON

ATTORNEY AT LAW

301 S. HIGH STREET

P.O. BOX 3231

WEST CHESTER, PA 19381-3231

(610) 696-4243

FAX: (610) 696-2919

THE VERSAILLES

1530 LOCUST ST., OFFICE D

S.E. CORNER 16TH AND LOCUST STS.

PHILADELPHIA, PENNSYLVANIA 19102

(215) 735-5583

September 16, 1998

PLEASE REPLY TO:

West Chester

David A. Szewczak, Prothonotary
Superior Court of Pennsylvania
1015 Grant Building
330 Grant St.
Pittsburgh, PA 15219

Re:  Commonwealth of Pennsylvania vs. Mark Bailey
     No. 1451 PGH 1998

Dear Mr. Szewczak:

        Please be advised I represent Mark Bailey in the above
matter.  I have enclosed the original and one copy of my Entry of
Appearance.  Attached to that is my Proof of Service.  I would
ask your assistance in filing this of record.  Please advise me
if there is a briefing schedule or if any documents are due into
the Court.  Thank you.

                                Very truly yours,

                                Samuel C. Stretton

SCS:das
enc.
cc:  Honorable John M. Leete
     Jeffrey Leber, Esquire
     H.B. Fink, Esquire
     Mark Bailey
     Martha Bailey

A-22

# IN THE SUPERIOR COURT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA  :  SUPERIOR COURT NO.
                                                      1451 PGH 1998
                    VS.

MARK BAILEY

## ENTRY OF APPEARANCE

TO THE PROTHONOTARY:

Please enter the appearance of Samuel C. Stretton,

Esquire, on behalf of Mark Bailey in the captioned appeal.

Respectfully submitted,

Samuel C. Stretton, Esquire
Attorney for Mark Bailey
301 S. High St.
P.O. Box 3231
West Chester, PA  19381
(610) 696-4243
Attorney I.D. No. 18491

A-23

Sony Micro Cassette Tape w/Statement of MARK CHRISTOPHER BAILEY

Taken on 02/28/97
Transcribed on 03/12/97

Tpr. William L. Dawson
Incident No.        F2-547516
Property Log No.    F2-2619

Charges:
Aggravated Assault
Simple Assault
Endangering Welfare of Children
------------------------------------------------------------------

DAWSON:   For the record, today's date is February 28, 1997, and it is now 1544 in the afternoon.  Also, could you tell us how long you've lived at the address you just mentioned there in Roulette?

BAILEY:   Approximately 8 months.

DAWSON:   OK.  Prior to that where did you live?

BAILEY:   312 North Main Street, Coudersport.

DAWSON:   Whose residence is that?

BAILEY:   Tammy Baker.

DAWSON:   And what relation is Tammy to any of you?

BAILEY:   Uh, my girlfriend's sister.

DAWSON:  Mark, the records, the doctor's reports states that Rebecca Moore had suffered a broken leg, a broken right leg and this was reported to the doctor on the 24th of September, 1996, when Rebecca was taken to the doctor's by yourself and Laurie Moore.  Is that correct?

BAILEY:   Yeah.

DAWSON:   Could you tell us what may happened that would've caused that particular injury to Rebecca?

BAILEY:   I was holding up above my head in one hand, playing around with her, she started to fall so I grabbed her leg and caught her with my other arm and pulled her into my chest so she wouldn't hit the floor.

DAWSON:   OK, and as a result of that, it sounded like it was an accidental type thing.  Is that correct?

A-24

BAILEY INTERVIEW
PAGE 2


BAILEY:   Yes, it was.

DAWSON:   And as a result of that, do you think Rebecca could have been injured?

BAILEY:   She could have been, yeah.

DAWSON:   OK.  Do you know or recall when that would have taken place?

BAILEY:   Uh, the 23rd of September.

DAWSON:   And how do you know it would have been the 23rd of September?

BAILEY:   Uh, because it happened just a little while before I had to leave for work.

DAWSON:   OK.  And at this time when you mentioned the 23rd of September, are you looking at a calendar page or something?

BAILEY:   Yeah.  Yes, sir.

DAWSON:   And that calendar page is from September of 1996.  Is that correct?

BAILEY:   Yes.

DAWSON:   And that helps refresh your memory?

BAILEY:   Yes.

DAWSON:   OK, and Rebecca was taken to the doctor's office on the 24th of September of 1996, she was examined at the office of Dr. Azar.  Is that correct?

BAILEY:   Yeah, we stopped there before we took her to the hospital.

DAWSON:   OK, and when she was taken to - is that Charles Cole Hospital?

BAILEY:   Yeah.

A-25

BAILEY INTERVIEW
PAGE 3


DAWSON:    In Coudersport?

BAILEY:    Yeah.

DAWSON:    Who examined her then?

BAILEY:    I have no idea.

DAWSON:    OK.  As a result of that examination, it was learned that
Rebecca had, in addition to the current injury of that day, had
sustained two prior broken legs and a broken rib.  Is that correct?

BAILEY:    As far as I know, yeah.

DAWSON:    OK.  Do you have any idea, can you tell us what may have
caused the injury to the rib?

BAILEY:    Uh, being upset, picked her up too hard.

DAWSON:    OK.  Who - who was upset?

BAILEY:    I was.

DAWSON:    OK, and who picked her up?

BAILEY:    I did.

DAWSON:    And what were the circumstances surrounding that?  Where
did it happen and, uh...

BAILEY:    At Tammy Baker's house in Coudersport.

DAWSON:    OK, and was there anything going with Rebecca that may
have caused you to be upset?

BAILEY:    Not with Rebecca herself.  She was crying; I was already
upset.  I should've just stayed away.

DAWSON:    OK.  Where was Rebecca at that time?

BAILEY:    She was in her crib?

DAWSON:    OK.  Is that a separate bedroom that she had?

BAILEY:    No, she was in the same room with her mother.

A-26

BAILEY INTERVIEW
PAGE 4


DAWSON:   Was there anybody with you in the room when you picked her up?

BAILEY:   No, I don't believe so.

DAWSON:   And how - could you describe to us how it was that you picked her up?

BAILEY:   Well, I picked her up - I picked her up like you would normally pick up a child, but with me being angry, I probably squeezed just a little too tight.

DAWSON:   Do you think it's possible as a result of that that the injury to the rib could have taken place?

BAILEY:   Yeah.

DAWSON:   How about the other two prior injuries to her leg?  Can you tell us how you think they may have happened?

BAILEY:   Yeah, one of them may have happened when I dragged her out of the car.  I was upset; bad day.  Instead of being easy, I just grabbed the car seat and her leg was up against the car seat when I grabbed it and I just grabbed and pulled the car seat out so I could get her out of the car and get her into the house and that was apparently the result of another injury.

DAWSON:   Had something taken place in the car that maybe caused you to be upset at that point?

BAILEY:   Jennifer had got sick and was fussing and that didn't help me out any with being of sound mind.

DAWSON:   OK, and where did that happen at?  Where was the car at at that time?

BAILEY:   It was at Tammy's house in Coudersport.

DAWSON:   So, so far you've talked about two leg injuries and one rib injury.  There's still another leg injury that perhaps you would know something about that also?

BAILEY:   Yes...

A-27

BAILEY INTERVIEW
PAGE 5


DAWSON:   Can you tell us anything?

BAILEY:   It could have happened when I went to pick her up out of the crib, her leg was between the bars and I picked her up and when I picked her up, her leg got caught and it...I mean, it vibrated the whole crib and that apparently was another result of a fracture.

DAWSON:   OK, and where did that happen?

BAILEY:   At Tammy's house.

DAWSON:   Just for the record, the first injury that we discussed when you had Rebecca above your head holding her with one hand, where were you when that happened?

BAILEY:   That was, if I remember correctly, was in Roulette.

DAWSON:   OK.  The last incident we - you talked about there when you picked Rebecca up out of the crib and her leg was caught between the slats of the crib, were you upset at that time?

BAILEY:   Yeah.

DAWSON:   What was that about, do you remember?

BAILEY:   No, I don't remember exactly what I was upset about.  I get upset over little, tedious things that I shouldn't get upset about.  I just fly off the handle over ridiculous things.

DAWSON:   Earlier today, Mark, you and I had a discussion and you gave me a statement prior to this one on tape and during that earlier statement you mentioned to me that you had problems with temper control and so on.  Is that correct?

BAILEY:   Yeah.

DAWSON:   Have you ever been treated for that?

BAILEY:   Yeah.

DAWSON:   And where were you treated?

BAILEY:   Bradford Hospital.

A-28

BAILEY INTERVIEW
PAGE 6


DAWSON:    And did you...were you confined there as a patient at times?

BAILEY:    Yeah.

DAWSON:    Do you remember when that was?

BAILEY:    I believe it was in May of '96.  It may have been May of '95.

DAWSON:    And have you ever taken medication for temper problems?

BAILEY:    Yes.

DAWSON:    Do you recall what that was?

BAILEY:    I believe it's (inaudible).

DAWSON:    And how long did you take that?

BAILEY:    I took that for probably 5 months and then I just stopped taking it.

DAWSON:    When did you stop taking it?  How long ago?

BAILEY:    Probably a year, a year and a half.

DAWSON:    In the recent months, have you made any contact with anyone about getting help with your temper problems again?

BAILEY:    Yes.

DAWSON:    And who was that?

BAILEY:    Uh, Coudersport Guidance Center.   Uh, to see a Pat Rupert.

DAWSON:    And have you had an appointment with Pat Rupert?

BAILEY:    I did, but I had to cancel it because I had fallen the day before and broke my right arm.

DAWSON:    OK, and you mentioned to me that you planned on recontacting her for a future appointment.  Is that correct?

BAILEY:    Yes.

A-29

BAILEY INTERVIEW
PAGE 7


DAWSON:   Have you had problems with keeping your temper with anyone else other than Rebecca?

BAILEY:   Yes, my ex-girlfriend, Jodi Lynn Murray.

DAWSON:   Where does Jodi live?

BAILEY:   Bradford.

DAWSON:   How about with your present girlfriend?

BAILEY:   Yes.  I hit her once when I was at a friend's house, we were drinking.  They called Jodi in Bradford, was causing trouble and I got upset and I smacked Laurie.

DAWSON:   How about with any other children?  Have you ever lost your temper with any of the other children in your household?

BAILEY:   I haven't really lost my temper.  I've got angry and yelled at them.  That's about it.

DAWSON:   Mark, a while back there's another young girl in the house, I believe she just turned 2 years of age by a...her name was Jennifer?  Was it?

BAILEY:   Yeah.

DAWSON:   Jennifer had been taken to Dr. Azar's office a while back for black and blue marks on her ears.  Are you familiar with that?

BAILEY:   Yeah.

DAWSON:   Do you have any idea what would have caused those black and blue marks?

BAILEY:   The only thing that I figure could have caused them was the car seat she was in.  She was too big for and the seat belts were hitting her ears.  And that was basically the only time that she would get them that I can recall was getting in and out of the car.

DAWSON:   There was nothing ever on your part that would have caused those marks on her ears?

A-30

BAILEY INTERVIEW
PAGE 8

BAILEY:    No.

DAWSON:    Trooper Davis, have anything to say that you should add or you can think of?

TPR. DAVIS:    Just wondering if any (several words inaudible) indicated you played a little too rough with the inside of the hand or (inaudible) results of that horseplay, even though it might have been an accident, Laurie told me earlier in the day this time (inaudible) kid's ears (inaudible) in a joking manner (several words inaudible) black and blue marks or whatever.  Did anything like that ever happen (inaudible)?

BAILEY:    Yeah, the only one that ever happened with was Allen when we played around I'd pick on him about his ears 'cuz he always gets his hair cut short and there's times that, you know, we get horsing around, I'll grab his ears, but not with Jennifer.  I...

TPR. DAVIS:    Anything that might have left a mark, even accidental?

BAILEY:    No.

DAWSON:    OK.  Anything else at all that you want to tell us or that or that you can think of that would help us at all here today?

BAILEY:    No, I told everything that I know, except for that I need help.

DAWSON:    Are you sorry for what has happened to Rebecca or for anything thing that has happened?

BAILEY:    Very fucking sorry.    I just don't want it to happen again.

DAWSON:    I know.  And Mark, we don't want it to happen again, either, so we'll try to do what we can to help you, OK?  It's uh, now about 1553 hours on February 28, 1997, and we'll conclude this interview at this time.

A-31

COMMONWEALTH OF PENNSYLVANIA   : IN THE COURT OF COMMON PLEAS
                               : OF POTTER COUNTY, PA

                         VS.   : NO. 93 OF 1997

      MARK BAILEY,                 : CRIMINAL DIVISION
                    Defendant


        PARTIAL TRANSCRIPT OF THE JURY TRIAL, held before the
Honorable John B.  Leete, President Judge, in the
Courthouse, Coudersport, PA, on December 12, 1997.


      A P P E A R A N C E S :


OFFICE OF THE DISTRICT ATTORNEY
OF POTTER COUNTY
Coudersport, PA  16915
BY:  JEFF LEBER, D.A.
For the Commonwealth


FINK & FINK,
Attorneys at Law
Main Street
Port Allegany, PA  16743
BY:  HAROLD B. FINK, ESQ.
For the Defendant


              Ann Marie Jusko
              Potter County Court Reporter
              Potter County Courthouse
              Coudersport, Pa  16915



A-32

2

# I N D E X   T O   W I T N E S S E S

## FOR THE COMMONWEALTH

| | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|
| Maryl Storey | 33 | | | |
| Janie Murphy | 35 | | | |
| Louise Dellaire | 39 | 50 | 65 | 67 |
| Robert Supinski | 74 | 103 | 122 | |
| Mariam Asar | 125 | 135 | 147 | |

A-33

33

M A R Y L   S T O R E Y, having been duly sworn, was examined

and testified as follows:


DIRECT EXAMINATION BY MR. LEBER:

    Q    Would you tell us your name and address?

    A    Maryl Storey, Coudersport Pennsylvania.

    Q    What is your occupation?

    A    X-ray tech.

    Q    And where are you employed?

    A    Charles Cole Hospital.

    Q    And how long have you been employed there?

    A    29 years.

    Q    And were you employed there in September of 1996?

    A    Yes, sir.

    Q    September 24th of 1996 did you have occasion to

take x-rays of a child?

    A    Yes, sir.

    Q    And what was the name of that child?

    A    Rebecca Moore.

    Q    Do you know what the date of birth of that child

was from what you determined?

    A    Not without seeing the x-rays.

    Q    I'm going to show you, Mrs. Storey, what are

marked as Commonwealth Exhibits 1, 2 and 3 and ask if you can

identify those please?

34

1    A    Yes, these are x-rays that were taken on September

2    24th, 96.

3    Q    And the person who was x-rayed at that time was

4    whom?

5    A    Rebecca Moore, birth date 2/3/96.

6    Q    February 3rd, 1996 is her date of birth and again

7    the date those x-rays were taken is what?

8    A    September 24, 1996.

9    Q    And those x-rays, that's a copy of the x-ray

10   that's actually held by the hospital or Dr. Dallaire at this

11   time?

12   A    That's correct.

13   Q    And those are accurate depictions of the x-rays

14   taken on those particular days?

15   A    Yes.

16          MR. LEBER: Nothing else thank you.

17          THE COURT:  Mr. Fink.

18          MR. FINK:  I wish I could think of some

19   questions to ask you, just a couple.

20   Q    You identified those x-rays which were shown to

21   you as being those of taken of Rebecca Moore and you knew

22   that to be true because Rebecca Moore's name is on those

23   x-rays?

24   A    Yes, they are, sir.

25   Q    And the date which they were taken is also on

A-35

35

1  those?

2      A    Correct.

3         MR. FINK:  Nothing further, thank you, ma'am.

4         MR. LEBER: Janie Murphy.

5

6  J A N I E   M U R P H Y, having been duly sworn, was examined

7  and testified as follows:

8

9  DIRECT EXAMINATION BY MR. LEBER:

10      Q    Your name and address please?

11      A    Janie Murphy, Coudersport, Pennsylvania.

12      Q    What's your operation?

13      A    X-ray technologist.

14      Q    How long have you been engaged in that occupation?

15      A    About 18 years.

16      Q    Where were you employed in September of 1996?

17      A    Charles Cole Memorial Hospital.

18      Q    Charles Cole Memorial Hospital here in

19  Coudersport; is that correct?

20      A    Yes.

21      Q    And what department did you work in in September

22  of 1996?

23      A    Radiology.

24      Q    Now, I'm going to ask you--I should have asked

25  Miss Storey she's identified exhibits 1, 2 and 3 being x-rays

A-36

36

1    she took on a certain date.  Do the x-rays, these exhibits 1,

2    2 and 3 indicate the time at which the x-rays were taken?

3        A    Yes.

4        Q    And is that shown on every x-ray plate that you

5    have?

6        A    Yes.

7        Q    Can you tell us from examining 1, 2 and 3 at what

8    hour those particular x-rays were taken?

9        A    2:39 in the afternoon.

10        Q    Okay 2:39?

11        A    Hm-hmm.

12        Q    And the next one?

13        A    2:41, 2:59.

14        Q    Miss Murphy, I'll show you these items marked as

15    exhibits, Commonwealth Exhibits 4 and 5 ask if you can

16    identify them for us, please?

17        A    Yes, I can.

18        Q    And what are they?

19        A    It's pelvis and lower extremities.

20        Q    They are x-ray plates; is that correct?

21        A    Yes.

22        Q    And those x-rays were taken by whom?

23        A    Myself.

24        Q    And who is the subject of those x-rays?

25        A    Rebecca Moore.

A-37

Q    And is the date of birth of that child indicated?

A    Yes, it is, 2/3/96.

Q    Now, with x-rays--

MR. FINK:  If Your Honor, please, I'll object to the date of birth of the child that's hearsay.  Whatever it's worth it's certainly hearsay and cannot be proven through this means.

MR. LEBER: I can rephrase that, Your Honor.

THE COURT:  Thank you.

Q    By the exhibits that you have in front of you does that indicate what the date of birth of that child is?

A    Yes, it does.

MR. FINK:  Objection.

THE COURT:  Overruled as to that particular question.

Q    And what is the birth date indicated?

A    2/3/96.

MR. FINK:  Objection.

THE COURT:  Without some foundation I guess have to sustain the objection.

Q    Whenever you take an extra of an individual is it usual procedure to indicate the birth date of the subject of the x-ray?

A    That's right.

Q    And how is it that you obtain the information

A-38

38

1    regarding the birth date of the child or of the subject?

2        A    Whoever is giving the information, could be from a

3    nurse or the mother, whoever is with the child.

4        Q    Now, the sticker on there that indicates 2/3/96 is

5    the date of birth.  From whom did you obtain that

6    information?

7            MR. FINK:  Judge, it's the same objection.

8    Forget the objection.  Go ahead, put it in that way.  It's

9    objectionable but go ahead.

10           MR. LEBER: Thank you.

11       Q    Okay I guess we can move on then.  After x-rays

12   are completed do you read the x-rays?

13       A    No.

14       Q    And who in the realm of the hospital is

15   responsible for reading x-rays?

16       A    The radiologist.

17       Q    And who requested these particular x-rays if you

18   recall?

19       A    I believe it was Dr. Asar.

20       Q    And Dr. Asar's specialty is what?

21       A    Pediatrician.

22       Q    Now, what time of day was it whenever you took

23   these particular x-rays?

24       A    This was at 1445.

25       Q    1445 means around 2:00?

A-39

39

1    A    Hm-hmm.

2    Q    2:45 p.m., is that correct?

3    A    Yes.

4    Q    I want you to look at these earlier x-rays maybe

5    look at them little bit more closely and examine the time

6    indicated on them.   You indicated those were 2:39 something

7    like that?

8    A    I'm sorry it is 12 there is a one in front of

9    them.

10    Q    So these were 12:39, 12:45; is that right?

11    A    Right.

12    Q    Those were the x-rays taken by Nurse Storey?

13    A    That's correct.

14        MR. LEBER: Nothing else.

15        THE COURT:  Defense may cross.

16        MR. FINK:  No questions.

17        MR. LEBER: Dr. Dallaire, please.

18

19    L O U I S E   D E L L A I R E, having been duly sworn, was

20    examined and testified as follows:

21

22    DIRECT EXAMINATION BY MR. LEBER:

23    Q    Your name and address please?

24    A    Louise Dallaire, Allegany, New York.

25    Q    What's your occupation?

A-40

40

1      A    I'm radiologist.

2      Q    And what kind of training does a radiologist

3    require?

4      A    Four years of medical school, four years of

5    residency.

6      Q    So what degrees do you hold?

7      A    I hold Bachelor of Science Degree and an M.D.

8    Degree.

9      Q    Your Bachelor of Science is from what institution?

10     A    University of Buffalo.

11     Q    Your M.D. Degree is what from where?

12     A    University of Buffalo also.

13     Q    When did you graduate from the University of

14   Buffalo?

15     A    Undergraduate 1972.

16     Q    Your graduate degree as a medical doctor?

17     A    1976.

18     Q    And what training have you had subsequent to

19   obtaining your degree?  Since you obtained your degree what

20   training have you had?

21     A    I had one year rotating internship and three years

22   of radiologist residency.

23     Q    And what is a radiologist?

24     A    Radiologist is one who interprets x-rays in its

25   loose sense, although there are a lots more than x-rays done

A-41

41

1   right now in that field.

2        Q    Are you a member of any boards or admitted to

3   practice with any state boards of medical examiners?

4        A    I'm licensed to practice in Pennsylvania and New

5   York currently.

6        Q    Are you again member of any society or other

7   boards?

8        A    I'm member of the Pennsylvania Medical Society ,

9   A M A and various other boards.

10       Q    And how long have you been actually actively

11  practicing your profession as a radiologist?

12       A    Since 1980.

13       Q    What hospitals do you have privileges with?

14       A    Currently just Charles Cole Hospital.

15       Q    In the past what hospitals have you had privileges

16  with?

17       A    It would be impossible for me to tell you the

18  numbers I was associated with. I was in the Navy and N C

19  Bremington where I worked for two years.  I was a radiologist

20  in Alaska, Kaiskag General Hospital for three or four years.

21       Q    So you've had a lot of experience?

22       A    Yes, sir.

23            MR. LEBER:  Your Honor, I'm going to be

24  offering Dr. Dallaire as an expert in radiology.

25            MR. FINK:  We think under the law of

A-42

42

1    Pennsylvania she is qualified as a radiologist under the

2    testimony.  We have no objection.

3          THE COURT:  Very well, we will receive Dr.

4    Dallaire as an expert witness in the field of radiology.

5          Q    Dr. Dallaire, in September of 1996 were you

6    employed in Charles Cole Memorial Hospital?

7          A    I was working at Charles Cole Hospital.  I'm not

8    Charles Cole employee.

9          Q    And on the 24th day of that month, September of

10    1996 did you have occasion to examine x-rays that purportedly

11    were x-rays taken of a subject by the name of Rebecca Moore?

12          A    Yes, I did.

13          Q    How was it that this case came to your attention?

14          A    I believe x-rays were brought to me perhaps by

15    Miss Storey.  I'm not sure who brought them to me.  She's the

16    one who took the initial films because Dr. Asar wanted to be

17    called about a reading of the films.

18          Q    When a x-ray technician takes an x-ray what is the

19    procedure generally from that point?

20          A    In this particular case they were brought for

21    verbal report, but often times they're just put aside and

22    read at a later time of day.

23          Q    I'm going to show you these exhibits which are

24    have been marked Commonwealth's Exhibits I'll give you all of

25    them, 1 through 5, and ask if you can identify them please?

A-43

43

1    A    These appear all to be copies of x-rays taken of

2  Rebecca Moore.

3    Q    And you have the original of these x-rays; is that

4  correct?

5    A    Yes, I do.

6    Q    Now, at first what part of the subject's body were

7  you examining or x-rays of which part of the subject's body

8  to determine her condition?

9    A    I was brought x-rays of the right lower leg.

10    Q    And did you examine those x-rays?

11    A    Yes, I did.

12    Q    And those are among the five that we have here

13  before us?

14    A    I believe so.

15    Q    And what was your conclusion to a reasonable

16  degree of medical certainty relative to the right leg of this

17  child?

18    A    That there were fractures.

19    Q    And what fractures did you observe?  Can you

20  describe them to us?

21    A    There were fractures of the lower ends of the

22  right lower leg around the ankle. There were what's called

23  bucket handle fractures or corner fractures. And these

24  fractures are considered fairly specific for child abuse.

25  There was also a healing fracture of the shaft of one of the

44

1    legs, of one of the bones in the lower leg.

2        Q    Now the first fracture you mentioned you talked

3    about a bucket handle fracture describe that for the jury as

4    best you can.

5        A    It's basically just a thin rim of bone right next

6    to the growth plate.

7        Q    And when you examined an x-ray plate and in this

8    circumstance were you able to give some kind of estimate as

9    to the age of the fracture?

10       A    Yes, the fractures that I initially described as

11   bucket handle those appeared relatively new, within two weeks

12   of age.

13       Q    The first and the fresh fracture that you noted

14   tell the jury as precisely you can where that was located?

15       A    The initial fracture.

16       Q    Right the freshest one?

17       A    The distal end of the tibia.

18       Q    Distal end of the tibia is what in layman's terms?

19       A    Right above the ankle, the main bone.

20       Q    Now you said you observed another fracture.  Where

21   was that other fracture?

22       A    The older fracture along the shaft of that same

23   bone.

24       Q    Okay.

25       A    Higher up.

A - 45

45

Q    This child was less than 8 months old at that time.  What about the quality of the bone of the child of that age?  Is it something that is easily broken?

MR. FINK:  I'm going to object to that I don't know whether that's properly within the scope of the expertise of the witness.

THE COURT:  I will ask counsel to clarify through appropriate questions if that is within the range.

MR. LEBER: Okay.

Q    In the course of your training as a radiologist tell us what training you have relative to what would relate to the strength of bones and how it relates to people of different ages and so forth?

A    I'm not sure what you mean by training specifically.  Young people's bones tend to to be more flexible than older peoples.

MR. FINK:  Objection the witness is seemingly giving substantive testimony within--

THE COURT:  Sustained.

Q    Dr. Dallaire, I have to qualify you relative to your experience and background and training relative to understanding the dynamics of a broken bone and how--

MR. FINK:  I'm going to object can he just ask the question.

THE COURT:  Overruled.

A-46

46

Q    Relative to again your training and so forth to understand the dynamics involved with bones generally and the way they grow, their strength and so forth.  So again my question goes specifically what your training is relative to that, through the course of your medical school, your internship and so forth and your experience?

A    Well, we're trained in the physiology of bone, the way bones grow.  In terms of radiologist we see, you know, pediatrics as part of the formal training.

Q    And did you have formal training in pediatrics?

A    As part of the general radiology residency.

Q    And that was when?

A    1977 to 1980.

Q    Your residency again was in Buffalo; is that correct?

A    My residency was from Massachusetts.

Q    And during the course of your approximately 17 years of experience have you had other occasions when you examined the x-rays of the bones of small children?

A    Yes, I have.

Q    And have you through your experiences gained insight into the nature of the bones of children?

A    Yes.

Q    So what is the difference between bones of a child and bones of a person whose more advanced in years?

A-47

47

1    A    Bones of a child are more flexible. They're not

2    fully formed, they need room to grow.  So the edges of it are

3    made so they can grow at the end.

4    Q    What does that mean in terms of the likelihood of

5    those bones breaking?

6    A    Well, the fractures that I described there are

7    certain points at which they may break under certain

8    conditions.

9    Q    Now, you've described the right leg of what you've

10    observed as a fresh fracture and older fracture.  After you

11    viewed those x-rays, made those determinations, did you

12    report that to Dr. Asar?

13    A    I had asked for a comparison of the other side.

14    Q    So additional x-rays were taken; is that correct?

15    A    That's right.

16    Q    And those are again Exhibits 1 through 5?

17    A    I believe so.

18    Q    And those were taken by Nurse Murphy; is that

19    correct?

20    A    I think those were still taken by Maryl Storey.

21         MR. FINK:  Your Honor, I must object to the

22    leading nature of the--

23         MR. LEBER: I'm trying to move it along.

24         THE COURT:  We're fairly leading.

25    Q    I'll show you Exhibits 4 and 5.  Those were

A-48

48

1    identified as taken by x-ray technician?

2        A    These were taken by Miss Murphy.  These were taken

3    later.

4        Q    And again did you compare them with the earlier

5    x-rays?

6        A    These were not the ones I was just referring to.

7        Q    The purpose of these later ones was what as far as

8    you know?

9        A    I requested the comparison of the left leg as is

10    fairly common practice to do when I'm examining extremities

11    of children. These other ones I believe were taken at Dr.

12    Asar's request after I gave her a verbal report on the phone.

13        Q    Did you obtain a comparison of the left leg?

14        A    Yes, we did.

15        Q    What did that reveal to you?

16        A    That there was an older fracture around the left

17    ankle and around the shaft of the tibia on the left side.

18        Q    Now the exhibits that you have before you that are

19    numbered 4 and 5 you said those were taken at the request of

20    Dr. Asar; is that correct?

21        A    I believe so.

22        Q    Did you examine those x-rays after they were

23    received?

24        A    Yes, I did.

25        Q    And what was the purpose of taking those x-rays?

A-49

49

```
 1        A    Well once the specter of child abuse was raised in
 2    this case it is common to take additional films to see
 3    whether there might be other fractures.
 4        Q    What did you find upon examination of these
 5    further x-rays?
 6        A    That there were two older rib fractures.
 7        Q    Now, you've referred to the rib fractures, the
 8    fracture of the left leg and the fracture to the shaft of the
 9    right leg as being older fractures can you give us some time
10    line regarding that?  What do we mean?
11        A    Well, we don't normally see new bone forming
12    radiographically until beyond two weeks and on these
13    fractures that I described as being older these all have new
14    bone laid down around them so at least two weeks old and
15    we're probably talking month, two months frame.
16        Q    So to a reasonable degree of medical certainty,
17    Dr. Dallaire, in examining the x-rays of Rebecca Moore how
18    many fractures did you find occurred to this child during the
19    first seven and a half months of her life?
20        A    Well, those that showed on x-rays were two rib
21    fractures, the new fracture of the right ankle, the older
22    fracture of the right lower leg and older fracture of the
23    left leg so I guess that's five.
24        Q    And hypothetically, Dr. Dallaire, if we discount
25    any kind of trauma like car accidents something of that
```

$A - 50$

50

1    nature and discount any type of disease of the bones of a

2    person, an 8 month old child that has these kind of fractures

3    and based upon that information do you have an opinion to a

4    reasonable degree of medical certainty what the cause of

5    these various fractures to this child would be?

6              MR. FINK:  Objection hypothetical question

7    asserts facts not of record.

8              THE COURT:  Counsel you want to state the

9    basis for your question.

10             MR. LEBER: I think I'll just withdraw the

11   question at this time, Your Honor.

12             MR. LEBER: Nothing else.

13             THE COURT:  Defense may cross.

14

15   CROSS-EXAMINATION BY MR. FINK:

16       Q    Doctor, good morning to you?

17       A    Good morning.

18       Q    You have testified concerning your knowledge of

19   bones and you have rendered certain statements concerning

20   bones of children as opposed to bones of older--I guess you

21   have testified it is my understanding that bones of younger

22   people are more flexible; is that true?

23       A    Yes, they tend to be more flexible.

24       Q    Is there a time in a child's life or a person's

25   life when the growth of bones cease?

A-51

51

1    A    Yes.

2    Q    And is there a general age of that person when

3  growth ceases?

4    A    Well, individual bones grow at different rates but

5  basically teen years.

6    Q    Okay. From zero age or the date of birth up to the

7  teen years when bones are still growing are they also

8  forming?  Is there additional formation?  Are they already

9  formed at birth?

10    A    They are already formed, basis of them, yes, is

11  already formed.

12    Q    Is there a difference in composition of the bone

13  as the child grows from birth to teen-age?

14    A    I assume so, yes.

15    Q    Does it depend on the individual, what the

16  individual consumes in terms of vitamins and minerals as to

17  the contents of the bones?

18    A    Yes, to a certain extent, yeah.

19    Q    Are there certain individuals--are there certain

20  babies, for instance children of up to 8 months of age who

21  have bones that are more pliable than others of the same age?

22    A    They can be.

23    Q    They can be. Are you able--were you able to tell

24  merely by x-rays as to the how pliable this child, this

25  particular child's bones were?

A-52

52

```
 1        A    Looking at the x-rays, in all of the x-rays in

 2   general this patient's bones appeared normal, aside from

 3   those bones that were fractured.

 4        Q    Okay. Now, I guess I'm going to ask you to look at

 5   all of the Commonwealth exhibits and we're going to start out

 6   with the--I have here 1, 2 and 3.  Was your testimony only as

 7   to 4 and 5 or did it include 1, 2 and 3?  I wasn't clear on

 8   that, doctor.

 9        A    I read all the x-rays.

10        Q    Okay.

11        Q    I'm going to give you access to all of the x-rays

12   while giving your testimony. Again what x-rays show the

13   newest fracture, the newest fracture?

14        A    The x-rays of the right lower leg.

15        Q    You need the numbers, exhibits?

16        A    Okay.

17        Q    Exhibit numbers?

18        A    Exhibits 2 and 1.

19        Q    1 and 2?

20        A    Yes.

21        Q    What does your trained eye?  See I wonder if you

22   could explain that to the jury when you look at Exhibits 1

23   and 2 and you see a fracture can you describe what you see?

24        A    It's an alteration in what norm, what one normally

25   sees as that particular bone.
```

A-53

53

Q    An alteration?

A    An alteration it can.

Q    What does that mean?  I'm sorry we can't blow it up for the jury to see.  Can you further describe it as in addition to calling it an alteration?

A    It could be a change in the contour of the bone, it can be a line through the bone, it can be actual separate piece of the bone, any of those things.

Q    Okay. Would your training, doctor, include an ability to render an opinion as to how that bone was broken? Please think of the question.  It's a yes or no answer. Would your training cover an ability or give you an ability to render an opinion as to how that bone was broken?

A    You're looking for yes or no answer?

Q    Sure, yes, I am.

A    Yes.

Q    Okay. Were you able to by looking at Exhibits 1 and 2 to render an opinion as to how the bone, the break that you saw occurred?

A    Would you repeat please.

Q    Sure it was not well phrased.  I'll try again. By looking at Commonwealth Exhibits 1 and 2, which are the x-rays of the newest fracture, which you've testified to are you able to discern or tell the jury how that break occurred?

A    The type of fracture the newest fracture?

A-54

54

Q    The question is a yes or no question?

            THE COURT:  Witness may also explain her answer.

A    Yes.

Q    Yes, you are.  Okay.  Will you tell us what your opinion is as to how that fracture occurred?

A    The type of fracture it is is associated with a forceful pulling or twisting motion, twisting motion.

Q    It is your opinion that that particular fracture occurred in that way?

A    That is what is thought to be the etiology of those types of fracture.

Q    Could it have occurred in another way?

A    Could it have?  In total realm of possibilities I suppose, but this is through reported etiology or cause for these fractures.

Q    Okay. Now, let's talk a little bit more about your opinion of how it occurred.  You say it occurred in a twisting manner; is that your testimony?

A    Reportedly in the literature these fractures cause--

Q    I'm interested in what your opinion is then if you want to go ahead how you arrived at your opinion, that's fine.  I'm asking you have you told this jury it is your opinion that this break occurred in a twisting manner?

A-55

55

A    It is my opinion that this injury most likely occurred by forceful pulling or twisting.

Q    Pulling, pulling or twisting those seem to be two almost diametrically opposed forces.  Pulling one thinks of-- well excuse me. Doctor, I ask you is it not not true that pulling is a different force than twisting?

A    I think one could be contained within the other.

Q    Could be.  They are two different types of forces are they not?  One is a pulling you say or a twisting, but the question to you, doctor, is, is it not true that they are two different types of forces, is it not true?

A    I guess.

Q    You're the one that used it, doctor.  I did not use the term you did.  Maybe I could get at it what do you mean by pulling?  You used the term I'm asking.

A    I'm telling you based on my experience and my reading that these reported mechanisms--

A    You used the term pulling, did you not?

A    Yes, I did.

Q    Would you tell the jury what you mean by pulling?

A    I think pulling is self explanatory.  I think if you're pulling a limb you may also involve twisting.

Q    Let's put twisting aside for one moment.  You have demonstrated by your hands here in the courtroom in front of the jury what you mean by pulling.  When you reach your hand

*A - 56*

56

1    out in front of you and then draw it straight toward you that

2    is pulling; right?

3        A    Hm-hmm.

4        Q    Now tell the jury what you mean by twisting?

5        A    Twisting would be a rotation.

6        Q    You have demonstrated that to the jury by rotating

7    your hand either clockwise or counter clockwise.  Do you now

8    acknowledge that pulling is a different force than twisting?

9        A    Yes.

10       Q    Okay. You are testifying that based upon your

11   observation of the x-ray the break you have observed therein

12   could have been occurring by a pull or a twist; is that true?

13       A    That is true.

14       Q    Are you able to testify as to the force required

15   to establish the break?  Do you have an opinion as to that?

16       A    No, I do not.

17       Q    Is it not true, doctor, that the break which you

18   observed in Commonwealth Exhibits 1 and 2 could have easily

19   occurred by non criminal means as opposed to criminal means?

20   You certainly can't say can you?

21       A    I cannot say the intent of whatever force was

22   used, which I would imagine would not be slight force.

23       Q    Doctor, is it not true that the break which you

24   observed in Commonwealth Exhibits 1 and 2 about which you

25   testified could just have easily occurred by non criminal

*A-57*

1    means as opposed to criminal means?

2         A    Yes, I cannot testify to the contents of the

3    force.

4         Q    Now, let's go to Commonwealth Exhibits 3, 4 and 5?

5         A    Okay.

6         Q    Commonwealth Exhibit 3 shows what?

7         A    These are the films of the opposite leg, the left

8    leg.

9         Q    The left lower leg.  Left lower leg fractures?

10        A    Yes.

11        Q    How many?

12        A    There is, there are fractures around the ankle.

13        Q    That question requires a number, an answer giving

14   a number.  Can you give a number?  We're talking about

15   Commonwealth Exhibit 3.

16        A    There are probably two fractures here.

17        Q    Your answer seems uncertain, doctor.  Are you

18   uncertain as to the number of fractures shown?

19        A    There is a fracture.

20        Q    Excuse me?

21        A    Yes, one of the bones is not very clear there is

22   at least one fracture there.

23        Q    Your answer seemed uncertain.  I guess you cannot

24   tell whether one, two or more; is that what you're saying?

25        A    There is at least one, yes.

A-58

58

Q    Let's talk about that one.

A    Okay.

Q    At least one that you see.  Where is it?  Wonder if you can describe the location on the child?

A    It is around the ankle.

Q    Do you know what bone it is?

A    Yes, tibia.

Q    Tibia?

A    Tibia.

Q    Are you able to describe that fracture.  How do you know it's a fracture?

A    There's a little separate piece of bone that's not suppose to be there.

Q    There's a separate piece of bone?

A    Yes.

Q    Could that separate piece of bone come at birth?

A    No.

Q    Could not have?

A    No.

Q    Could only have come from a break?

A    Yes.

Q    What type of break?

A    This is called a corner fracture.

Q    Called a corner fracture.

Q    C O R N E R?

A - 59

59

1    A    Yes.

2    Q    What does that mean?

3    A    It's descriptive for a type of fracture at the end
4    of the bone that looks like a corner.

5    Q    Okay. That's appropriate.  Can you tell or do you
6    have an opinion as to how that occurred?  I mean whether it's
7    a twist, a pull, karate chop?

8    A    The fracture on the left side is similar to those
9    seen on the right side so, yes.

10    Q    What?

11    A    If I'm to postulate an etiology, it would be
12    similar to the right side.

13    Q    I apologize to the court reporter and I apologize
14    to the witness.  I don't mean to interrupt you.  Sorry. Are
15    you saying that corner fracture in Commonwealth Exhibit 3
16    came in your opinion from either a pull or a twist?

17    A    Yes.

18    Q    Is it not true that it is equally possible that
19    this could have occurred from non criminal means as opposed
20    to criminal means?

21    A    I cannot testify to the intent of the force.

22    Q    So is it not true?

23    A    Yes.

24    Q    Let's take Commonwealth Exhibit 4 what is shown
25    there?

A-60

60

1    A    This is an image of the pelvis and both lower

2  legs.

3    Q    Is that different than is shown on 1, 2 or 3?

4    A    Yes.

5    Q    How many fractures are shown there?

6    A    The fractures of both lower legs can be seen on

7  these.

8    Q    Can you give me a number?

9    A    Can I give you a number?  I can tell you what

10  bones are fractured.

11    Q    Not what bones the number of fractures.  Forget

12  bones for the time being.  I'm looking for a number?

13    A    At least three.

14    Q    Three fractures in Commonwealth Exhibit 4?

15    A    Correct.

16    Q    Okay. Now, describe to the jury where they are?

17    A    These are the fractures that I already described.

18  They're fractures of both ankles, and about both lower legs.

19    Q    Wait a minute.  Are these different fractures?

20    A    No, they are not these are the same fractures

21  included on this film.

22    Q    So if you take 1, 2, 3 and 4, Commonwealth

23  Exhibits 1, 2, 3 and 4 I've heard about three fractures; is

24  that true?

25    A    That is correct.

A-61

61

Q      What is shown on Commonwealth Exhibit 5?

A      This is one picture of the patient's rib cage.

Q      Rib cage.  Which side?

A      Both sides.

Q      Both sides.  Doctor, can you tell us whether or not you observed any fractures on Commonwealth Exhibit 5?

A      Yes, there are two.

Q      Two fractures.  Where are they please?

A      There is a fracture of the right 6th rib and the on the side, yes, and the left 7th rib.

Q      How many ribs do we have?

A      Most people have 12 on each side.

Q      Can you tell me the type of fracture on the right rib cage?

A      They're both healing fractures.

Q      That means that goes to the, I guess, the age of the fracture.  Are you able to further describe the fractures?

A      They look like not displaced fractures.

Q      What?

A      Not displaced.

Q      Not displaced that means it is just a crack and bone remains in place?

A      Right.

Q      Do you have an opinion as to how that occurred,

A-62

62

1    the crack, the fracture on the right rib cage?

2         A    These injuries are not specific.  I don't think I

3    could tell you how these occurred.  Direct force perhaps.

4         Q    How about the left one?

5         A    The same.

6         Q    Same. And is it also the same with regard to the

7    etiology the source that you are--it is equally as likely

8    that occurred from non criminal means as opposed to criminal

9    means?

10        A    Yes, I cannot testify to the intent.

11        Q    Now, one further area is to the age.  We got the,

12   we know about the newest fracture shown I think in

13   Commonwealth Exhibit 1?

14        A    I think 1 and 2, yes.

15        Q    In the first place can you render an opinion with

16   more precision than you did on direct examination as to the

17   age of the fractures, Numbers 2 and 3?

18        A    No, all I can say that they are older, greater

19   than two weeks of age.

20        Q    Tell the jury what you see when you look at

21   fractures two and three, you see a part of the healing

22   process?

23        A    Yes, you see the new bone starting to form around

24   the fracture site.

25        Q    Is it completely healed?

A-63

63

1      A      No.

2      Q      Are you able within your area of expertise to

3    render an opinion as to whether or not ordinarily it would be

4    a source of pain, pain?

5      A      I would not comment on that.

6      Q      That would be outside of your area of expertise?

7      A      An acute fracture should cause pain, but healing

8    fractures I would think would not cause much pain.

9      Q      You say fractures Numbers 2 and 3 were not fully

10    healed?

11      A      That's correct.

12      Q      Do you have an idea as to how much longer it would

13    be before it would be fully healed?

14      A      Perhaps a month or two.

15      Q      How long does it take for the healing process to

16    start after initial fracture right away?

17      A      Should start right away.

18      Q      Right away?

19      A      Yeah, we don't see it on x-rays early.

20      Q      And when you say the healing process is started

21    and new bone growth had commenced tell the jury what you saw

22    on the x-rays which led you to that conclusion?

23      A      New bone growth is exhibited by--

24      Q      How do you know it's new as opposed to old?

25      A      The configuration of the bone, the way it looks.

A-64

64

Q    I assume that.

A    It's not old.

Q    Can you tell the jury--you can't make us radiologists overnight I understand that, doctor, could you tell us what it was that you saw that led you to that conclusion?

A    Configuration.  What that means is the outline of the bone.  The outline of the bone is different.  Basically bone is white on x-ray and new bone is also white and you can see white around the fracture line.

Q    You can see?

A    The white new bone.

Q    Color?

A    It will--

Q    Not configuration but color is the difference?

A    Also configuration.

Q    Can you show me that in Commonwealth Exhibit 3 or whatever Exhibit better yet?

A    There's no way for me to project it.

Q    Okay.

A    But there's no way I can project it from what we have here.

Q    Any way telling how old the rib fractures were?

A    They're greater than two weeks old.

Q    Two weeks?

A-65

65

A     The rib fractures are greater than two weeks old means it occurred more than two weeks before this child presented to be x-rayed.

MR. FINK:  Doctor, thank you very much.

THE COURT:  Ladies and gentlemen, before we go into any redirect we're little over due for our morning recess.  Take a ten minute break at this time. During this recess and all the others please do not discuss the case among yourselves or with anyone else. Court will stand in recess for ten minutes.

(Ten minute recess).

THE COURT:  Welcome back, ladies and gentlemen. Our game plan we'll go to noon or very shortly thereafter, find a convenient breaking point, take one hour for lunch then get you right back to work, take mid afternoon break.  Then as soon as I can we'll give you predicted stopping time for tonight. Unfortunately I can't do that very accurately.  I hear the testimony at the same time you do.  I don't get much better of an idea how long things are going to take than you have.  We'll do our best to keep you fully informed Commonwealth redirect.


REDIRECT EXAMINATION BY MR. LEBER:

Q     Dr. Dallaire, Mr. Fink is asking about the etiology or cause of a particular fracture and you talked

A -66

66

about pulling or twisting and you rendered an opinion to a

reasonable degree of medical certainty this was caused by a

pulling or a twisting. What do you rely upon in order to

render such an opinion in that?  How do you reach that

conclusion?

      A    Through literature, radiological literature.

      Q    And Mr. Fink in his cross-examination of you asked

about each particular bone and whether you could render an

opinion relative to that particular fracture that occurred.

Given the fact that this is a child less than 8 months of

age, given the fact that this is a child less than 8 months

of age and given what your observations were of all these

x-rays and all the fractures that you have enumerated, does

that give you basis to render an opinion as to whether or not

to a reasonable degree of medical certainty this was caused

by a criminal act or by a--

              MR. FINK:  Objection leading, extremely

leading.

              MR. LEBER: I don't think so.

              THE COURT:  Let's get the question down.

              MR. LEBER: I'm done with the question.

              THE COURT:  Witness may answer.

      A    Would you repeat it.

      Q    Considering all that you observed, all the x-rays

you observed and fractures which you've identified, putting

*A-67*

67

1   them all together does that allow you to render an opinion to

2   a reasonable degree of medical certainty as to whether this

3   was caused by accident or by criminal means?

4           MR. FINK:  Objection, leading plus he's

5   cross-examining his own witness.

6           THE COURT:  Overruled.  As I understand the

7   question relates to considering all of the x-rays, all the

8   testimony thus far?

9           MR. LEBER:  Right.

10      A    Considering all the x-rays, the fractures, the

11  types of fracture, the number of fractures it is my opinion

12  that this picture is highly consistent with child abuse.

13          MR. LEBER: Thank you, nothing else.

14          MR. FINK:  I must object to that.  It's

15  clearly leading, it's clearly cross-examining his own

16  witness.

17          THE COURT:  I ruled on it, ruling stands.

18          MR. FINK:  I know you have.

19

20  RECROSS EXAMINATION BY MR. FINK:

21      Q    I guess you testified on cross-examination, did

22  you not, doctor, that you were unable to tell whether or not

23  this was done by criminal means or non criminal means; didn't

24  you say that?

25      A    Yes, I did.

*A-68*

68

Q     Now, we have the break, the district attorney asks you a question now you've changed your mind?

A     No, I have not changed my mind.

Q     Your answer remains the same?

A     Yes, it does.

Q     Your answer is that you cannot tell whether-- your testimony is that it is equally likely that the breaks occurred from non criminal as opposed to criminal means?

MR. LEBER: Objection, Your Honor.

THE COURT:  Gentlemen, let's get one voice at a time here.

MR. LEBER: My objection, Your Honor, it misstates the testimony.

THE COURT:  That objection is sustained that misstates the witnesses answer on redirect.  Counsel may recross.


MR. FINK:

Q     Let's start over again, doctor, when I questioned you, it was my understanding that when I questioned you it was my understanding that you testified that you, that it was equally as likely that the fracture shown in Commonwealth Exhibits 1 and 2 came from non criminal as opposed to criminal means, you did say that, did you not?

A     I said that I could not testify to the intent of

A-69

69

the force used.

Q    Doctor, you're saying now you're talking about force.  I'm talking about source not force, source not force.  Did you not testify when I cross-examined you that it was equally as likely that the break shown in x-rays Numbers 1 and 2 came from criminal as opposed to non criminal means?

A    I don't think, I don't think that's exactly what I said.

Q    What did you say?

A    I said that I could not tell under what circumstances these fractures occurred whether it was a criminal act or an accident or anything else like that I could not state that.  However--may I continue?  May I just add?

Q    Oh, doctor, say anything you want to say.

A    Based on the radiological literature and based on looking at these x-rays alone--I only look at x-rays.  I did not see the patient or anything else--these fractures, the type of fractures and number of fractures are very suspicious for child abuse. Now, I may not be positive what your definition of criminal is.  I think perhaps I'm stuck in the lingo.

Q    We'll go into that in detail so there will be no question left in your mind. You are testifying that the fresh break, the most recent break demonstrated on Commonwealth

A - 70

1    Exhibits 1 and 2 you could not tell whether it came from a

2    criminal or non criminal means, whether it was accident,

3    mistake how it occurred; is that true?  Isn't that what you

4    said?

5         A    Could not tell what specifically the intent was.

6         Q    Right so?

7         A    But the pattern of and nature of the fractures in

8    radiology is consistent with child abuse.

9         Q    I'm sorry what did you just say?

10        A    The types of fractures that are present

11   particularly about the ankle, the number of fractures in

12   different stages of healing are consistent with the

13   radiographic pattern one sees in child abuse.

14        Q    Doctor, are they as equally consistent with

15   sources other than child abuse?

16        A    Taken as individual fractures I suppose an outside

17   possibility would be one, but the whole picture we have, I

18   look at the whole picture.

19        Q    The question is are they equally as consistent

20   with sources that are not child abuse?

21        A    Not taken as a whole picture, no.

22        Q    Let's go into that.  Now, you mentioned some kind

23   of literature in your testimony as a source of your

24   conclusion?

25        A    Yes.

*A-71*

71

Q    What literature is it?  What did you read?

A    Specifically pediatric texts, radiological texts.

Q    Can you refer to any specific pediatric text which you read to lead you to this conclusion?

A    Yes, I have one in my car.  I'm not sure of whole name it's Auld Anatomy.

Q    Is your car here?

A    Not well, yes, it's parked outside, yes.  I also have texts in my office.

Q    Okay now, the number of fractures and the age of the fractures and the place of the fractures is that what you're saying all of that leads you?

A    Yes.

Q    Yes?

A    Yes.

Q    Let's talk about child abuse.  What do you mean child abuse?  What does that mean to you?

A    Physical harming of a child.

Q    I'm sorry?

A    Physical harming of a child.

Q    Physical harm to the child, nothing more, nothing less?

A    I think that's a difficult question to answer.

Q    Are you able to tell the jury what you mean when you say child abuse?  That requires a yes or no.  Yes, Mr.

A-72

72

1   Fink, I am or no, sir, I'm not able to.  Describe to the jury

2   what you mean by child abuse.

3        A    Yes.

4        Q    Yes, you are.  Tell the jury what you mean by

5   child abuse?

6        A    I'll expand on what I said before.  Physical

7   harming of a child could be mental harming of a child.

8        Q    Is that it?  Mental harm to the child?

9        A    I would imagine abuse can be physical or mental.

10       Q    Physical or mental.  Anything else?  Any other

11  thing you want to say about your definition of child abuse?

12       A    I'd like to keep it that way.

13       Q    So that according to your definition of child

14  abuse child abuse can come either by intentional or

15  unintentional means?

16       A    Yes.

17            MR. LEBER:  Objection.  Strike the objection.

18            THE COURT:  Objection has been withdrawn

19  counsel may proceed.

20       Q    Intentional or unintentional means child abuse

21  according to your definition can come from an accident; can

22  it not?

23       A    Yes, it would all depend on what your definition

24  of accident is.

25       Q    What's your definition?  Tell the jury what your

A-73

73

1    definition of accident is?

2        A    Something that is not intended is.

3        Q    So to sum up I guess you have said both on direct

4    and cross-examination that you saw on Commonwealth Exhibits 1

5    and 5 five total fractures the most recent of which was I

6    think the left leg, the second and third were on the right

7    ankle and the fourth and fifth were two ribs, one on the

8    right and one on the left rib cage?

9        A    The most recent was the right side.

10        Q    Okay. Individually you could not tell from what

11    source they came and it could have come from most any source

12    as long as it was either it came from a pulling or twisting

13    motion except the ribs you couldn't tell there at all; is

14    that true?

15        A    That's true.

16        Q    You've also said that it is more likely than not

17    that it came from child abuse, which you have defined as

18    injury to a child mental or physical coming from an

19    intentional or unintentional act.  Have I summarized that

20    correctly?

21        A    Yes.

22            MR. FINK:  Thank you very much. Your Honor,

23    I'm done.

24            THE COURT:  If there's nothing further

25    witness may step down.

A-74

74

1          MR. LEBER: Thank you.

2          MR. LEBER: Dr. Supinski please.

3

4    R O B E R T   S U P I N S K I, having been duly sworn, was

5    examined and testified as follows:

6

7    DIRECT EXAMINATION BY MR. LEBER:

8          Q     Tell us your name and address please?

9          A     Dr. Robert Supinski.   Route 6, Cole Medical

10   Center, Coudersport, Pennsylvania.

11         Q     What is your occupation?

12         A     I'm orthopedic surgeon.

13         Q     How long have you been engaged in that profession?

14         A     I've been in the practice of orthopedic surgery in

15   Coudersport since 1985.

16         Q     Can you tell the jury what your training is for

17   your position as an orthopedic surgeon?

18         A     Yes, I obtained a Bachelors of Science at the

19   University of Pittsburgh in 1976.   I then entered the

20   University of Pittsburgh Medical School and I finished

21   medical school in 1980. I entered the university hospital,

22   Pennsylvania State University at Hershey in 1985 and

23   completed an internship in surgery.   Then entered the

24   orthopedic program, completed a four year residency in

25   orthopedic surgery which ended in 1985. I became licensed to

A-75

75

1    practice in the State of Pennsylvania in 1981. I have

2    achieved board certification in orthopedic surgery.

3    Following my graduation with the University Hospital at

4    Hershey I've recertified in orthopedic surgery and hand

5    surgery.  I became a fellow of the American College of

6    Surgeons and I'm board certified as I said in orthopedic

7    surgery, and I'm member of the board of the American Academy

8    of Orthopedic Surgery, currently Orthopedic Society Board of

9    Directors, member of the Potter County Medical Society, A M A

10   and Pennsylvania Medical Society.

11       Q    Can you tell us what in your training pertains to

12   orthopedics relative to children and injuries to children?

13       A    Well, the word orthopedics takes it's derivation

14   from straight child.  So orthopedics has always been

15   concerned with children, the correction of the forming of the

16   children and even to this day a major part of our training is

17   required in straight orthopedic pediatrics.  So during the

18   course of the curriculm for orthopedics the board of

19   orthopedic surgery requires that you have no less than nine

20   months of dedicated orthopedics. Throughout remainder of your

21   training there is orthopedics which is mixed with adult

22   training.  So we have a very indepth amount of orthopedics

23   dealing with child problems of any number of varieties.

24       Q    Define orthopedics for the jury if you would,

25   please.

A - 76

76

1    A    Orthopedic surgery as it's practiced today in this

2    country has to do with the treatment of bone and joint

3    deformities, tendon and connected tissue deformities and

4    problems as well as nerve problems. Anything that has to do

5    with musculoskeletal system, the parts that make us work,

6    walk everything from arthritis to trauma, and trauma is a

7    major portion of orthopedics along with metabolic bone

8    diseases and other types of arthritic conditions effecting

9    the part of our body that allows us to move about.

10    Q    In the course of your studies and your training

11    tell us about what training you have relative to radiology?

12    A    Well, radiology is something that everybody learns

13    some of during the course of general medical training during

14    medical school, but specifically in orthopedics we spend a

15    major part of time looking at x-rays that have to do with

16    musculoskeletal system and that is a major portion of our

17    training. In fact there have been several studies recently

18    which have shown that interpretations of x-rays from

19    orthopedists to radiologists essentially are equivalent for

20    the musculoskeletal system for looking at routine x-rays, and

21    it's in fact the course of our practice we routinely will

22    treat fractures and treat problems before the x-rays are even

23    seen by the radiologist because that's part of the practice.

24    In fact, it's something that we do day in and day out and we

25    actually will x-ray fracture or injury before, and when I say

A-77

1    fracture, fracture is broken bone, cracked bone.  It is all

2    essentially same thing different words for same problem.

3    We'll take a broken bone or fracture and we will x-ray it

4    when it first occurs and follow that periodically to make

5    sure there isn't any deformity to the bone and assess the

6    healing of the bone, and we'll follow this until the bone is

7    completely healed.

8        Q    During the course of your training have you had

9    training relative to the detection and treatment of

10   individuals who have suffered from child abuse?

11       A    Yes.

12       Q    And tell us what that training has been?

13       A    Well, in addition to the normal training in child

14   abuse that you get during medical school and during pediatric

15   rotations there is specific training that is given to you

16   because during your residency because you're obviously

17   treating the child, children who receive the blunt of this,

18   and most recently I completed a study course on child abuse

19   that was required by the New York State licensure.  I'm

20   licensed in the State of New York.  They require that.  So

21   it's ongoing thing.  We are constantly training and training

22   doesn't really end. We, for example, as I stated I'm board

23   certified and every so many years we will recertify, and in

24   fact we in addition to that year we're required to have a

25   certain amount of continuing medical education and in the

A-78

78

course of that all child abuse and training for that as well
as other orthopedic problems is normally, it's a routine
thing and it's something that we hear about on ongoing
basis.  It isn't one specific time.

Q    Since your completion of your internship at
Hershey Medical Center have you continually engaged in the
practice of orthopedic medicine?

A    Well, if I may correct you, my orthopedic
residency my internship per say there isn't internship my
first year was in surgery my last four years concerned
orthopedic surgery that residency and that, yes, since I left
that I've continually engaged in orthopedic surgery.

          MR. LEBER:  Your Honor, I'm going to offer
Dr. Supinski as an expert in the area of orthopedics
particularly pediatric orthopedics and on issue of child
abuse.

          THE COURT:  Counsel may cross as to
qualifications.

          MR. FINK:

Q    Doctor, good morning to you.

A    Good morning.

Q    You have been offered as an expert particularly in
the field of pediatrics I understand?

A    If I understand the question, correctly it was in
the field of orthopedic surgery and pediatric orthopedics,

A-79

79

1    and whereas there are some people who practice nothing but

2    pediatric orthopedics.  I do not practice that exclusively.

3    I do practice orthopedics.  Part of that in large portion

4    deals with pediatric orthopedics.

5         Q    Large portion.  Well, doctor, let's--why don't you

6    give the jury a percent of your orthopedic surgical patients

7    that are over 12 years of age, under 12 years of age.  Under

8    12 years of age if you can you do that?

9         A    Yes, I can.

10        Q    Do it please.

11        A    That's approximately 20 percent of my patients.

12        Q    I'm sorry?

13        A    20 percent.

14        Q    20 percent?

15        A    Yes.

16        Q    Are under 12 years of age?

17        A    Yes.

18        Q    Doctor, you testified, I believe, about training

19    in in reference to child abuse, did you not?

20        A    Yes.

21        Q    What was your training did I understand?

22        A    I have stated that my training was continuing from

23    the time I entered medical school through my orthopedic

24    residency training and subsequently I've taken additional

25    continuing medical education courses on the subject.

A-80

80

Q    Let's talk about medical school first.  What courses did you take in medical school; that was in 1980?

A    In medical school it was between 1976 and 1980 and yes, in 1978 I had to do a pediatric rotation and at that time I had training in child abuse but subsequently--

Q    You had courses in medical school?

A    No, as part of medical school.

Q    Medical school, no?

MR. LEBER: My objection is to Mr. Fink not allowing the witness to complete his answer I just appreciate--

THE COURT:  Witness may explain his answer.

Q    Certainly.  I apologize.

A    There is no such thing as courses in medical school in child abuse.

Q    Okay.

A    There are rotations in different subjects.  Just as there are no courses in gall bladder disease or total knee replacements.  What there are is a--what there is is a period of training and period of pediatrics on rotation during the time you do pediatrics and lectures before that.  This is a normal part of training. This is a recognized part of any physician's training training in this state. As a matter of fact, it's required that we be trained in that.  It's a state statute as I understand.

A-81

81

Q    Doctor, excuse me, are you or are you not saying that in medical school you had training in child abuse?

A    Yes, I have.

Q    Yes, you did. That is not demonstrated by any particular course; is that true?

A    That is correct. There is no course entitled child abuse 101.

Q    What courses did you--how were you submitted to the field of child abuse in medical school?

A    As part of our normal training, which includes course in pediatrics, it also includes a course in psychology.  During those times we were exposed to child abuse, that was only one small portion of my training.

Q    Now, during your residency you had part of your residency dedicated to pediatrics did I understand?

A    Yes.

Q    Where did you take your residency?

A    At the Milton Hershey Medical Center of the Pennsylvania State University.

Q    How long was your residency?

A    The residency for orthopedic surgery requires you have to a five year period of time, which includes your first year of surgery and subsequent four years of orthopedics.

Q    Is the answer five years?

A    Five years.

A-82

82

Q    Thank you very much. And of those five years how much was dedicated to pediatrics?

A    Of the five years it's required to be no less than nine months specifically.

Q    Is the answer to my question nine months?

A    No, it is not no less than nine months that is dedicated.  In fact there is more than nine months because during the remainder of the time you are dealing with a variety of problems, which would include children's orthopedics.

Q    What's the short end answer?

A    There is no short answers.

Q    You can't tell me what period of time was dedicated?

A    It was more than nine months.

Q    Ten years is more than nine months?

A    Well, I have been constantly training since then so one might say you've studied child abuse as part of your training for the past ten years.

Q    You have told the jury that you are well trained in the field of child abuse, have you not?

A    Yes.

Q    What is your definition of child abuse, doctor?

A    My definition of child abuse is anything that is either done actively or passively that does not insure the

A-83

83

1   health and well being of the child. Children have the right

2   to be raised without harm. They have a right to be protected.

3   At one point in time in this country children were not

4   recognized as having rights, and in fact the first child

5   protection laws came about because they had to be sheltered

6   by the humane society, and my definition is that a child

7   should not be subjected to anything that might harm his

8   ability to grow and have a safe environment.  So that would

9   include both mental and physical, sexual harm, anything that

10  would harm that child.

11       Q    Intentional or unintentional?

12       A    Unintentional abuse occurs. The child has a right

13  to protection, that child cannot protect itself. A child who

14  is not ambulating, child who is in a crib deserves to be

15  protected. Neglect is as much abuse as active abuse.

16       Q    I'm sorry.

17       A    Neglect.

18       Q    Neglect?

19       A    And failure of protection is as much abuse as

20  actual active abuse, both of those are equivalents.

21            MR. LEBER: Can we approach briefly?

22            (Following discussion held at the Bench).

23            MR. LEBER: Judge, I'd like to impose a

24  general objection to defense counsel's demeanor. I think that

25  Mr. Fink is acting disgusted by his hand motions. He's

A-84

84

1  attempting to cut the witness off from completing his

2  answers. I think that he generally is expressing a demeanor

3  which is intended to minimize or belittle the expertise of

4  this witness. I think he did the same thing with the last

5  witness.

6          MR. FINK:  He's doing that himself.

7          THE COURT:  Now wait a minute, we're not

8  getting into a debate, that's not going to happen, that's not

9  going to happen in this case. Alright. I'm not going to enter

10  a specific ruling.  I want to make sure that this witness is

11  accorded the same courtesy and respect we try to give all

12  witnesses in the court.  He should have a chance to explain

13  his answers fully in accordance with law.  Let's proceed.

14          THE COURT:  On qualifications you may

15  continue.

16          MR. FINK:  Your Honor, I have no further

17  cross-examination on qualifications.

18          THE COURT:  In the absence of any objection

19  we will receive the witness as offered as an expert in

20  orthopedic surgery, orthopedics, pediatric orthopedics and

21  child abuse.

22

23  MR. LEBER:

24      Q    Dr. Supinski, you were employed at Charles Cole

25  Memorial Hospital or engaged in your practice at Charles Cole

A-85

85

1    Memorial Hospital in September of 1996; is that correct?

2         A    No, I began practicing in July of 1985 and I have

3    been self employed.

4         Q    But--

5         A    But in September of 1996 I was practicing there.

6         Q    Okay. And on September 24, 1996 did a pediatric

7    case come to your attention?

8         A    Yes, I was asked to go to the Emergency Room to

9    see a child.

10        Q    And that child was whom?

11        A    It was the child in question here, Miss Moore.

12        Q    And did you see the child at that time?

13        A    Yes, I did.

14        Q    Based upon what you observed did you have an

15   estimate as to the age of that child?

16        A    This was a child who was six or seven months of

17   age. She appeared her stated age, which was the history given

18   to the nursing staff in the Emergency Room by the

19   accompanying adults.

20        Q    Who were the accompanying adults to best of your

21   recollection?

22        A    At that point in time I was under the impression

23   it was the mother and the father.

24        Q    Are either of those individuals, the person you

25   thought was the father or mother are they present in the

A-86

86

1    courtroom today?

2         A    Yes.

3         Q    Who is in the courtroom today?

4         A    The father, who I thought was the father is that

5    gentleman, is present.

6         Q    You're indicating the gentlemen seated next to Mr.

7    Fink?

8         A    Yes.

9              MR. LEBER: Your Honor, if the record would

10   note he's identified the defendant.

11             MR. FINK:  We'll acknowledge he's identified

12   my client.

13             THE COURT:  Noted in the record.

14        Q    At that point did you have an opportunity to

15   discuss this case with Mr. Bailey and with the other, with

16   the female that was with him?

17        A    Yes.

18             MR. FINK:  I'm going to object to the term

19   discuss this case being so general as to--

20             THE COURT:  Alright I'll ask counsel be more

21   specific.

22        Q    Did you discuss with the two individuals who were

23   there, Mr. Bailey and the woman who you identified as the

24   mother the injuries to Rebecca Moore, the daughter?

25        A    Yes, I discussed the injuries to this child.

A-87

87

Q    Can you tell us what, if anything, you recollect that Mr. Bailey, the defendant in this case, told you about what had occurred and what happened to this child causing these injuries?

MR. FINK:  Your Honor, please may I approach the bench I'm going to interpose an issue of corpus delicti at this point.

THE COURT:  Gentlemen, you may approach.  I it's not my intention to decide this case at side bar.

(Following discussion held at the Bench).

MR. FINK:  I do not know whether there is any inculpatory statements coming from the lips of the witness as it relates to my client.  In case he intends to do so I respectfully suggest that no evidence as to confession or admission as to the charges can properly be admitted because there's been no testimony up to this point that it is more likely than not that a crime has been is committed and that the victim was the victim of that crime. The corpus delicti--

THE COURT:  Alright I think I understand the issue.  I have no idea where you're headed here.

MR. LEBER: As far as--there's certainly no inculpatory statement that was made.

MR. FINK:  Thank you.

Q    Dr. Supinski, to rephrase the question what did Mr. Bailey tell you in terms of what had happened to this

A-88

88

1    child?

2        A    What I remember was that he was very upset of the

3    fact that child had been injured, in fact was tearful, stated

4    he didn't know how anything like this could have happened. In

5    fact I think his words were, "How could something like this

6    have happened? "

7        Q    In the course of your dealing with the case of

8    Rebecca Moore what did you rely upon to make a diagnosis in

9    this case, if you did make a diagnosis?

10            MR. FINK:  Your Honor, I'm going to object in

11   what case?  A diagnosis of what?

12            MR. LEBER: I do believe I said the case of

13   Rebecca Moore.

14            THE COURT:  That was my understanding.  I

15   don't think there's been any testimony as to diagnosis as of

16   yet.  The question was was there a diagnosis. Commonwealth

17   may proceed.

18       A    My diagnosis was this child had acute fracture of

19   her ankle and multiple other fractures which were of varying

20   ages and varying stages of healing.

21       Q    How did you reach the conclusion relative to these

22   various fractures?

23       A    At the time I was asked to go to the Emergency

24   Room there had already been x-rays taken and I was able to

25   look at those x-rays, observe those x-rays, and based upon

A-89

1    the x-rays as well as examination of the child.

2        Q    Doctor Supinski, I believe you had in front of

3    you, unless they've gone someplace else, five exhibits which

4    are x-ray film can you identify them please?

5        A    Yes, Exhibit 1 which is an x-ray of the right

6    lower leg that includes both anterior view, it's two-view

7    x-ray of the right lower extremity, which includes anterior

8    posterior view from the front and a view from the side.  And

9    this shows the more acute injury, the one that brought her to

10    the hospital for x-rays, and that includes a fracture of the

11    ankle including both bones the tibia and the fibula and that

12    is described was described by many as Salter two fracture.

13    It's definition of type of fracture going through the growth

14    plate and into the bone and that is a descriptive term. It

15    also shows some evidence of the covering of the bone being

16    grazed on the tibia shaft a little bit indicating there may

17    have been an older injury as well noted in there.  I don't

18    see any acute fracture there at this point in time, and in

19    fact the right lower extremity fracture would be consistent

20    with the swelling and discomfort the child had in that right

21    lower extremity. For the second x-ray, that's two more views

22    of the same, of the same lower extremity on the right it's

23    slightly different angles but it shows same thing. The third

24    x-ray is a two view x-ray of the--on this one I don't see the

25    marker that tells me it's right or left but that may be a

$A-90$

1    function of the view here but this shows--

2              MR. FINK:    I can't hear the witness.

3         A    On this view of number, the third I cannot tell

4    whether this is marked right or left it maybe a function of

5    the fact that lighting is poor in here.    This is additional

6    x-ray and I believe this is left leg.    There is identifying

7    mark on here so I'll refer to the fourth exhibit where both

8    legs are on it, and in fact this does show additional

9    periosteal bone formation on the left leg further up.    And

10   there are--looking at this it shows a fracture of the ankle

11   on this x-ray, which I believe is the left, that is in a more

12   advanced form of healing rather than the right which is acute

13   fracture. And there is also another finding on this x-ray

14   which shows that there is remodeling of a fracture of the

15   tibial shaft, that indicates not only has the bone healed but

16   now attempts to go straighten itself after healing in a

17   crooked position, that indicates a much later form of

18   healing.

19        And finally, there are fractures in the ribs laterally

20   on the right and left, and these fractures appear to be even

21   much earlier fracture because these have already lost any

22   parosteal bone formation and show it is in an advanced form

23   of healing.    So this one appears--the rib x-rays appear to

24   have been the earliest injury. The fracture to the tibia

25   shaft appears to be a later injury and the angulated fracture

A - 91

91

1    on the right which is remodeling appears that in fact that

2    was older, and finally there were ankle fractures and those

3    ankle fractures as well as what was described earlier as

4    these corner fractures.  What that means it's the corner of

5    the bone, it's metaphysis.  Like this right at the corner.

6    So originally when people name things they frequently named

7    it in plain language so it's nothing mysterious.  It's where

8    parosteal comes down over the growth plates, that's in fact

9    distributed.  You see an injury right at the bone that speaks

10   to the way in which the injury occurs.

11        Q    You've used several terms.  When you refer to

12   acute fracture what does that mean?

13        A    When you have an acute broken bone or fracture is

14   the same thing, you will see that it's like you've broken a

15   piece of stick in two pieces. You break it and there are two

16   fresh pieces of stick.  It looks there's two pieces of stick

17   there.  As the body heals the first thing that happens in

18   healing doesn't--you can't say healing started today or

19   healing starts in two weeks.  When you have an injury, the

20   first thing that happens is you get pain, swelling and

21   bleeding because the bone has blood and that blood comes out

22   and it forms a blood clot.  So earliest form of healing is

23   exactly what you see when you cut yourself you get a blood

24   clot.  In that blood clot you get fiber material that forms

25   around broken bones and eventually the body says, ah ha, it's

A-92

1   broken, we're going to start fixing this.  So next thing that

2   happens body starts to go in and chew away the end of the

3   bone. If you were going to glue something, you would glue the

4   broken part.  The body does that, starts nickeling away,

5   we're broken up, let's starts putting glue in that, you get

6   something called a soft callus.  You don't start to see that

7   somewhere around three or four weeks.  Usually two to three

8   weeks you don't see new bone in child of this age.  So by two

9   weeks you start to see little bit of bone, not really bone

10  but calcification of the soft callus, that's what you really

11  see two to three week period on these bones.  So we can say

12  that some of these x-rays show that injury occurred

13  immediately prior because there's no formation of new bone.

14  There's no sign of healing.  So you can say that that

15  happened somewhere prior to two weeks and normally more than

16  likely after examining the patient it happened in the prior

17  two or three days. Probably immediately but it was a very

18  short period of time and then you start to see this

19  calcification of the callus and the periosteal, which is the

20  covering of the bone, starting to cover more bone. After it

21  heals further, you get--that becomes a solid piece, you no

22  longer see just the calcification and parosteal.  Its solid

23  piece body starts to smooth it back down and reshape it so

24  that it looks like the bone, it's continuation of healing in

25  fact eventually down the road these bones will go back to

93

1  being absolutely normal.  In fact if we were to x-ray this

2  child today we may not see any signs of these injuries

3  assuming there haven't been new injuries.

4      Q    You also used the term growth plate what's the

5  growth plate.

6      A    Growth plate is what a child--when a child is born

7  it has a large amount of cartilage.  Most of the skeleton

8  starts out as cartilage as calcium is placed in there it

9  forms something that has structure so body can grow. Long

10 bones grow in two directions.  They grow, if you had a pencil

11 they grow along the edges and get wider, it also gets longer.

12 The way it can do that there are cells which allow it to grow

13 in width, that's parosteal and that's a very active structure

14 in a child that's why they heal so quickly to grow.  On the

15 left what you have is a piece of bone, then you have some

16 cartilage at the end, then you have another piece of bone. In

17 fact that whole end was cartilage little earlier in life than

18 bone starts to form in there.  The cartilage is hard bone

19 cartilage, which is the growth plate and then more hard bone.

20 In fact, that cartilage grows very rapidly and it also

21 applies behind it so when you stop growing that growth plate

22 closes and the reason you stop growing because the growth

23 plate finally stops growing faster, then the bone ossifies

24 and it's a soft area. Cartilage is like the covering on

25 chicken bone, the white stuff, it's very soft and pliable and

A-94

94

1   it's easy to break that.  It's easier to break that than it

2   is the bone itself so it takes less force to do that.

3       Q    Okay. And specifically where is this growth plate

4   located?

5       A    Well, there are several growth plates in the

6   bone.  There are growth plates both distally.  Distally means

7   down by the ankle closer to the floor and leg that's distal

8   and there's more up at the knee.  Long bones have growth

9   plates generally both ends.  This child had the--one we're

10  talking about is down at the ankle.

11      Q    Now let's go back to September 24, 1996 and your

12  observations at the emergency room.  Tell us first of all

13  what you observed relative to this child Rebecca Moore?

14      A    The child had pain and swelling in the right ankle

15  and there was, there were concerned parents or people who

16  appeared to be parents, certainly they were the ones who were

17  parenting the child at the time and other than that the child

18  looked relatively healthy.  There were a few bruises.  I

19  believe there's some bruises on the face and at this point in

20  time was, without going back to the Emergency Room records

21  looking at it, I cannot recall whether there were bruises on

22  the body as well.  I don't believe there were bruises

23  anywhere but the face or side of the head and the ankle in

24  question.

25      Q    You just described the ankle as being swollen.

A-95

1    Anything further you can tell us about what you observed of

2    the ankle at the time?

3        A    Well, it was painful if touched.

4        Q    What about it's color?

5        A    Well broken bones tend or broken areas tend to

6    have redness and swelling.  It appeared to be more acute than

7    the lightest bluish tinge you get from old injury or bruise.

8    It appeared something that occurred relatively recently.  It

9    was swollen and red.

10       Q    What causes that?

11       A    That's after the bone breaks or area is injured

12   that's the bleeding that occurs.  It is something that looks

13   almost like a bruise but it is in fact because the blood

14   comes out it's irritating and trauma to the surrounding soft

15   tissue.

16       Q    Did you in fact observe these x-rays that are

17   before you on September 24th?

18       A    Yes, I did.

19       Q    Now, looking at Commonwealth Exhibits Number 1 and

20   2 tell us specifically with those items what you observed as

21   far as any abnormalities?

22       A    Well, 1 and 2.  I'm sorry show me that right lower

23   extremity.  Specifically the two bones at the bottom, and

24   what I see is a new acute fracture down at the ankle

25   involving the two bones at the growth plates, what has been,

A-96

1    what could be called corner fracture or a little fracture

2    that you broke the leg on that piece of bone, Salter II

3    fracture is another word for that.  I see periosteal reaction

4    up in the shaft.  What it appears bone is remodeling.  Shaft

5    itself has been broken some time previously, that time frame

6    would be somewhere in the three to four, three to six week

7    period, more likely around four weeks.

8              THE COURT:  Since it appears we're getting

9    into some extended testimony we'll feed this jury. I think at

10    this time we'll take the noon recess until 1:15. During this

11    recess, ladies and gentlemen, do not discuss the case among

12    yourselves or with anyone else. Thank you. Court will stand

13    in recess until 1:15.

14              Noon recess.

15              THE COURT:  I hope you all got fresh air and

16    sunshine.  We'll put you back to work. We'll be going until

17    5:00 tonight. Dr. Supinski, remains under oath. Commonwealth

18    was on direct.

19

20    MR. LEBER:

21        Q    Dr. Supinski, I believe you finished by discussing

22    the Exhibits 1 and 2.  Let's examine Exhibit No. 3 ask if you

23    can tell us what your findings were relative to Exhibit 3?

24        A    Exhibit 3 as I stated earlier, was what I believe

25    to be the left lower leg and appears there is an L here.

A-97

97

1    These x-rays look distinctly different from the ones that are

2    clearly marked as the right, and in this light it does appear

3    that there is a healing fracture on the tibia, and there are

4    also marginal or quarter fractures down around the ankle

5    indicating there was at least one if not two fractures in

6    there of varying ages distinctly different from the left--

7    I'm sorry the right lower extremity, which was acute fracture

8    and distinctly which appears to be shaft what was remodeling.

9        Q    Exhibits 4 and 5 would you examine them, please.

10       A    Exhibit 4 is a frog lateral of the lower

11   extremities as part of a series of trauma type series looking

12   for other injuries, and this clearly shows the right tibia

13   with bow that's remodeling which appears of the angular shaft

14   fracture anterior, periosteal fracture on the left tibia and

15   shows a pelvis with no apparent fractures.

16       Q    When you say a frog?

17       A    That's position of the child's legs it's just way

18   of getting both legs on the same x-ray. It's of no, it's just

19   lying anterior A P or posterior or lateral x-ray.  And Number

20   5 shows rib fractures of both the right and left chest and

21   this shows fractures which are later stage of healing where

22   there is not periosteal reaction, but the bone appears to be

23   in advanced healing where you can see there had been a

24   fracture of advanced healing.

25       Q    Let's go back again to the Emergency Room where

A - 98

98

1   you saw this patient.  Is that where you saw Rebecca Moore

2   the first time?

3        A    Yes, it was.

4        Q    Describe what you did at that point as far as

5   treatment for Rebecca?

6        A    At that point in time I placed the child in a

7   cast, and the type of fracture she had was one that I would

8   have expected to heal in simple casting such that she would

9   be able to relieve her pain and allow her to go onto heal,

10  and in fact she did go onto heal without any difficulty.

11       Q    You discussed relieving her pain.  Can you tell us

12  what your observations of this child were in the Emergency

13  Room on that date relative to any pain she may have had?

14       A    This child really didn't complain of any pain

15  unless you were to touch her leg and move it.  In fact she

16  was able to sleep most of the time.  We attempted to treat

17  her with very gentle application so to let this heal.  She

18  was not in excruciating pain as long as you did not touch

19  that extremity. Frequently when a child is injured they cry

20  and become exhausted.  If you don't disturb them very much,

21  they'll continue to sleep as long as you don't move the

22  extremity very much.  She wasn't under extreme duress or

23  anything of that type.

24       Q    What would normally be the symptoms of a child of

25  that age would suffer for any of the other fractures?

A-99

99

A    It would be expected that child would cry significantly for several days.

Q    Now, doctor, based upon the history you obtained during the visit of the mother and Mr. Bailey to the Emergency Room, based upon your examination of this child, based upon the x-rays which you viewed and your experience and training did you reach an opinion as to a reasonable degree of medical certainty as to how these injuries occurred?

A    My opinion was that there were multiple fractures of various stages of healing. Looking at the bio mechanics of each type of injury frequently we'll try and figure out how the injury occurred so we can then treat it appropriately. And the fractures that were around the ankle or the quarter fractures are frequently something that will happen because the periosteum is strengthened near the growth plate, that is something that happens with shaking or traction. The fractures of the tibia appear, at least the tibia that was remodeling, the one that was angled, appeared to be as a result of direct trauma. The fractures of the ribs could be caused by either direct blow or compression but compression would tend to give you multiple fractures bilaterally so it appeared these were direct blows more than likely.  So each of them are slightly different mechanism, but they are ones which can be reproduced in the laboratory setting, and in

A-100

1   fact we do actually reproduce on animal models and variety of

2   different experimental models to try to better understand

3   these type of injuries whatever type of fracture there is.

4        Q    So again did you have an opinion to a reasonable

5   degree of medical certainty as to causation of these?

6        A    In a child who is not ambulatory, who has muscle

7   strength in the 6th to 7th month of age group where they are

8   physically unable to injure themselves in this manner it is

9   my opinion based upon a reasonable degree of medical

10  certainty this child was undergoing abuse and has had

11  multiple injuries inflicted upon it by some other person or

12  persons.

13       Q    Now, are there diseases children may suffer which

14  result in frequent breaking of the bones?

15       A    Yes, they are.

16       Q    And what are those diseases?

17       A    Well the one that is most commonly talked about is

18  osteogenesis imperfecta. That in those instances children

19  will have frequent fractures of bones and usually with small

20  amounts of trauma. They have other findings, familial

21  histories, the whites of their eyes are actually blue.  In

22  fact these children will have painful fractures and they'll

23  have painful fractures that will be discovered at the time of

24  birth or shortly afterwards.  Even though they break their

25  bones very easily it's very painful and they go onto heal

A-101

101

1   normally.  This is kind of thing even if the child had this

2   diagnosis the child's needs had been neglected because the

3   child had never been treated for anything like this.  These

4   were multiple injuries over time. In addition, this child did

5   not have the other significant metaphysis.  Children tend to

6   have different appearance. They tend to be short for their

7   age.  I in my medical school class we had students who

8   actually had osteogenesis imperfecta and had it and as a

9   result we all became familiar with that and it was that's one

10  of the better known diagnoses.  This child did not have that.

11  There are several other types of vitamin deficiencies,

12  Vitamin D deficiencies and things of that nature. One of the

13  problems with that the growth plates would be abnormal.

14  These were normal growth plates.  All the growth plates would

15  be abnormal.  This child did not have that. The fractures

16  were not tended to be isolated.  If they were osteogenesis

17  imperfecta they would have fractures in various places.  Just

18  the trauma of birth would cause this child skull fractures,

19  clavicle fractures, that's why this child does not fit in

20  that category. Frequently children of that would die at

21  birth. In addition there are, there's a periostitis, and this

22  child did not have that because all the bones, long bones

23  weren't effected. In addition the ribs or other members are

24  of different structure than long bone so it is different type

25  of bone.  This child does not have that diagnosis, that's one

A-102

102

1    one could expect because they were in fact none of the

2    findings were truly symmetrical.

3        Q    Do you have an opinion to reasonable degree of

4    medical certainty the condition you observed in Rebecca Moore

5    on September 24, 1996 could be caused by anything other than

6    child abuse?

7        A    Yes, it's my opinion that it could not been caused

8    by anything other than child abuse.

9        Q    Thank you. Doctor, can you give us any evaluation

10   of what kind of force in terms of pound or whatever it might

11   be is required in order to cause a break or a fracture such

12   as occurred to the lower right leg of Rebecca Moore?

13       A    It would not be a great force. It would be--each

14   of these areas are slightly different, the growth plates in

15   fact can be quantitated. That type of injury in that age

16   group would be more than likely it could be done by just

17   shaking the child.  So we're talking very low force, under

18   ten pounds. Certainly fracture of the tibia shaft would be

19   something slightly greater.  It could be in the realm of 10

20   to 20 pounds, but it would have to be direct blow, in fact

21   that's the ribs.  For example, that could be done by a direct

22   blow, would not have to be excessive force, it would not have

23   to be hundred pounds.  It could be as simple as somebody

24   shaking a kid, a child vigorously, which is why people are

25   told not to do that, but the growth plate could be shattered

A-103

103

1    by shaking or direct pulling of the foot at the growth plate

2    in the realm of ten kilograms, which would be under 20, 22

3    pounds.

4                    MR. LEBER:  Thank you.  I have nothing else

5    of Dr. Supinski.

6                    THE COURT:  Very well. Counsel for defense

7    may cross.

8

9    CROSS-EXAMINATION BY MR. FINK:

10        Q    Doctor, I'd first like to ask you a few questions

11   if I may about the examination of the child that you

12   conducted in the Emergency Room. Do you have the records of

13   that Emergency Room observation and treatment with you?

14        A    No, I do not.

15        Q    When were you summoned to the Emergency Room at,

16   what time approximately?

17        A    I can't tell you that.

18        Q    Who was there when you arrived there?

19        A    The mother, the defendant, and the only other

20   person that I can recall in the actual Emergency Room was Dee

21   Carr, other than that I cannot recall.  I also recall going

22   to the radiologist office to look at the x-rays and at that

23   time Dr. Wallisch was in attendance.

24        Q    The x-rays had already been taken before you

25   arrived at the Emergency Room; is that true?

A-104

104

1    A    That's true.

2    Q    We're talking about the five, at least the five

3 x-rays which are currently in front of you; is that correct?

4    A    That's correct.

5    Q    Okay.

6    A    Also Dr. Dallaire was there in the x-ray

7 department office.

8    Q    Is that unusual for you to be called to the

9 Emergency Room in a situation such as this?

10    A    No, it's not.

11    Q    The observable injury was to the right ankle?

12    A    The observable injury, I believe, it was to the

13 right ankle, I believe it was to the right ankle was the

14 acute injury, but I'd have to take a look at the x-rays.

15    Q    You're looking at what exhibit?

16    A    Well, at this point in time I'm going to look at

17 Exhibits 1 and 2 and there is acute fracture of the right

18 ankle.  So yes, it would be the right ankle. Now the left

19 ankle, this would be Exhibit 3, also shows injuries but the

20 right ankle is the one that.

21    Q    Now, what you observed outside of the x-rays on

22 the child was swelling, was there any discoloration?

23    A    The--I believe there was some redness there at the

24 time, but that's not unusual.

25    Q    Was the child conscious as you examined her?

A-105

105

A    She slept some of the time and she was easily aroused, but she was not, as I stated previously, she wasn't crying loudly. I attempted to treat her without arousing her.

Q    Doctor, when you examine such an injury you try to obtain any history you can from anybody that's there; do you not?

A    Yes, I do.

Q    And history is important in the diagnosis and treatment of most any injury; is it not?

A    It's definitely something that contributes to the abilities to render care.

Q    Did either the mother or my client give you any history concerning why the child was brought in or concerning the particular injury involved?

A    No, there was no history which explained what had happened. There had been a statement perhaps the sister had fallen on the child, but no explanation for all of the injuries.

Q    For what?

A    For all of the injuries.

Q    I refer only to the injury that was observable?

A    There was rendered an explanation that perhaps a child had fallen, a sibling had fallen on this child.

Q    Who gave you that explanation?

A    At this point in time I can't recall that.    I

A-106

106

1    believe--I cannot absolutely recall that.  I believe it was

2    the mother, but I honestly couldn't say for sure.

3         Q    Was that explanation consistent with the injury as

4    you saw it?

5         A    No, it was not.

6         Q    Okay. Now we're talking only about the ankle

7    injury that was observable by the swelling and I guess

8    possible discoloration?

9         A    Yes.

10        Q    Tell me why the explanation was inconsistent in

11   your opinion with what you observed?

12        A    Well, the type of injury that you would obtain

13   from a child falling on the other child would be a direct

14   blow to the mid shaft of the tibia, for instance, and that

15   could have accounted for one of the fractures, one of the

16   older fractures certainly not at the ankle. If the child had

17   fallen and somehow had twisted the extremity you might have

18   had a spiral fracture, but that was not what was observed.

19   What was observed was a traction type injury to the growth

20   plate where one--where the growth plate had to be pulled

21   apart.

22        Q    Now, you observed that from external examination

23   of the ankle itself or from the x-rays or both?

24        A    From the x-rays more than the examination.

25        Q    What x-rays did you observe particularly?  1, 2

A-107

and 3?

A    1 and 2 were consistent with this injury, which is the ankle injury.

Q    Now, there has been previous testimony describing what the expert witness thought to be the type of force not the extent or degree of force but the type of force.  Do you have an opinion as to the type of force that may have accomplished the break which we've been discussing?

A    That type of injury occurs with a traction type injury or a side to side type injury.

Q    Now let's try to define these terms for the jury. Traction type, what do you mean when you use the word traction?

A    Something that stretches the periosteal around the growth plate, in other words the covering around the growth plate. The growth plate is weaker than the ligaments, therefore, if you were to shake a child, the growth plate would fail before the ligaments or before the bone that could be what causes a corner type fracture. A direct blow to the side can cause that as well. In a child of this age one would not see this like with a child running or walking because a child doesn't.  So you would have to have either something that pulled the growth plate or something that had an angular force, direct blow across.  It almost is like breaking a stick with your thumbs there, that also would do that by

A - 108

108

1    pulling at the other side.

2        Q    How about something falling on the child?

3        A    That would not cause this type of fracture at the

4    growth plate that would cause a shaft fracture but not one

5    that would stretch the periosteum giving you a corner

6    fracture.

7        Q    Traction was one word you used about right ankle

8    injury and what was the other word, traction or?

9        A    I may have used direct blow.

10        Q    Direct blow?

11        A    Direct blow to growth plate very difficult to do

12    that.

13        Q    Would a karate chop be a direct blow?

14        A    That would be extremely difficult due to this to

15    this ankle because of the nature of it it would be more of

16    something pulling at the, what they call paracardial ring.

17        Q    I'm trying to get you to describe a direct blow

18    and what you mean by a direct blow.  You've talked about

19    traction, we understand that.  Tell me about a direct blow.

20    A hammer?  How about a hammer?

21        A    It's unlikely that this was caused by a direct

22    blow.  It's a possibility that you could cause a growth plate

23    injury by pushing on the opposite side.  The most likely

24    cause of this injury given this age and size of the patient

25    is one of a traction injury either pulling it or shaking the

A-109

109

child, and it is associated with children who are shaken, one of the findings that you have.

Q    How about if a sibling pulled the leg that would be traction; would it not?

A    Certainly that could be.

Q    Incidently, would you include injuries resulting from interplay between siblings to be child abuse?

A    There have been people who are experts on child abuse who have stated that if children are routinely injured without supervision because of their siblings that in fact may be considered a form of child abuse if that's answering--

Q    I guess could you answer my question yes or no?

A    Well could you state your question again. I'll see if I can do that.

Q    Absolutely. Could interplay between siblings wherein one child is injured be termed child abuse under your definition?

A    Yes.

Q    Thank you. Now, the expert witness heretofore appearing in this case did describe the possibilities of the right ankle injury as resulting from a pull or a twist would you agree with that twist?

A    No, I would not.

Q    Would you agree with that twist?

A    No, I would not.

A-110

110

Q    Now, how many fractures resulted in the swelling that you observed on the child on the right ankle?

A    Most likely the two bones that were broken the tibia and fibula, which would be considered that ankle fracture.  There were two bones.  If you say how many fractures there were two fractures, but it was only one ankle.

Q    Could you tell the age of those two fractures?

A    Yes, to within--it was less than two weeks more likely less than one week based upon this radiographic appearance and this age.

Q    Were they the same age?

A    They appeared to be.

Q    The same age?

A    They appeared to be.

Q    So to say they're within two weeks or one week is really not quite accurate.  Your testimony is that both fractures appeared to be of the same age which leads me to conclude, doctor, that they both occurred at the same time, would that be your conclusion?

A    My conclusion would be that they both occurred in the first, within a week.  You cannot differentiate any closer than that.

Q    Okay. I guess you have said they appeared to be of the same age meaning they could have occurred at the same

A-111

111

1    time or could have occurred within one week?

2         A    That's correct.

3         Q    Okay. Only those two fractures were shown on

4    Exhibits 1 and 2?

5         A    I think my prior testimony--

6         Q    I don't care about your prior testimony.  Would

7    you mind looking at the exhibits and telling me the answer

8    please?

9         A    You're asking only those two were seen on Exhibit

10   1 and 2.

11        Q    Yes, sir.

12        A    In my opinion there's a tibia shaft fracture as

13   well which makes a third fracture.

14        Q    Are you able to definitively state that?

15        A    Yes.

16        Q    Three fractures shown in 1 and 2?

17        A    Yes.

18        Q    The first two of the right ankle and the third one

19   was where?

20        A    The tibial shaft.

21        Q    Also in the right ankle?

22        A    No, that's in the lower mid portion of the lower

23   leg.

24        Q    Tell me about that fracture.  Is that the same age

25   as the other two?

A-112

1          A     No.

2          Q     What that take the same type of force as the first

3     two fractures about which you've testified?

4          A     No.

5          Q     What type of force would most probably cause the

6     third fracture shown in Exhibits 1 and 2?

7          A     That would have been consistent with a direct

8     force on that, such as your karate chop.

9          Q     Hammer?

10         A     Hammer, karate chop, things like that.

11         Q     I understood the last expert witness produced by

12    the Commonwealth testified that all three fractures shown in

13    1 and 2 are also shown in 3; would you agree with that?

14         A     There appears to be a tibial shaft fracture in

15    here.  As I previously stated I cannot absolutely state that

16    this is the right or left because the extra marker is not

17    seen.  I don't see all three fractures on Number 3 that I see

18    on 1 and 2.

19         Q     Okay. The two fractures that you do see on 3 are

20    both of the right ankle?

21         A     No, I see a tibial shaft fracture.  I'm really

22    having some difficulty seeing the ankle on this x-ray in this

23    light.

24         Q     So I guess you're telling the jury that 3 also and

25    only solely shows the tibial fracture?

A - 113

113

A    What I'm saying in this light this is all I can see here and say definitively.  It may be on the originals or on this on a view box I might be able to see more of it than here.

Q    Are you saying those exhibits being copies you might not be able to see everything that would be demonstrated on the originals?

A    That's possible.

Q    Is that what you're saying?

A    That's possible certainly in this light without x-ray view box.

Q    Doctor, Exhibit 4 what does that show?

A    Well, as I've previously testified, it shows tibial shaft fracture on the right, what appears to be a periosteal reaction on the left ankle.  Both of the ankles themselves are obscured by the person holding the child's legs. It shows a pelvis and two femurs.  It shows normal growth plates of proximal tibia and distal tibia, proximal fibula and lower lumbar spine.

Q    I guess we can get at what we need this way. Doctor, how many fractures in addition to those shown in 1, 2 and 3 are shown on 4 in addition?  Now you understand the question?

A    While being that I don't know what 3 is I really can't tell you what x-ray 3 is of.  I don't know if it's

A-114

114

right or left leg so I can't tell you how many in addition to
this.  If it's the right leg, I can tell you that all total I
see two tibial shaft fractures.  I see an ankle fracture of
the tibial and fibula.  So I see at least four fractures.
And on the left on the opposite one, if three is of the other
one, there may in fact be a corner fracture.  I can't answer
to that today.  If you would like to present another x-ray
for me to look at, I can perhaps.

Q    I'm sorry, doctor, I thought on direct examination
you did testify as to what your opinion of Exhibit 3 showed,
that's okay no problem. Do I understand that Exhibit 4 shows
how many fractures?

A    It clearly in this light it clearly shows two
tibial shaft fractures.  If you'd like me to speculate what I
can or can't see around the ankles, I would, but I would hate
to speculate this is too important.

Q    I don't want you to speculate.  When you mention
"in this light," quote unquote, when you are in the O R do
you have an intensified lighting system you put the x-ray up
against it and it's a much better lighting than it is here;
is that not true?

A    That's correct.

Q    So I guess what you're saying is that absent that
type of direct lighting that is afforded in the E R and
Operating Room you really can't for sure tell about the

A-115

115

number of fractures and whether they're in the left or right

or whatever?

   A    No, I'm not saying that.  I can tell you that in

my opinion that this child and based upon what my opinion was

before without even viewing this that the child had tibial

shaft fracture and most likely both legs. Both ankles had

been injured and there were two bones broken in the right

ankle, therefore, my number of fractures would be minimum of

three on the right leg and what appears to be two more in the

left leg, plus two in the chest which would bring my total

to--

   Q    Doctor your lack of being definite concerns me.

You appear to be speculating as to whether or not some of the

fractures you mentioned exist?

   A    I'm trying to give you the benefit of--I have no

doubt in my mind there were a minimum of five fractures in

the lower extremities.  I'm trying to testify as to this

x-ray, which I'm not satisfied with to testify here, but in

my opinion even if we throw this one away we're still talking

about five fractures in the lower extremities. If you count

this one, there's another fracture.

   Q    I guess I'm just trying to ascertain from whence

the information came that leads you to the conclusion there

are at least a minimum of five fractures in the lower

extremity.  I'm trying to get this through reading of the

A-116

116

1  x-rays which have been put into evidence by the Commonwealth,

2  which have been used through out this trial to date, and are

3  you able to tell me what five fractures are shown in the

4  x-rays with this lighting?  Yes or no?

5      A    Yes.

6      Q    Okay tell us now again once more?

7      A    There are two rib fractures.

8      Q    Wait a minute you're talking about what exhibits,

9  talking about lower extremities?

10      A    We have right ankle with a fibula.

11      Q    Shown by what?

12      A    And a tibial fracture.

13      Q    Two fractures?

14      A    Two fractures of the tibia, one fracture by the

15  fibula shown by Exhibits 1 and 2 and Exhibit 4.

16      Q    Please doctor. How many fractures are shown in 1

17  and 2 collectively Exhibits 1 and 2?  I want to go over this

18  again.

19      A    Exhibit 1 shows and 2 both show a fracture of the

20  tibial shaft, a fracture of the distal tibia and a fracture

21  of the fibula.

22      Q    That's three fractures?

23      A    That's right, that's what I've said.

24      Q    Alright.  Now, doctor, you can't tell as to

25  Exhibit 3; is that true?

A-117

117

A    I can tell there are fractures on Exhibit 3.  What I'm not willing to say whether that is a picture of the right or left.  If you can definitively say it is of the left, I can tell you how many I can see there.

Q    You don't know whether they're same fractures as shown in exhibit 1 and 2?

A    That's correct based upon what you've given me to look at.

Q    I've got three fractures shown in 1 and 2.  We can't use 3 for sure.  What additional is shown in 4?

A    You can see a tibial shaft fracture.

Q    Of what leg?

A    Of the left leg.

Q    Now the other tibial shaft fracture of the right leg?

A    They're distinctively different that's correct.

Q    Anything else?

A    Well, if you would met let me walk to the window I can hold it up to the window.

Q    Doctor, sure do anything you can to answer my question, anything you can.

A    I can only see the tibial shaft fracture on 4 as on the left leg.

Q    Thank you. Now, so far we can specify four separate and distinct fractures in the four x-rays; is that

A -118

118

true?

A    That's correct.

Q    Now, I don't know whether we talked about the first two fractures you said were caused by traction or I thought you said a direct blow; is that true?

A    My opinion in this case, this specific case that was caused by traction.

Q    The next tibial fracture or both tibial fractures, I guess, to the right and left were caused by direct blows such as a hammer; is that true?

A    Whether it was a hammer or piece of wood, a hand it was something that caused a direct blow.

Q    Okay I'm not picking on you.

A    I really wouldn't expect a hammer to be used without seeing more crush injury to the skin so I don't like that analogy.

Q    Now, the rib fractures we haven't talked much about those except that they exist and are shown in Commonwealth Exhibit 5.  There are two fractures as I understand it, one to the right rib cage and one to the left cage, 6 and 7th ribs respectively; is that true?

A    Yes.

Q    They are known as in place fractures; is that true?

A    I've never heard anybody really describe it in

119

place.

Q    I thought the Commonwealth's last witness or last expert witness but how would you describe it?

A    They were rib fractures.

Q    That means?

A    Non displaced.  There is displaced open fractures, closed fractures it means ribs were broken best described as healing fractures.  No way at this point in time whether to say they were displaced or not.

Q    How old were the rib fractures?

A    Those rib fractures show advanced healing, they show evidence of remodeling and as such based upon that it would be an excess of six weeks.

Q    Did you state a period?

A    It appears this would, it would be four to six weeks, beyond four and most likely around 6 weeks.

Q    What based upon your experience and opinion what type of force would cause the rib fractures?

A    As I previously stated, there are two types of forces one would be a compression and that also could be what has caused it.  I would have expected to see more fractures. It is possible as they were bilateral it was a direct compression caused at the same time. The other thing it could be a direct blow such as with your hammer.

Q    If I went up and squeezed you and were strong

A-120

120

1    enough, would that be a compression type force?

2        A    Yes.

3        Q    Is there any other type of force that you might

4    well expect would cause this type of rib injury?

5        A    No.

6        Q    Now, I guess you did in fact render an opinion

7    that these injuries based upon your experience were caused by

8    child abuse; is that what you said?

9        A    Yes.

10       Q    And you described child abuse as any activity or

11   inactivity that would cause mental or physical pain or injury

12   to a child or lessen that child's well being?

13       A    Yes.

14       Q    Would that be correct?

15       A    Yes.

16       Q    And I assume that lack of criminality would be

17   just as consistent as criminality within that definition; is

18   that true?

19       A    No.

20       Q    Why would that be?

21            MR. LEBER: Judge, I think I'm going to object

22   to that line of questioning.  It's come up before, but I

23   think it probably is putting the witness in a position of

24   making a legal determination, which I do not think he should

25   have to do.

*A-121*

121

          MR. FINK:  Judge, I agree with that, I agree
with that.  I can see the error of my ways in the question
that I presented.

          THE COURT:  Ladies and gentlemen, counsel
have basically both agreed that the issue of causation and
what is and what is not criminal conduct is something covered
really in the instructions that I'll give you at the end of
the trial.  I'm glad everybody agrees on that.

     Q    Let me ask it this way, doctor, when you say
that--when you rendered an opinion that these were caused by
child abuse it could be neglect; could it not?

     A    It seems that my definition includes that as a
form of child abuse.

     Q    It does include neglect?

     A    Neglect, yes.

     Q    It includes lack of proper parenting such that one
might not at all times be aware of the dangers that the child
is in and, therefore, the child could come to injury; is that
not true?

     A    In the broadest sense, yes.

     Q    And so when you render an opinion within a
reasonable degree of medical certainty that these injuries
were caused by child abuse, that is within the perimeters of
your definition; is that true?

     A    Yes.

A-122

122

1          MR. FINK:  Thank you very much, doctor, I

2   have nothing further.

3          THE COURT:  Any redirect?

4          MR. LEBER: Yes, Your Honor briefly

5

6   REDIRECT EXAMINATION BY MR. LEBER:

7      Q    The right ankle fractures again those are

8   fractures to what two bones?

9      A    The tibia.

10         MR. FINK:  Objection already asked and

11  answered it's not proper redirect examination.

12         THE COURT:  I believe that has been certainly

13  covered.

14         MR. LEBER: Judge, I apologize I thought it

15  needed clarifying on that point. It seems to me some

16  confusion was generated, but I'll move on.

17     Q    Mr. Fink asked you about the issue of neglect in

18  your definition of child abuse and so forth and he asked you

19  whether the interplay between siblings may be considered to

20  be child abuse and you answered that it could be.  Under what

21  circumstances could that be?

22     A    Where one child goes about inflicting repeated

23  injury to another child when the supervising adults should

24  have been able to prevent that.  Certainly having a single

25  accident is understandable to children wrestling together,

A-123

123

but one would expect to teach the older child they can't play

with the baby that way.  Certainly those types of things

would fall in that definition. Having one child be jealous of

the other child and repeatedly injuring the child that could

be considered abuse because the supervising adults should

have been able to add protection for that, to recognize that

type of thing.

Q    In Exhibit 5 you talked of rib fractures, you

talked about compression fracture or direct blow as being

possible causes of that type of fracture.  I don't believe

you concluded when we were talking about, you and Mr. Fink

were talking about compression fracture.  Do you have an

opinion as to whether they were caused by compression

fracture or direct blow?

MR. FINK:  I guess I'm going to object to

that as having been covered.  Clearly he described what

compression fracture is to the injury.

MR. LEBER: But we were discussing these

particular injuries caused by compression.

MR. FINK:  I think he so testified.

THE COURT:  I'm not certain on that.  As to

this specific question witness may answer.

A    The fact that they occurred very closely together

and in a very narrow ban up until just recently I wasn't

aware of how you could compress in such a narrow band.  It

A-124

124

1    appears that some people would inflict punishment on children

2    by wrapping a belt around--

3              MR. FINK:  I'll object to that I ask that the

4    jury be instructed to disregard it.

5              THE COURT:  Objection is sustained, jury will

6    disregard that.

7         Q    Again the question could this have been a

8    compression fracture?

9         A    Other than anything causing very narrow

10   compression it would be more consistent with a direct blow.

11        Q    Now, when one picks up the baby, small child one

12   frequently reaches out, puts their hands around the chest

13   area the rib area of a child and lifts the child up.  Is

14   there any relationship between that kind of a grip on the

15   child and injuries you see here?

16             MR. FINK:  Objection there's no basis for

17   that testimony, there's no basis for that question, it's a

18   hypothetical.  In essence there's nothing on the record to

19   support it.  Furthermore, it's--

20             THE COURT:  I think I'll sustain.

21             MR. LEBER: Okay thank you, Your Honor.

22             MR. LEBER: I don't believe I have any more

23   questions, Dr. Supinski, thank you.

24             MR. FINK:  Nothing further thank you, doctor.

25             THE COURT:  Thank you, witness may step down.

A-125

125

1          MR. LEBER: Dr. Asar please.

2

3     M A R I A M   A S A R, M.D., having been duly sworn, was

4     examined and testified as follows:

5

6     DIRECT EXAMINATION BY MR. LEBER:

7          Q     Your name and address, please?

8          A     My name is Dr. Mariam Asar. I live on Route 6, 1

9     Port Allegany Road, Coudersport Pediatrics.

10         Q     And your occupation?

11         A     I am pediatrician.

12         Q     And how long have you been a pediatrician?

13         A     Three and a half years now.

14         Q     What is a pediatrician?

15         A     A pediatrician is a physician who specializes in

16    children's health and those issues.

17         Q     Can you tell us about your medical education.

18    Let's start with when you first attended medical school.

19         A     Yes, I did my medical school in Pakistan where I

20    received my Bachelor of Science and Bachelor of Medicine

21    Degree.  From then I moved onto United Kingdom where I did

22    several years in obstetrics as well as pediatrics and I have

23    my license to practice in United Kingdom.  I came here in

24    '91, did my residency out of Albany Medical Center Hospital

25    from 91 to '94 and since then from '94 I have been in

A-126

126

Coudersport. I did my board certification in '95 and received

my fellowship in '96 of the American Board of Pediatrics.

Q    And so you're license is in what area?

A    Pennsylvania.

Q    What particular area?

A    In Pediatrics.

Q    Are you a member of any societies?

A    Yes, I am.  I am a fellow of the American Academy

of Pediatrics.  I am member of A M A and Potter County as

well as Pennsylvania Medical Society.

Q    And tell us specifically what type of training, if

any, you received relative to the issue of child abuse?

A    Yes, when you do your pediatric training the

residency is three year residency. You see children right

from the beginning until the end, and I did see a fair amount

of child abuse being in an area where you see inner city

children.  This was a medical hospital, school.

Q    And is there any other specific training that

doctors who are licensed in Pennsylvania are required to

undertake relative to child abuse?

A    You're not required to, but I have received, I

have continued the continuing medical education in various

areas.  You need about 50 units of C M E.  I have 300 units

in the last year for C M E.

Q    And what states are you licensed to practice

A-127

127

1    medicine in?

2         A    In America in Pennsylvania only.

3         Q    And again you've been in Coudersport since 1994;

4    is that correct?

5         A    That's correct.

6         Q    And you're affiliated with what medical facility?

7         A    Charles Cole.

8         Q    During the course of your professional practice

9    here in Coudersport have you had occasion to be the treating

10   physician for one Rebecca Moore?

11        A    That is correct.

12             MR. LEBER:  Your Honor, I'm going to offer

13   Dr. Asar in the area of pediatrics and in the area of child

14   abuse.

15             THE COURT:  Counsel may cross as to

16   qualifications.

17             MR. FINK:  Doctor, I have no

18   cross-examination, but would like to extend a belated welcome

19   to the doctor.

20        A    Thank you.

21             THE COURT:  Very well, Dr. Asar will be

22   received as expert in pediatrics and child abuse.

23        Q    Dr. Asar, this has come up with the two previous

24   physician's training who testified in this case do you have a

25   definition of child abuse?

A-128

128

A    Child abuse at various times is maltreatment of a child in any form is child abuse.   Physical abuse is infliction of physical injury to a child through malicious, cruel or inhumane treatment, that's physical abuse. Then you have emotional and sexual abuse too.   In this case I think we are going to limit to physical abuse.

Q    You indicated before that you were the treating physician for Rebecca Moore.   When did you first encounter Rebecca?

A    When the child was six days of age, she was seen in my office with jaundice. At birth the mom had directed me as a physician covering for the child, but I must have been away or whatever.   She was taken care of by my colleague Dr. Condon.

Q    Now, the date of birth according to your records for this child is what?

A    I don't have it with me, but February 23, 1996.

Q    Now, in September, specifically September 24, 1996 did you have the occasion to see Rebecca?

A    I had occasion to see Rebecca on several occasions before this particular date. The last time I seen her when the child was about four and a half months of age at which time she received her regular well child visit and physical, plus immunizations. In September, I believe 24th of September as I was leaving my office which was about 12:15, 12:25 this

A-129

129

child was brought in.  I did not see who was accompanying the

child except mother.  My main concern was the mom who just--

she had the child bundled and she just happened to uncover

the extremity, that right extremity, lower extremity, showed

me the child's leg which appeared bruised.  My understanding

at that point was that another sibling had fallen on this

particular child.  It happened hour or two before her

presentation at my office.  It was lunch time, my staff had

gone.  I gave her x-ray form to go to the hospital and to

bring the child back to my office.  Once the x-ray is done

and anything needed, if you will, is done at that point

whatever is needed for the child is done.

    Q    Okay. And did the to the best of your knowledge

these individuals went to the hospital; is that correct?

    A    That is correct.

    Q    Following their visit to the hospital did you have

occasion to review with Dr. Dallaire her radiological

findings, her findings from x-rays?

    A    I was called on the floor which I often am.  If

there is a concern people do call me I prefer to be called

even if it is a bruise I prefer to be called.  I was called

by Dr. Dallaire.  There is a corner fracture of the right

lower extremity at which point, at that point there had been

x-rays of the other extremity to look at and see to get

comparative views.  And I was told there were other fractures

A-130

130

1    too, at which point I recommended or requested rather that we

2    take the skeletal subway, which is x-ray of all the long

3    bones as well as the skull to look for physical abuse or

4    injury.

5        Q    Now, let's go back to when you saw Rebecca Moore

6    outside your office on that date.  Can you describe for the

7    jury what her extremity looked like that you saw, you

8    observed at that time?

9        A    The brief glimpse I did receive outside the office

10   on the road to me it looked a little bent and bruised, and my

11   concern like I said before was to send this child for

12   appropriate treatment right away and then to bring her back

13   for full history and exam, et cetera.

14       Q    Now, you indicated earlier too that before you saw

15   this child on September 24th you had last seen her when she

16   was approximately four and a half months old; is that

17   correct?

18       A    That's correct.

19       Q    And on September 24th the child would have been

20   approximately seven and a half months old?

21       A    Around that age, yes.

22       Q    The child that you saw at four and a half months

23   old can you describe that child in terms of its health and so

24   forth?

25       A    The child had been healthy all along up to the

A-131

131

four and a half months that I had seen her.

Q    And did you observe anything that would suggest any type of fractures of any limbs or any part of her body?

A    No.

Q    Now, after you received the report from Dr. Dallaire and you requested the additional survey, what did you do then?

A    Once I got confirmation that child had rib fractures as well along with several other fractures I contacted the Children and Youth, who are there for protection of the children to make sure that the necessary is done.  I did not want the parents to leave the hospital even to come to my office.  I wanted her dealt with right there and then, as well as I called Dr. Supinski and requested for a consult to deal with the fracture.

Q    Did you meet with Mrs. Moore, the mother, and Mr. Bailey at any time?

A    To be honest with you I don't remember dad as much as I do mom, whoever brings the child over.  In fact, I don't recall anybody being there except the mother, who had the child in her hand on that date.  I did call the mom and speak to her over the phone and told her I would be talking to Children and Youth about this.

Q    Now, since September 24, 1996 has Rebecca Moore continued in your care?

A-132

132

```
 1        A    That is correct, up to today's present date.
 2        Q    When was the last time you actually saw Rebecca,
 3   if you can recall?
 4        A    I believe October 13th was the last time she was
 5   seen, about 20 months.
 6        Q    October 13th then of 1997?
 7        A    That's correct.
 8        Q    Again you said she's about 20 months at that time?
 9        A    Around about that age.
10        Q    Between the time this child was seven and a half
11   months on September 24th of 1996 and October 13th of 1997 did
12   you observe any other fractured bones or any other complaints
13   that would suggest child abuse relative to this child?
14        A    No.
15        Q    Now, during the course of your service for Rebecca
16   Moore did you have an opportunity then to further consult
17   with Dr. Supinski and Dr. Dalllaire relative to this
18   particular incident and their findings on September 24th
19   1996?
20        A    I don't believe so.  As soon as we figured--I
21   didn't speak with Dr. Supinski, I don't believe I did, but I
22   did speak with the radiologist who in effect was good enough
23   to call me over the phone and inform me about the various
24   fractures. I just put in a consult to Dr. Supinski. I don't
25   think we spoke about anything further.
```

A-133

133

Q    Based upon the facts of which you were aware at
this time, based upon the report that was given to you by Dr.
Dallaire and based upon your experience with this child both
before and after this incident on September 24th of 1996, and
also based upon your training and expertise did you reach a
conclusion or an opinion as to how these injuries occurred to
this child?

MR. FINK:  I'm going to object to that as
leading. If Your Honor please, counsel can ask if she has an
opinion and ask her how that is based, but counsel is
suggesting to the witness what the basis of her opinion is
and that's why it's leading.

THE COURT:  Certainly can ask the witness if
she has an opinion, then we can get basis for it.

MR. LEBER:  Let's do it that way.

Q    Do you have an opinion as to what caused these
various injuries?

A    Yes, with hindsight now.

MR. FINK:  Question has been asked and
answered.

Q    Dr. Asar, Mr. Fink says that's a yes or no.  No
question you've answered yes?

A    Sure.

Q    What do you base your opinion upon?

A    Well, there are various factors that come into

A-134

134

effect.   One is this actually happened on a Thursday looking
back at things and child was not brought in until Monday
lunch time and at the time nobody made a call.   This child
should have been seen on Thursday. The second thing there are
various fractures of various ages that were picked up and rib
fractures and that itself are really suggestive of
pathognomic abuse, corner fracture is another fracture a
pathognomic of child abuse and less proven otherwise.

    Q    Specifically, I know it's repetitive what is it in
your background that upon which you rely in forming an
opinion in a case, in this case or in any case such as that,
as this?

    A    Your experience, literature, you look at
everything, you look at the parents. This mom had been pretty
good with follow ups until about four and a half months after
which I did not see this child and then all of sudden I'm
seeing a child at lunch time brought in, making it appear
that injury had occurred more or less the same morning and
that was my assumption until I came to know this actually had
happened four days before, which is I think a form of neglect
if not abuse.

    Q    And based upon your experience as you described it
and what you've observed that day and what you learned from
Dr. Dallaire again did you, do you have an opinion, as you
said you have an opinion what is your opinion as to the

A-135

135

1  causation of these injuries?

2      A    To me I don't have an opinion except abuse.  This

3  child was abused especially with the hindsight which is

4  always 20/20.

5          MR. LEBER: Thank you nothing else.

6          THE COURT:  Counsel may cross.

7

8  CROSS-EXAMINATION BY MR. FINK:

9      Q    Doctor, I heard about one tenth of what you said.

10  Your English is excellent so it's not your English it's my

11  hearing, plus you have a voice I have tough time picking up.

12  I guess if you find my questions redundant or repetitive

13  please excuse me.

14      A    Sure.

15      Q    You first became the child's doctor when please?

16      A    I was designated as a physician by the mother.

17      Q    Excuse me, it requires an answer as to a date or

18  time.  Give me a date if you can.

19      A    I saw the child six days of age.

20      Q    Six days of age?

21      A    Six days, when the child was a week old.

22      Q    Did you give me a date?

23      A    I gave you the time, the child was one week old.

24      Q    Thank you, got you.  So you had been the child's

25  doctor since the child was one week old and you remain so

A-136

136

1    today; is that correct?

2        A    That's correct.

3        Q    And how did it come about that you became the

4    child's doctor?

5        A    The mother designated me as the child's physician

6    because I had taken care of the older sibling.

7        Q    Fine that's fine. The mother contacted you a week

8    after the child was born and you became the child's doctor;

9    is that correct?

10        A    Actually the mother designated me at birth.  We do

11    cross cover.  The child was covered by another pediatrician

12    at the time of birth.

13        Q    I see. Well, does that mean that you, when someone

14    is expecting they pick a physician and then when the child is

15    born they give the name of that particular physician?

16        A    Yes.

17        Q    Okay.

18        A    So I was actually the child pediatrician from

19    birth.  I didn't actually see the child until one week of

20    age.

21        Q    You were contacted next when in relation to the

22    care of the child?

23        A    At two weeks of age.

24        Q    Two weeks?

25        A    Hm-hmm.

A-137

137

Q     And next do you have some record of when you were next contacted with you?

A     I personally I do have records.

Q     Is that available?  Could I see it, please?

A     Sure.

Q     Thank you very much.  You have gotten out of your brief case a folder and that folder you were presenting to me to look over, and it represents a written record of when you were contacted concerning the care and treatment of the child?

A     Yes.

Q     Thank you.

        MR. LEBER: Judge, can we approach on this real briefly.

        THE COURT:  You may.

        (Discussion held at the Bench off the record).

Q     Doctor, I would just a soon have you look at your own records I don't need to see them.

A     Thank you.

Q     To refresh your recollection as to when you were contacted the chronology as to when you were contacted by whom and for what concerning the treatment of the child?

A     Right from birth.

Q     Sure.

A-138

1     A    I saw the child at six days of age with jaundice.

2  Then the child was seen two weeks for a regular physical

3  which was normal. The child, children are normally seen at

4  two weeks for a regular physical. Then the child has been

5  seen at six weeks with just a cold following that this child

6  was seen at two months of age when she received a regular

7  physical as well as immunizations.

8     Q    Now, doctor up to this time are these contacts

9  with the child at the insistence and request of the mother?

10     A    That is correct.

11     Q    Continue we're up to two months.

12     A    At three and a half months this child was seen for

13  ear infections.

14     Q    What kind of infection?

15     A    Ear infection.

16     Q    Did you treat the ear infection?

17     A    That is correct.

18     Q    Was there any indication that came from any type

19  of trauma?

20     A    No.

21     Q    Okay. This child was then seen at four months of

22  age again for regular physical and immunizations and--

23     Q    For what?

24     A    Regular physical and immunization.

25     Q    For a physical.  When you perform a physical on a

A-139

1  child at four months what do you do?

2       A    You look at the child, examine the child from top

3  to bottom starting from the head, go to the feet.

4       Q    And at four months you were convinced there was no

5  injury as a result of any trauma; is that true?

6       A    That is correct.

7       Q    Next time?

8       A    This child was then seen on September 24th when

9  parents--

10       Q    So it goes from four months old.  What was the

11  date of that when child was four months old?

12       A    6/96.

13       Q    June of 96?

14       A    That's correct.

15       Q    Okay so June of 96 everything was alright; right?

16       A    To my knowledge.

17       Q    Do you have a date there?

18       A    June 19th.

19       Q    June 19th.  Then three months and five days after

20  was the next time you saw the child?

21       A    That is when they drove up with the child pointing

22  to the extremity.

23       Q    Okay.

24       Q    How were you contacted to effectuate the September

25  24th contact?

A-140

140

1    A    I was not contacted.  As I was leaving the office

2    about 12, parents just drove in with the child and to me it

3    appeared that something had happened in the morning that is

4    why they were driving up, nobody contacted the office to make

5    an appointment.  I just saw this child in the mother's arms

6    and she just uncovered the leg to show me right extremity

7    which had the bruise.

8    Q    Okay. Was the the child awake or asleep?

9    A    The child was awake and fine.

10    Q    Was the child crying?

11    A    No, the child wasn't crying.

12    Q    The child appeared normal?

13    A    Without undressing the child, yes.

14    Q    The child appeared normal, the mother uncovered

15    the child and showed you what portion of the child?

16    A    Just the right lower extremity.

17    Q    What did you see?

18    A    I saw the bruise on the right lower extremity.

19    Q    Did you see any other bruises?

20    A    I did not undress the child.  I wanted to get this

21    child to the hospital.

22    Q    Excuse me, you don't have to explain.

23    A    No, I didn't.

24    Q    That's fine. If you'd be kind enough to just try

25    to answer my question then you can explain until the cows

A-141

1    come home.  Forget the cows come home, that's an expression,

2    I shouldn't say that.

3         A    I did not look for any other bruises let me put it

4    this way at that time.

5         Q    Where did the child go from there?

6         A    I give them an order form to go to the hospital

7    and get the limb x-rayed.

8         Q    Your office is not at the hospital?

9         A    No, it's about a mile down from the hospital.

10        Q    Okay, alright. Here's my client in back of me.

11   Did you see my client?

12        A    I don't recall anybody else except the mother and

13   the child.

14        Q    Okay. You accompanied the mother and the child to

15   the hospital?

16        A    No, I didn't.

17        Q    You did not?

18        A    No, I did not see a reason at that point.

19        Q    When did you next see the child?

20        A    After this incident.

21        Q    After September 24th you said, you told us the

22   circumstances under which you saw the child.  When did you

23   see next see the child?

24        A    September 30th when the child was brought by the

25   foster mom.

A-142

142

Q     The child was what?

A     The child was brought to office by a foster parent.

Q     Did you follow the treatment as far as the right ankle is concerned?

A     That is correct.  The child's leg was in a cast at that time.

Q     It was what?

A     In a cast.

Q     Now you have rendered an opinion here concerning the source of the ankle injuries and I guess others.  It is my understanding in rendering that opinion you took into consideration what one thing at that time, what items did you consider in arriving at the opinion that these injuries were caused from child abuse or that this child was abused?

A     Okay. The child was presented on Monday at lunch time.

Q     What Monday?

A     Monday the 24th of September.

Q     You're considering when you saw the child on the 24th of September?

A     That is correct.

Q     What did you see that you considered in arriving at your opinion?

A     I found out that this child actually had on

A-143

143

1    Thursday had suffered--

2        Q    What did you see on September 24th that you

3    considered in arriving at your opinion?  You understand the

4    question?

5        A    No, I don't.

6        Q    Okay.  It is my understanding that you have told

7    us there were certain considerations that you, certain things

8    that you considered in arriving at your opinion?

9        A    Yes.

10        Q    As to the abuse of the child?

11        A    That is correct.

12        Q    I've asked you what those are.  One of them, first

13    one, as I understand what you saw on September 24th?

14        A    Even before that if you take history.

15        Q    Just one at a time.  I confuse easily.  I do.  I

16    confuse easily.  Let's go one at a time.  If you want to

17    start with before that, that's fine.  What was that you saw,

18    heard or considered beforehand which led you to the

19    conclusion that the child was abused?

20        A    The mere fact that this child was brought four

21    days after the injury had occurred and I was not--I haven't

22    finished yet.  I was not aware of this until later on in

23    time.

24        Q    Okay.  I understand the first thing is that the

25    child was not brought in for treatment on the ankle until

A -144

144

1    four days after the incident which gave rise to the broken

2    ankle; is that what you're saying?

3        A    That is correct.

4        Q    And that you weren't notified?

5        A    Nobody in fact contacted my office to make an

6    appointment, the people just drove up to the hospital office.

7        Q    Okay.  Now how did you learn that there was an

8    incident which occurred on September 20th which gave rise to

9    the broken ankle?

10        A    I came to find out through Dr. Dallaire and Dr.

11    Supinski.

12        Q    This is important?

13        A    I came to realize when the history was taken in

14    the Emergency Room that this child actually had--the mother

15    stated this incident happened on Thursday.

16        Q    The mother stated, the mother said in the

17    Emergency Room that it happened, something happened four days

18    beforehand?

19        A    That is correct.

20        Q    Who did she tell that to?

21        A    Dr. Dallaire and Dr. Supinski as well as Emergency

22    Room staff.

23        Q    I didn't hear that.  Are they still here?

24            MR. LEBER:   Emergency room staff?

25        A    It is stated in his notes.  It is stated in Dr.

A-145

145

Supinski's notes stated in black and white mother stated 7th

month old sibling fell on Thursday on this child's leg.  We

are not saying this incident, injury occurred because of

that.  I am simply stating this child was brought four days

later.

Q    You're telling the jury that because the mother

said that four days before a sibling or other child fell on

Rebecca--

A    That is correct.

Q    That an incident occurred four days beforehand; is

that true?

A    What I'm trying to say that history was

inappropriate and did not fit with the findings.

Q    Did you believe that she was telling the truth

when she said that?

A    Right at that moment I did.

Q    Did you believe that she was telling the truth?

A    I did indeed I did.

Q    Yes.

          MR. LEBER: The witness is answering.

          THE COURT:  I need to have counsel come up

here.

          (Off-the-record discussion held at the

Bench).

          MR. FINK:  That side bar was my fault I'm not

A-146

146

1    hearing I apologize to you.  It's not your fault, your

2    English it's very good.

3        A    Maybe I'm not speaking loud enough.

4        Q    Now, again, I asked you if you believed that

5    mother of the child was telling the truth when you heard that

6    mother had said in the Emergency Room that another child had

7    fallen on Rebecca four days beforehand.  Did you believe

8    that?  Yes or no?

9        A    This I came to know later.

10       Q    Did you believe it?

11       A    I did believe it.  I had no reason not to.

12       Q    Okay. Fine I agree. Would you term that or

13   construe that as being child abuse?

14       A    I'm sorry.

15       Q    When another child would fall on Rebecca?

16       A    That's inappropriate supervision, sort of neglect.

17       Q    That's child abuse?

18       A    Neglect there are different definitions.

19       Q    Got you. What else did you consider in arriving at

20   your opinion that the child was the subject of child abuse?

21       A    Like I said, the history first of all from the

22   mother did not go along with the physical finding because

23   this was not an injury sustained from child falling on this

24   infant and the mere fact that this child had several

25   injuries, several fractures in various phases of healing.

A-147

147

Q    Let me cut right to the quick here if I can.  I'm going to try to shorten this if I can. First question that was asked to you by Mr. Leber was you were asked to give your definition or your understanding of child abuse?

A    That is correct.

Q    It is my understanding that you believe that child abuse is any depreciation of the condition and of the child both mentally and physically from whatever reason or from whatever source; would that be true?

A    I'm not sure if I understand you correctly.

Q    Then you give your own definition once again.

A    Physical injury to the child which is physical injury inflicted on the child through cruelty or any inhumane treatment, that's physical abuse.  You have neglect where you do not provide adequate supervision, care, appropriate admonition of the child.

Q    The source of the physical abuse can be from many many different types of sources legally and illegal?

A    That is correct.

MR. FINK:  Thank you, nothing further. I apologize to the Court.

THE COURT:  No problem.


REDIRECT EXAMINATION BY MR. LEBER:

Q    Dr. Asar, one or two questions if I may.  Mr. Fink

A-148

148

asked you again about when you heard the conversation of the events that was offered by the mother at the Emergency Room, that is a sibling fell on this child.  Mr. Fink asked you if you believed it, and you said you did believe it at the time; is that correct?

     A    I did believe it at the time when it was given to me.  In retrospect, like I said, hindsight which is always 20/20 I find it difficult to believe now.  I disagree, I would not believe it.

     Q    Why do you not believe that now?

     A    Because of the findings.

     Q    Can you enumerate those?  What is basis for that?

     A    History, which was inappropriate to the actual finding four days later the child is brought for exam and the finding of multiple injuries including rib fractures, corner fractures that were described by Dr. Dalllaire, which would be pathognomic of child abuse unless proven otherwise.  These are things that have been hammered into our heads when training.  If we don't pick these up, the child can come in DOA which is basically dead on arrival to the Emergency Room.

              THE COURT:  Recross.

              MR. FINK:  I don't think so, Your Honor.

              MR. LEBER: Thank you Dr. Asar. Thank you.

              (End).

A-149

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
: OF POTTER COUNTY, PA

VS. : NO. 93 OF 1997

MARK BAILEY, : CRIMINAL DIVISION
            Defendant

**TRANSCRIPT OF THE REMAINDER OF THE JURY TRIAL**, held
before the Honorable John B. Leete, President Judge, in the
Courthouse, Coudersport, PA, on December 16-17, 1997.


A P P E A R A N C E S :


OFFICE OF THE DISTRICT ATTORNEY
OF POTTER COUNTY
East Second Street
Coudersport, PA  16915
BY:  JEFF LEBER, D.A.
For the Commonwealth


FINK & FINK,
Attorneys at Law
Main Street
Port Allegany PA  16743
For the Defendant


            Ann Marie Jusko
            Potter County Court Reporter
            Potter County Courthouse
            Coudersport, Pa  16915



A - 150

# I N D E X   T O   W I T N E S S E S

## FOR THE COMMONWEALTH

|  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|
| Kenneth Davis | 154 | 156 | 176 | |
| Alan Moore | 178 | 183 | 184 | |
| Lori Moore | 184 | 192 | 204 | 208 |
| Alice Carr | 209 | 214 | | |
| Tammy Baker | 215 | 223 | | |
| Chad Setzer | 233 | 236 | 240 | 240 |
| | | | 244 | 248 |

## FOR THE DEFENSE

|  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|
| Michael Hicks | 283 | 289 | -- | |
| Martha Bailey | 296 | 300 | | |
| Mark Bailey | 306 | 340 | 364 | 365 |
| | | | 367 | |

## REBUTTAL

|  | Direct | Cross |
|---|---|---|
| Amy Tuttle | 369 | 372 |

A-151

150

1    THE COURT:  Take afternoon recess at this

2  time for approximately ten minutes.  During recess do not

3  discuss case among yourselves or with anyone else.  Thank you

4  very much. Court will stand in recess for ten minutes.

5            (Ten-minute recess).

6            MR. LEBER:  Trooper Davis.

7            MR. FINK:  Your Honor, may it please the

8  Court, may I have an offer of proof as to this next witness.

9            THE COURT:  Go ahead.

10            MR. LEBER: Your Honor, Trooper Davis will

11  testify that on February 28th, 1997 that he had occasion to

12  interview the defendant at the Pennsylvania State Police

13  Barracks of Coudersport and at that time the defendant

14  confessed to this officer that he did break several bones of

15  Rebecca Moore, and that he related that this happened because

16  he could not control his anger, and Rebecca reminded him of

17  his son.  And Trooper Davis further would testify that he

18  also was present when the tape recorded statement was taken

19  subsequent to that which was conducted by Trooper Dawson.

20            MR. FINK:  May it please the Court, we'll

21  object to that as the corpus delecti has not been met. It is

22  my understanding, Your Honor, under the corpus delecti rule

23  it is a two-step process, and the first issue is whether or

24  not there has been testimony presented in court whereby the

25  it would indicate that it was more likely than not, quote

A-152

151

1   unquote, or more likely than not that victim was harmed by

2   criminal conduct unquote. The next of the two step process is

3   that his Honor must charge the jury, as I understand the

4   rule, that they must find beyond a reasonable doubt that the

5   particular crime charged was proven other than by confession

6   and that the victim suffered from the crime.

7        Now, I respectfully submit that first step has not been

8   achieved so that the Court cannot allow any inculpatory

9   statements or confessions or admissions because I think

10  viewing the testimony in the most favorable light to the

11  Commonwealth one cannot conclude that the victim was, it was

12  more likely than not that victim was harmed by criminal

13  conduct.

14            THE COURT:  Commonwealth I think that general

15  statement of law I believe to be pretty correct.  Do you want

16  to comment on its applicability to this case?

17            MR. LEBER: My feeling is that corpus delicti

18  preliminary threshold requirement has been met. Certainly we

19  have the evidence of three expert witnesses to this point

20  indicating that they believe that the injuries that occurred

21  to Rebecca Moore were consistent with child abuse and all of

22  them said that they've believed that nature of it was at

23  least by indication was an act of child abuse.  However, they

24  also said that neglect could be child abuse if that existed

25  and that if it was caused by another party. For instance, the

A-153

152

suggestion that there could, the one injury could have

occurred because the child falling on the--on her sister.

Again, I believe that the corpus delecti requirement has been

met simply by the fact these three experts have indicated

that this child was in fact the victim of child abuse.

MR. FINK:  If I may reply to that, Your

Honor. Your Honor, as I understood the testimony of all three

expert witnesses under their definition of child abuse it is

not necessarily criminal at all and, therefore, I think, Your

Honor, that there's a big step here that needs to be taken

that has not, cannot be taken. Might I respectfully suggest

that even if you pass the first, if the Commonwealth passes

the first test at the conclusion of the trial of the

Commonwealth case, I would make the appropriate motions for

directed verdict of acquittal and or a demur based on the

fact that under no circumstances could the jury find that

beyond a reasonable doubt and they're not allowed to look at

the confession.  So considering the other testimony before

they consider the confession that they could not find beyond

a reasonable doubt that the crime was committed and that the

victim was injured as a result of the crime, and I'm talking

about the crime, the crimes that are charged.

THE COURT:  I think that's really what we

have to talk about. There's been a lot of discussion about

term child abuse but the defendant is not charged with child

A-154

153

1    abuse the defendant is charged with four counts of aggravated

2    assault, four counts of simple assault and four counts of

3    reckless endangerment of a child essentially, I paraphrased

4    the child, but that's essentially what it is, endangering the

5    welfare of children I believe is the formal title.  So I'm

6    not sure that all these definitions, which I agree are in

7    part contradictory, that we've heard I'm not sure that they

8    answer the present query. I do think that the first threshold

9    has clearly been met because the three medical witnesses have

10   testified to events or occurrences or injuries which would

11   indicate that there were fractures in different parts of the

12   body at different times which at least thus far in the

13   Commonwealth case went untreated except for the events of

14   September 24th, if I recall the date correctly. Therefore, I

15   would--there also has been testimony that these, as to the

16   likelihood and probability, that these types of fractures can

17   and frequently do result from trauma, and again I'm very

18   generally paraphrasing the three health care providers.  It

19   seems to me that initial burden has been met to show that

20   criminal means are essentially most likely involved in the

21   injuries that were suffered.

22        As to the second test, certainly the law is very clear

23   that jury has to receive that instruction, and I would

24   certainly intend to so instruct at the proper time.  So the

25   offer is noted, the objection is noted and we will proceed.

A-155

154

1    We'll bring the jury down.

2                THE COURT:  Ladies and Gentlemen, we had a

3    couple more matters to take care of on the record which would

4    not require your presence, but we got those out of the way

5    Commonwealth may proceed.

6                MR. LEBER: Trooper Davis please.

7

8    K E N N E T H   D A V I S, having been duly sworn, was

9    examined and testified as follows:

10

11   DIRECT EXAMINATION BY MR. LEBER:

12        Q    Your name and address, please?

13        A    Trooper Kenneth L. Davis, P.O. Box 6889 Cherry

14   Street, Montoursville, Pennsylvania 17754.

15        Q    And you are Pennsylvania State Trooper?

16        A    That is correct.

17        Q    How long have you been so employed?

18        A    Approximately five and a half years.

19        Q    And you are stationed in what barracks?

20        A    Currently Montoursville.

21        Q    That's what troupe?

22        A    F Troupe.

23        Q    Coudersport is part of that troupe; is that

24   correct?

25        A    That's correct.

A-156

155

        Q    And on February 28th, 1997, did you have occasion
to be at the Coudersport Barracks?

        A    I did.

        Q    During that date did you interview the defendant
in this case?

        A    I did.

        Q    And tell us what you did prior to questioning Mr.
Bailey?

        A    He was mirandized.

        Q    By mirandized you mean what?

        A    I read him his rights, which he had acknowledged
and signed off on a waiver form.

        Q    And after doing that tell us what you asked him
and how he responded?

        A    Just asked issues about the injuries Rebecca Moore
sustained, at which time he confessed to me being involved in
four different broken bones, areas of the right leg, left
leg, the ribs, at which time I notified Trooper Dawson.

        Q    Did Mr. Bailey give you any explanation why he had
caused these injuries to Rebecca Moore?

        A    Yes, his anger and that she reminded him of his
other child.

                MR. LEBER:  Nothing else, thank you,
cross-examine.

A-157

156

CROSS-EXAMINATION BY MR. FINK:

 Q    Officer, how did it come about that you were from Montoursville you got up here to Coudersport barracks?

 A    I was asked.

 Q    By whom?

 A    Trooper Dawson.

 Q    Why?

 A    Why?  Lie detector test, a polygraph test.

 Q    A polygraph test is the same thing for the jury, a polygraph is lie detector, right?

 A    Polygraph also detects the truth not only lies.

 Q    In common parlance those of us who are not really familiar with the words of the trade so to speak refer to a polygraph test as a lie detector test; don't we?

 A    Yes.

 Q    And so you came up to Coudersport to give my client a polygraph test?

 A    Yes.

 Q    Does that require a certain machine to operate?

 A    A polygraph instrument.

 Q    And you were the operator of that; is that true?

 A    The examiner.

 Q    And there are not too many people in the troupe that are able or qualified to give polygraph tests; is that true?

A-158

157

A    There's one per troupe, approximately fifteen per state.

Q    You were called up from Montoursville on February 28th, 1997 or?

A    We're dealing in 97 but approximately a month before that that the test was scheduled or to be scheduled on that particular day.

Q    Nonetheless you came up, the defendant voluntarily came in.  He wasn't under arrest or anything?

A    No.

Q    And he voluntarily came in for the purpose of submitting to a polygraph test; is that right?

A    That's correct.

Q    Now, do you ordinarily interview people who are going to be giving polygraph tests before they take the test?

A    Most definitely.

Q    Is that what you did here?

A    Yes.

Q    That was a pretest interview; is that right?

A    That is correct.

Q    Is that done in a separate room where the test is being given?

A    No.

Q    Is there any other officer around?

A    In the beginning Trooper Dawson witnessed his

A-159

158

1   Miranda Rights being read.

2        Q    I'm sorry, sir?

3        A    In the beginning of the pretest I also qualify I

4   also count the mirandizing as a pretest, which Trooper Dawson

5   witnessed and signed off on the waiver form as a witness, and

6   Trooper Bailey--Mark Bailey also printed his name and signed

7   off on the waiver form, then it's just I and the examinee.

8        Q    Now, it was just you and my client in the room

9   when you asked him certain questions?

10       A    That is correct.

11       Q    In the pretest?

12       A    That's correct.

13       Q    Do you have a copy of those questions specifically

14  verbatim that you asked?

15       A    Yes.

16       Q    And do you have those written down?

17       A    Yes.

18       Q    May I see it please?

19       A    Alright. Which were shown to you also on our other

20  hearing.

21       Q    Thank you, officer.  Now what you have directed my

22  attention to is a form?

23       A    That is correct.

24       Q    And there is certain handwritten notes here.  Who

25  made those handwritten notes?

A - 160

159

A    I did.

Q    The handwritten notes really show questions, do they not?

A    That is correct, questions intended to be used for the polygraph test.

Q    Were those questions written down on this paper before you asked them or not?

A    I think we were working on that when we were discussing--

Q    Sir, just yes or no question.  Were these questions written down on the paper before you asked them to my client?

A    No.

Q    No. When did in relation to asking the questions did you write these down on the paper?

A    When we started talking about the injuries they weren't written down on the paper prior to talking to your client.

Q    In the form the first comment is the name, which is blank, the date which is blank and the incident number, which is blank; is that true?

A    That is true.

Q    And the next line in the written form regarding dash and you have written in there, "those broken bones of Rebecca." When did you write that in relation to when you

A—161

160

questioned my client?

     A    After we talked.

     Q    After you were done?

     A    After we talked.

     Q    After you talked?

     A    Correct.

     Q    So you don't know whether this is exactly what you told him or not?

     A    No, it is exactly what I told him, that's why it's written down, but we discussed the case, the facts, the reason why he's there prior to writing down the test questions.  Why should I write down something that may not be used.  It's a waste of time.

     Q    Okay. The first question is--well, you read the first question.

     A    Certainly. "Regarding those broken bones of Rebecca do you intend to answer truthfully to each question about that?"

     Q    What's the answer?

     A    We didn't get that far, he confessed to the crime.

     Q    Also what's written down here is not a recording of what my client told you?

     A    What do you mean.

     Q    That which is written on the sheet that you presented to me is not a recording of what he told you; is

A-162

161

that true?

     A    I don't understand.

     Q    Do you understand the question?

     A    No, that's what I'm asking I don't understand.

     Q    You directed my attention to a particular paper that you have in your folder after I asked you if you had written down his answers.

     A    I didn't write down his answers.

     Q    You did not write down his answers.  Did you write down the questions that you asked him?

     A    Yes, they're right here.

     Q    The questions are written down but the answers are not?

     A    Right because he started confessing, at which time I got Trooper Dawson.

     Q    You say it's confessing, they're the ones that will decide whether he confessed or not, that is their job.

     MR. LEBER: I think we're arguing with the witness here.

     THE COURT:  Yes, let's do this on a question and answer basis without comments.

     Q    I apologize, Your Honor. Would you just tell the jury whether or not you have a written statement of what my client told you after or during the time you questioned him?

     A    No, I don't have anything written.  We have it

162

1    taped.

2        Q    You have a recording of it?

3        A    Yes.  I don't have it, Trooper Dawson has it.

4        Q    Do you have a recording of what he told you when

5    you say that he confessed?

6        A    No.

7        Q    So you didn't bother to write down his confession

8    and you didn't bother to record what you say is his

9    confession; is that true?

10       A    No, that's not true.

11       Q    Is that true?

12       A    No.

13       Q    Okay. Did you record it?

14       A    With Trooper Dawson.

15       Q    Did you record what he told you, officer, I guess

16   you testified previously you didn't?

17       A    No, I did not record it per say.  Trooper Dawson

18   recorded after he told me.  At that particular time he had

19   his hand in a cast, not able to write, at which time--I do

20   not carry a recorder--Trooper Dawson got his.  We took a

21   taped statement.

22       Q    Officer, you're telling me that Trooper Dawson who

23   is the complaintant here, he's the state police officer,

24   complaintant sitting at the prosecution table he recorded

25   something; right?

A-164

163

A    That is correct.

Q    Was that something what the defendant told you as a result of your questioning my client?

A    That is correct.

Q    I thought you told me that the only ones in the room at the time you did your pretest was my client and you?

A    I was.

Q    Then how did it come about that Trooper Dawson was able to record what my client told you in answering your questions when he wasn't there?

A    After your client confessed to me, I said let me get Trooper Dawson we'll go over what you told me.  Then we taped. There's no need to continue with polygraph test or exam after a confession.

Q    Let me try this way. Where did Trooper Dawson make a recording of what my client said?  Where at the barracks? Was it in the room where you conducted your questioning?

A    Yes.

Q    Whose questions were answered by my client when the recording took place?

A    Trooper Dawson's.

Q    That's not what I had asked you. What I asked you was whether or not you have a recording of what my client told you in response to your question?

A    No, I do not have a recording of that.

A-165

164

Q    Thank you. And you don't have that in writing either, do you?

A    No, I do not.

Q    Is it not usual that an investigating officer would put in writing what the defendant told him if it amounted to a confession?

A    Yes, which we got a taped confession, which is better.

Q    But what he told you wasn't taped; was it?

MR. LEBER: Judge.

A    Yes, it is.

MR. LEBER: This is being redundant, it's repetitive.  I think that testimony is clear of what happened here, and I don't know why we're beating this dead horse.

THE COURT:  I suggest we're beating dead horse.  We should essentially move on.

Q    What did the defendant tell you which is not recorded, which is not written or of record, what did he tell you?

A    We'll start with the rib injury. He mentioned that he may have squeezed too much.

Q    What?

A    The ribs, that he may have squeezed the child too much which caused those particular injuries. One of the leg injuries he mentioned that he dragged the child while in the

A - 166

1   car seat out of the car, which may have caused that pulling

2   injury in that one particular leg.

3        Q    Excuse me.  Let's stop right there.  As to the leg

4   did he tell you when that was done?

5        A    He didn't give a specific time.

6        Q    Did you ask him when it was done?

7        A    I believe so but I would have to check the taped

8   statement.

9        Q    Did you ask him who was there?

10       A    Yes.

11       Q    What did he say?

12       A    Without looking at my notes.

13       Q    You have notes?

14       A    Well, the taped statement.

15       Q    You have notes of his statement to you?

16       A    I have a copy of Trooper Dawson's reports which

17   has the transcribed tape.

18       Q    Officer, I've been accused of being redundant, of

19   asking same question.  I have, that's true.  What the

20   district attorney says is true.  I keep getting different

21   answers.  Do you have any notes, recordings of any kind of

22   what my client told you when you say he confessed, any notes

23   at all?

24       A    With only me in the room, no.  I have taped

25   statement afterwards, which is redundant of what he told me.

A-167

166

Q    Officer, please, my questioning has to do with what he told you, which you say amounted to a confession which led you to call Trooper Dawson to get a recording; right?

A    Right.

Q    What did he tell you?

MR. LEBER: Judge, this has been asked and answered.

THE COURT:  Well, as I understand it where we are the witness has made comments that he attributes to the defendant as to two alleged injuries.  I don't know if there are other comments as to other alleged injuries.  If so, if I understand, that's counsel's question.

MR. FINK:  Thank you, your Honor. What I'm trying to elicit from the witness is what my client told him outside of Trooper Dawson's presence at the pretest.

THE COURT:  I am under the impression that is the answer that's being given.

A    Right that is his question.  My answer is same thing he told me was same thing in the taped statement.

Q    Tell us then what it is?

A    I have to review the taped statement.

Q    What are you looking at?

A    A copy of the criminal incident report.

Q    Is that a writing of what my client told you?

A - 168

167

```
 1        A    What do you mean by writing?

 2        Q    Is that a record of what my client told you,

 3    officer?

 4        A    Yes, yes, it is.

 5        Q    May I see it?

 6        A    Sure.  Starting from there.

 7        Q    This is what my client told Dawson?

 8        A    That's the same what he told me he told Dawson.

 9        Q    He told you that he lived in Roulette

10    approximately 8 months.  Did you question him?

11        A    Yes, I have his address.

12        Q    Your questioning, questions are the exactly the

13    same as Trooper Dawson's questions; is that true?

14        A    No, the answers are the same. The questions--

15    you're asking me what he told me in the pretest prior to

16    getting Trooper Dawson in the room to get taped confession--

17    are the same. Is that hard to understand?

18        Q    Yeah, it is.

19             THE COURT:  I'll ask the witness to refrain

20    from questioning counsel.

21        Q    Tell me what my client told you that amounts to a

22    confession as far as you're concerned?

23        A    Sir.

24        Q    You can use anything you wish to refresh your

25    recollection.
```

A-169

168

A    I believe the last one we were talking about was the car injury.  Trooper Dawson asked same as I did the prior two injuries. "One of them may have happened when I dragged her out of the car, I was upset, bad day.  Instead of being easy I just grabbed the car seat and her leg was up against the car seat when I grabbed it and I just grabbed and pulled car seat out so I could get her out in the Carr and get her into the house, and that was apparently the result of another injury."

Q    That's exactly the same as he told you when you questioned him alone exactly?

A    Not word for word but outcome is the same, yes, car seat, pulled her out, grabbed her out.

Q    He said he had a car seat, she was in a car seat, right?

A    That is correct.

Q    He said he pulled her out of the car seat?

A    That is correct.

Q    And dragged her into the house is that what he said?

A    I could read it again.  Yeah, one of them may have happened when I dragged her out of the Carr.  I was upset, bad day, instead of being easy--

Q    Excuse me, sir.  Tell the jury what my client said in your own words about that incident in your own words?

A-170

169

1    A    My own words. She was in the car seat, he just

2    yanked on her leg to get her out of the Carr.

3    Q    He yanked her out of the Carr?

4    A    That's what it says here, yes.

5    Q    That's a confession.  Any other thing that he said

6    that was a confession.  Officer, can you answer that

7    question?

8    A    Yes.

9    Q    What else did he say that amounted to a

10   confession?

11   A    The other leg injury being child's leg was stuck

12   between the crib legs or crib gate, whatever you want to

13   describe that particular wall of the crib.

14   Q    Tell the jury what he told you that amounted to a

15   confession?

16   A    Baby's leg was there.  He still picked her up--

17   there's enough, he just picked her up with enough force

18   knowing the leg was still stuck there, it rattled whole baby

19   crib, which possibly resulted in that injury.

20   Q    Did he tell you that it resulted in an injury?

21   A    Yes, look here in the confession see what his

22   exact words were.

23   Q    Wait a minute you're telling the jury that he told

24   you that he picked the child up from the crib with such force

25   that it rocked the crib?

A - 171

170

1      A     That's correct.

2      Q     And what injury did that result in?

3      A     A leg injury.

4      Q     Did you ask him about whether she cried or whether

5  her mother was or was anybody there?  Now this is a

6  confession of a serious crime; is it not?

7      A     Yes, it is.

8      Q     You bet. And did you ask him who was there at the

9  time?

10     A     Yes.

11     Q     Can you answer that, officer?

12     A     Yes, he was only--

13     Q     What did he say?

14     A     He was only person in the room with the child.

15  All the other people were in the house, Lori Moore--

16     Q     Did you ask him if the child cried?

17     A     Yes.

18     Q     What did he say?

19     A     It cried.

20     Q     The child cried?

21     A     Right.

22     Q     Did you ask him if he told the child's mother?

23     A     He said they talked after a custody hearing back

24  in February 26th of the same year about what may have caused

25  one of the leg injuries.  Now since there's so many leg

A-172

171

1    injuries I'm not sure which one it related to, but I believe

2    it related to this one.

3        Q    This is what you termed to be a confession of a

4    serious crime.  Did you ask him when it happened?

5        A    Yes.

6        Q    Did you ask him when it happened?

7        A    Yes.

8        Q    What did he say?

9        A    I don't believe he had a specific time frame in

10   which it happened other than when he lived with Lori Moore at

11   her sister's house.

12       Q    Where?

13       A    Let me check my notes.

14       Q    Sure. Those notes that you're looking at are

15   Trooper Dawson's statements, questioning is that what you're

16   looking at?

17       A    No, it would have been probably September of '96

18   time frame.

19       Q    What's time frame?

20       A    September of '96.

21       Q    You were telling me where this was suppose to have

22   happened?

23       A    I said Lori Moore's sister's house.

24       Q    Which is where?

25       A    Roulette.

A-173

172

Q    Roulette.  I want you to be sure of this.

A    It's not Roulette.  It would have happened in probably better in Lori's house.

Q    Wait a minute this is the criminal conduct that he's confessing to and you are aware, are you not, that you have to file a criminal complaint in the county in the township where it occurred; are you not?

A    Most definitely.  I did not file that.

Q    So that would be an important question where it occurred, right?

A    Exactly.  Coudersport.

Q    First you said Roulette then you said Coudersport?

A    Coudersport.  There's lots of notes here.

Q    Now, that is relation to him picking the child up out of the crib.  It happened in September, in September of '96 in Coudersport, right?

A    Roughly, yes.

Q    Now, was there anybody else around when he took the child out of the baby holder in the Carr?

A    The car seat.

Q    Yeah.

A    I believe there was.  Let me check my notes.

Q    Sure you check your notes.

A    He mentioned Jennifer.

Q    Who is Jennifer?  Did you ask him who Jennifer

A-174

173

1    was?

2         A    I believe that was asked or was actually known

3    prior to that by Trooper Dawson.

4         Q    When did this take place?

5         A    That would have been 12/96.

6         Q    Where did it take place?

7         A    Coudersport.

8              MR. LEBER: Judge, I think I'm going to make

9    an objection on several levels here. One, is that this

10   officer obviously is not the investigating officer in this

11   case. The examination is exceeding the scope of the direct

12   examination at this point. We have indicated that in the

13   opening statement to the jury we would produce the tape

14   recorded statement, which is the best evidence of what

15   occurred on that particular occasion and just appears to me

16   we're going over same ground here continually, that it's

17   repetitious and that there is nothing being accomplished here

18   and we should move onto other areas that's consistent with

19   the direct testimony that's been presented.

20             THE COURT:  I think we have a certain amount

21   of repetition, however, certainly counsel is entitled to test

22   officer's recollection if that's in fact what we're testing.

23             MR. FINK:  Why, yes, Your Honor.

24             MR. LEBER: We're not doing that.  If the

25   officer is, Your Honor, reading off of this statement.

A-175

174

THE COURT:  That's a concern I have.

MR. FINK:  Me too, Your Honor, the question is what the witness told him.  He has said the witness has told him exactly the same thing.

THE COURT:  That is basis for my ruling you may question the witness about matters within his own recollection.

Q    Did my client tell you where this took place, the Carr incident?

A    At Coudersport, Tammy's house.

Q    But didn't tell you when?

A    Probably did and the best way to answer my particular job is to find out if a person is telling the truth or not.  Once I established that there was a problem and person is being deceptive, slash lying I assist the investigator where to go with his interviews, which after he gave me the rough idea of the injuries to the child, what probably caused those injuries, that is Trooper Dawson's job, that's the reason why I have taped statement by him. If Trooper Dawson was not there nor had anybody else, I would have had fully documented notes, everything written down because then it would be my particular case to testify on.

Q    Do you understand that whole line of questioning has to do with your testimony of what my client told you; do you understand that?

A-176

175

A    Yes.

Q    And you have thus far answered what my client has told you by reading the statement of what he told Trooper Dawson; is that true?

A    Yes, I tried to answer your questions, but my answers are ambiguous when you ask specifics, therefore, I'll have to consult the notes of the taped statement.

Q    Did he confess to any other incidents of abuse?

A    Just rib injuries and the leg injuries.

Q    The ribs?

A    Yes.

Q    And the ankle on September in September; is that right?

A    Sometime in the Fall of '96.

Q    He didn't say when?

A    I don't believe he gave specific dates and times exactly.

Q    Well, did you ask him?  This is serious crime he's confessing to.  Did you ask him about the specific time and date?

A    I believe we went over it.

Q    What did he say?

A    I do not recall exact dates and times that is reason why we have Trooper Dawson to get the taped statement.

       MR. FINK:  Nothing further.

A-177

176

THE COURT:  Any redirect?


REDIRECT EXAMINATION BY MR. LEBER:

Q    So that I understand this, Trooper Davis, you were

in a separate room with Mr. Bailey; is that correct?

A    That is correct.

Q    And your purpose in being there was what?

A    To polygraph the examinee, which would be Mr.

Bailey.

Q    While you were preparing for that polygraph

examination Mr. Bailey made certain statements to you; is

that correct?

A    That is correct.

Q    After he made those statements what did you do?

A    I got Trooper Dawson.

Q    And you mentioned that there was a tape recorded

statement taken?

A    Yes.

Q    Were you present through out the taking of that

tape recorded statement?

A    Yes.

Q    Now, when you first got on the stand why didn't

you tell the jury whenever I first asked you questioning

about being here for a polygraph exam?

A    Because he was never given a polygraph exam.

A - 178

177

Q    Is there a legal reason why you don't discuss polygraphs in court?

A    Not to hinder perhaps the jury's decision, but the Court does recognize polygraph and there are Commonwealth decisions on that especially one where confessions are given.

Q    Now, again were you the investigating officer in this case?

A    No.

Q    Who was the investigating officer?

A    Trooper Dawson.

Q    If you were the investigating officer in terms of preparing notes of this particular interview, would you have conducted yourself differently?

A    Yeah.

MR. FINK:  Objection irrelevant what he would have done as investigating officer.

THE COURT:  In view of the nature of the cross overruled.

A    Exactly.  If I was the investigator, I would have handled it lot more different, but since Trooper Dawson, it's his case and he was available I let him proceed because he's the one most likely going to have to testify more so than myself.

MR. LEBER:  Thank you, Trooper Davis.

THE COURT:  Recross?

A-179

178

                    MR. FINK:  No, Your Honor, thank you very

much.

                    MR. LEBER:  Call Alan Moore to the stand.


A L A N  M O O R E, having been duly sworn, was examined and

testified as follows:


DIRECT EXAMINATION BY MR. LEBER:

        Q    Alan, can you tell me your name and your address.

        A    I can't remember my address.

        Q    You don't know your address.  How about your name,

full name?

        A    Alan Moore.

        Q    How old are you, Alan?

        A    Eight, I mean nine.

        Q    When is your birth date?

        A    December 15th.

        Q    That was yesterday; wasn't it?

        A    Hm-hmm.

        Q    Happy birthday.  So you're nine now; is that

correct?

        A    Yeah.

        Q    You go to school?

        A    Yeah.

        Q    What school do you go to?

A-180

179

1    A    Elementary school.

2    Q    Where is that?  Coudersport?

3    A    Coudersport.

4    Q    And what's your mother's name?

5    A    Lori.

6    Q    And do you live with your mom?

7    A    No.

8    Q    You live with your aunt?

9    A    Yeah.

10    Q    What's her name?

11    A    Tammy.

12    Q    She lives here in Coudersport; is that right?

13    A    Yeah.

14    Q    Did you used to live with your mom?

15    A    Yes.

16    Q    And do you remember back in the period of time

17    after your sister Rebecca was born?

18    A    Yeah.

19    Q    Do you remember where you lived at the time?

20         THE COURT:  Could I have counsel step up here

21    a moment.

22         (Off-the-record discussion held).

23         MR. LEBER:

24    Q    Again Rebecca is your sister, right?

25    A    Yeah.

A-181

180

Q    How old is Rebecca?

A    One.

Q    Okay and whenever she was really little where did you live at first?  Do you remember?

A    No.

Q    Okay. And whenever Rebecca was little and you were about 7 years old was there somebody else that lived with you and your mom and Rebecca.  I guess you have another sister, Jennifer; is that correct?

A    Yeah.

Q    Was there somebody else that lived with you then?

A    Yeah.

Q    Who was that?

A    Mark.

Q    Mark Bailey?

A    Yeah.

Q    He's the guy seated over there; is that correct?

A    Yeah.

Q    And was there a time when you saw something happen between Mark and Rebecca that upset you?

A    Yeah.

Q    Do you know where did that happen?

A    Roulette.

Q    In Roulette.  Where did you live at the time that happened?

181

A    Roulette.

Q    You lived in Roulette then?

A    Hm-hmm.

Q    Who all lived with you in Roulette at that time, Alan?

A    My mom, my Uncle Mike and Jennifer and Rebecca and Mark.

Q    So your Uncle Mike, your mom, Jennifer, Rebecca and Mark.  Again Mark is Mark Bailey; is that correct?

A    Yeah.

Q    And what was it that happened?  What did you see happen that caused you to be upset?

A    Mark like was in one of his mad attitudes, and he like yanked Rebecca out of the car seat.

Q    What happened, Alan, whenever Mark ripped, as you said, Rebecca out of the car seat?

A    She started crying.

Q    And how long did she cry?

A    I don't know.

Q    You don't know.  Did you see anything that happened to Rebecca because of that, anything that happened to her leg?

A    It got stuck.

Q    It got stuck. And after she was unstuck and after she got out of the Carr or Mark took her out of the car, did

A-183

182

1    you see her leg after that?

2        A    No, because I was still in the Carr.

3        Q    You were still in the Carr.

4        Q    Did you go into the house then?

5        A    Yeah.

6        Q    And after that did you see Rebecca's leg?

7        A    No, because I went to bed.

8        Q    You went to bed.

9        Q    Okay. How about the next day or so did you see

10    Rebecca's leg?

11        A    No, because I had to go to school next day.

12        Q    You had to go to school next day.  Do you remember

13    a time when Dr. Supinski testified that Rebecca had a cast on

14    her foot.  Do you know what a cast is?

15        A    Yeah.

16        Q    Do you remember when she had a cast on her foot?

17        A    Yeah.

18        Q    And how long before she had a cast on her foot did

19    this happen that you saw Mark pull her out of the car seat?

20        A    I don't remember.

21        Q    You don't remember.

22        Q    But you lived in Roulette at that time; is that

23    correct?

24        A    Yeah.

25                MR. LEBER: Thanks a lot, Alan, I appreciate

A-184

183

it.

THE COURT:  Thank you.  Defense may cross.

MR. FINK:  Just a couple questions of this young man.

CROSS-EXAMINATION BY MR. FINK:

Q    Alan, I'm H. B. Good to meet you.  I ain't gonna bite, honest.  Do you know this fellow here?

A    Yeah.

Q    Is he a good guy?

A    I don't know.

Q    Do you get along good with him?

A    Sort of.

Q    How about your sister?  She get along good with him?  How about your mom?

A    I don't know.

Q    You don't know.  Okay. Just a couple more questions.  You were in a conversation, you were talking to the D.A., the District Attorney, Mr. Leber, in the back of this courtroom, right?

A    Yeah.

Q    Today?

A    Yeah.

Q    Were you talking over what you'd say here?

A    Yeah.

MR. FINK:  Alan, thanks so much.  I have

A-185

184

1   nothing further thanks.

2              MR. LEBER: Just one other question, Alan.

3      Q    When you and I talked when we were back there in

4   the back of the courtroom what did I tell you about the way

5   that I wanted you to testify?  Do you remember?

6      A    No.

7      Q    What did I tell you I wanted you to tell the jury?

8      A    The truth.

9      Q    The truth.  Thank you.

10             MR. LEBER: I have nothing else, Alan.

11             THE COURT:  Anything on recross?

12             MR. FINK:  No, Your Honor.

13             THE COURT:  Thank you very much for coming in

14  today.  You can step down now.

15             MR. LEBER:  Lori Moore, please.

16

17  L O R I  M O O R E, having been duly sworn, was examined and

18  testified as follows:

19

20  DIRECT EXAMINATION BY MR. LEBER:

21     Q    Would you tell us your name and address please?

22     A    Lori Moore, and my address is P.O. Box 264,

23  Coudersport.

24     Q    And how old are you, Miss Moore?

25     A    27.

A-186

185

Q    Do you have children?

A    Yes.

Q    How many children do you have?

A    Four.

Q    Their names and ages?

A    I have Alan, he's nine, I have Anthony, he's 6, Jennifer is 2 and Rebecca she's 1.

Q    Now, Rebecca was born when?

A    February 2nd of '96.

Q    And at the time when Rebecca was born where did you live?

A    With my sister in Coudersport.

Q    Her name is?

A    Tammy Baker.

Q    And at that time what was your relationship to the Defendant, Mark Bailey?

A    He was my boyfriend.

Q    And where did he reside at that time?

A    I think at that time he was still staying with my sister and me.

Q    And how long did he continue to stay with your sister and you?

A    He moved back out I think in March.

Q    And then after that did you and Mr. Bailey get together again?

A-187

186

1    A    Yeah, we didn't split up.  He just moved out of

2    there and back to Bradford.  We stayed seeing each other.  He

3    moved back into my sister's house in either May or June when

4    he started working over at Emporium Specialties.

5    Q    And how long did you continue to live at your

6    sister's house along with Mr. Bailey?

7    A    Up until September.

8    Q    That's September of 1996; is that correct?

9    A    Yes.

10    Q    And where did you go from your sister's house?

11    Where did you move to?

12    A    Roulette.

13    Q    And what was the address in Roulette?

14    A    P.O. Box 81, Roulette.

15    Q    And who all lived with you in Roulette?

16    A    Me, and Mark and Alan and Jennifer, Rebecca and my

17    brother Mike.

18    Q    How long did you stay together with Mr. Bailey

19    after you moved to Roulette?

20    A    We were together until he went to jail and then we

21    broke up, and then after he got out of jail we got back

22    together for a while.

23    Q    And how long after you got back together did you

24    and Mr. Bailey continue to be together?

25    A    Until October of this year.

A-188

187

Q    And since then you've been separated from him; is that correct?

A    Yes.

Q    Now, who was the pediatrician, the doctor who took care of Rebecca?

A    Dr. Asar.

Q    And did you take Rebecca to see Dr. Asar for regular visits?

A    Yes.

Q    Now, on September 24th of 1996 did you have occasion to see Dr. Asar on that date?

A    No, I just took her into her office because she had a swollen leg.

Q    The question was did you see Dr. Asar on that date?

A    Yes.

Q    Where was it that you saw her?

A    At her office.

Q    And after seeing Dr. Asar what did you do?

A    She gave me some papers to take Rebecca to the hospital to have her leg x-rayed so I took her to the hospital.

Q    Why was it that you went to see Dr. Asar on that day?

A    Because Rebecca's leg was swollen.  It had, like

A-189

188

1     it was black and blue and it kind of looked funny.

2         Q    What do you mean it looked funny?

3         A    It was, looked like it was kind of crooked.

4         Q    And when did you first notice that her leg was

5     kind of crooked and swollen?

6         A    It was probably--my sister pointed it out to me

7     probably like the Saturday before I took her.

8         Q    Do you know what day of the week it was that you

9     took Rebecca to Dr. Asar's office and then to the hospital?

10        A    I do believe it was on a Monday.

11        Q    When you went to see Dr. Asar on that date did

12    anybody go with you?

13        A    Yes, Mark did.

14        Q    And Mark is the defendant here?

15        A    That is correct, yes.

16        Q    And who did you see when you went to the hospital?

17        A    I really don't remember who I seen.

18        Q    Any of the doctors who have testified here today?

19        A    I remember seeing Dr. Supinski there, but that was

20    at the end.  The rest of them I don't remember.

21        Q    Do you remember anyone else here in the courtroom

22    was present in the Emergency Room when you were there that

23    day?

24        A    I don't.

25        Q    Do you remember Mrs. Carr here, the lady seated

A - 190

189

1    right behind me?

2        A    Yeah, I think she was in the room with us when

3    just before they put the cast on and while they were doing

4    the cast.

5        Q    Now, during the time that you were at the

6    Emergency Room and you met with Dr. Supinski did Dr. Supinski

7    basically explain to you as he testified today of what his

8    findings were?

9        A    Yes.

10       Q    Did you give any explanation to Dr. Supinski at

11   that time or to anyone else as to what happened to the child?

12       A    Yes, I told him that I thought maybe it was

13   because my daughter had fallen on her because she was sitting

14   in a car seat.  She had her leg draped over the car seat and

15   my older daughter fell on her leg while it was draped over

16   the car seat.

17       Q    How old was your older daughter at that time

18   approximately?

19       A    She was little over a year old.

20       Q    Now, was Mr. Bailey, the defendant, was he present

21   with you in the emergency room throughout this entire period

22   of time?

23       A    Yes.

24       Q    And did he offer any explanation as to what had

25   happened to this child?

A-191

190

A    I don't remember.

Q    Whenever you were told by Dr. Supinski of what his findings were relative to this case can you tell us how Mr. Bailey reacted to that news?

A    He was upset and he cried.

Q    Did he have anything to say at that point?

A    Just basically that he couldn't believe that it happened and he wanted to know how it happened.

Q    And did he say anything relative to who did it and what he thought of that?

A    Not that I can remember.

Q    Now, what happened then with Rebecca after you were done with Dr. Supinski?

A    Children and Youth Services took her into their custody.

Q    And how long did she remain in Children Youth Services custody?

A    She's still in their custody.

Q    Since that date of September 24th, 1996 have you had continuing contact with Rebecca?

A    Yes.

Q    How frequently do you see her?

A    At first it was like every other weekend, but now we see her every weekend.

Q    Can you tell us whether or not there have been any

A-192

191

1    injuries which have occurred to Rebecca since September 24th,

2    1996?

3        A    Not that I'm aware of.

4        Q    Now, in February of 1997, I believe February 28th

5    of 1997, did you have occasion to go to the Pennsylvania

6    State Police Barracks with Mr. Bailey?

7        A    Yes.

8        Q    And after you were at the Pennsylvania State

9    Police Barracks with Mr. Bailey did he make any statements to

10   you relative to what he had told the officers at that time?

11       A    He had told me that he had told them that he did

12   it and I asked him--

13       Q    That he what?

14       A    That he had possibly done that to Rebecca, and I

15   asked him why.  And he said that he couldn't handle her

16   crying and that Rebecca reminded him of his son.

17       Q    What was the problem with his son?

18       A    He wasn't able to see his son.

19       Q    What, if anything, did Mr. Bailey tell you more

20   specifically as to how he might possibly hurt Rebecca?

21       A    I don't remember.

22       Q    You don't remember?

23       A    I can't recall right now.

24       Q    Now, Mrs. Moore, are you currently employed?

25       A    Yes.

A-193

192

Q     Where are you employed?

A     Emporium Specialties over in Austin.

MR. LEBER:  Nothing else of Mrs. Moore thank you.

THE COURT:  Counsel may cross.

CROSS-EXAMINATION BY MR. FINK:

Q     Lori, good afternoon to you.  Long day. Lori, when was it that you and my client first started to live together in relation to the birth of Rebecca?  I'll put it that way.

A     He was staying with me and my sister when I had Rebecca.

Q     Stop right there. Now you and your sister was she older or younger sister?

A     Older.

Q     You, your sister, my client and were there any children living in the house at that time?

A     Yes, my son Alan, my daughter Jennifer and my sister's daugther.

Q     Three others were living in the house and where was that?

A     In Coudersport.

Q     Coudersport?

A     Yeah.

Q     Okay. Whose house?  Who was the chief renter or

A -194

193

1    who would you say was the head of the house so to speak?

2         A    My sister.

3         Q    I'm sorry?

4         A    My sister.

5         Q    There were two sisters?

6         A    No, only one sister.

7         Q    Sorry okay. Now, Rebecca--my client did not father

8    Rebecca; is that true?

9         A    That's true.

10        Q    After Rebecca's birth--and incidentally was

11   Rebecca born up at Charles Cole here in Coudersport?

12        A    Yes.

13        Q    And that was in February of 1996?

14        A    Yes.

15        Q    How did my client act toward Rebecca after she

16   came home from the hospital?

17        A    He held her, he played with her.  I mean not much

18   more than anybody else.  She was just a new born baby.  All

19   she did was sleep.  So there wasn't whole lot of time spent

20   with her, but I mean when I wasn't holding her or would

21   actually let somebody else hold her he held her and feed her

22   and stuff like that.

23        Q    Who was considered primary caretaker of Rebecca up

24   to the time that you and my client split up?

25        A    I was.

A-195

194

```
 1        Q     You were.  Okay. Did there come a time when you
 2   moved from your sister's house in Coudersport?
 3        A     Yes.
 4        Q     Where did you go?
 5        A     To Roulette.
 6        Q     And when was that?
 7        A     In September.
 8        Q     Do you know what date?
 9        A     I do believe it was around 10th.
10        Q     I'm sorry?
11        A     It was around the 10th of September.
12        Q     Around the tenth?
13        A     Hm-hmm.
14        Q     10th of September okay. Now, up to that time, to
15   the time you moved from Coudersport to Roulette could you
16   describe, and as Rebecca got a little older did my client
17   continue to play with her and did he get along well with her?
18        A     When he was there.  He wasn't there all the time.
19   He was working.  He'd get frustrated sometimes when she'd
20   cry.
21        Q     Up to September 10th of 1996 when you moved to
22   Roulette were you aware of any physical injuries to Rebecca?
23        A     No, I was not.
24        Q     How often did you bathe her?
25        A     Every day.
```

A-196

195

Q    You would give her a bath, and I assume you would--she was bare naked when you did that?

A    Yeah.

Q    And you were never aware of any injury or was there any?

A    There was one time that her foot was swollen and black and blue.

Q    Let's talk about that now. Her foot was caught where?

A    It wasn't caught any where.  It was swollen and black and blue.

Q    Okay let's talk about that. Which foot was that?

A    I don't recall.

Q    Okay. Do you know when it was in relation to when you moved from Coudersport to Roulette?

A    I know it was when I was still in Coudersport, but I don't know how long.

Q    Do you have any idea how that came about that her foot was black and blue?

A    No, I don't.

Q    Were you ever aware that Mark was ever alone with Rebecca?

A    I don't ever remember Mark being alone with Rebecca except for like if he'd get up with her middle of the night or something like that.  There was always somebody in

A-197

196

1    the house.

2        Q    Do you remember whether Rebecca complained as

3    babies complain like crying or whining concerning her

4    apparent injuries to her foot before you moved to Roulette?

5        A    There was one time at my sisters when we changed

6    her diaper she would cry a lot and we thought she had a

7    dislocated hip, and I talked to Dr. Asar about it, which

8    means she had a physical, and Dr. Asar said there was nothing

9    wrong with her, there was nothing wrong with her hip, there

10    was nothing wrong with her.

11        Q    That was specific reference to this black and blue

12    Mark that you observed?

13        A    No, this was a different time.

14        Q    Now, what I'm trying to focus in on right now is

15    the black and blue mark you found on her foot.  You don't

16    know which one before you moved from Coudersport to Roulette,

17    and I guess I've asked you was there any evidence or does she

18    show you in any way that a baby can show a mother that that

19    hurt her?

20        A    If you touched it, she would really.

21        Q    Did you take her to the doctor because of that?

22        A    No, I did not.

23        Q    You did not?

24        A    No.

25        Q    And did the doctor ever observe it?

A-198

197

1    A    I don't recall if she did or not.

2    Q    Do you know whether the doctor gave her a physical

3    after you saw it?

4    A    She been to the doctor after.

5    Q    And by the doctor we're talking about the doctor

6    that had cared for her since a week after her birth; right?

7    A    Right.

8    Q    Up to right now?

9    A    Right.

10   Q    Were you ever aware of Rebecca having difficulty

11   in breathing or any rib injury that she may have had?

12   A    No, she had a small bruise on her ribs at one

13   point in time.

14   Q    On her?

15   A    Her one rib at one point in time, but it was

16   nothing that I would have been worried about.  It was just a

17   small--

18   Q    Did she evidence any pain in reference to any rib

19   that you know of?

20   A    I don't recall.

21   Q    Now, other than the black and blue foot that

22   didn't give you cause for--you were not concerned about that,

23   I gather, is that true?

24   A    I was, but the reason I didn't take her to the

25   hospital for that is because my daughter, Jennifer, had been

A -199

198

1   there several times for the same symptoms, and every time I

2   took her to the doctor Dr. Asar would always tell me there

3   was nothing wrong with her, that she didn't know what was

4   causing her feet to swell and turn black and blue.

5        Q    Would you say those symptoms ran in the family?

6        A    I have no idea, not that I know of.

7        Q    You're older daughter had the same symptoms; is

8   that right?

9        A    Yeah, she would get swollen feet and they would

10  turn black and blue.  She would--also her ears would swell up

11  and turn black and blue.

12       Q    Really?

13       A    Yes.

14       Q    And the doctor would say there was nothing wrong?

15       A    She gave me several different answers as to why

16  they were doing it, from dry skin to whatever.

17       Q    Now, let's go up to September 24.  You had lived

18  in Roulette for a couple of weeks?

19       A    Yes.

20       Q    Who lived with you then?

21       A    Me, Mark, and Alan, Jennifer, Rebecca and my

22  brother Mike.

23       Q    Who?

24       A    My brother Mike.

25       Q    Your brother Mike, that's six of you, I guess?

A-200

199

1    A    Yeah.

2    Q    Did there come a point in time when it came to

3    your attention that Rebecca had another swollen and

4    discolored foot or ankle?

5    A    It was more up in her lower leg area that was

6    swollen and discolored.

7    Q    What area?

8    A    Lower leg like in her shin area up in there.  It

9    wasn't her foot or her ankle it was more like her shin.

10    Q    When you talk about shin, you're talking of the

11    area half way between the knee and the ankle?

12    A    Yeah.

13    Q    Front or back or both?

14    A    Both.

15    Q    And when you first observed anything in that area

16    tell the jury what you saw?

17    A    It was black and blue. It was swollen.

18    Q    Now, you didn't take her to the hospital right

19    away, right?

20    A    No.

21    Q    But did you keep an eye on it so to speak?

22    A    Yeah.

23    Q    It kept getting worse?

24    A    Yeah, I took her to the hospital finally because

25    her leg looked crooked to me.  It looked like it was out of

A-201

200

1    place or something.

2            Q    And how bad was it swollen at that time?

3            A    The swelling wasn't really bad at that time.  It

4    wasn't as bad as it had been, it had went down.

5            Q    It had been almost double its size; hadn't it?

6            A    Probably.

7            Q    The swelling went down but you asked to have it

8    checked out any way?

9            A    Yes.

10            Q    Now, when you first noticed or just before you

11    first noticed it were you aware that there was any traumatic

12    event to Rebecca, that is somebody may have jumped on her or

13    something like that?

14            A    Only thing I knew about was my daughter, Jennifer,

15    falling on her while she was sitting in her car seat.

16            Q    Your daughter Jennifer.  Your daughter Jennifer is

17    about two years old and about 30 pounds?

18            A    She was--she wasn't two years old, she's only two

19    now, but she was heavy for her age.  I don't recall how much

20    she weighed or anything.

21            Q    Now, what event did you observe in reference to

22    your daugther Jennifer and little Rebecca?

23            A    Jennifer had fallen on Rebecca's leg while she was

24    sitting in the car seat.  Her leg was like this in the car

25    seat.  Her leg was draped over the car seat like this.  She

A-202

201

1  was sitting in the car seat playing with her toys, Jennifer

2  fell and when she did she went onto her leg.

3       Q    You've indicated that with your right arm and hand

4  that respresenting Rebecca's leg that her leg was kind of

5  draped over the car seat and that your daughter, Jennifer,

6  fell basically on her ankle so that it was a downward thrust

7  at her ankle, I guess.  Was that a fair statement of what

8  happened?

9       A    I would suppose.

10      Q    Okay did you see this happen?

11      A    Yes.

12      Q    Did Rebecca cry?

13      A    Yeah, for a few minutes, but after I picked her up

14 and usually babies calm down after they're picked up, she

15 did, so I didn't really.

16      Q    Do you remember whether or not that night you

17 noticed any swelling or discoloration of the shin?

18      A    I don't remember seeing it.

19      Q    That's the event about which you told Dr.

20 Supinski?

21      A    Yes.

22      Q    And do you believe as you sit there right now that

23 that's what caused the injury evidenced by the swelling of

24 September 24th?

25      A    I honestly couldn't tell you, I'm not a doctor, I

A-203

202

1    don't know if that's what caused it or not.

2        Q    You're a mother and you were there?

3            MR. LEBER: Your Honor, I think she's

4    answered.

5            THE COURT:  Witness has I believe indicated

6    she can't say.

7        Q    Did you ever see Mark do anything to Rebecca to

8    injure her?

9        A    I never seen him, no.

10       Q    Even though Mark was not the father of Rebecca did

11   it appear to you that Mark loved Rebecca?

12       A    He always seemed to do good with all my kids.

13       Q    Was Rebecca staying for a time with your sister?

14   After the Children Youth Services hearing, Rebecca was taken

15   from you; is that true?

16       A    Yes.

17       Q    Did she live with your sister for some time?

18       A    After she was taken from me.

19       Q    Yeah.

20       A    No.

21       Q    Her father?

22       A    Yeah, she was living--she didn't live with her

23   father.  She was in a foster home.

24       Q    Did she live with her father at any time?

25       A    For a little while just recently.

A-204

203

Q    Did it come to your attention that the father's wife was abusing Rebecca?

MR. LEBER: Objection, Your Honor.

THE COURT:  Would counsel approach.

(Off-the-record discussion held).

THE COURT:  The objection is sustained jury will disregard that remark in its entirety.

Q    Do you know whether or not prior to September 24, that child ever stayed there or saw, Rebecca ever stayed or saw her father?

A    No, she did not.

Q    Would you say that Rebecca was a happy baby?

A    Yeah, most times she was.  She'd have her times when she was cranky.

Q    You have stated somewhere, have you not, that you didn't go any place without Rebecca, Rebecca was your baby and you didn't go any place without her; isn't that true?

A    Pretty basically.  There might have been a couple times she went to a baby sister.

Q    Where was that?

A    The baby sister, usually my sister.

MR. FINK:  I have no other questions.

THE COURT:  Anything else?

MR. LEBER: Redirect, yes.

A - 205

204

REDIRECT EXAMINATION BY MR. LEBER:

    Q   Miss Moore, Mr. Fink asked you about Mr. Bailey's relationship with your children and you said that he always seemed to do good with all my kids. How did the kids react to Mr. Bailey?

    A   When I first got with him, they were okay with him, but towards the end Jennifer was afraid of him. And Alan, I don't believe, I don't really know, he just kind of didn't say much, but Jennifer was afraid of him.

    Q   You several times said that Alan, that Mark was never alone, then you qualified that by saying there was always someone in the house. Even though somebody was in the house were there ever times when Mark, for instance, would have been in a different room with Rebecca alone?

    A   Yes, several times.

    Q   And you heard your son Alan's testimony here today; is that correct?

    A   Yes.

    Q   Do you recall the incident of which he describes?

    A   I do vaguely. I remember that Mark and I had been fighting that day, and I had taken Jennifer into the house, and he was getting Rebecca out and Alan of course was following, but I had already went to the house.

    Q   So Mark was alone with the baby at that time other than for Alan; is that correct?

A-206

205

```
 1        A    Yeah.

 2        Q    And you indicated that you and Mark were arguing;

 3   is that correct?

 4        A    Yeah.

 5        Q    And when in relationship to when you arrived home

 6   had you been arguing?

 7        A    I don't know.

 8        Q    How would you describe Mr. Bailey's demeanor, his

 9   conduct at that particular time?

10        A    I honestly can't recall.

11        Q    Now, when you talked about the one time that

12   Rebecca had a black and blue foot you indicated that occurred

13   in Coudersport; is that correct?

14        A    Yes.

15        Q    And is that a separate incident from the incident

16   that took you to the hospital on September 24th; is that

17   correct?

18        A    Yes.

19        Q    Now you also talked about problems you had, that

20   you had taken Rebecca to Dr. Asar because she would cry

21   whenever you were changing her diapers?

22        A    Yeah.

23        Q    Tell us what you would do that would cause Rebecca

24   to cry?

25        A    Just the normal lifting of her legs to pull her up
```

A-207

206

1    to change her diaper would make her cry, and if you like bent

2    her leg or something she would cry.

3        Q    And how long after you observed that was it that

4    you finally got Rebecca to Dr. Asar's office?

5        A    It was shortly after I noticed it because my

6    sister said, told me that it might be a dislocated hip.  So I

7    had taken her to the hospital to make sure, to Dr. Asar's to

8    make sure it wasn't a dislocated hip.

9        Q    Shortly after being how many days?

10       A    I don't remember.  It was whenever I could get an

11   appointment to get in.

12       Q    Then you talked about an incident where it was

13   swollen in the area of her shin and it was black and blue.

14   Was that incident separate from the incident that caused you

15   to go to the hospital on September 24th?

16       A    That was when I went to the hospital on the 24th.

17       Q    And the times that you said that Mark might have

18   been with Rebecca alone in other parts of the house did you

19   ever hear Rebecca respond in any way whenever Mark was with

20   her that caused you concern?

21       A    She would always--she didn't really seem to like

22   Mark a whole lot. She always pretty much cried a lot when he

23   was around, but usually he'd go in like when she'd wake up at

24   night and give her a bottle.  After he gave her a bottle,

25   she'd calm down and go to sleep.

A-208

207

Q    You testified that Mark got frustrated whenever the baby cried.  How would Mark act whenever the baby cried?

A    He'd sometimes yell.

Q    Yell at who?

A    The kids.

Q    Would he yell at Rebecca?

A    I'm not sure if I ever heard him yell at Rebecca or not.

Q    When you say the kids you mean Alan and Jennifer?

A    Yeah.

Q    Again, at that time Jennifer would have been approximately how old?

A    About a year and a half maybe.

Q    You mentioned that Jennifer had had similar signs or symptoms relative to her feet as you observed on Rebecca and that she also had injuries to her ears.  When was that in relationship to when you and Mark lived together?

A    I can't remember when the bruising on Jennifer started. It was like when she was probably ten or eleven months old and I started seeing him.  I don't remember how old she was.  I started seeing him in July.  She was born in February so.

Q    You started seeing him in July of '95, would that be correct?

A    Yes.

A-209

208

Q    And she was born in February of '95; is that correct?

A    Yes.

Q    And these started appearing when she was ten or eleven months old?

A    (Indicating yes).

MR. LEBER:  Nothing else, thank you.

THE COURT:  Any further questions for this witness?

MR. FINK:  Just additional line, Your Honor. I'm not so sure it's proper recross, but with the Courts indulgence.


RECROSS EXAMINATION BY MR. FINK:

Q    When you took Rebecca to the hospital on September 24, did you notice any marks on her face?

A    Yeah, she had a bruise like on her, I think it was on her cheek.

Q    Burn?

A    A bruise.

Q    A bruise.  Do you know how that occurred?

A    She had hit her face in the crib on the bars of the crib because I had taken the bumper pad out of her crib.

MR. FINK:  Thank you very much.

THE COURT:  Thank you.  You may step down.

A - 210

209

1     Any brief witnesses that Commonwealth would care to call late

2     at the end of the day.  I can call Mrs. Carr.

3

4     A L I C E  C A R R, having been duly sworn, was examined and

5     testified as follows:

6

7     DIRECT EXAMINATION BY MR. LEBER:

8         Q     Your name and address, please?

9         A     My name is Alice D. Carr of Coudersport,

10    Pennsylvania.

11        Q     What is your occupation?

12        A     I'm a registered nurse.  I'm working at Charles

13    Cole Hospital in the Emergency Room.

14        Q     How long have you worked in the emergency room?

15        A     Ten years.

16        Q     How long have you been a nurse?

17        A     Ten years.

18        Q     And were you present at the emergency room on the

19    24th day of September 1996?

20        A     Yes.

21        Q     What was your role in the Emergency Room on that

22    date?

23        A     I'm the 3 to 11 charge nurse and I had just come

24    on duty, and the sign off nurse had told me that there was a

25    child with a possible suspected child abuse in Room 2 that

A-211

210

1    hadn't been assessed yet and was waiting for Children and

2    Youth Services and Dr. Supinski to come up and see her.

3        Q    Tell us what observations you made of this child

4    at the time when she was in the Emergency Room?

5        A    I went into the room, introduced myself to the

6    mom, and at the time I thought it was the dad, and I did a

7    basic assessment on the child per our protocol in the

8    Emergency Room. I undressed the child, put on a little

9    hospital gown, took a heart beat, blood pressure, pulse,

10   temperature. Did a physical assessment where I noted she had

11   two bruises on her face, one on her forehead by her temple

12   and one underneath her left eye.  They were yellow, sort of

13   fading. Further assessment indicated a small crooked right

14   ankle, foot area that had swelling and redness and bruising.

15       Q    Incidentally, I didn't establish this.  Who was

16   that child in the Emergency Room?

17       A    Rebecca Moore.

18       Q    And how old was she at that time?

19       A    7 months.

20       Q    And who was with her in the emergency room?

21       A    Her mother, Lori, and Mark Bailey.

22       Q    And that's the defendant that's seated here; is

23   that correct?

24       A    Yes.

25       Q    You indicated that you observed yellow bruises.

A-212

211

1    Again, where did you observe them to be?

2        A    On the left forehead close to the temple and the

3    left cheek underneath the eye.

4        Q    And did either Mr. Bailey or Mrs., Miss Moore the

5    mother indicate to you what had happened?

6        A    I had asked them specifically if they knew what

7    happened to the child, where she had gotten the bruises, and

8    Mrs. Moore said that Rebecca's 18 month-old sister had fallen

9    on her four to five days prior to her coming to the hospital.

10        Q    You indicated that the bruise that you observed on

11    the foot was yellow and green?

12        A    Right.

13        Q    In your training what's significance of that?

14        A    They're old, they're not as fresh as a one day

15    bruise.  As they're fading, they turn from purple to green to

16    yellow until they fade away.

17        Q    And again this was the 24th of September 1996?

18        A    Yes.

19        Q    Do you recall what day of the week that was?

20        A    It was a Monday.

21        Q    And they indicated that--this Mr. Bailey and Miss

22    Moore indicated to you that this incident occurred when?

23        A    Four to five days prior to them coming in.

24        Q    Now, did there come a point in time when it was

25    explained to Mr. Bailey and Miss Moore that this child would

A-213

212

1    be taken by Children and Youth Services?

2         A    After I was, after I assessed the child and had

3    gone out of the room.

4              MR. FINK:  I assume this is not responsive.

5    Requires a yes or no answer.

6              THE COURT:  Witness should answer.

7         A    Yes.

8         Q    Go ahead, tell us what happened.

9         A    After I done my assessment on the child, I went

10   back out to find further information because it was just a

11   brief description of what was going on.  When I went into see

12   the child, I came out and I was told that Joy Glassmire--

13             MR. FINK:  Objection hearsay and it's

14   irrelevant.

15             MR. LEBER: What you were told relative to

16   anything else you can't testify to.

17             MR. FINK:  What's the question before the

18   witness?

19             THE COURT:  There isn't one.

20             MR. LEBER:  There was a while ago.  Let's get

21   one.

22        Q    How did Miss Moore react whenever told that the

23   child would be taken by Children Youth Services?

24        A    She became very upset, started crying.

25        Q    And how did Mr. Bailey react?

A-214

213

1    A    He became upset and he started crying.

2    Q    Do you recall anything that Mr. Bailey had to say

3  during the time that he was in the E R with you and this

4  child and Miss Moore?

5    A    When I was in talking with the parents, we were

6  just basically chit chatting and talking about the kids and

7  because the mom had said that 18 month-old child had fallen

8  on top of her and hurt her leg and Mr. Bailey had said that

9  the kids were always playing around and falling on top of the

10  baby and stuff.

11    Q    Was that his explanation for what had happened?

12    A    Yes.

13    Q    And at that point were you aware of the fact that

14  Dr. Supinski and Dr. Dallaire had determined that there were

15  four or five fractures all together?

16              MR. FINK:  Objection irrelevant.  Whether she

17  was aware or not has nothing to do with the case.

18              THE COURT:  Overruled.

19    A    Yes.

20    Q    To the best of your recollection were Miss Moore

21  and Mr. Bailey aware of that at that time?

22    A    Not until Dr. Supinski came in to speak with them.

23    Q    That was after?

24    A    Yes.

25              MR. LEBER:  Nothing else, thank you.

A - 215

214

1          THE COURT:  Counsel may cross.

2

3     CROSS-EXAMINATION BY MR. FINK:

4          Q     Dee, I have no questions.

5               MR. FINK:  I'm sorry, I have no questions.

6     Thank you.

7               THE COURT:  Thank you very much. We've had a

8     good long day.  Now I got to speak to the attorneys one

9     minute before I send you folks home, figure out what time we

10    ought to start tomorrow.  Counsel step up here.

11              THE COURT:  Ladies and gentlemen, after

12    conferring with counsel I guess we're making reasonable

13    progress on the case, and I'll ask you to be here a few

14    minutes before 9:00. It is my intention that we will start at

15    9:00. During overnight recess, ladies and gentlemen, do not,

16    repeat, do not discuss this case among yourselves or with

17    anyone else including family and friends, fellow workers,

18    make no effort to get any further information on this.  Get a

19    good night's rest.  Come see us little before 9, and we will

20    get to work. Thank you.  Court will stands in recess until

21    9:00 tomorrow morning.

22                    (Overnight recess).

23              THE COURT:  Welcome back, ladies and

24    gentlemen, today to apparently the last day of our trial.

25    Nice to have you all back with us. As we start, I want to add

A-216

215

1    one caution to all the other instructions I've given you. I

2    do not know if there is any local media coverage of this

3    trial. If there is, I think best thing we will have you do is

4    avoid local various newspapers and avoid local radio station

5    because any information you get about the case, as I said

6    yesterday, needs to come as you're all together in the jury

7    box here in the courtroom, not from any other source. I want

8    to instruct you on the record to disregard all media reports

9    of these proceedings whether it's newspapers, radio or

10    whatever. Okay thank you. We'll note appearance of the

11    District Attorney and prosecuting officer for the

12    Commonwealth. Defense Counsel and Defendant are here we will

13    proceed. Commonwealth.

14            MR. LEBER: Thank you, Your Honor. Call Tammy

15    Baker to the stand please.

16

17    T A M M Y   B A K E R, having been duly sworn, was examined

18    and testified as follows:

19

20    DIRECT EXAMINATION BY MR. LEBER:

21        Q    Your name and address, please.

22        A    Tammy Baker, Dorris Apartments, Number 10,

23    Coudersport.

24        Q    What is your relationship to Lori Moore, the

25    mother of Rebecca Moore?

A - 217

216

1    A    I'm her sister.

2    Q    And do you know Rebecca's date of birth?

3    A    February 3rd, '96.

4    Q    And are you employed, Mrs. Baker?

5    A    I work for Adelphia.

6    Q    Now, I want to go back to 1996 after the birth of

7 Rebecca Moore.  Were you familiar with where Rebecca and

8 mother, Lori, resided?

9    A    Yes.

10    Q    Where did they reside at the time Rebecca was

11 born?

12    A    When she was born, they lived with me.

13    Q    That was here in Coudersport?

14    A    Here in Coudersport.

15    Q    And who else resided with you during the first few

16 months of Rebecca's life?

17    A    My sister and her son, Alan, her daughter,

18 Jennifer, my daughter and my brother lived there off and on

19 and Michael.

20    Q    And did there come a point in time when another

21 individual came to live with you?

22    A    Yes, Mark Bailey also stayed there.

23    Q    Mark Bailey is the defendant seated next to Mr.

24 Fink; is that correct?

25    A    Yes.

A-218

217

Q     When was it approximately when Mark Bailey began to live with you in Coudersport?

A     He stayed there before she had Rebecca for a while.  Then he left, and then he became employed at Emporium Specialties and it was easier for him to get a ride from Coudersport so he moved back in, I'm not really sure, I know it was after he started working at Emporium Specialties.

Q     Can you be approximate in telling us?

A     I know it was end of school, beginning of summer.

Q     Late May or June?

A     Right.

Q     Again that's 1996; is that correct?

A     Yes.

Q     How long did Mr. Bailey continue to live with you?

A     He stayed there until him and Lori got an apartment down in Roulette in September.

Q     September of what year?

A     '96.

Q     And who all moved to that apartment in Roulette?

A     Mark Bailey, Lori and her son, Alan, and her daughter, Jennifer, and her daughter, Rebecca.

Q     What about your brother Mike?

A     He lived between here and there so both places.

Q     Did there come a point in time when Rebecca was residing with you, with her mother and other people that you

A-219

218

1     noticed that she was having problems?

2          A     Yes, I had noticed that she had black and blue

3     foot.  It wasn't really black like a bruise, it looked more

4     like--actually I don't how to describe, around the toe area

5     there it was brown dots, like blood vessel broken or

6     something like that.  I don't know how to describe it really.

7          Q     When approximately was that?

8          A     I'm not really sure.  I don't remember dates, I'm

9     not really sure.

10          Q     Was it before or after Mark Bailey came to live

11     with you?

12          A     It would have been after.

13          Q     Any other problems that you noticed with Rebecca

14     of a physical nature?

15          A     Not while she was there.  I didn't take care of

16     Rebecca as much as I had the other kids.  Lori took care of

17     her, bathed her, did that kind of stuff with her.  I stepped

18     back, I helped take care of Jennifer a lot and Jennifer got

19     attached to me.  I didn't want Rebecca to get attached

20     because I knew it made Lori a little upset when Jennifer got

21     attached to me.

22          Q     Was your sister, Lori, working at the time when

23     she was living with you?

24          A     I don't remember when she started working at

25     Emporium Specialties.

A-220

219

Q    After Lori, Mr. Bailey, the children moved to Roulette did you continue to have contact with Rebecca?

A    Yes, Lori used to, her and Mark used to bring her up either Friday or Saturdays on weekend and I'd keep her until Sunday afternoon.

Q    On or about the weekend, I guess, it would have been 21st of September, did Lori and Mark bring Rebecca to stay with you?

A    Yes.

Q    Did you notice anything unusual with Rebecca?

A    She told me when Lori brought her in, she told me Rebecca's leg was hurt.

        MR. FINK:  Objection.

        THE COURT:  Sustained as to those words.

Q    You can't state what someone else said.

A    I looked at Rebecca's leg, it was bruised in the ankle area.

Q    Did you say anything to Lori and Mark at that time?

A    I asked them if they, I asked Lori if she had taken her to the doctor and she told me, no, and I told her that I thought she should take her to the doctor.

Q    And what was Rebecca like that weekend?

A    She was okay as long as you didn't move her around a lot.  If she got jolted a little bit, she'd cry because of

A-221

220

her leg hurting I assumed it was because of her leg hurting.
I had to be careful when diapering her and cleaning her
because she would cry real easy.  The bruise looked really
bad so I assumed it was because her leg was hurting.

Q    And how long did Rebecca stay with you that
weekend?

A    She was there until Sunday afternoon.

Q    Did you say anything more to Lori and Mr. Bailey
whenever they came to pick the child up?

A    I told Lori that she, Rebecca seemed to be
uncomfortable with the leg and I was really worried about it.
I really thought she should take her up to the Emergency Room
or to the doctor and get it checked because I was really
concerned.

Q    That was Sunday afternoon?

A    Yes.

Q    Did you see Rebecca between that Sunday afternoon
and the time when she was in fact taken to the doctors?

A    I don't think so.

Q    Tell us what you observed regarding the
relationship between Rebecca and Mr. Bailey?

A    When they stayed at my house, he would play with
her like he had the other children.  She seemed to be fine
with him. After they moved, especially that weekend that she
had come up with the broken leg Lori brought her in which was

A-222

221

1    unusual usually Mark was the one that carried her in.  She

2    brought her in, set her down.  She had one of those infant

3    seats she brought her in with car seat, set her by the side

4    of the chair.  Mark came in little later.  When he sat down

5    beside her in the chair, she looked up at him and started

6    screaming.  So I picked her up and put her in the other room.

7        Q    There has been testimony by Lori whether Mark was

8    ever alone with this child.  What's your recollection

9    relative to that?

10       A    When he was, when they were at my house--only

11   time, of course, I worked during the day I wouldn't know

12   during the day, only time he would be alone with her if they

13   happened to be in the bedroom, there was always someone in

14   the house.  Any other time I wouldn't know because I was

15   either working or working somewhere else.  They took Rebecca

16   a lot on the weekends, I would keep the other two kids.  They

17   would take Rebecca when they would go visiting in Bradford or

18   wherever.

19       Q    What about did you ever have any circumstances

20   that were unusual with contact between Rebecca and Mark?

21       A    Yes, one time.

22            MR. FINK:  I'm going to object to that it's

23   too broad and may or may not be objectionable, but the

24   question seems irrelevant.

25            THE COURT:  Do you want to make an offer up

A-223

222

1    here.

2            (Following discussion held at the bench) MR.

3    LEBER: Miss Baker will testify that on one occasion Mr.

4    Bailey went into a bedroom because Rebecca was crying, closed

5    the door and Rebecca was heard to cry much more loudly after

6    that, that was at Miss Baker's home.

7            THE COURT:  Okay.

8            MR. FINK:  I have no objection.

9        Q    You may go ahead.  Answer the question.

10       A    One time when they were still living at my house

11   Rebecca was in the bedroom, and I know it was when we were

12   still living there because she was in the crib in the bedroom

13   and she started crying, and Mark was the one that got up and

14   went into her.  When he went in, he closed the door. I said

15   to Lori, why would he close the door?  After he went in

16   there, she screamed.  Lori then went in to bring Rebecca into

17   the living room.

18       Q    What happened when Lori brought Rebecca out?

19       A    She seemed to be upset.  Nothing was ever--I

20   didn't ever talk to her about it or anything so.

21       Q    During the time Rebecca lived with you did you at

22   any time, any other time notice any physical problems or pain

23   that Rebecca was having?

24       A    At one time we were--there was one time when we

25   thought she had a dislocated hip.  We had to be really

A-224

223

careful about how we touched her legs or diaper.  We had to

lift her--normally you lift their legs to put diaper on. We

had to lift her buttocks to slide the diaper under.  I was

concerned then and told Lori.  My daughter had been born with

a dislocated hip.  I thought maybe she had the same thing.

And so I told Lori she should take her to the doctor and ask

the doctor if that could be what the problem was.

         MR. LEBER:  Thank you, Miss Baker, nothing

else.

         THE COURT:  Counsel may cross.

CROSS-EXAMINATION BY MR. FINK:

    Q    Good morning to you. I apologize to you I didn't

catch your name.

    A    Tammy Baker.

    Q    Tammy, could you tell me, excuse me if my

questions elicit testimony that's already been given, but I

didn't quite understand all of your testimony.  Okay.

    A    Okay.

    Q    Could you tell me when it was that Mark first came

to live with you and others in Coudersport?

    A    He lived there with Lori before she had Rebecca.

He had stayed at the house while she was pregnant because he

was the one going to take her to the hospital.  So he lived

there then and then--

A-225

224

Q    Excuse me, that tells me generally.

A    I don't know dates, I just know they moved in.

Q    How about a month, how about a season?

A    When they first came there I'm not sure.

Q    How about a season fall, spring, summer, winter?

A    Could have been fall or winter of '95.

Q    Fall or winter of '95.  Of course Rebecca was born in February of '96; right?

A    Yes.

Q    Now, before Rebecca was born, who lived in the house after Mark got there?

A    Lori and Mark and Lori's son, Alan, Lori's daughter, Jennifer, my daughter and my brother lived there off and on.

Q    Who is your brother?

A    Michael.

Q    How old is he approximately?

A    I think he turned 23 this year.

Q    This was your home.  Did you rent or did you own?

A    I rent.

Q    And it was in your name; right?

A    Yes.

Q    So you had control of, I guess, who came in and who came out?

A    Yes.

A-226

225

Q    Now, after Rebecca or at the time Rebecca was born, I guess, immediately prior Mark took your sister to the hospital for the birth of Rebecca; is that correct?

A    Yes.

Q    Was the father of Rebecca in the picture at all as far as you're concerned?

A    No.

Q    Now, what was the first thing that you noticed about any injury or apparent injury to Rebecca?

A    When she was real little her older brother had been wrestling around and fell on her.  She was just a few months old and she had hurt her rib area.

Q    How do you know that?

A    That he hurt her rib area because there was a small black and blue mark.  She was tender to touch, we had to be careful how we carried her.

Q    What part did you take in the care of Rebecca?  In other words, I want to know how much contact at that point you had with Rebecca?

A    With Rebecca, I played with her and held her and stuff, but Lori took care of her more than I did.

Q    Were you working at the time?

A    Yes.

Q    And your hours were?

A    8 to 5.

A-227

226

Q    So I guess between basically say 7:00 in the morning until six at night you did not see Rebecca, would that be fair?

A    Probably 7:30 to 5:30.

Q    Now, do you know when it was that you first, that Rebecca's little brother fell on her and hurt her rib?

A    Yeah, he did that in the evening when I was there. I had seen, I had witnessed that.

Q    When was that?

A    She was only a few months old, it would have been spring.

Q    Maybe April, March, March or April probably of '96?

A    April or May probably.

Q    When was the next time you observed an apparent injury or discoloration or something about Rebecca?

A    Towards the end of summer I noticed her foot was sore.

Q    Now, what did you notice that she reacted adversely to? A touch of her foot? How did it come that you noticed that?

A    Well, she had her socks off, and I noticed that mark on her foot. She was also tender. Like her sister, Jennifer, would swing her in the swing and she'd pull her by her feet and she didn't like that.

A - 228

227

Q    Her sister would pull her?

A    In the baby swing she would pull by her foot.

Q    What kind of baby thing was that?

A    Baby swing.

Q    Sorry.

A    That's okay.

Q    That was a little swing that was set up in the living room perhaps?

A    Yes.

Q    And she would be placed in the swing and her sister would grab hold of her feet and pull and push her in the swing?

A    She would grab hold of her feet and pull her up so she'd start swinging.

Q    Can you describe to the jury what it was that you saw on her foot?

A    Well, like in between her toes and around her toe nails it wasn't really black and blue like purple, black and blue mark.  I don't know how to describe, it was like little brown dots.

Q    Dots?

A    Like dried blood or something under the skin, something like that.  It wasn't really purple, black and blue type.

Q    It was not black and blue?

A-229

228

1       A    It was more, there was a lot of them around down

2  between the toe areas and around the toe nails.

3       Q    How about Athlete's foot?

4       A    No, I had seen--

5       Q    It looked like skin irritation is what you're

6  saying?

7       A    No, I had seen same type of mark on her sister,

8  Jennifer earlier, a few months earlier and I was told it was

9  probably she had gotten her hand caught between car seat and

10  door when they put her in the door, it's like a squeeze or

11  pinch or something like that.

12       Q    I guess I want, I'm sorry, I'm not trying to pick

13  on you at all I'm trying to really understand what it was

14  that you saw, a little round dot or a number of little round

15  dots?

16       A    A number of little round dots.

17       Q    Were they colored?

18       A    They were like brown or they looked like dried

19  blood underneath the skin.

20       Q    Dried blood. Was there any--did you see any

21  obvious source of that blood?

22       A    No.

23       Q    Can you remember what foot it was?

24       A    No, I don't recall.

25       Q    Kind of irrelevant. It was between the toes?

A - 230

229

1    A    It was inbetween the toes and around the toe nail

2    area.

3    Q    Okay. Was any question raised about it?

4    A    Yeah, I had said to my sister I wondered what it

5    was. We had seen the same type of thing in Rebecca on

6    Jennifer.

7    Q    On Jennifer?

8    A    When she was younger also.

9    Q    At this time in Rebecca's life was she being taken

10   to her doctor periodically?

11   A    Yes.

12   Q    Do you know whether or not it was shown to her

13   doctor at all?

14   A    I don't think so, I don't know for sure.

15   Q    Okay. And that was, I guess, what a few months

16   after you noticed the rib thing?

17   A    Yeah.

18   Q    That would take it into about June or July?

19   A    Probably July.

20   Q    What was the next thing you saw concerning Rebecca

21   and any marks of discomfort or evidence of discomfort?

22   A    Well, when she--when she had--when we thought

23   maybe she had the dislocated hip, I don't know whether that

24   was at the same time or not, I knew that she was

25   uncomfortable and we thought maybe she had the dislocated

A - 231

230

1    hip.

2        Q    Did you see anything?

3        A    No.

4        Q    How did she display her discomfort?

5        A    When we went to change her diaper or anything like

6    that, she would get really whiney or cry if we picked her

7    legs up to change her diaper.

8        Q    My kids would do that when I would do that, change

9    the diaper.  Did you see any rash or anything?

10        A    No, that's why we assumed dislocated hip.

11        Q    You saw nothing.  I gather from your testimony

12    there came a time when she cried a little more than usual

13    when her diaper was changed regardless of who changed it?

14        A    Yes.

15        Q    Next?  What was the next thing you saw?  Anything

16    else?

17        A    Well, the time that Mark had left the room because

18    Rebecca was crying and when he went in the room she screamed.

19        Q    Was that the incident about which you testified

20    she was crying in the room and Mark went into change her

21    diaper?

22        A    I don't know what he went in the room for.  He

23    went in the other room and closed the door.

24        Q    When was this approximately?

25        A    A few weeks before they moved out.  They moved out

A-232

231

1    in September so it would be like in August.

2         Q    Mid August, is that fair?

3         A    Fair.

4         Q    Mid August who was there at the time?

5         A    Lori, my sister and her children, Jennifer and

6    Alan, Rebecca and Mark and myself and probably my brother

7    Michael.

8         Q    Now, the baby is in the bedroom?

9         A    Yes.

10         Q    And the baby starts to cry?

11         A    Yes.

12         Q    And nobody gets up except Mark?

13         A    Well, we were, he was the first one that got up.

14         Q    Okay. And Mark goes into the bedroom and you hear

15    the baby cry louder; is that a fair statement?

16         A    Yes.

17         Q    Then Mark came out?

18         A    Lori went in to see what was going on.

19         Q    Okay.  Did it come to your attention that anything

20    was going on or anything?

21         A    Well Lori was upset when she came out, but the

22    baby was crying so I didn't ask any questions.

23         Q    Okay. And then I guess the last thing that you

24    observed was the injury of around September 24?

25         A    Yes.

A - 233

232

```
 1      Q    Now, they by that time had moved to Roulette?

 2      A    Yes.

 3      Q    Is that true?

 4      A    That's true.

 5      Q    Were you also living in Roulette?

 6      A    No, I stayed here in Coudersport.

 7      Q    How did it come about that you saw the injury of

 8  mid September?

 9      A    I babysat for Lori and Mark on weekends so they

10  could have time alone and they would bring the children over

11  on Friday or Saturday so they brought her over.

12      Q    Got you. So Rebecca was brought to your house on a

13  weekend before she was taken to the hospital in late

14  September; is that a fair statement?

15      A    Yes, that's true.

16      Q    What did you observe in reference to Lori's foot

17  or ankle at the time?

18      A    Rebecca's foot.

19      Q    Sorry.

20      A    I noticed that she had black and blue ankle.  It

21  was black and blue around the ankle and real tender.

22      Q    Do you remember when it was that you saw this?

23      A    Yes, when Lori and Mark were there.  Lori actually

24  showed it to me.

25      Q    She showed it to you?
```

A-234

233

1    A    Yes.

2    Q    Do you recall whether it was swollen at that time?

3    A    It was possibly.  I don't remember if it was

4    swollen.

5    Q    It's okay. As a result of that you tried to induce

6    Lori to take the child to the hospital at that time; is that

7    what your testimony was?

8    A    Yes, that's true.

9    Q    And I guess she didn't at that time?

10    A    That's true.

11            MR. FINK:  I have nothing further.   Thank you

12    very much.

13            THE COURT:  Anything further from the

14    Commonwealth?

15            MR. LEBER: No, I have nothing else, Mrs.

16    Baker.

17            THE COURT:  Thank you, ma'am.

18            MR. LEBER: Call Chad Setzer to the stand

19    please.

20

21    C H A D  S E T Z E R, having been duly sworn, was examined

22    and testified as follows:

23

24    DIRECT EXAMINATION BY MR. LEBER:

25    Q    Your name and address, please?

A - 235

234

1     A     Chad Setzer, R.D. 1 Box 451 Third Street,
2     Roulette.
3     Q     How long have you lived in Potter County?
4     A     All my life.
5     Q     Did there come a point in time when you met Mark
6     Bailey?
7     A     Yes, I did in Potter County Jail.
8     Q     You were in the Potter County Jail at that time?
9     A     Yes, I was.
10     Q     You were an inmate?
11     A     Yes.
12     Q     And at that time were you aware of what Mark
13     Bailey was in the jail for, what was he charged with?
14     A     Not when he came in I didn't, it was when I asked
15     him.
16     Q     And what did Mr. Bailey tell you?
17     A     He was being charged with breaking a baby's
18     bones.  I didn't know the charges just that.
19     Q     And when was that approximately?
20     A     I can't remember.
21     Q     When were you in jail?
22     A     From November 30th until August 8th.
23     Q     November 30th of 199_?
24     A     6.
25     Q     Until August 8 of 1997; is that correct?

A - 236

235

1    A    Yes.

2    Q    And how were you and Mr. Bailey housed at that

3    time?

4    A    We were on C block, it's a four room block.  They

5    usually don't have more than four people in there.

6    Q    During the time you were on that cell block with

7    Mr. Bailey did you discuss with Mr. Bailey the charges

8    against him?

9    A    Yes, I did.

10    Q    Can you tell the Court what it was that Mr. Bailey

11    told you about what happened?

12    A    He told me that he had the baby in his arms.  He

13    had it like this, he was holding it up.

14    MR. LEBER:  Indicating holding it above his

15    head in one hand.

16    A    Yeah, he dropped the baby on the floor.

17    Q    What else did he say to you about that?

18    A    He told me that he dropped the baby and that he

19    was being charged with breaking its bones, but he said that

20    he wouldn't get in trouble for it because her brother sat on

21    her, that's what he was gonna say and he also asked Rodney

22    Colon how he could get out of jail and into a mental ward.

23    Q    Did he tell you at that time how he felt about

24    this child and about his girlfriend?

25    A    Yes, he did.  He said the baby was inbetween him

A - 237

236

1    and his girlfriend, it was nothing but a nuisance.

2                        MR. LEBER:  Thank you, nothing else.

3                        THE COURT:  Counsel may cross.

4

5    CROSS-EXAMINATION BY MR. FINK:

6             Q    Good morning, young man.

7             A    Good morning.

8             Q    What were you in jail for?

9             A    Drugs.

10            Q    What about drugs?

11            A    Selling.

12            Q    You were in jail for selling drugs?

13            A    Yes.

14            Q    And that was in November of '96?

15            A    Yes.

16            Q    What was your sentence?

17            A    8 months.

18            Q    Did you serve it?

19            A    Yes.

20            Q    Well, is it not true that it had a minimum and

21    maximum your sentence?

22            A    Yes.

23            Q    It was 8 months to what?

24            A    I can't remember.

25            Q    Sir?

A - 238

237

| | | |
|---|---|---|
| 1 | A | I can't remember. |
| 2 | Q | You don't remember what your sentence was? |
| 3 | A | No, I don't. |
| 4 | Q | Are you on probation now? |
| 5 | A | Yes. |
| 6 | Q | Tell the jury a little bit about being on |

probation.  Is it not true that you are required to do

certain things for--as your probation officer directs?

| 9 | A | Yes. |
| 10 | Q | How long are you going to be on probation? |
| 11 | A | Until 11/13/99. |
| 12 | Q | I'm sorry? |
| 13 | A | 11/13/99 I believe. |
| 14 | Q | You got a state sentence than; didn't you? |
| 15 | A | No, I was on probation before. |
| 16 | Q | Oh, you were on probation before you were arrested |

for selling drugs?

| 18 | A | Yes. |
| 19 | Q | Why? |
| 20 | A | Criminal conspiracy. |
| 21 | Q | To do what? |
| 22 | A | Theft by Unlawful Taking. |
| 23 | Q | What was the object of the theft? |
| 24 | A | A weed eater. |
| 25 | Q | What kind of drugs did you cell? |

A-239

238

```
 1        A    Marijuana.

 2        Q    Were you in jail when Mark was put in jail?

 3        A    Yes, I was.

 4        Q    And approximately when was he first put in jail,

 5   if you know?

 6        A    I can't remember dates in there.

 7        Q    I'm not asking dates, a month?

 8        A    I don't remember them, I'm sorry I don't.

 9        Q    That's okay, don't worry about it. He had a broken

10   arm at the time in jail?

11        A    Yes, he did.

12        Q    He was suffering from low blood sugar at the time?

13        A    Yes, he was.

14             MR. LEBER: Objection.

15        A    Yes.

16        Q    He was having a tough time emotionally when he was

17   in jail; was he not?

18        A    Yes, he was.

19        Q    So his arm was in a sling; right?

20        A    Yes.

21        Q    He was having trouble with high or low blood

22   sugar, right?

23        A    Right.

24        Q    And there were times when he would literally shake

25   and quiver because of the low blood sugar; isn't that true?
```

A - 240

239

1      A    Yes.

2      Q    And it was under these circumstances that he told

3  you what you told the jury he said, right?

4      A    He wasn't always like that in jail, it was only

5  times.

6      Q    He always had a broken arm?

7      A    His arm was always broken, yeah.

8      Q    Do you know whether or not he was always in pain

9  with his arm when he was in jail?

10      A    I don't.

11      Q    You don't know?

12      A    I can't feel his pain.

13      Q    Right. How old are you, young man?

14      A    21.

15      Q    Where do you live?  Where you from?

16      A    Roulette.

17      Q    Now, are you sure he told you that the baby

18  dropped on the floor?  He didn't say he grabbed the baby by

19  the leg to keep the baby from dropping on the floor?

20      A    No.

21      Q    Didn't tell you that?

22      A    No.

23           MR. FINK:  I have no further questions. Good

24  luck to you, young man.

25      A    Thank you.

A-241

240

THE COURT:  Anything further for this
witness?


REDIRECT EXAMINATION BY MR. LEBER:

Q    Mr. Setzer, you told the jury you sold marijuana.
How much marijuana did you cell?

A    A half ounce.

Q    A half ounce.  And Mr. Fink asked you about being
on probation and you have to do what your probation officer
directs.  Did he direct you to do anything relative to this
case against Mr. Bailey?

A    No, he did not.

Q    Did anybody tell you that you had to come in and
testify in this case?

A    No, I wasn't talking to anybody from my probation
office or anything.

Q .   And did you receive any benefit because of coming
in here to testify from the police or from the District
Attorney's Office or probation or anything like that or from
the Court?

A    No, I do not.

            MR. LEBER: Thank you, I have nothing else.

            THE COURT:  Recross.


RECROSS EXAMINATION MR. FINK:

A-242

241

Q    Did you ever tell my client that you had some counts dropped against you because you were willing to testify against Mark, did you ever tell him that?

A    No, I did not.

Q    Let me try to refresh your recollection.  Is it not true that when you were in Cell Block C in jail with Mark you told him that you were going to have some counts dropped against you?

A    That's not true.

Q    Do you remember when you came back to jail with some papers that were given to you after just talking to your attorney or somebody that you showed to Mark?

A    I've had a lot of papers in jail.

Q    Well, do you recall an occasion when you came back to jail with some papers and showed them to Mark and discussed them with him; do you remember that?

A    No.

Q    Never happened?

A    I might have discussed my case, but I did not discuss any papers from my attorney with him.

Q    Well, let me ask you this.  Do you remember ever discussing with Mark the Commonwealth willing to drop any charges against you for any reason?

A    The only thing they ever dropped on me was secondary charges.  I don't know if I mentioned that with him

A - 243

242

1   or not.

2        Q    You're saying that in fact the Commonwealth did

3   drop one or more of the charges against you; is that true?

4        A    Yes, I did.

5        Q    And?

6        A    Yes, yes, they did.

7        Q    And you don't know whether you discussed that with

8   Mark or not?

9        A    I don't know.  I don't think he was there at the

10  time they offered me a plea bargain. They offer a lot of

11  people plea bargains.

12       Q    Well, let's get into that a little bit.  What

13  charges were originally filed against you.

14       A    I don't know.

15            MR. LEBER: I'm going to object.  There's no

16  foundation for this.  I think that we need to establish when

17  this discussion was.  If it's before Mr. Bailey and Mr.

18  Setzer met, of course it's irrelevant.

19            THE COURT:  I would think that some time

20  frame would be useful and of course any files that we have

21  here in the courthouse are certainly available.

22            MR. FINK:  Very well, Your Honor, I'll try to

23  lay a little more foundation.

24       Q    Do you know when it was that in respect to Mr.

25  Bailey being in jail that one or more charges were dropped

A-244

243

```
 1    against you?

 2         A    I don't understand.

 3         Q    Okay. You have told us that certain criminal

 4    charges were dropped against you; did you not?

 5         A    Yes, I did.

 6         Q    Now, at that time when you first learned of that

 7    was Mr. Bailey in jail?

 8         A    I do not know.

 9         Q    Sir?

10         A    I don't know.

11         Q    Do you know when it was that you first learned the

12    charges were going to be dropped, some charge was going to be

13    dropped against you?

14         A    I don't know when it was.  I was in jail almost

15    nine and a half months.  I denied my parole in Potter County

16    so I could finish community service hours before I had to go

17    to another County for failure to appear because I was in this

18    County.  I failed to appear in another county.  I wanted to

19    get my community hours so I denied my parole here.  I don't

20    know.  I was in jail almost nine and a half months.  I don't

21    remember dates.

22         Q    Were there charges in another county?

23         A    Yes, there were.

24         Q    Was that in addition to the conspiracy and

25    receiving stolen property?
```

A-245

244

```
 1        A     That was a DUI.

 2        Q     What county was that in?

 3        A     McKean.

 4        Q     Who was it that agreed to drop--you were talking

 5   about Potter County charges where they agreed to drop some of

 6   them; isn't that true?

 7        A     Yes.

 8        Q     And that was in reference to your drug arrest?

 9        A     Yes.

10        Q     But you don't know whether you discussed that with

11   my client or not?

12        A     I do not.

13              MR. FINK:  I have nothing further.

14              THE COURT:  Anything further?

15              MR. LEBER: Judge, since that went pretty

16   broad can I ask a few more questions?

17              THE COURT:  You may.

18

19   MR. LEBER:

20        Q     Chad, would it refresh your recollection when

21   there's a plea agreement entered in your experience, is that

22   placed, put in writing?

23        A     Yes, it is.

24        Q     And did you in fact make a plea agreement with the

25   District Attorney's Office relative to your drug charges?
```

A-246

245

1    A    Yes, I did.

2    Q    And did that again have anything to do about any

3    testimony against Mr. Bailey?

4    A    No, it did not.

5    Q    Mr. Setzer, I'm going to show you what's been

6    marked as Commonwealth Exhibit Number 6, ask if you can

7    identify that?

8    A    That's my plea agreement.

9    Q    And whose signatures appear on there?

10    A    Bob Kuhl, mine, I can't read the other one.

11    Q    Probably mine than I suspect.  Does it look like

12    it might be?

13    A    Probably is.

14    Q    And is there anything in there that says anything

15    about you testifying on behalf of the Commonwealth against

16    Mr. Bailey?

17    A    No, there is not.

18    Q    And then you had mentioned another matter.  I

19    guess you didn't mention that another matter, retaliation

20    against witnesses that you were charged with about that time?

21    A    Yes,.

22    Q    Incidentally what's the date of that plea

23    agreement?

24    A    4/16/97.

25    Q    And I'm going to show you what's been marked as

A-247

246

1     Commonwealth Exhibit Number 7, ask if you can identify that

2     please?

3          A     Another plea agreement.

4          Q     Again who signed that?

5          A     Same people.

6          Q     And the date of that is?

7          A     Same date 4/16/97.

8          Q     And that's when you entered your plea on both of

9     those charges?

10         A     Yes.

11         Q     And before that time you were in jail because of a

12    probation violation; is that true?

13         A     Yes, it is.

14         Q     Relative to the first matter, the one you referred

15    to as drugs you see after each of those charges the various

16    Counts 1, 2, 3, 4, et cetera.  There is an F or M do you know

17    what that F or M means?

18         A     Felony or Misdemeanor.

19         Q     What's the more serious?

20         A     Felony.

21         Q     And relative to the drug charges what did you

22    plead guilty to?

23         A     Two Felonies.

24         Q     And that is conspiracy and delivery of drugs; is

25    that correct?

A-248

247

```
1        A     That's correct.

2        Q     And one Felony and one Misdemeanor, what happened

3   with them?

4        A     They were dropped.

5        Q     And I guess there's two other Misdemeanors down at

6   the bottom those were?

7        A     Dropped.

8        Q     And on the matter at Number 18 of 1997 you were

9   charged with how many counts?

10        A     Three.

11        Q     And the first count was criminal conspiracy; is

12   that correct?

13        A     Yes, it is.

14        Q     That was graded as?

15        A     Felony 3.

16        Q     And you plead guilty to that?

17        A     Yes, I did.

18        Q     And what charges were dropped?

19        A     Terroristic threats and criminal attempt.

20        Q     And those are graded as what?

21        A     Misdemeanor 1 and Felony 3.

22        Q     So again at any time was there any discussion

23   either on the record or off the record about you testifying

24   against Mr. Bailey?

25        A     No, there wasn't.
```

A - 249

248

1      MR. LEBER:  Thank you, nothing else.

2      MR. FINK:  Just briefly.

3

4  MR. FINK:

5      Q    The plea agreements, and I guess there are two of

6  them, the first one indicated that you were charged with six

7  counts, six, is that not true?

8      A    True.

9      Q    Criminal Conspiracy, Violation of the Drug Act,

10  Delivery, Violation of the Drug Act, Delivery, Violation of

11  the Drug Act Possession, Violation of the Drug Act Possession

12  of Paraphernalia and Theft by Deception all on one criminal

13  complaint; is that true?

14      A    True.

15      Q    And the Commonwealth agreed that if you would

16  plead guilty to the first two they would drop four of the six

17  charges; is that true?

18      A    True.

19      Q    Now, by plea agreement on the same day there were,

20  indicates that on the criminal complaint you were charged

21  with Criminal Conspiracy, Terroristic Threats and Criminal

22  Attempt is it my understanding that terroristic threats was

23  based upon an allegation that you threatened a witness?

24      A    True.

25      Q    And you plead guilty to Criminal Conspiracy a

A - 250

249

1   Felony 3.  What was that Criminal Conspiracy charge about?

2        A    Retaliation.  We conspired to retaliate.

3        Q    You plead guilty to a charge that you conspired

4   with another to retaliate against a witness; is that true?

5        A    True.

6        Q    Now, this is dated 4/16/97.  You say you don't

7   know whether Mark Bailey was in the jail at that time?

8        A    I don't know.

9        Q    Thank you very much.

10            THE COURT:  Alright.  Thank you, witness may

11   step down.

12            MR. LEBER: Trooper Dawson please.

13

14   W I L L I A M   D A W S O N, having been duly sworn, was

15   examined and testified as follows:

16

17   DIRECT EXAMINATION BY MR. LEBER:

18        Q    Your name and address, please?

19        A    William L. Dawson, Pennsylvania State Police,

20   R.D., Coudersport, Pennsylvania.

21        Q    And you're a state Trooper; is that correct?

22        A    That's correct.

23        Q    How long have you been so employed?

24        A    Little over 25 and a half years.

25        Q    What's your specialty within the state police?

A-251

250

```
 1        A    Criminal Investigator.

 2        Q    And what is the responsibility of a Criminal

 3   Investigator?

 4        A    We usually get assigned more involved criminal

 5   incidents, basically time consuming incidents.

 6        Q    What was Trooper Davis, who has testified here,

 7   what was his role in this investigation?

 8        A    He was called in to assist me as being a polygraph

 9   operator.

10        Q    And was he involved in the case any more than on

11   that one particular day to conduct a polygraph test?

12        A    No, sir.

13        Q    Now, when was it that Mr. Bailey was in fact

14   placed under arrest?

15        A    March the 19th of 1997.

16        Q    And at that time was he placed in incarceration?

17        A    Yes, sir, he was picked up on a warrant, placed in

18   the jail.

19        Q    Now, one other sort of clerical thing I wanted to

20   clear up.  There's been testimony in this case about what

21   happened on September 24th of 1996.  Have you consulted a

22   calendar?  Did you have in your notes what day of the week

23   September 24th, 1996 was?

24        A    That was a Tuesday.

25        Q    So people who have testified it was a Monday are
```

A-252

251

1    in error?

2        A    According to the calendar, yes, sir.

3        Q    During the course of the investigation how many

4    times did you have an opportunity to interview Mr. Bailey?

5        A    Three times.

6        Q    The first time was when?

7        A    October 26th of 1996.

8        Q    And at that time did you question him regarding

9    the specific allegations in this case, that is that Rebecca

10   Moore had suffered several broken bones?

11       A    Yes, sir, I did.

12       Q    Did he have any kind of explanation for you at

13   that time?

14            MR. FINK:  Your Honor, I'm going to object to

15   the word explanation.  There's no suggestion that he has to

16   explain anything at this point.

17            THE COURT:  Sustained as to that word.

18       Q    Did Mr. Bailey provide you with any information

19   that indicated how these injuries to Rebecca Moore may have

20   been caused?

21       A    He basically had no idea other than accidents

22   involving siblings at the time.

23       Q    Now, when and where did this first interview

24   occur?  You said it was in October of 1996.

25       A    It occurred at the Pennsylvania State Police

A - 253

252

1    barracks on Denton Hill, outside of Coudersport.

2        Q    And in that particular interview and in all

3    interviews you do with defendants do you give them any

4    warnings before you proceed to interview?

5        A    Yes, sir, Mr. Bailey was advised of his Miranda

6    warnings prior to the statement.

7        Q    That was the first time you talked to Mr. Bailey?

8        A    That's correct.

9        Q    When was the next time?

10        A    I believe I spoke to him on the phone just very

11    briefly.  I think it was around the first of February of 97.

12        Q    And what did you speak to Mr. Bailey about at that

13    time?

14        A    Just to confirm that he was still willing to take

15    a polygraph test.

16        Q    And was a polygraph test then set up at that time?

17        A    Yes, sir, it was.

18        Q    And when was the polygraph test to be held?

19        A    On the 28th of February of 1997.

20        Q    And where was that to be held?

21        A    At the Coudersport State Police Barracks.

22        Q    And did you have discussions with Mr. Bailey

23    before the polygraph test was administered?

24        A    Yes, sir.

25        Q    And at that time did you take a statement from Mr.

A-254

253

1    Bailey?

2         A    Yes, sir, I did.

3         Q    And was that first statement tape recorded?

4         A    No, sir, it was not.

5         Q    When was that statement relative to the tape

6    recorded statement that has been mentioned in this case?

7         A    It was roughly two hours prior to.

8         Q    And at that time did Mr. Bailey--again was he

9    advised of his Miranda Rights?

10        A    Yes, sir, he was.

11        Q    And how do you give them to him?

12        A    I read them verbatim off of the statement form.

13        Q    Did Mr. Bailey indicate whether he understood

14    them?

15        A    Yes, sir, he did.

16        Q    Did he indicate at that time he was willing to

17    talk to you?

18        A    Yes, sir, he did.

19        Q    Now, at that time when you talked to Mr. Bailey

20    did Mr. Bailey make any statement about what happened to

21    Rebecca that caused the leg injury in September of 1996?

22        A    Yes, sir, he did.

23        Q    What did he tell you?

24        A    He told me that he had been somewhat playing with

25    Rebecca and had held her above his head with his left hand

A-255

254

open palmed and was twisting her back and forth and she began

to slip out of his hand and to prevent her from hitting the

floor he grabbed a hold of her right leg with his right arm

and drew her into his body.

Q    And did he give you a date on which that occurred?

A    He advised me that to the best of his knowledge it

was the day prior to the girl being taken to the hospital,

which would have been the 23rd of September.

Q    Now, did he describe what physical affects he saw

on Rebecca's body as a result of that incident?

A    He stated that the following day Lori showed him

the leg and that it appeared swollen and bruised.

Q    During that interview did you ask Mr. Bailey

whether or not he had done anything else to Rebecca?

A    Yes, I believe I did.

Q    And how did he respond to that?

A    That he had not.

Q    And after you completed that short interview, what

happened then?

A    Mr. Bailey at that point had agreed to go ahead

with the polygraph test, and he was then basically taken into

the conference room where he was again advised of his rights

by Trooper Davis and witnessed by myself, and I then left the

room and he Trooper Davis conferred or talked.

Q    How long did it last that defendant was in the

A - 256

255

room with Trooper Davis?

A    I would venture to say perhaps 20 minutes, give or take, I really don't know, 15.

Q    The statement that you said Mr. Bailey gave you before he went into the polygraph room or have the polygraph done with Trooper Davis what time was it approximately when you had that?

A    About 1:00.

Q    That would be in the afternoon?

A    That is correct.

Q    Did anyone else come with Mr. Bailey to the State Police Barracks at that time?

A    Yes, sir.

Q    Who was that?

A    Lori Moore.

Q    Now, what happened after Mr. Bailey and Trooper Davis were in the room together in that 15 minutes or however long it was, what happened then?

A    Trooper Davis then came and contacted myself and advised me that Mr. Bailey had made certain statements to him and that negated the necessity for the polygraph test that we could take another statement from him.

Q    Tell us when you talked to Mr. Bailey at 1:00 and times after that whenever he was taken to give the statement how Mr. Bailey acted, what was his demeanor like?

A - 257

256

1    A    The first statement I took from him on the 28th of

2    February he, when he talked about the one incident he seemed

3    somewhat remorseful at that point to a great degree.  Then

4    during the second statement he came somewhat emotional,

5    crying, so on.

6    Q    Trooper, Dawson, I'm going to show you a Sony

7    microcassette with various markings on it and we'll consider

8    this as Commonwealth Exhibit Number 9.

9         MR. FINK:  Your Honor, although I don't think

10   a record was made of it in chambers we have already stated

11   that we have no objection.  As far as we're concerned the

12   district attorney does not have to further qualify that as

13   being a true and authentic tape of the conversation.

14         THE COURT:  Thank you very much.

15         MR. LEBER:  Thank you, Your Honor.

16   Q    And again this is the tape that was taken when?

17   A    On the afternoon of February 28th, 1997.

18   Q    And who was present whenever this tape recording

19   was made?

20   A    Myself, the defendant, Mr. Bailey and Trooper

21   Davis.

22         MR. LEBER:  Your Honor, with leave of the

23   Court I'd like my secretary to come up and play this tape for

24   the jury.

25         MR. FINK:  No objection, Your Honor.

A-258

257

1          THE COURT:  Ladies and gentlemen of the jury,

2    you'll hear a tape recorded, I guess, interview for lack of a

3    better term.  If any of you have any difficulty hearing

4    please put your hand up and let us know we'll try and do

5    that.

6          (Tape played).

7      Q    Trooper, Dawson, were there a couple more lines in

8    that statement after Miss Colton shuts that off?

9      A    Yes.

10     Q    The last thing I heard on the tape was you saying,

11   are you sorry for what has happened to Rebecca or for

12   anything that has happened?  And did Mr. Bailey respond to

13   that?

14     A    Yes, sir, he did.

15     Q    What did he say?

16     A    He said he was very sorry, he didn't want it to

17   happen again.

18     Q    And how did you conclude the tape then?

19     A    I think I stated, I know, Mark, we don't want it

20   to happen again so we'll try to do what we can to help you

21   okay. It's now about 1553 hours on February 28th, 1997 and

22   we'll conclude this interview at this time.

23     Q    That's the end of that interview?

24     A    That terminated the interview, correct.

25     Q    Who was present throughout that interview with Mr.

A - 259

258

1    Bailey?

2        A    Mr. Bailey was present, myself, and Trooper Davis.

3        Q    And the voice on that tape recording asking the

4    questions was whom?

5        A    Was myself.

6        Q    And there was a long inaudible question close to

7    the end. Who was that?

8        A    That was Trooper Davis.  He was further away from

9    the tape recorder.

10        Q    And the person who was responding to these

11    questions that were asked is whom?

12        A    Mr. Bailey.

13        Q    You're indicating the defendant next to Mr. Fink;

14    is that correct?

15        A    That is correct.

16        Q    One other thing. Little Alan Moore testified here

17    yesterday.  Did you talk to him at one point?

18        A    Yes, I did.

19        Q    Do you remember where and when that occurred

20    approximately?

21        A    I don't recall exactly when I spoke to him, during

22    school hours when he was attending school in Port Allegany.

23        Q    Alan testified yesterday that he observed the

24    defendant take Rebecca out of a car seat, that she might have

25    been injured at that point.  Did you ask Alan when you

A-260

259

1    interviewed him whether he ever saw Mr. Bailey hurt Rebecca?

2    A    Yes.

3    Q    And how did he respond?

4    A    He responded, no, at that time he did not.

5            MR. LEBER: Thank you, I have nothing else.

6            THE COURT:  Very well, defense may cross.

7

8    CROSS-EXAMINATION BY MR. FINK:

9    Q    Officer, good morning to you.

10    A    Good morning.

11    Q    The last question or series of questions

12    propounded by the District Attorney concerning little Alan

13    who testified here yesterday do I understand that you had

14    interviewed him at some previous time?

15    A    That is correct.

16    Q    And he said he didn't know my client?

17    A    No, that's not what he said.

18    Q    He said he didn't see any thing such as he

19    testified to yesterday?

20    A    Correct.

21    Q    Now, going back to the series of interviews you

22    had with my client. Your first interview or first contact was

23    on or about October 26th of 1996; is that true?

24    A    That is correct.

25    Q    And that physically took place at the State Police

A-261

260

1    Barracks just outside of Coudersport; is that true?

2         A    That's true.

3         Q    How did it come about that he got there?  Was he

4    under arrest or anything?

5         A    No, sir.

6         Q    Was he requested to or asked to come?

7         A    He and Lori were asked to come.

8         Q    And he voluntarily came?

9         A    And he voluntarily came, that is correct.

10        Q    I guess you don't know was he told for what

11   purpose that he was being asked to come to the barracks at

12   that time?

13        A    Yes.

14        Q    What was he told?

15        A    Basically the investigation and the injuries of

16   Rebecca Moore.

17        Q    Okay. And my understanding of your testimony is

18   that he basically said that he had no idea of how a

19   particular injury or any injuries concerning Rebecca

20   occurred.  Was that the substance of his statements to you at

21   that time?

22        A    That is correct, that's basically correct.

23        Q    Next you had a telephone interview with him on or

24   about February 1st, 1997; is that correct?

25        A    I recontacted him and Lori by phone.

A-262

261

Q    You called him?

A    Right.

Q    What did you ask him at that time?

A    Well, in order to answer that question I'll go back to the interview on the 26th of October.

Q    Fine.

A    At that point I asked him if he would be willing to take a polygraph test relative to this incident.

Q    What did he say on October 26th?

A    He said he would be doing that.  So in February I merely contacted him to see if he was willing to do so prior to my going to the extent of making the arrangements.

Q    Officer, I guess you say that most lay man don't understand how a polygraph test works would you say that would be probably true?

A    Probably true.

Q    When you asked him on October 26th if you were willing to take a polygraph test, did you explain it to him?

A    No, sir.

Q    You just asked him are you willing to take a polygraph test?

A    That's correct.

Q    Didn't tell him what it was, didn't for what purpose, didn't tell who would give it, didn't tell when it was to be given or why or anything else?

A - 263

262

1      A    I didn't know when it was to be given, the time

2  and date had not been set.

3      Q    I'm just asking.

4      A    No.

5      Q    Now, we're up to the phone conversation of

6  February 1st and you call him and you ask him are you willing

7  to take a polygraph test and again no explanation?

8      A    None other than it was relative to this incident.

9      Q    Did you tell him he didn't have to take a

10  polygraph test?

11      A    Certainly.

12      Q    Did you tell him anything else about the test at

13  all?  Whether the results could or could not be used in

14  court, what it might or might not show, what would occur if

15  certain answers were given as opposed to other answers,

16  anything at all?

17      A    No, sir.

18      Q    Okay. It is my understanding that there are only

19  one or two polygraphs or people who can operate a polygraph

20  test or give a polygraph test in the troupe?

21      A    I believe Trooper Davis is the only one in our

22  troupe area.

23      Q    The troupe headquarters is in Montoursville?

24      A    That's correct.

25      Q    And it covers a particular geographical area;

A-263

263

1   right?

2        A    That's correct.

3        Q    And so pursuant to the phone conversation

4   initiated by you to my client it was agreed that a time would

5   be set up to whereupon he was to come in and submit to a

6   polygraph test; is that true or not?

7        A    Prior to which contact?

8        Q    No, the phone conversation of February 1st.

9        A    That was strictly to make sure he was still

10  willing to do that so I could go ahead and make the

11  arrangements.

12       Q    So you made the arrangements and then Trooper said

13  he'd come up on certain day, you called my client back and

14  said come in on such a day.  Is that the way it worked?

15       A    Correct.

16       Q    And the second phone call to notify him of the

17  polygraph test again no explanation of what was happening of

18  the polygraph test, the results, the possible consequences or

19  anything else?

20       A    No, sir, I'm not the polygraph operator.

21       Q    I know that.  And so on a given day pursuant to

22  your second phone call to my client he came in together with

23  his girlfriend?

24       A    That's true.

25       Q    Now, before he went in the room with the officer

A-264

264

1  who was to give the polygraph test did you tell him anything

2  about consequences or describe anything to him about the

3  results of the test at that time?

4      A    No.

5      Q    Was Sergeant Shirley there?

6      A    Sargent Shirley was at the barracks, yes.

7      Q    Was there anything said about, either before or

8  after the pretest interview conducted by the polygrapher, was

9  anything said to my client that if he would admit to causing

10  the injuries to Rebecca that a certain consequence would

11  happen?

12      A    Not to my recollection.

13      Q    Let me see if I can refresh that recollection. Did

14  you or Sergeant Shirley in your presence tell my client that

15  if he admitted to causing the injuries to Rebecca that he

16  would get nothing more than a fine?

17      A    I can't imagine a statement like that being made

18  by an officer, no, sir.

19      Q    I'm with you, officer, I can't either, but the

20  question is do you remember, did you say that or didn't you?

21      A    No, sir, I didn't say that.

22      Q    Did you hear Sergeant Shirley say that?

23      A    Not to my recollection, he did not.

24      Q    So as I understand it my client comes in the

25  barracks, he is shown into another room where first you and

A - 265

265

1    the polygrapher and my client are, then you go out and the

2    polygrapher and my client are alone and the pretest

3    commences?

4        A    True.

5        Q    Now, is the pretest really part of the test?  Is

6    that ordinarily done before any polygraph test is given?

7        A    A pretest interview is conducted by the examiner,

8    yes.

9        Q    Again, nothing was told to my client about whether

10    the results of the polygraph test could be used in court or

11    any consequences of the polygraph test or what it was?

12        A    That I don't know.  All I was there was basically

13    for the reading of his rights.  I witnessed the reading of

14    his Miranda Rights and I left the room.  I didn't know what

15    Trooper Davis explained.

16        Q    Tell the jury what you read, the Miranda rights

17    what does that mean?

18        A    That means he does not have to talk to us without

19    an attorney present. If he could not afford to hire an

20    attorney, one would be provided for him at no charge,

21    basically.

22        Q    You done good.  Is he is informed that he doesn't

23    have to do this?

24        A    That's correct.

25        Q    And if he wants to do it, he can have an attorney

A-266

266

1    present if he wishes?

2            A    Correct.

3            Q    And notwithstanding that he said in essence, go

4    ahead?

5            A    That's correct.

6            Q    I want you to tell me, did he have his arm in a

7    sling at the time?

8            A    Yes, sir, I believe he did.

9            Q    Was he asked about any discomfort that may have

10   been occurring at the time because of that arm being in a

11   sling, was he asked about it at all?

12           A    Again, I don't know if Trooper Davis asked him.  I

13   don't believe I did.

14           Q    You didn't?

15           A    Not that I recall.

16           Q    The forearm was that taped to his side at the

17   time?

18           A    That I don't know.

19           Q    You can't recall?

20           A    I don't recall it.

21           Q    Well you saw it?

22           A    His arm was in a sling in February.  He certainly

23   didn't have his shirt off.

24           Q    The question is you did see his arm in a sling?

25           A    Yes, but taped I don't know.

A-267

267

```
1        Q     The answer is, yes, but you can't recall whether
2   his forearm was taped to the his side or not because of the
3   length of time; right?
4        A     Yeah.
5        Q     You said at some point he seemed very upset and
6   broke down and cried, I think, was your testimony?
7        A     Hm-hmm, that's correct.
8        Q     When was that in relation to the pretest before,
9   during or after?
10       A     It was during the interview, the taped interview.
11       Q     So it was after the pretest?
12       A     After the pretest.
13       Q     To answer my question. The taped interview did not
14  take place in the polygrapher room; is that true?
15       A     That is not true it did take place in that room.
16       Q     It did take place in the polygraph room?
17       A     That's correct.
18       Q     And as I understand it sometime during the pretest
19  the officers, the polygrapher says, well, stop, calls you in
20  and says he's confessed?
21       A     Basically, that's correct, yes.
22       Q     And so we'll take an interview of his confession,
23  is that essentially correct?
24       A     Yes, sir.
25       Q     Did you tell him that you're going to tape the
```

A-268

268

1  interview?

2        A    Yes, sir.

3        Q    He had no objection to the taped interview?

4        A    No, he did not.

5        Q    And he was, I'm sure, told that if he didn't want

6  the taped interview he wouldn't have to give it?

7        A    Yes.

8        Q    Okay. Your last statement on the taped interview,

9  officer, preceded by Mark saying, I'm sorry I just don't want

10  it to happen again, and you say, I know, and, Mark, we don't

11  want it to happen again either so we'll try to do what we can

12  to help you.  Okay it's now about 1553, so on, so forth.

13  What did you mean we'll do what we can to help you?

14        A    Mean try to do what we can so he doesn't injure

15  anybody else.

16        Q    What did you have in mind?  I don't know what you

17  meant by that.  I guess I'd like to have you tell the jury

18  what you had in mind?

19        A    I'd be willing to help him seek, see Pat Rupert if

20  I could do that, help him seek more counseling if I could do

21  that, whatever he wanted to do.

22        Q    When was the arrest effectuated?

23        A    I believe the the 19th of March.

24        Q    When was the interview?

25        A    The 28th of February.

A-269

Q    Now, you got what you considered to be a confession; is that true?

A    Correct.

Q    On the 28th of February and 20 days elapsed between what you considered to be a confession and your arrest of the defendant; is that true?

A    Basically, yes, I don't have, I haven't counted them.

Q    Now, let's let the jury understand a little bit about the procedure that you go through in effectuating an arrest, you merely essentially take possession of the body of the defendant and put him under your control; is that not true?

A    That's true.

Q    And he is taken before the District Justice after an arrest?

A    True.

Q    Did you do that in this case or did you initiate a process otherwise?

A    We had a warrant and physically picked him up and took him before the magistrate.

Q    The district justice issues the warrant; right?

A    Right.

Q    And issues the warrant at your request basically?

A    Correct.

A-270

1    Q    And the district justice, a district justice is

2    always available in Potter County at any time; is that not

3    true?

4    A    That's true.

5    Q    And that process of obtaining a warrant at takes

6    maybe 20 minutes to half an hour; is that a fair statement?

7    A    You talking about the whole process, the entire

8    process or the process before the magistrate.

9    Q    The process of getting a warrant?

10   A    It takes me little longer than that.

11   Q    How long does it take you?

12   A    Depends on what the circumstances are.  If I have

13   to sit down at the typewriter, type up the criminal

14   complaint.  If I have to type it, it takes me longer than

15   that filing procedure and what takes place at the office.

16   Q    Let's talk about that.

17              THE COURT:  I'm going to interpret here I got

18   to give reporter a break.  Ladies and gentlemen, we're going

19   to take morning recess at this time for approximately ten

20   minutes. During this recess as with the others again, do not

21   discuss the case among yourselves or with anyone else don't

22   let anyone talk to you about the case.  I want you to avoid

23   all media reports. Court will stand in recess for ten

24   minutes.

25              (Recess).

A-271

271

1    THE COURT:  We will note the jury is not

2    present, however, the parties are present with counsel.  Mr.

3    Fink, you indicated there was something you wished to place

4    on the record.

5    MR. FINK:  I brought to the attention of the

6    Court during recess that the motion that I wish to make at

7    this time would in no way be affected by any additional

8    cross-examination that I may have of the officer or indeed

9    any further testimony of the officer at all. I wish to--it is

10   my understanding that this is the Commonwealth's last

11   witness.

12   MR. LEBER: Correct.

13   MR. FINK:  That being so, Your Honor, we

14   would move for directed verdict of acquittal or a demur to

15   the evidence based upon the corpus delecti rule. It is the

16   position of the defendant, Your Honor, that viewing all of

17   the non confession evidence in a light most favorable to the

18   Commonwealth the Commonwealth has clearly failed to prove

19   beyond a reasonable doubt that the particular crimes with

20   which the defendant has been charged occurred.  The issue is

21   not who committed them, but the issue is, as I understand the

22   law, as set forth by the leading case in its prodigy, is the

23   Court at the time he charges the jury must charge the jury

24   that if they do not find that Commonwealth has proven beyond

25   a reasonable doubt that the particular crimes with which the

A -272

272

1    defendant has been charged occurred and that victim was

2    harmed as a result of those particular crimes the jury can

3    not consider any evidence of confession. I think that's

4    exactly where we are, and it is our claim that as a matter of

5    law, as a matter of law viewing the record as previously

6    suggested the jury cannot make that finding. And,

7    accordingly, Your Honor, it is our position that based upon

8    the record as it is the Court must grant the motion.

9        I would like to make an additional motion and that is

10   that same motion that namely that the Court must enter a

11   directed verdict of acquittal as to each and every charge of,

12   I think, the 15 counts, whatever there are in the criminal

13   information in favor of the defendant, and or in the

14   alternative we demur to the evidence as to each and every

15   charge. Even if you consider the confessions, because I

16   don't believe if you consider the confessions that the crimes

17   of aggravated assault, simple assault, with the element of

18   intent or the reckless conduct as the cases describe

19   recklessness as it relates to aggravated and simple assault

20   have been proven beyond a reasonable doubt taking into

21   consideration the evidence in light most favorable to the

22   defense. So for those reasons, Your Honor, we respectfully

23   request a directed verdict of acquittal and or demur to the

24   evidence.

25                THE COURT: Thank you. Commonwealth do you

A-273

273

1    care to reply?

2    MR. LEBER: Judge, I have no problem obviously

3    with the charge to the jury concerning the corpus delecti

4    rule and assume the Court was going to do that. But beyond

5    that it seems to me that clearly the threshold requirement

6    has been met, that testimony of the three physicians was that

7    there was in fact abuse of this child and that led to

8    particular injuries that were suffered. Again, I think

9    clearly the threshold issue, threshold requirement is met by

10    the testimony that was produced before any evidence was

11    produced of a confession, and I think the Court should

12    proceed.

13    MR. FINK: May I say one further thing on

14    corpus delecti?

15    THE COURT: Is the Commonwealth done.

16    MR. LEBER: I'm done.

17    MR. FINK: I would respectfully request the

18    Court to consider the posture of the case, and if the Court

19    refused my motion at this stage, allows the case to go to the

20    jury, the jury would bring in a verdict of guilty. I would

21    think that on a post sentence motion considering the record

22    as it is now the Court would be compelled to find as a matter

23    of law the jury could not find that Commonwealth proved that

24    the crimes had been committed by evidence extrinsic to the

25    confession evidence, and so I think it's a question of do you

A-274

1    want to do it now or do you want to do it later as I see the

2    case.

3                THE COURT:   Thank you. Again to pick up on

4    our discussion of yesterday.  I think essential elements of

5    the law particularly as relating to the corpus delecti rule

6    have been correctly set forth. First, the Court is required

7    to make a decision, which I did yesterday, that the evidence

8    is more consistent with criminality than accident or other

9    non criminal causes. We are talking here about a series of

10    fractures in an otherwise healthy infant. We are looking at

11    the testimony of a number of health care providers, who I'll

12    be the first to say had some intriguing concepts of what is

13    and what is not abuse, but I'm not sure that has anything to

14    do with this decision because I think in looking at this the

15    Court ultimately like the jury can use some common sense

16    approach to this, and I think that under any standard the

17    evidence aside from the alleged confession is far more

18    consistent with criminality than accident or non criminal

19    causes. We could change a few facts and or, I shouldn't say

20    facts, we could change a few of the Commonwealth assertions

21    made through testimony and that might be, for example,

22    query.  I'm not saying I would rule differently if we were

23    looking at one fracture given the state of the record, if

24    we were looking at fractures with some diagnosed health

25    problem of the child that might make the child more prone to

A-275

1    fractures, than I think that would be an issue that would

2    warrant certainly further concern, but at this time I

3    reaffirm my position of yesterday.  I feel that the evidence

4    is far more consistent with criminality than accident or

5    other non criminal causes. We will have to broach that in the

6    jury charge, and what the jury does with that.  I can't

7    speculate what they'll do with that I'm sure counsel will all

8    talk about that in your closing arguments at the appropriate

9    time. So I will be denying the motions made relative to the

10   corpus delecti rule.

11        For the other motions, the demurs, we are looking

12   essentially at three offenses times four incidents each of

13   aggravated assault, that defendant allegedly attempted to

14   cause serious bodily injury or caused such injury

15   intentionally, knowingly or recklessly. And there are

16   elements.  And then, of course, we go to causing

17   intentionally, knowingly or recklessly causing serious bodily

18   injury, and we're looking at Endangering the Welfare of a

19   Child by violating duty of care. I think there is sufficient

20   evidence there that the jury could form a basis for a verdict

21   of guilty if they accept the Commonwealth evidence as

22   presented.  Again, that is within their province using common

23   experience and common sense.  So I feel that evidence at this

24   stage is sufficient to go to the jury subject, of course, to

25   the special charges that have been submitted. Thank you very

A-276

1    much.  We'll bring the jury down.

2            THE COURT:  Welcome back, ladies and

3    gentlemen of the jury.  We did give our court reporter a

4    break then we had matters to deal with before you came down.

5    I try to give her regular break otherwise she ends up working

6    through our breaks.  I doubt if we understand the intensity

7    of what Ann Marie does because she listens to what everyone

8    says.  Of course, we've also been known to have more than one

9    of us speak at a time so that makes it complicated.  As she

10   is hearing she has to set it down with her Stenograph keys

11   and that is transmitted to a computer disk.  So it's a very

12   intense type of thing. I'm sometimes guilty of running a

13   little bit too long.  I like to give her a break

14   approximately hour and a half to hour 40 minutes.  So

15   sometimes we all get carried away with the moment and don't

16   do that.  I gave her a full break, did a little more business

17   now we're back with business with you Trooper Dawson was on

18   the stand subject to cross.

19            MR. FINK:  Thank you.

20       Q    Officer, we're talking about what is necessary to

21   effectuate an arrest.  You have told the jury that it was 19

22   or 20 days between the statement that was given to you, which

23   you deemed to be a confession and the actual arrest of the

24   defendant. Is that true?

25       A    That's true.

A-277

277

1      Q    Now, I was asking you about the availability of

2   district justices within the county from whom you were to get

3   a warrant for the arrest of any individual charged with a

4   crime, and you indicated that always in Potter County there

5   is some district justice that is available for that purpose.

6   I then asked you what was necessary in terms of procedure and

7   time, and I guess you were telling the jury that you first

8   have to physically type up a criminal complaint, which is the

9   statement of criminal charge or charges against any

10  particular defendant; is that true?

11     A    That's true.

12     Q    Okay. Now, in this case there was quite a list of

13  them, I guess, you don't type fast but I guess you would have

14  taken no more than an hour to prepare that complaint?

15     A    Approximately.

16     Q    And then you would file that complaint with the

17  district justice, would you not?

18     A    That's true.

19     Q    And the district justice at your request after

20  having received the complaint would issue a warrant for the

21  arrest of the defendant?

22     A    Correct.

23     Q    And is there any other procedure in the arrest

24  process which is involved?

25     A    Usually would confer with the District Attorney's

A-278

1    Office prior to doing all of what you just mentioned.

2        Q    I'm sorry?

3        A    Usually I would confer with the District

4    Attorney's Office prior to.

5        Q    You would ask the district attorney if it's okay

6    to file a criminal complaint?

7        A    In some circumstances I just review where we stand

8    in the investigation with him.

9        Q    Okay.  Was there any unusual unavailability of the

10   district attorney or assist district attorney in reference to

11   this arrest?

12       A    Not that I recall, no.

13       Q    So the district attorney as far as you're

14   concerned was available.  So what we're talking about you

15   first go to the district attorney who is available, you then

16   take an hour to prepare a complaint, you then take the

17   complaint down to district justice, take her maybe 15 or 20

18   minutes to prepare the warrant of arrest, would that be

19   reasonable?

20       A    Reasonable, yes.

21       Q    And would physically give you the warrant and you

22   would actually serve it on the defendant, you would arrest

23   him?

24       A    Yes.

25       Q    Take him into custody?

A - 279

279

```
 1        A    Yes.
 2        Q    And then you bring him back to the District
 3   Justice Office?
 4        A    Yes.
 5        Q    And he would be arraigned and bail would be set?
 6        A    Yes.
 7        Q    And if he can't make bail he's put in jail?
 8        A    Yes.
 9        Q    That's what he was doing over there in jail when
10   this young man, Mr. Setzer, testified that he talked to my
11   client in jail; is that true?
12        A    Right, yes.
13        Q    He didn't meet bail?
14        A    No, he did not.
15             MR. FINK:  Officer, thank you very much.
16   Just a moment, please. Officer, I have nothing further.
17                  THE COURT:  Any redirect?
18                  MR. LEBER: Couple questions.
19
20   REDIRECT EXAMINATION BY MR. LEBER:
21        Q    One question Trooper Dawson, during the course of
22   your investigation did you determine Mr. Bailey's age?
23        A    Yes, sir.
24        Q    And what was it at the time that this incident
25   occurred?
```

280

1    A    26 years of age, 26 years of age.

2    Q    Mr. Fink asked about Mr. Bailey's cooperation with

3    the taking of the polygraph test.  He indicated he was

4    willing to take the polygraph test?

5    A    Yes, sir, originally he did.

6    Q    What happened on the day that polygraph test was

7    scheduled relative to him taking the test?

8    A    When it was scheduled time for them to be there,

9    Mr. Bailey stayed out in the vehicle, Miss Moore came into

10    the barracks and stated that Mr. Bailey had decided against

11    taking the test.

12    Q    And did Mr. Bailey remain at the police barracks

13    at that point?

14    A    No, sir, he left.

15    Q    And he later returned?

16    A    Yes, sir, he did.

17    Q    And at that time decided that he would take the

18    polygraph test?

19    A    Yes.

20         MR. LEBER: Nothing else, thank you.

21         THE COURT:  Recross.

22

23    RECROSS EXAMINATION BY MR. FINK:

24    Q    You're telling us now that my client and his

25    girlfriend or paramour initially came to the barracks, the

A - 281

1   paramour went in and told you that he decided not to take the

2   test?

3         A     Yes.

4         Q     Was the polygrapher already there at that time?

5         A     I believe he was.  If not, he was scheduled to

6   arrive very shortly.

7         Q     What did you do, look out the window, see my

8   client in the car or something at that time?

9         A     I believe I walked out and spoke to him at that

10  time.

11        Q     What did you tell him at that time?

12        A     Asked him if he was going to take the test or not

13  basically.

14        Q     And what did he say?

15        A     He said he decided not to.

16        Q     Was that the end of that conversation?

17        A     Basically.  He left then in the vehicle and drove

18  into town.

19        Q     How long was he gone?

20        A     I don't know.  I didn't maintain a vigilance at

21  the window to watch for his return.

22        Q     Approximately. An hour?

23        A     Approximately, I don't know.

24        Q     Now, had the polygrapher come up solely for the

25  the purpose of giving my client the polygraph test?

A-282

1    A    No, sir.

2    Q    He came up for other purposes?

3    A    Yes, sir.

4    Q    So he had to stay on station any way to perform

5    work for those other purposes which you've mentioned, right?

6    A    Yes.

7    Q    And then Mark and his girlfriend came back and

8    voluntarily came in and told you he changed his mind again.

9    What was said then?

10    A    Mark didn't--the girlfriend did not depart with

11    Mark when he left, she remained at the barracks.

12    Q    He told you he was then willing to take the test

13    or change his mind once again or what?

14    A    Yes, sir, later in the afternoon he stated he

15    changed his mind and would take the test.

16    Q    Do you have a record of this, the time he came in

17    the first time, when he left, when he came back in?

18    A    No.

19    MR. FINK:  Officer, thank you very much.

20    THE COURT:  Thank you, Trooper, you may step

21    down.

22    MR. LEBER: Your Honor, the Commonwealth would

23    move for the admission of their exhibits 1 through 8.

24    MR. FINK:  Your Honor, we have no objection.

25    THE COURT:  Alright thank you very much all

A-283

283

1  Commonwealth exhibits will be deemed admitted.

2        MR. LEBER: Your Honor, the Commonwealth

3  rests.

4        THE COURT:  Thank you very much. Ladies and

5  gentlemen, the Commonwealth has concluded its portion of its

6  case-in-chief and we'll now be turning the floor over to Mr.

7  Fink on behalf of the defendant.

8        (Opening argument given by Mr. Fink).

9        MR. FINK:  Thank you, Your Honor. Brother

10  Michael.

11        MR. LEBER:  Your Honor, may I ask for an

12  offer on this witness, please.

13        (Following discussion held at the bench).

14        MR. FINK:  Your Honor, this witness will

15  testify as to his observations and interrelationship between

16  the defendant and Rebecca and the defendant and his paramour

17  during the period of time in question. He will give

18  statements concerning his observations as to how they treated

19  each other, how Mark particularly treated this child and the

20  other children in or about the family.

21        MR. LEBER: Okay.

22

23  M I C H A E L  H I C K S, having been duly sworn, was

24  examined and testified as follows:

25

A-284

284

DIRECT EXAMINATION BY MR. FINK:

1

2    Q    State your name, please?

3    A    Michael Hicks, Brother Michael Hicks.

4    Q    Brother Mike, that's how I know you, I hope you

5  don't mind?

6    A    That's fine.

7    Q    Why are you called Brother Michael?

8    A    I'm a member of a religious order, Society of

9  Saint Gabriel and have been for 30 some years and because of

10  that when we take vows of poverty, chastity and obedience to

11  members of this community we take on the title of religious

12  brother.

13    Q    Does that mean that you have a particular duty or

14  function within that religious sector or group?

15    A    Yes, we have a responsibility to take on the

16  apostolic or the work of the society within the community,

17  the Catholic church community and within the order.  Our

18  responsibility is to respond back to the community of the

19  work that we're doing within that community work.  I am doing

20  it is at Saint Francis Parish in Bradford, Pennsylvania.

21    Q    You used to be here in Coudersport, is that not

22  true?

23    A    Maybe 17, 20 years ago, yes, Saint Eulalia's.

24    Q    Been that long?

25    A    Yep.

A - 285

285

Q     Brother Michael, I ask you whether or not you know my client?

A     Yes, I've known Mark for maybe eight, ten years.

Q     And do you know his mother who is seated here in the courtroom?

A     Yes, I've known her and family for the same amount of time.

Q     Have you had occasion to become acquainted with the situation in which Mark chose to live from approximately November of 1995 to the time he was arrested?

A     Yes.

Q     How did it come about that, Brother Michael, that you became aware of his living situation?

A     Because Mark before this time had lived in my home in Bradford on 1 Oakland Avenue probably for five years previous, six years previous to that.

Q     Was that when you were living there also?

A     Yes.

Q     So I gather that Mark lived with you for that period of time?

A     Yes, to teach responsibilities, I rented him room and facilities within the house.  He didn't have full run of the house yet he had full run of the house.

Q     And within the frame work of the period of time involved, where he lived with the mother of the child in

A-286

1    question, who has been referred to as his paramour, namely

2    from November of 1995 until the time he was arrested how did

3    it come about that you were able to observe and become aware

4    of his living situation?

5        A    Well, I was trying to help and I knew both Mark

6    and Lori from the time they met.  Mark introduced Lori to me

7    and I was trying to help them put some sort of, maybe what we

8    would call a committment together. They would also come back

9    almost every weekend when they were over here in Coudersport

10   or living in Roulette, they would come over to my home almost

11   every weekend and would stay for the weekend being the fact

12   that we're only two houses away from his mother's house so it

13   was convenient and my house is large enough to hold them.

14       Q    By they who do you mean?

15       A    Lori and Mark mostly and sometimes the children

16   would come as well.  Alot of times the children would come

17   along too.

18       Q    Did you in fact during this period of time have

19   occasion to observe the interaction between Mark and Rebecca

20   after of course after Rebecca was born, which was February

21   1996?

22       A    Yes, yes, I did, many times.

23       Q    I wonder if you would be kind enough to inform the

24   jury as to your observations of the interaction between Mark

25   and Rebecca?

A - 287

287

1       A   I believe I have seen a good rapport between Mark

2   and the baby. The caring, the gentleness, the concern about

3   this child's well being was evident.  When the child cried,

4   Mark was on his way to pick up the child and to care for it,

5   to play with.  As the child was progressing in age, dressing,

6   eating, being around.  At the time we had two dogs in the

7   house making sure that there was safety there for that. Alot

8   of little intimacies that go on with--as adults should have

9   with a child.

10       Q   Thank you. Brother Michael, did you additionally

11   observe any rapport between Mark and any of Rebecca's older

12   siblings, brother or sister?

13       A   Yes, both of them because the whole family would

14   be there once in a while and there was good rapport. Alan

15   Michael, the young man who you heard from, a good guy,

16   growing up 8 years old had someone to play with and someone

17   to do things with and hang around with and looked on to Mark

18   as a, I feel, big brother so there was good rapport there, a

19   lot of horse play, few broken windows or things got broken,

20   but that happens.  And with Rebecca's older sister, who was

21   always looking out the window, here comes Mark as she could

22   pronounce it, hands open up when he would come in. I know

23   I've heard the thing about the crying out and that when he

24   was around, and that didn't happen in Bradford to my

25   knowledge at all.

*A-288*

288

Q    Brother Michael, did you, were you able to observe during this period of time the rapport and relationship between my client and Lori?

A    Yes, I did.

Q    And what were your observations in that regard?

A    That's a struggle. That was a struggle sometimes. There are, they had a lot of happy times, went and did things, and had fun doing things with the children, going by themselves, bowling, things like this. As a couple they had struggles as they were starting to get to know each other, and my personal opinion is that committment has to be built up.

Q    Based on your knowledge of Mark and observations of Mark particularly as it relates to the interrelationship between him and Lori and her children could you, do you have any opinion as to whether Mark had formed any intent at any time to harm the children?

A    No. In my home there's children all the time, being a piano teacher and music teacher they're in and out for lessons, good rapport with those children. Always taken an interest in them and taken an interest in that family and looking forward to becoming a more solid family as the years went along.  There was no intention of hurting, if anything, he'd probably bend over backwards to make sure they were happy, and he did without, both of them, Lori and him did

A-289

289

1   without to make sure the kids had what kids need.

2                   MR. FINK:  Cross-examine. Thank you very

3   much.

4                   THE COURT:  Mr. Leber.

5

6   CROSS-EXAMINATION BY MR. LEBER:

7        Q    Brother Michael, you estimated that you knew Mr.

8   Bailey for eight or ten years; is that correct?

9        A    Yes.

10       Q    And five of those years he actually resided in

11  your home?

12       A    Yes, maybe more.

13       Q    Which five year time span was that?  Can you

14  describe that for us?

15       A    Probably, probably from the age of 19 or 20 on.

16       Q    So I believe the testimony is he's 26 now 27 now?

17       A    27 now, right.

18       Q    From the ages of approximately 19 until 24, 25

19  something like that?

20       A    Hm-hmm.

21       Q    So you've taken quite an interest in this young

22  man over the years; is that correct?

23       A    Yes.

24       Q    And any particular reason why you got together

25  with this young man or he found you?

A - 290

290

1      A    Well, actually there is.  I was probably more

2  friends with the whole family, with his younger brother I had

3  taught in school and his sister.  They were up the street,

4  being by myself Martha cooks well, I stop up for supper,

5  coffee, something like that.  So there was somebody there

6  being by myself it was alright.

7      Q    So you would describe yourself as real good friend

8  of the Bailey's?

9      A    Of the family, yes.

10      Q    Now, when do you believe that the relationship

11  between Mr. Bailey and Lori Moore began?

12      A    I'll tell you it began the summer before the

13  school year of 1995/96 because they were living--Mark had met

14  Lori and were on Washington Street right across from the

15  school where I taught so I waived and honked as I went home

16  from school.

17      Q    So they were living together at that time in the

18  summer of 1995 that would have been?

19      A    I believe so, yes.

20      Q    And obviously Rebecca was not born at that time;

21  isn't that correct?

22      A    No, Lori would have been expecting.

23      Q    Now, in testimony apparently established that some

24  time in late '95, early '96 that Lori and Mr. Bailey did live

25  together, subsequently after Rebecca was born they were

A-291

291

separated for a period of time.  Did Mr. Bailey come back and
live with you at that time?

    A    Yes.

    Q    That would have been March to June of '96, perhaps
something in that ball park?

    A    You're close.

    Q    And then he moved back to Coudersport and lived
with Lori and her sister; is that correct?

    A    Right.

    Q    Now, during the time that Mark and Lori lived with
her sister here in Coudersport were you ever in their home?

    A    Yes.

    Q    How many times?

    A    Maybe, I won't say more than six, but not less
than four times I had been over, not for long periods of
time.

    Q    The testimony establishes that around the
beginning of September of 1996 that the couple lived in
Roulette--

    A    Yes.

    Q    --in an apartment down there or house down there
and they continued to do so up until this incident occurred
on September 24th.  Did you visit with them in Roulette at
any time during that period?

    A    Yes, probably more times than Coudersport.

A - 292

292

Q    You talked about Lori and Mr. Bailey coming to visit you in Bradford on weekends--

A    Yes.

Q    --is that correct?  First you said sometimes or alot of times the children would come along.  Which was it sometimes or alot of times?

A    Right I did say that.  It's probably sometimes would be the best if we understand the same terminology.

Q    And whenever you would visit this couple in Roulette or in Coudersport would that be on weekends or weekdays?

A    Probably in the evenings on the weekdays since I was teaching during the day.

Q    And during that period of time you observed good rapport between Mr. Bailey and the children?

A    Yes.

Q    You described the nature of the relationship between Mr. Bailey and Lori as to being, as to having struggles?

A    Yes.

Q    By struggles did you mean that there was anger and arguing between the two of them?

A    At times, Hm-hmm.

Q    And was that arguing sometimes very heated?

A    Loud.

A-293

293

Q    And was that arguing occurring in front of these children?

A    More than likely not in my home.

Q    How about in Roulette or Coudersport?

A    I wasn't there when they were having any arguments. They might have had one and they weren't talking to each other, they were little disgusted what the other one might have been thinking, but I could think of the attitude on that but not any actual arguments.

Q    Would you describe Mr. Bailey's nature of that of having a bad temper?

A    A strong temper not a bad temper.  I would not use the word bad.

Q    What's the difference between a strong temper and a bad temper?

A    Alright boisterous, persistent in what he's going to do, takes a lot of talking and clarification to get a point across especially if he's not feeling well.  You know he has his medical problem, his acting up, making sure he understands and listens.

Q    Were you aware, or is it true, do you know, as appeared in the tape recording that was played for the jury here that he was treated at Bradford Hospital because of his anger?

A    I know he was in the Bradford Hospital.  I don't

A-294

294

1    know if it was anger or depression, could have been or

2    Diabetes I'm not sure.

3         Q    When was that?

4         A    I'm not sure if it was earlier than his

5    introduction to Lori or within the first part of that, I

6    can't tell you.

7         Q    Were you aware of whether he was taking any kind

8    of medication to control his anger?

9         A    Yes.

10        Q    And do you know what that medication was?

11        A    No.

12        Q    And do you know whether or not as he stated in the

13   taped interview that he quit taking that anger control

14   medicine?

15        A    I didn't keep track of when he took his medicine.

16   I could tell, only thing I could really tell of his Diabetes

17   if his sugar was going down I could tell within his

18   conversation, his tone of voice, maybe like on this tape,

19   things like that.  I can hear that because I'm accustomed to

20   that to him.

21        Q    And again, you were aware that he was in fact

22   taking medication because of the problem of anger control?

23        A    Yes.

24        Q    So again your opinion is that he did not have a

25   bad temper just a strong temper?

A-295

295

1    A    That's the way I personally would put it, yes.

2    Q    Now, Mr. Bailey on this tape recording talked

3    about his relationship with Jodi Lynn Murray.  Were you aware

4    of that relationship?

5    A    Yes.

6    Q    And he testified on here that he had struck her at

7    one time.  Were you aware of that?

8    A    I was aware of it.  I did not see it.

9    Q    He admitted that to you?

10    A    I know about it because of reports that were made

11    of it and discussion between the two of them on it, yeah.

12    Q    And on the tape again he indicated that he had

13    struck Lori on one occasion.  Were you aware of that?

14    A    That's, yes, the same as you've heard.  I wasn't

15    present for the striking, but I know of it, yes.

16    Q    Mr. Bailey tell you about that?

17    A    We discussed the concept of hitting people, yes.

18    Q    So were you counseling him because of his lack of

19    control of his temper?

20    A    I wouldn't put it in the value of a formal

21    counseling, no, but as a friend as I would with any friend

22    and I strongly out speak my opinion of it, and I did when

23    we've been together, talking about situations, yes.

24    Q    Did you feel a need as a friend and your church

25    connection with him to advise him he needed to work on

A-296

1    controlling his temper?

2          A    Yes, we would work on it, yeah.

3                  MR. LEBER:  Thank you nothing else.

4                  MR. FINK:  Brother Michael, thank you very

5    much.  I have nothing further at this time thank you.

6                  THE COURT:  Thank you very much, brother.

7    Ladies and gentlemen, it's just about noon.  We'll take the

8    noon recess at this time until 1:00. During the recess again

9    don't discuss the case among yourselves or with anyone else.

10   I want you to avoid W F R M  AM and FM.  I don't know what,

11   if anything, is in the papers. The two that are potentially

12   around are the, three, Olean Times, the Bradford Era and the

13   Enterprise.  I ask you to postpone your news from that and

14   any media sources.  See you back here at 1:00. Court will

15   stand in recess until 1:00.

16                 (Noon recess).

17                 THE COURT:  Welcome back. Turn the floor over

18   to Mr. Fink behalf of the defense.

19                 MR. FINK:  Call Martha Bailey please.

20

21   M A R T H A  B A I L E Y, having been duly sworn, was

22   examined and testified as follows:

23

24   DIRECT EXAMINATION BY MR. FINK:

25         Q    You are Martha Bailey; is that true?

A - 297

1    A    Yes.

2    Q    Mrs. Bailey, what relation, if any, are you to my

3    client?

4    A    I'm his mother.

5    Q    How many children do you have?

6    A    Four.

7    Q    Mark is where in relation to the four children?

8    A    The second.

9    Q    Number two. Where do you live?

10    A    Bradford.

11    Q    How long have you lived there, Martha?

12    A    Probably about 12 years.

13    Q    Have you had occasion to observe your son, my

14    client, Mark, in an interrelation with Lori Moore and Rebecca

15    and Lori's other children?

16    A    Yes, I did.

17    Q    Between February of 1996 when Rebecca was born and

18    this date what opportunity have you had to see my client in

19    an interrelationship between him and Lori and her children?

20    A    Well, Mark and Lori and the children came to my

21    home several times on mostly weekends and also in August of

22    '96 they visited us.  We were on vacation camping at

23    Allegany State Park, and they came there to visit. They had

24    all three of the children with them at that time.

25    Q    Where was that vacation?

A-298

298

1  A  Well, we were camping at Allegany State Park by

2 Salamanca.

3  Q  Allegany State Park?

4  A  Yeah.

5  Q  For how long a period was that?

6  A  We were there for a week, but Mark and the

7 children had stopped like on the weekend, on I believe it was

8 a Sunday that they spent most of their time.

9  Q  Based on the opportunities as you've described to

10 observe them as they interrelated with each other what would

11 you say about your observations as to the interrelationship

12 first of all between Mark and Lori's children?

13  A  It was a very good relationship. They were real

14 happy with Mark, they called him dad most of the time.

15 Whenever they wanted something they asked him, whether it be

16 a sandwich or--this would be mostly Michael and Jennifer they

17 were older of course, and whatever they wanted he took care

18 of what they wanted.

19  Q  What would you say about your observations as it

20 related to Mark's concern over the welfare of the children?

21  A  He loved those children.

22  Q  Tell the jury what you saw which made you believe

23 that?

24  A  Well, one incident.

25  Q  Or what you heard, what you saw or heard?

A-299

299

1      A    One incident I saw was while we were at camp we

2  had always set on the picnic benches.  We were inside the

3  cabin, which had a cement floor at the time and Jennifer fell

4  backwards and bumped the back of her head.  Lori and Mark

5  were both sitting side by side.  Lori did not get up at all.

6  Jennifer put her hands toward Mark for him to pick her up.

7  He picked her up and held her and covered her until she was

8  alright, until she quit crying. He held her the whole time.

9  Later the same day, most the time Rebecca the littlest one

10  she was either in say stroller, in a car seat the entire

11  time. I did not one time see Lori take her out to change her

12  diaper. She, Lori, did attempt one time to feed her.  She

13  started to cry and Lori said, well I'm just not going to

14  bother right now and whatever I don't know what the food was,

15  but it was in a little baby food jar.  Mark went over, he got

16  the spoon and he set there and the baby did eat quite a bit

17  compared what he had, what she had when her mother had tried.

18      Q    What have been your observation concerning the

19  relationship between Mark and Lori since you've had an

20  opportunity to observe them?

21      A    Well, most of the time they seem to get along when

22  I saw them. I didn't really see anything that said they

23  wouldn't have.

24      Q    Have you ever seen Mark harm, physically harm any

25  child?

A-300

300

```
 1        A    Never, and I have nine sisters and one brother and
 2   between the nieces and nephews and great nieces and nephews
 3   they count 100 and we get together every year for family
 4   reunion. We've never had any problem whatsoever and all the
 5   kids love Mark, and if he is not right there they want to
 6   know where he's at because they know that if they want to go
 7   for a ride or they want to play a game or whatever Mark will
 8   be there for them, and Mark has been that way since he was
 9   very young.
10        Q    Based on your observations and of course on the
11   historic knowledge of your son, do you, what do you have to
12   say about Mark's propensity to place any child in danger or
13   hurt any child?
14        A    He would not.
15        Q    You're saying that under oath?
16        A    Yes, yes, sir, I am.
17             THE COURT:  Cross-examine.
18
19   CROSS-EXAMINATION BY MR. LEBER:
20        Q    Does your son have problems controlling his anger?
21        A    It's not so much it's anger.  He does have
22   problems with his Diabetes and sometimes his sugar gets too
23   high or his sugar gets too low and that either one or the
24   other can cause him to have problems more so if the sugar is
25   high.  He does sometimes get agitated if it gets too low,
```

A-301

301

1    anybody that knows about low blood sugar.  He has passed

2    right out from low blood sugar.

3        Q    The blood sugar doesn't cause him to be angry or

4    violent?

5        A    If his blood sugar gets high, it just, I would say

6    maybe be irritated.

7        Q    If his blood sugar is high he might be irritated?

8        A    Yes.

9        Q    Irritated meaning he doesn't have much patience?

10        A    Well, because his sugar is out of control.

11        Q    So he's been treating right along with insulin for

12    his Diabetes problem; is that correct?

13        A    He has been, but he has had problems with it being

14    too high and he has had problems being too low, where he's

15    been taken to the emergency room because of mostly the low

16    blood sugar is when he passes out.  So that's when he's had

17    to have ambulance called for him because.

18        Q    So other than the fact that he has this problem

19    with Diabetes you don't think there is anything that causes

20    him to be angry or violent?

21        A    No, I've never seen him violent.

22        Q    But you know he has been violent; don't you?

23        A    Not violent, no.

24        Q    You know he hit his girlfriend?

25        A    I do not know for certain because I did not see

A - 302

302

1   that.

2        Q    Did Mark tell you he did?

3        A    I don't recall if he did or not.

4        Q    Did he tell you he hit Lori?

5        A    No.

6        Q    So you don't know about that?

7        A    And Lori did not tell me either if it happened.

8        Q    Now, you indicated that you believe that his

9   problems stem from his Diabetes, but you are aware that he

10  has been treated for his problems with controlling his anger;

11  are you not?

12       A    Well, when he was hospitalized one time, and I'm

13  not sure of the date myself, but as soon as he was in the

14  hospital and had his diabetic needs taken care of he was

15  alright.

16       Q    What hospital was he in?

17       A    Bradford Hospital.

18       Q    What section of the hospital was he in?

19       A    Well they put him on the Psych unit.

20       Q    On the Psych unit?

21       A    Just for only just a couple days.

22       Q    To your knowledge do they basically put people

23  with Diabetes in the Psych unit?

24       A    I don't know how they run.

25       Q    Was he taking any other medication other than that

A - 303

1   for his Diabetes if you know?

2          A    Pardon me?

3          Q    Was he taking any other medication other than the

4   medication for his Diabetes?

5          A    I don't really know.

6          Q    Does the drug Tofranil mean anything to you?

7          A    I don't really know anything about that drug.

8   I've heard the name, that's all.

9          Q    When was it when he was in the Psychiatric Ward at

10   the Bradford Hospital, the date that he was in there,

11   approximately when was it?

12          A    I think it might have been in '95, the Summer of

13   '95.

14          Q    And what was the incident that precipitated that?

15   Why did he end up in the Psych ward, what happened to cause

16   that?

17          A    I really don't know other than the fact that there

18   was, he was like had been with one girl and then Lori became

19   involved in a situation and it caused problems, and that's

20   caused problems between Mark and Lori I would imagine between

21   the three of them.

22          Q    So there were two woman involved with your son at

23   the same time?

24          A    I don't know it was at the same time.  He broke up

25   with one and went with Lori.

A-304

304

Q    And this other person was Jodi?

A    Yes.

Q    Now, you indicated that relative to the relationship between Mark and Lori that most of the time they get along?

A    Well, they did when I saw them. I didn't see them a lot. Like I said, only on the weekends, usually Saturday. I was at work if they come by on weekend and then they stayed down the street at Brother Michael Hicks' home. They did come up to my house, they'd bring the children up, they'd eat.

Q    So as far as you know whenever you saw them they seemed to get along?

A    Yes.

Q    And obviously that means there were a lot of times whenever you didn't see them; is that correct?

A    Well, I can't speak for why I didn't see them.

Q    You don't really know how they got along when you weren't present?

A    That's right.

Q    Again, your son you've attributed this to Diabetes but what have you observed in terms of his anger, what does he do? For instance, does he smash windshields on his vehicles?

A    Well, he would rather smash a windshield or a window than to hurt somebody.

A - 305

```
Q    So he's done that?

A    Yes, he has.

Q    How many times?

A    I don't know.

Q    More than once?

A    I don't know how many times.

Q    Do you know whether it was more than once or not?

A    I do not know.  I do know he did once.

Q    What did he smash the windshield with?

A    I don't know.  I don't know.  I didn't see it.  I
saw the windshield after the fact.

Q    Whose vehicle was it that he smashed the
windshield on?

A    I don't know if it was his own vehicle or one he
was driving.

Q    When was that?

A    I don't know when it was.  I have no idea.

Q    Do you know why he smashed the windshield on his
vehicle?

A    No, I don't.

Q    Did he admit to you that he smashed the windshield
on the vehicle?

A    I don't know.  It was not my responsibility for
the windshield so I wasn't concerned about the windshield
because--
```

306

1      Q    My question was did he admit to you that he had
2  smashed the windshield on the window?
3                  MR. FINK:  Your Honor, I think that's been
4  asked and answered, she doesn't know, she wasn't there.
5                  THE COURT:  I believe the answer has been she
6  doesn't know; is that correct?
7      A    Yes, sir.
8                  MR. LEBER: Nothing else of Mrs. Bailey.
9                  MR. FINK:  I have no redirect, thank you.
10                 Going to call Mark Bailey, the defendant,
11 please.
12
13 M A R K   B A I L E Y, having been duly sworn, was examined
14 and testified as follows:
15
16 DIRECT EXAMINATION BY MR. FINK:
17     Q    Mark, in answering my questions I'm going to ask
18 you to talk to the jury because I want to make sure they
19 hear.  Okay?
20     A    Okay.
21     Q    You are Mark Bailey, you're the defendant in this
22 matter; is that true?
23     A    Yes.
24     Q    Mark, how old are you?
25     A    27.

A-307

307

Q    What's your education?  Did you graduate from high
school?

A    No.

Q    How far did you go in high school?

A    Tenth grade.

Q    Can you read and write?

A    Yes.

Q    How come you quit in tenth grade?

A    I don't know.  I just thought I was 18 and I could
just go.

Q    Okay. Mark, after you quit, did you go to work?

A    Shortly after, yes.

Q    Okay. What has been your work history, please
since you quit high school in tenth grade?

A    I've worked in grocery stores.

Q    What did you do in grocery stores?

A    I was stock boy. I'd help people carry out their
groceries.

Q    Where was that do you know?

A    That was Bells Supermarket in Bradford.  I worked
at Burger King in Bradford and then I did some like private
work cutting fire wood with a friend of mine. I've worked in
factories and at the present time I'm working at a pizza shop
delivering pizzas.

Q    Where?

A-308

1    A    In a pizza shop delivering pizzas.

2    Q    Mark, I guess I would like to ask you where you

3    now live?

4    A    Right now I'm staying in Duke Center, 714 Main

5    Street, P.O. Box 197.

6    Q    714 Main Street where?

7    A    Duke Center, PA.

8    Q    You live alone?

9    A    No, Michael Hicks owns the place and he is staying

10   there too.  I'm just there temporary until I can get on my

11   feet again and get my own place.

12   Q    Where did you live before that Mark?

13   A    Roulette.

14   Q    And is that when you were with Lori?

15   A    Yes.

16   Q    Did there come a point in time when you and Lori

17   no longer lived together?

18   A    Yes.

19   Q    When was that?

20   A    When I got put in Potter County Jail.

21   Q    Okay now let's go back. Did there in fact come a

22   time when you and Lori Moore began to live together?

23   A    Yes, we first started living together in, I guess,

24   it would be, it was July of '95.

25   Q    July of '95 and was that in Coudersport?

A-309

1      A      In a pizza shop delivering pizzas.

2      Q      Mark, I guess I would like to ask you where you

3   now live?

4      A      Right now I'm staying in Duke Center, 714 Main

5   Street, P.O. Box 197.

6      Q      714 Main Street where?

7      A      Duke Center, PA.

8      Q      You live alone?

9      A      No, Michael Hicks owns the place and he is staying

10   there too.  I'm just there temporary until I can get on my

11   feet again and get my own place.

12      Q      Where did you live before that Mark?

13      A      Roulette.

14      Q      And is that when you were with Lori?

15      A      Yes.

16      Q      Did there come a point in time when you and Lori

17   no longer lived together?

18      A      Yes.

19      Q      When was that?

20      A      When I got put in Potter County Jail.

21      Q      Okay now let's go back. Did there in fact come a

22   time when you and Lori Moore began to live together?

23      A      Yes, we first started living together in, I guess,

24   it would be, it was July of '95.

25      Q      July of '95 and was that in Coudersport?

A-309

309

```
 1        A    No, sir.

 2        Q    Where was that?

 3        A    Bradford.

 4        Q    Bradford. In whose name was the apartment at that

 5   time?

 6        A    Jeff and Ryan Patterson.

 7        Q    Who was living in the home at that time?

 8        A    Jeff, and his wife, their children, me, Lori,

 9   Jennifer and Alan and then Jeff's brother and his girlfriend

10   was renting the basement.

11        Q    Now, Jennifer and Alan are children of Miss Lori

12   Moore, right?

13        A    Yes.

14        Q    Were you aware at that time of how many children

15   Lori had?

16        A    Yes.

17        Q    How many were you aware that she had at that time?

18        A    I was aware that she had two living with her and

19   one that was living with its father.

20        Q    Did she ever tell you whether they were fathered

21   by the same or different people?

22        A    No, she didn't.

23        Q    How did you get along with Lori's children at that

24   time when you first started to live with her?

25        A    We got along good. Alan was glad to have somebody
```

A-310

310

1   around that would do stuff with him and acknowledge that he

2   was there.

3        Q    Okay. Did there come a point in time when you

4   moved from Bradford to another place in another town with

5   Lori?

6        A    Yes.

7        Q    Where and when was that?

8        A    It was Coudersport and it was just before she had

9   Rebecca.  As her pregnancy got closer to the ninth month, I

10  started staying in Coudersport so I would be there to take

11  her to the hospital.

12       Q    What, if any, physical and or emotional problems

13  were you treating for at the time you moved with Lori to

14  Coudersport, if anything?

15       A    Diabetes and the doctor had me on medication.

16       Q    Let's talk about your Diabetes a little bit.

17  Diabetes is a disease that needs an artificial control of

18  insulin; is that true basically?

19       A    Yes.

20       Q    How long had you been suffering as far as you know

21  from Diabetes?

22       A    Up until I met Lori.

23       Q    Going back from birth from whatever?

24       A    I got diagnosed with Diabetes when I was 13.

25       Q    13?

A-311

311

1    A    Yes.

2    Q    And when Diabetes was first diagnosed did you

3  receive treatment for Diabetes at that time?

4    A    Yes.

5    Q    And what kind of treatment did you get?

6    A    Was put on insulin shots.

7    Q    Shots?

8    A    Yes.

9    Q    How often?

10   A    Twice a day.

11   Q    Did you use those yourself?

12   A    Yes.

13   Q    And was that still the case when you and Lori

14  first got together?

15   A    Yes.

16   Q    What were your symptoms if the Diabetes were not

17  properly controlled?

18   A    If like if my blood sugar was high, I'd get

19  agitated and just wouldn't really have any reason.

20   Q    If your sugar was high--

21        MR. LEBER: I'm just going to point out that,

22  Mr. Fink, your client was answering the question while you

23  were talking at the same time.

24   Q    I didn't mean to interrupt.

25   A    When it's high, I get agitated rather easily than

A-312

312

1   if it was in control, and if it's low I get shaky, I can't

2   really navigate that way. My speech gets slurred and if it

3   goes beyond that point, I don't do nothing about it I found

4   out that it can make you pass out.

5       Q    Have you passed out before because of low blood

6   sugar?

7       A    Yes, sir, I did October 8th of this past year I

8   was driving to my mom's to get something for my sugar because

9   my brother saw me downtown, told me to get to my mother's.  I

10  did, went right by my mom's house right by three convenient

11  stores going out East Main Street in Bradford.  I passed out,

12  hit a telephone pole and wrecked my car.

13      Q    How many times have you passed out because of

14  blood sugar?

15      A    Got to be close to seven or eight, and that's I'd

16  say last three or four years.

17      Q    What do you do about high blood sugar?  Is that

18  when you take insulin or did you take candy what do you do?

19      A    When your blood sugar is high, like there's

20  designated times take your insulin.  For me, for example,

21  it's in the morning.  I get up, take my shot, eat breakfast,

22  go through the day.  At dinner time, take my shot, eat

23  dinner.  If it's after I've already had it, only thing I can

24  do is exercise.

25      Q    During these periods of high and low blood sugar

A-313

313

1    other than when you pass out are you able to maintain

2    consciousness or understanding of basically what you're

3    doing?

4        A    Yes.

5        Q    Okay.  Now, when you moved from Bradford to

6    Coudersport with Lori were you working?

7        A    No.

8        Q    Was she working?

9        A    No.

10       Q    Did there come a point in time when you lived in

11   Coudersport that you went to work?

12       A    Yes.

13       Q    Where did you go to work when you were living in

14   Coudersport?

15       A    Emporium Specialties in Austin.

16       Q    And did Lori work at that time also?

17       A    No.

18       Q    Now who was living with you and Lori when you

19   moved to Coudersport?

20       A    It was me, Lori, her children and her sister,

21   Tammy and her brother, Mike and Tammy's daughter, Tiffany.

22       Q    How about Alan and Jennifer?

23       A    Yes, they were there too.

24       Q    Was Children and Youth Services involved with

25   Lori's children at all do you know?

A- 314

314

```
1        A    I know of one count in McKean County where she had
2   a run in with them.  I don't know the extent of it.
3        Q    Now, did there come a time when she became
4   pregnant in or about February of 1996; is that true?
5        A    Yes.
6        Q    She was pregnant and gave birth to a child?
7        A    Yes.
8        Q    You had been with her approximately 7 months
9   before the birth of that child; is that right?
10       A    About that, yes.
11       Q    You took Lori to the hospital to give birth to
12  that child?
13       A    Yes.
14       Q    Now, after she came back from the birth of the
15  child, brought the child with her was anybody different than
16  what you've mentioned living in the house in Coudersport or
17  the apartment, whatever it was?
18       A    No.
19       Q    Same people?
20       A    Yes.
21       Q    Plus a new arrival?
22       A    Yes.
23       Q    Now Lori was not working at this time, right?
24       A    Correct.
25       Q    And were you working at the time of the birth of
```

A-315

315

1    the new arrival?

2        A    No.

3        Q    You were not?

4        A    No.

5        Q    Did there come a point in time when you again

6    became employed after February of '96?

7        A    Yes, it was June.

8        Q    In June?

9        A    Yes.

10       Q    And you worked where then?

11       A    Emporium Specialties.

12       Q    Now, was Lori working at that time?

13       A    No.

14       Q    So from the birth of the child in February '96

15   through June at least when you became re-employed she was not

16   working?

17       A    No, sir, she wasn't.

18       Q    Was she home all the time as far as you know?

19       A    Yes.

20       Q    Now, when you went to work for Emporium

21   Specialties in June of '96 what shift did you have?

22       A    First shift, I worked 7 to 3.

23       Q    7 to 3?

24       A    Yes.

25       Q    And that is in Emporium, Pennsylvania?

A-316

316

1    A    Austin, Pennsylvania.

2    Q    I'm sorry Austin.  Lori testified that she would

3    consider herself to be the primary care taker of the child,

4    would you agree with that?

5    A    Yes.

6    Q    What, if anything, did you do toward the care of

7    the child from the date Lori brought her back from the

8    hospital to say June when you became employed?

9    A    Well, I was around.  I would help any way I

10    could.  There was a time after Rebecca came home that I did

11    move back to Bradford.

12    Q    Did you change diapers?

13    A    Yeah, I've changed a few of them.

14    Q    Did you feed her?

15    A    Yes.

16    Q    Did you play with her?

17    A    Yes.

18    Q    When she would cry, were there times when you

19    would go to her as opposed to the mother or anybody else?

20    A    Yes.

21    Q    Now, did there come a point in time before you

22    moved from Coudersport that Lori became employed?

23    A    No.

24    Q    So from birth of the child right up until

25    September of 1996 Lori was not employed?

A-317

317

A    Correct.

Q    Was she home all day as far as you knew?

A    Yes, as far as I knew she was home all day or unless she had to go to the store or up to where her sister works to see her.

Q    Let me get this straight and for the purpose of answering this question I would like to have you consider everybody over 18 years of age as adults.  How many adults were living in that house other than you and Lori between February of '96 and September of--and the time you moved to Roulette, how many adults persons?

A    Two.

Q    And were either of them working?

A    Yes, I believe they both were.

Q    So after you went to work the only adult in the house was Lori?

A    Yes.

Q    When you were working?

A    Yes.

Q    Okay. Now, before you moved, you and Lori moved to Roulette were you ever aware that Lori was injured, not Lori I'm sorry Rebecca?

A    No.

Q    Did you ever see any discoloration on her body or ever have any reason to believe that she had been injured by

A-318

318

1    anything?

2    A    No, only time I will see a bruise is when Lori

3    would show me that she had one, that was normally either

4    before she put her in the bath tub or brought her out to get

5    her dressed.

6    Q    Did you ever see, for instance, an injury or a

7    mark on the rib cage?

8    A    I don't recall that I have.

9    Q    Did you ever see any discoloration of the shin

10    bone or tibia on either leg?

11    A    On the right leg I did.

12    Q    When was that?

13    A    September of '96.

14    Q    Before that had you seen anything?

15    A    No.

16    Q    Nothing. Now, you moved to Roulette and when you

17    moved to Roulette did you retain your job?

18    A    Yes.

19    Q    Working at Emporium Specialties in Austin?

20    A    Yes.

21    Q    Did Lori get a job after you moved to Roulette?

22    A    No.

23    Q    While you were together?

24    A    No.

25    Q    Now, I guess I'd like to ask you about your

A-319

319

1  relationship as far as you were concerned with the three of

2  Lori's children that were with you, that were with her.  How

3  do you feel that you got along with them?

4      A    I feel I got along great with them.  I loved them

5  as if they were my own.

6      Q    How did you get along with the other two, Jamie

7  and Jennifer?

8      A    Jamie?

9      Q    The boy and Jennifer?

10     A    Alan.

11     Q    Alan and Jennifer?

12     A    Me and Alan got along good. Me and Jennifer she

13  was kind of shy of me for a while.

14     Q    I thought that Alan kind of testified that you

15  didn't get along too well or something.  Do you have any

16  explanation for that?

17     A    No, I don't.

18     Q    Tell the jury about couple of things that come to

19  your mind and how you and Alan got along?

20     A    Well, I got a C B in my car and Alan he thought it

21  was really neat and he kept asking if he could talk on it and

22  stuff.  I said you're too little for it yet, but I figured

23  what's it gonna hurt.  So he got on it and by luck he got on

24  that one day sitting in front of Tammy's and there was

25  another little boy talking on his dad's radio.  They talked

A—320

——

320

1    for five, ten minutes.  Alan thought it was neat. Every time

2    me and Alan would get in the car I would have to turn C B on

3    so he could either hear other people talking to do something

4    with him.  It was really neat, this is cool, I got somebody

5    to play with, somebody I can do things with, somebody to take

6    me places.

7         Q    Did you have much relationship, if any, with

8    Jennifer?

9         A    In the beginning I didn't.  She went to Geisinger

10   to have a penny removed from her throat and after we come

11   back from that it was like she was attached to me, and there

12   was, there was like a bond for me and Jen.

13        Q    When was the first time that it was brought to

14   your attention after you moved to Roulette that Rebecca had

15   injured her foot or ankle?  How was it brought to your

16   attention?

17        A    I was in bed sleeping and Lori was up with the

18   kids and Alan and Jennifer and Rebecca were out in the living

19   room, which was outside our bedroom door, and Lori came in to

20   wake me up, kids were out there and Rebecca was crying and

21   she asked what was wrong, and that's when Alan had said that

22   Jennifer fell on Rebecca's leg, and then it was not too long

23   after that that Lori brought Rebecca in and showed me that

24   her leg was bruised.

25        Q    Were you aware that there came a time when Rebecca

A-321

321

1  was taken to the hospital in reference to that apparent

2  injury?

3       A    Yes.

4       Q    Did you go there?

5       A    Yes, I did.

6       Q    What, if any, discussion did you have with

7  Rebecca's mother, Lori, concerning that apparent injury, what

8  discussion did you have, if any?

9       A    I don't recall.

10       Q    Were you concerned over Rebecca's welfare?

11       A    Yes, I was.

12       Q    At that time did you think that you were

13  responsible for or may have been responsible for that?

14       A    No.

15       Q    I understand that you went first of all to Dr.

16  Asar?

17       A    Yes.

18       Q    And she was just leaving so she referred you to

19  the hospital; is that true?

20       A    Yes.

21       Q    What were you aware of that happened at the

22  hospital, to the best of your recollection tell the jury just

23  exactly what you were aware of?

24       A    I didn't know what was wrong.

25       Q    Were you aware, for instance, that child was

A-322

322

1       treated in the Emergency Room?

2           A    Yeah, I was aware of that.

3           Q    Did you talk to Dr. Supinski at that time?

4           A    Briefly, he come in and explained about the cast

5       that he was putting on Rebecca's leg.

6           Q    Now, did you or were you with Lori when the child

7       was brought home from the hospital?

8           A    When?  After?

9           Q    When Rebecca was brought home from the hospital

10      after September 24?

11          A    No, Rebecca didn't come back home.

12          Q    Did Rebecca return with her mother from the

13      hospital?

14          A    No, she didn't.

15          Q    Do you know why that was?

16          A    They said that she had fractures and that they

17      were taking her into their custody.

18          Q    Who was?

19          A    Children and Youth Services.

20          Q    Children and Youth Services took the child into

21      the custody of that service at that time; is that right?

22          A    Yes, after everything was done with Rebecca they

23      took her with them.

24          Q    Do you know whether Rebecca was ever returned to

25      the custody of her mother as of this date?

A-323

323

1      A    Only on weekends.

2      Q    After September 24, 1996 did you become, do you

3 recall whether or not you were contacted by any police

4 officer?

5      A    Yes.

6      Q    How long after September 24th were you contacted?

7      A    I don't recall.

8      Q    My recollection was that there was testimony that

9 in October the arresting officer first contacted you and

10 asked you to come to the barracks, would your recollection

11 disagree with that?

12     A    No.

13     Q    Do you remember the contact?

14     A    I believe it was by telephone.

15     Q    By telephone. And the arresting officer who sits

16 at counsel table called you by the phone on the phone?

17     A    Yes.

18     Q    What did he say to you?

19     A    He just asked for me to and Lori to go up and give

20 him a statement about what happened.

21     Q    Okay. He didn't ask you to come to the barracks

22 for an interview at that time or anything?

23     A    Not that I recall.

24     Q    Do you recall the next contact he had with you?

25     A    No, I don't.

A-324

324

Q    Do you need a lifesaver or something, any sugar?

A    No, I'm fine.

Q    Do you remember being asked to go to the police barracks in Coudersport?

A    Yes.

Q    Do you know who it was that asked you to do that?

A    Trooper Dawson.

Q    And do you remember when that was approximately?

A    No, I don't.

Q    And did you go to the barracks at his request?

A    Yes.

Q    Did he tell you before you went why he was asking you to go to the barracks?

A    For I believe he stated as a statement for what happened with Rebecca.

Q    Okay. And did he interview you at the barracks at that time?

A    Yes, there was an occasion, I believe, that one that he interviewed me and Lori both.

Q    Did he ask you anything about what you knew about Lori's injury or injuries on the first time you went to the barracks?

A    Yes, I believe he did.

Q    What did you tell him if you can recall?

A    I don't recall what I told him.

A- 325

325

1      Q    Now, do you remember whether or not at the first

2    time you went to the police barracks that you had any feeling

3    that you had contributed in any way to any injury of Rebecca?

4      A    No.

5      Q    Do you recall after that there came a time when

6    you were asked to again go to the barracks for the purpose of

7    taking a polygraph test?

8      A    Yes.

9      Q    Who was it that asked you?

10     A    Trooper Dawson.

11     Q    And what method of communication by letter, by

12   phone or did he come to your house?

13     A    Telephone.

14     Q    What was your response?

15     A    I told him, yes.

16     Q    Did you know what a polygraph test was?

17     A    Sort of.  I didn't know the full extent of it.

18     Q    Did you know whether or not it could be used, the

19   results could be used in court?

20     A    No, I did not.

21     Q    Did you know that there was a special operator

22   that had to operate a machine that was hooked up to you?

23     A    I didn't know it had to be a special operator.  I

24   just knew the only one that was closest was the gentleman

25   that he had told me about.

A-326

326

Q    And was there subsequently a time again when he called you, they were ready to give you the polygraph test?

A    Yes, it was a couple weeks before.

Q    A couple weeks before the test?

A    Around the first of February he called to see if we were still going to take the test and that way he could call the guy back and schedule the date.

Q    February of '97?

A    Yes.

Q    This year?

A    Yes.

Q    Okay. Did you go to the barracks on the appointed day to take the polygraph test?

A    Yes.

Q    Up to the time that you actually went to the barracks were you told anything about the test?

A    No, I wasn't.

Q    You and Officer Dawson agree on that. When you got there what happened?

A    Well, prior to that, going up to take the test I was advised, me and Lori both were advised by a public defender from Wellsboro, I believe his name was Walrath, not to take the test for anybody unless we had an attorney present and that's when I decided that I was going to wait to see if I could get an attorney.

A-327

327

Q    You were advised by Attorney Tom Walrath,

Assistant Public Defender in Wellsboro, Assistant Public

Defender for Potter County that you should not take the test?

A    Yes, unless I had an attorney with me.

Q    Unless you had an attorney with you. Did he

volunteer to go with you?

A    No.

Q    So that's why you went and told them you wouldn't

take the test?

A    Correct.

Q    Then what happened?

A    The day of the test I took Lori up and she went

in, and I wasn't going to until I could contact an attorney,

and Trooper Dawson come out after I returned.  I did leave, I

took Lori's brother, Mike, and daughter, Jen, we went to

McDonalds for lunch and went back up, and he came out to the

car and told me that his boss wanted to talk to me, and he

said it would only take a couple minutes.

Q    Who said this?

A    Trooper Dawson.

Q    He asked you to come in, talk to him, it would

only take a couple minutes?

A    Yes, he wanted me to come talk to his boss.

Q    Did you go in and talk to him?

A    Yes.

A - 328

328

Q     What did he say?

A     They discussed the case about Rebecca and at that time I knew that I basically walked into a trap because if I didn't either take the test or answer the questions I wasn't going to get back out that door and that's how I felt, and we got talking and Trooper Dawson and Sergeant Shirley both told me most likely if I admitted to this the D A would only give me a fine.

Q     Both Trooper Dawson and Sergeant Shirley told you that most probably if you what?

A     If I admitted to this, these charges, that I would most likely just get a fine out of it.

Q     Okay. Now, was this before you went in to talk to the polygrapher, the man who testified yesterday that gives the polygraph test?

A     Yes, because he was giving the polygraph test and I was in Sergeant Shirley's office, and then we was in the kitchen area of the State Police Barracks and that's where I was told that.

Q     Now, after that did you go into talk to the polygrapher, the person giving the polygraph test?

A     Shortly after that, yes, I did.

Q     And did you basically tell him what you later told Trooper Dawson that was on that recording that we heard?

A     Yes, I did.

A - 329

329

Q    I'm going to refer to that recording and ask you
some questions about it.  When you were asked by Trooper
Dawson, could you tell us what may, could you tell us what
may happen that would have caused that particular injury to
Rebecca, talking about her broken right leg, necessitating
the trip to the doctor on September 24th.  You said I was
holding her up above my head in one hand, playing around with
her, she started to fall so I grabbed her leg and caught her
with my other arm and pulled her into my chest so she
wouldn't hit the floor.  Did that actually happen?

A    Yes, sir, that did actually happen.

Q    And what made you think of that incident when he
asked you that?  Did you at that time think that may have
caused the injury?

A    Yes, at that time, I did, I felt that might have.

Q    Had you thought about that before?  Had you
thought about that incident that may have caused the injury
before that?

A    Not that I recall.

Q    Dawson then asked you, "Okay sounded like it was
an accidental thing, is that correct"?  And you said, "Yeah."
It was pointed out to you by Trooper Dawson in that interview
that it was learned when Rebecca was taken to the doctor that
in addition to the right ankle injury she also sustained leg
and rib injuries, breaks and you were asked, "Do you have any

A - 330

330

idea, can you tell us what may have caused those injuries?"
You said in answer to that you said, "Being upset, picked her
up too hard." And then you're talking about picking her up
and you may have picked her up too hard to injure her ribs.
Did that actually happen?

A    Not that I recall.  I just, I was just answering
questions that he asked me.

Q    You were asked by Trooper Dawson, "and what were
the circumstances surrounding picking her up like that?"  You
say, "At Tammy Baker's house in Coudersport."

Q    Dawson, "Okay, was there anything going on with
Rebecca that may have caused you to be upset?"

A    "Not with Rebecca herself, she was crying. I was
already upset I should of just stayed away."  Question,
"Where was Rebecca?" Answer, "In the crib."  Question, "Is
it a separate bedroom?" Answer, "No, same room." Question by
Dawson, "Could you describe to us how it was that you picked
her up?" Answer, "Well, I picked her up, I picked her up like
you would normally pick up a child, but with me being angry I
probably squeezed just a little too tight." Do you remember
squeezing just a little bit too tight?

A    I really can't answer that because I wouldn't know
how.

Q    Why did you say that at that time?

A    I was scared.

A-331

331

Q    Let me digress for a minute. Tell me about your condition when you appeared for the interview with Trooper Dawson did you have a broken arm then?

A    Yes, I did.

Q    When did you break your arm about do you know?

A    February.

Q    February of '97?

A    Yes.

Q    And how was it taken care of?

A    By Dr. Supinski.

Q    Was it in a cast or sling or what?

A    No, he just had it in a splint.

Q    Other than being scared was there any other problem that you were experiencing at that time?

A    From being nervous my blood sugar was fluctuating. I was on 500 milligrams of painkiller for my arm.

Q    Now, after talking about you probably squeezed just a little too tight, Dawson said, "Do you think it's possible as a result of that the injury to the rib could have taken place?" And you say, "Yeah." Dawson, "How about the other two prior two injuries to her leg can you tell us how you think they may have happened?" You said.  "Yeah, one of them may have happened when I dragged her out of the car. I was upset, bad day.  Instead of being easy I just grabbed the car seat and her leg was up against the car seat when I

A- 332

332

1    grabbed it, and I just grabbed and pulled the car seat out so

2    I could get her out of the car and get her into the house and

3    that was apparently the result of another injury." Now did

4    that actually happen that you remember picking her and the

5    car seat out of the car?

6        A    There was one time when I took her out of the car

7    that her foot got caught on the seat belt for the front seat.

8        Q    Let's go into that and find out exactly what you

9    did. Where is the car seat?  In the front or back?

10       A    In the back seat.

11       Q    In back seat. And is she strapped into the car

12   seat?

13       A    Yes, it was.

14       Q    And the car seat was it attached to the back of

15   the back seat over the back or how?

16       A    It was--when we take her and Jennifer both in and

17   out of the car we take the car seats in the house with us and

18   she--I bent to take her out she was in the car seat.  I was

19   grabbing the car seat to take her and the car seat both out.

20       Q    So she was in the car seat?

21       A    Yes, she was still buckled into the car seat

22   itself.

23       Q    You were picking her and the car seat out of the

24   car?

25       A    Yes.

A-333

333

Q    How did you figure that might have hurt her?

A    I don't know.

Q    Okay. Do you remember whether or not she evidenced
any pain when you did that?  Did she cry do you remember?

A    I do not remember.

Q    Now, Dawson asked you immediately after that, "Had
something taken place in the car that maybe caused you to be
upset at that point?"  And you said, "Jennifer had got sick
and was fussing and that didn't help me out any of being of
sound mind." Do you remember that?

A    Somewhat, yeah, I remember.

Q    Jennifer getting sick, did she throw up?

A    Yeah, big time.

Q    Okay. Dawson question, so far you've talked about
two leg injuries and one rib injury there's still another leg
injury that perhaps you would know something about is that
also correct?" And you say, "Yes." Dawson, "Can you tell us
anything?" It could have happened when I went to pick her up
out of the crib, her leg was between the bars and I picked
her up, and when I picked her up her leg got caught and I
mean it vibrated the whole crib, and that apparently was
another result of a fracture." Did that actually happen?

A    Yeah, there was a time that I did pick her up out
of the crib, and I don't know if it was her foot or her knee
that hit, but it did, it was an old crib.  It shook a little

A-334

334

1    bit, but I didn't think it would cause any injury. She was

2    fussy when I picked her up.  She didn't fuss any more or any

3    less.

4         Q    Why did you tell the police officer that these

5    particular incidents may probably or whatever you said

6    probably resulted in the injuries, can you tell us?

7         A    I was basically going by what they told me before

8    the interview that if I admitted to it I'd get a fine, and I

9    figured that way everything is over, I won't--nobody will

10   have the harassment any more.

11        Q    Okay. Now, can you remember when you were arrested

12   after you were interrogated by Trooper Dawson, how long

13   afterwards?

14        A    It was about 19, 20 days.

15        Q    I think according to Trooper Dawson it was about

16   19 or 20 days does that correspond with your thinking?

17        A    Yes.

18        Q    Did it surprise you that you were arrested?

19        A    No, not really.

20        Q    Did you know that you were going to be arrested?

21        A    Basically, yeah, I figured they got what they

22   wanted now, you know, he told me before I left they'd be

23   getting hold of me.

24        Q    When you were arrested, were you taken before the

25   district justice?

A-335

335

```
 1        A    Yes.

 2        Q    Bail set?

 3        A    Yes.

 4        Q    And you couldn't meet the bail so you went to

 5   jail?

 6        A    Yes.

 7        Q    How long were you in jail about?

 8        A    A little over a month.

 9        Q    I'm sorry?

10        A    Little over a month.

11        Q    A little over a month. It was while you were in

12   jail that I became your lawyer?

13        A    Yes.

14        Q    Describe how you were, I can't, you can describe

15   how you were when I came in to see you tell the jury were you

16   suffering in any way?

17        A    With my arm and my sugar not getting right care I

18   was pretty basically distraught, didn't have any sense of

19   even what was going on.  I was just like it was like, like la

20   la land.

21        Q    Do you remember a young man by the name of Setzer

22   who testified in this courtroom today who was in jail at the

23   same time?

24        A    Yes.

25        Q    He was in your cell block?
```

A - 336

336

```
 1        A    Yes.

 2        Q    Do you remember talking to him about what you were

 3   charged with or what you may have done or anything about your

 4   case?

 5        A    No, he asked.  I told him I had four counts of

 6   aggravated assault, that was it.

 7        Q    Did he say anything to you about testifying

 8   against you?

 9        A    No, he didn't say anything to me but I got

10   transported from Potter County Jail over to Warren and when I

11   got back there was a new guy in our cell. We got along and my

12   preliminary came up and they, something was said out front

13   that I was telling about it.  I don't know if it was really

14   said or not.

15              MR. LEBER: I'll object going into hearsay.

16              THE COURT:  Sounds like we're headed for

17   hearsay here.

18        A    Any way when I got back they moved my cell and

19   this new guy, I believe his name was Roger Dunn, told me

20   that.

21              MR. LEBER: Excuse me.

22              MR. FINK:  You're not allowed to say what

23   anybody else told you so let's just forget that okay.

24        Q    Do you have any children?

25        A    Yes, I have one son.
```

A- 337

337

Q    Where is that child living?

A    He's living with his mother.

Q    Is that custody thing or has it been in litigation before a judge or anything?

A    Yes.

Q    What county?

A    McKean.

Q    What is the caption of the case?  Who is the mother of the child?

A    Jodi Lynn Murray.

Q    Is there an order of court outstanding with reference to the custody of your son?

MR. LEBER:  I'm going to object to that.  I'm not sure what the relevance is.

MR. FINK:  I haven't asked what's in it.  I ask if there was, I intend to show this to Mr. Leber and to the Court.

THE COURT:  As to this question, objection is overruled.

MR. FINK:  Your Honor, after the last question on the record I showed the district attorney the two page custody Order dated October 5th, 1996 signed by the Honorable John M. Cleland, Presiding Judge of McKean County with particular notation to the first paragraph of the second page thereof which says, quote, "Father agrees that there

A-338

338

1    should be no contact between Lori Moore and their son." I

2    showed it to the Court.  His Honor asked me what I felt the

3    relevance was, and I informed the Court that I felt that this

4    was in essence a court order suggesting that Lori Moore was

5    not fit to, was not a fit environment for the subject of the

6    custody, namely the son of the parties, Mark Christopher Dale

7    Bailey and Jodi Lynn Murray. His Honor suggested that this

8    was character assassination and irrelevant.  It is my

9    position, Your Honor, on behalf of the defendant that it is

10   relevant and tends to show that Court felt that Jodi, I'm

11   sorry, that Lori Moore was not a good environment for this

12   child, that being so she may well have not been a good

13   environment for the the subject child sub of this proceeding

14   as oppose today my client.

15           MR. LEBER: Judge, our position it's

16   immaterial and irrelevant, it's hearsay. Further, I would

17   just point out that text of that order says that defendant

18   agrees that the son will not be with Lori Moore. We have no

19   idea what the basis of that is, and I think it's again

20   prejudicial to the Commonwealth. It opens Pandora's box of

21   issues and I think it's not admissible under any theory as

22   offered.

23           THE COURT:  As offered I think it's

24   irrelevant, certainly well could be hearsay and definitely

25   most clearly it invites the jury to jump into wild

A - 339

339

imagination.  Is it because the parties don't get along,
somebody smokes, somebody drinks.  We don't know, and I can't
tell the jury to engage in that speculation even if we get
through the other inadmissible problems so the offer is noted
on the record and I will decline to permit it.

MR. FINK:

Q    Mark, since you were arrested for the charge or
series of charges which you now face here in this courtroom
have you seen Lori Moore?

A    Yes.

Q    Under what circumstances?

A    When I got out of jail, I went to see her and it
was from then on that we were seeing each other.  And then
she left me this past October.  And then she got a hold of me
it was on a Wednesday night, and then there was a Sunday that
she called after work and she come and stayed in Duke Center
so I could take her to Bradford to get some papers from a
doctor--and then Tuesday I took her to the doctor and then it
was like she asked me if I was going to the next doctor's
appointment.  She was suppose to call, I was suppose to pick
up a prescription for her.  There was something else I was
suppose to do, she was suppose to call, and she hasn't called
since.

Q    Have you ever intentionally harmed in any way
physically or otherwise any of her children?

A-340

340

```
1        A     No, sir, I did not.

2        Q     Have you ever placed any of her children in a

3   situation where for which you were responsible that it was

4   practically certain that that situation would cause harm or

5   injury to the child?

6        A     Not that I'm aware of.

7        Q     Do you recall the incident where that was

8   testified to whereby, I guess, Lori and her sister and you

9   were in the living room and Rebecca was in her crib and she

10  cried and you were the one that got up and purportedly closed

11  the door and then there was louder crying by Rebecca, do you

12  remember that incident at all?

13       A     No, I don't.

14                 MR. FINK:  Cross-examine.

15                 THE COURT:  Commonwealth.

16

17  CROSS-EXAMINATION BY MR. LEBER:

18       Q     Mr. Bailey, you apparently ceased living with Miss

19  Moore about the time that Rebecca was born; is that correct?

20       A     Yes.

21       Q     And then you moved back to live with her at her

22  sister's house in June; is that correct?

23       A     Yes.

24       Q     That's when you got the job at Emporium

25  Specialties?
```

A- 341

341

1     A     Yes.

2     Q     And during that period of time Lori was not

3  employed; is that correct?

4     A     No, she wasn't.

5     Q     How was she supported during that period of time?

6     A     She was on public assistance.

7     Q     Receiving public assistance.  Now, there was talk

8  about your medications.  Your mother testified about that and

9  so forth.  Were you at any time taking medication to control

10 your anger?

11    A     Yes, I was.  At the time it was called Tofrinal

12 T O F R I N A L.

13    Q     And how long were you taking that?

14    A     I was taking it regularly for a couple months

15 after I got out of the hospital.  There was a couple times I

16 got upset and I just said I ain't going to bother taking it

17 any more.

18    Q     Are you taking it now?

19    A     No, I'm taking something Wellbutrin.

20    Q     That's something to control your anger?

21    A     For depression, and I don't know how he worded

22 it.  It's for two different things.

23    Q     Well, does that work to control your anger?

24    A     It helps, yes.

25    Q     And you're taking that now?

A-342

342

1    A    Yes, I take it twice a day.

2    Q    So you feel that is effectively controlling your

3    anger?

4    A    It helps, yes.

5    Q    And without taking medication of some kind do you

6    acknowledge that you do have a problem with anger?

7    A    To an extent.

8    Q    What extent is that?

9    A    I mean, I get, everybody gets upset, but there's

10    times I feel I go over board.

11    Q    So there are times whenever you feel that you get

12    more angry than the average person gets angry; is that

13    correct?

14    A    There's times, yes.

15    MR. FINK:  I guess I'll belatedly object,

16    more angry than ever, I don't know what that means.

17    MR. LEBER:  I believe I said more angry than

18    the average person.

19    MR. FINK:  I'm sorry.

20    THE COURT:  Right.

21    Q    And I asked your mother about incidents when you

22    smashed the windshields on vehicles.  How many times has that

23    happened?

24    A    A lot more than nine.

25    Q    More than nine times?

A-343

343

1    A    Yeah.

2    Q    What would you smash the windshields with?

3    A    My fist.  There was one incident where I was told

4    that I wasn't, by my ex-girlfriend, I wasn't allowed to take

5    my truck out in the woods with a friend of mine.  I grabbed

6    my T bar out of the back and smashed the window and said, now

7    the truck won't go anywhere.

8    Q    You were angry at your girlfriend?

9    A    She wasn't paying for the truck.  She thought she

10   was going to tell me.  You go buy a new sports car and your

11   wife telling you you ain't taking it downtown.  It was my

12   truck I think I had a right to be upset. Yeah.  I probably

13   took it over board but.

14   Q    And you said more than nine times you've smashed

15   windshields?

16   A    I figure in the last, I'd say within the last

17   five, six years I've replaced about nine windshields.

18   Q    And this one, the one you've mentioned with your

19   girlfriend when she told you you couldn't take the truck you

20   did that with some kind of a bar, some kind of tool?

21   A    It was a teeter pipe.

22   Q    The rest of them you did with your fist?

23   A    Yeah, a lot easier to break them with your fist on

24   the inside then on the outside.

25   Q    When was the last time you broke a windshield with

A-344

344

1    your fist?

2           A    I don't recall, it's been a while.

3           Q    Now, you were with Lori Moore until October, two

4    months ago?

5           A    Yes.

6           Q    From the time you got out of jail?

7           A    Yes.

8           Q    And where have you and Lori lived?

9           A    1 Oakland Avenue, and then from there 714 Main

10   Street, Duke Center.

11          Q    So Bradford first then Duke Center?

12          A    Yes.

13          Q    The new medicine that you described that you're

14   taking when did you start taking that?

15          A    When I was in jail.

16          Q    Okay. Now, do I understand Mr. Fink asked you

17   about whether you observed any injuries to Rebecca.  Do I

18   understand you're testimony to be that the only time you

19   would see it would be when Lori would show you bruises; is

20   that correct?

21          A    Yes, because I wasn't around Rebecca as much as

22   Lori.  I worked all day and by the time, well, yeah, I work

23   all day, I'd come home, me and Lori would sometimes go out or

24   we'd take the kids.  Bath times if there was something wrong

25   she would come and show me.

A-345

345

Q    And how many times did that happen that there was
something wrong?

A    I don't remember.

Q    Was it more than once?

A    I don't think it was.

Q    And you went on to say you never really saw
anything before September of 1996; is that correct?

A    To the best that I can recollect, yes.

Q    Now you gave testimony about the incident when you
were in bed, Lori was out with the children, Rebecca started
to cry, Lori came and woke you up and told you that Jennifer
had fallen on Rebecca; is that correct?

A    No, Lori was in the bedroom with me when Jennifer
had fallen on Rebecca because she hollered out and asked Alan
why Rebecca was crying, then Alan told Lori that Jennifer had
fallen on her leg.

Q    And that was in September of 1996?

A    Yes, we were living in Roulette.

Q    You were living in Roulette. And do you know when
that happened in relationship to when Rebecca was taken to
see Dr. Asar and taken to the hospital for x-rays and so
forth?

A    It was that morning, the morning that she fell on
her is when Lori showed me the bruise I believe.

Q    So when you first woke up that morning that's when

A-346

346

1    it was that very day that you went to the hospital?

2        A    I believe so, and it was--I usually sleep until

3    afternoon so I was it was mid day, and at that time I was

4    working three to eleven shift.

5        Q    And so that day would have been Tuesday; is that

6    correct?

7        A    I believe so, yes.

8        Q    Let's talk about Mr. Setzer's statement, his

9    testimony he gave here. Basically you're saying Mr. Setzer's

10    statement wasn't true?

11        A    Yes, I never discussed nothing with him.  All I

12    told him was I had four counts of aggravated assault, that

13    was it, and then I went to Warren and I came back. `He come

14    in back into the cell with an envelope of papers saying he

15    just got so many counts dropped against him and he snickered

16    about it.

17        Q    Now, Mr. Setzer's testimony he did say among other

18    things that you wanted to find out how you could go to Warren

19    State Hospital; is that correct?

20        A    No, it ain't, trust me, I ended up there.  It's

21    not the place to be and I did not ask how to get out of jail.

22        Q    Did you not believe that by claiming that you were

23    insane or had some kind of mental problem you would be able

24    to beat this charge that's against you?

25        A    Can you say that again.

A-347

347

Q    Did you believe that if you could show that you
were insane or that there was some kind of other mental
problem that caused you to do what you did or what you were
charged with doing that you would be able to beat this charge
against you?

A    No.

Q    So you did go to Warren State Hospital?

A    Yes.

Q    And I guess everybody knows that's a mental
institution?

        MR. FINK:    Excuse me.  May we approach?

        (Following discussion held at the bench).

        MR. FINK:    It was me trying to get him into
Warren State Hospital.  It was I that tried to get him into
Warren State Hospital.  I was afraid that he would commit
suicide and I tried I called everybody, including you.

        THE COURT:    I believe that sounds familiar
actually.

        MR. FINK:    And I'm afraid I'll have to try to
take the stand.  I know the ethical, I'm sorry, but unless we
can do something about it now I don't know what to do about
it.

        THE COURT:    It's a mess because he mentioned
it on his direct.

        MR. LEBER:    I can try to straighten it out on

A-348

348

1    the record and ask him specifically.

2                    MR. FINK:  He may not know it, but I will

3    swear on the record that I called everybody.

4                    THE COURT:  In fact that sounds familiar.

5                    MR. FINK:  To try to get him in the hospital.

6                    THE COURT:  I believe I have firm

7    recollection that you did speak to me about it.

8                    MR. LEBER: I don't have a problem with the

9    Judge, with the Court maybe right now giving a curative

10   instruction.  I don't feel responsible for it.

11                   MR. FINK:  I'm not.

12                   MR. LEBER: To avoid mistrial I don't want to

13   waste any more time.

14                   MR. FINK:  I don't know what to do.

15                   THE COURT:  Let's talk about what I should

16   tell the jury.  Reference was made to the defendant being in

17   a mental hospital, counsel have agreed that one reason he

18   entered a mental hospital was suggestion of his counsel, who

19   had concerns of his well being.

20                   MR. LEBER: I'd like the Court to know that I

21   just became aware of that, I was not aware of that.

22                   MR. FINK:  I don't doubt that a bit.

23                   THE COURT:  Ladies and gentlemen of the jury,

24   there was most recently a reference made in the direct

25   examination by Mr. Fink and now in the cross-examination by

A-349

349

1    Mr. Leber relative to the defendant here, Mr. Bailey, being a

2    patient at Warren, which I guess is in fact known to most of

3    us as a mental health treatment facility. Counsel have agreed

4    to have me tell you that we all just learned--I shouldn't,

5    Mr. Fink has shared with us and refreshed my recollection

6    that one reason Mr. Bailey entered that facility was at the

7    request of his counsel who was concerned about his mental

8    health status. The Commonwealth did not know that prior to

9    the side bar. Mr. Fink reminded me that he had called me on

10   that very subject matter some months ago, and I believe that

11   is my recollection as well now that he jogged my memory.  So

12   we wanted to set the record clear as to how that came about,

13   and again do not infer anything adverse to the Commonwealth

14   or the defense because I think we all just became aware of

15   that, again at the words of Mr. Fink. So thank you.

16              MR. LEBER:

17        Q    As a result of your visit to Warren, was it at

18   that time you were placed on this new medication; is that

19   correct?

20        A    Yes, when I first got there, they, what they did

21   like a past medical history, and the doctor that I was seeing

22   felt that with everything that he got off my old records that

23   this other drug would be more appropriate, and I've been on

24   it ever since.

25        Q    So prior to going to Warren you were not taking

*A-350*

350

1    anything relative to your depression or your anger problems?

2        A    No, I wasn't.

3        Q    And on the statement that you gave to Trooper

4    Dawson you indicated that you were in, you were being treated

5    at Bradford in May of 1995; is that correct?

6        A    Yes, that was '95, and I believe the month was

7    May.

8        Q    In May of '95, and that it was at that time that

9    you were prescribed the Tofrinal?

10       A    Yes.

11       Q    At that time when you gave the statement to

12   Trooper Dawson you said you took that for approximately five

13   months and then I just stopped taking it; is that true?

14       A    I'm not really sure exactly how long I did take

15   it.

16       Q    So if that was true May is the fifth month to the

17   tenth month, until October of 1995 you took that, is that

18   correct approximately?

19       A    Somewhere around there, yeah.

20       Q    And I think also Trooper Dawson also asked you

21   when did you stop taking it, how long ago, and you said

22   probably a year, a year and a half.  So that would have been

23   a year, year and a half before February 28th of 1997; is that

24   correct?

25       A    About that, yes.

A - 351

351

Q     So during that period of time you weren't taking any medication for that problem?

A     No, the only medicine I was on was for my Diabetes.

Q     And included in that period of time when you weren't taking any medication for that was the period of time during which you were living with Lori and during which Rebecca was living with you; isn't that correct?

A     Yes.

Q     So that condition existed as well as the Diabetes during that period of time; is that correct?

A     Yeah.

Q     Those were the two medical problems in essence that you were facing at that time; is that correct?

A     That and my busted arm.

Q     And your broken arm okay. With your Diabetes when your blood sugar would get high you would get agitated; is that correct?

A     Yes.

Q     Agitated does that mean irritable?

A     Sometimes.

Q     When you're agitated or irritable does that mean you're short on patience?

A     Sometimes not always.

Q     And does that mean that things like children

A — 352

352

crying or children making demands upon you cause you to be
upset?

    A    No.

    Q    That never happened?

    A    I get, you know, a little bit upset when they'd
cry, nothing that was real drastic or anything.

    Q    Okay. Now, in July of '95, I guess, according to
your testimony and that of Brother Michael you and Lori were
together in Bradford; is that correct?

    A    Yeah, I believe it was July.

    Q    When was it that you were admitted to the Bradford
Hospital?

    A    May of '95.

    Q    Alright.  You did testify to that I'm sorry. Now,
you indicated that here that in your testimony you admitted
there was a problem with taking Rebecca out of the car at one
time where she may have gotten her foot caught?

    MR. FINK:  I'll object to that.  He did not
say it was a problem.  What he said was how he did it,
Commonwealth is characterizing it as a problem.

    THE COURT:  We'll let counsel rephrase.

    MR. LEBER: I'll rephrase.

    Q    You did testify that something happened relative
to Rebecca at some point when you took her out of the car,
out of the car seat; is that correct?

A-353

1    A    Yeah, it was a time when her foot got caught on
2    the seat belt.
3    Q    Her foot got caught in the seat belt.  Now Alan
4    came in, little boy, Alan Moore came in and testified that he
5    saw you pull her out of a child restraint seat when you were
6    in Roulette and that it caused Rebecca to be very upset, cry
7    and scream, so forth?
8    A    I don't ever recall that happening.
9    Q    That never happened. In your statement that you
10   made to Trooper Dawson that was recorded here the quote, I
11   believe using your language was that on, Page 4 you said, "I
12   dragged her out of the car, I was upset, bad day." Did Alan
13   witness that?
14   A    No, I never dragged her out of the car.
15   Q    Was that a word that Trooper Dawson put into your
16   mouth, dragged?
17   A    I may have said that but I have never done it is
18   what I'm telling you.  I never dragged a kid anywhere.  I
19   mean when I pick them up I pick them up with respect. I never
20   drug a kid out of any car.
21   Q    But that is the word that you used?
22   A    Yes, it's the word I used but I never done it.
23   Q    Now, I believe it was Trooper Davis that testified
24   that you acknowledged that you had a great deal of anger, you
25   stated that you do have one child, that's a son; is that

A-354

354

1   correct?

2       A   Yes.

3       Q   And he lives with his mother; is that correct?

4       A   Yes.

5       Q   And was there a time when you weren't able to see

6   that child?

7       A   The whole time I was with Lori.

8       MR. FINK:  Your Honor, counsel is opening up

9   an area which has been precluded to me, and I would

10  respectfully suggest that unless counsel finds another line

11  of questioning that I ought to be allowed to explore what

12  he's opened up.

13      MR. LEBER: Not related at all, Your Honor.

14      THE COURT:  We're not going to speculate at

15  either table.  You know my guidelines let's go with that.

16     Q   I guess the last question was was there a time

17  when you couldn't see that son?

18     A   Yes, there was.

19     Q   And Trooper Davis had stated that made you angry.

20  Did that make you angry?

21     A   I was angry at the child's mother, yeah, it's my

22  son no matter who I'm with, doesn't mean I should not be

23  allowed seeing him.

24     Q   He also said that you told him that Rebecca

25  reminded you of your son and the fact that you were not able

A-355

355

1   to see your son; is that true?

2       A    Yes, yeah, she reminded me of my son.  I loved her

3   as if she was my son.

4       Q    Now, again this incident where you indicated that

5   Jennifer fell on Rebecca's leg that happened in Roulette?

6       A    Yes.

7       Q    And that happened on September 24th?

8       A    I believe that's the day it happened.  I was

9   sleeping when it happened.

10      Q    Now, when you gave your statement to Trooper

11  Dawson regarding the first incident, the one that you said

12  was accidental did you or did you not tell Trooper Dawson at

13  that time that occurred on September 23rd?

14      A    It was right in that time frame I don't remember

15  exact date.

16      Q    But did you tell Trooper Dawson--did you hear the

17  tape?

18      A    No, I didn't hear the tape.  I was sitting over

19  there I could not hear it.

20      Q    So on September 23rd if that is in fact your

21  statement on the tape this incident occurred when Rebecca

22  fell and you caught her by the leg, and then the next day is

23  the day that Jennifer falls on Rebecca and you go to the

24  hospital; is that correct?

25      A    I believe so, yes.

A-356

356

Q    Mr. Fink also asked you about your statement that regarding the car seat whether you meant it or not.  You said I dragged her out of the car, I just grabbed and pulled the car seat out so I could get her out of the car and into the house, and that was apparently the result of another injury, and Trooper Dawson asked you had something taken place, and Mr. Fink read that you said Jennifer got sick and was fussing.

Q    Did Jennifer throw up?

A    She made a pretty good mess in the back seat and I wanted to get Rebecca out of it.

Q    That caused you to be upset?

A    I was upset, but not to a real frantic extent.

Q    Your statement was, Jennifer had got sick and was fussing and that did not help me out any with being of sound mind; is that what you said?

A    I don't recall if that's what I said or not.

Q    So what you're saying is the part about Jennifer getting sick and fussing that part is true, but the part about dragging Rebecca out of the car is not true?

A    I didn't drag her.  I picked the car seat up.  I put the front seat forward and I pulled her out so I could get her out of the car.  You got to pull you can't just pick up and expect her to get her out from the back seat of a car.

Q    And the incident I guess we're talking about the

A-357

357

1    second or actually third bone break you testified, "I went to

2    pick her up out of the crib, her leg was between the bars, I

3    picked her up, when I picked her up, her leg got caught and

4    it vibrated the whole crib".

5                MR. FINK:  Is there a question?

6                MR. LEBER:  There's about to be if I have a

7    chance.

8        Q    The term, "it vibrated the whole crib," are those

9    words that Trooper Dawson put into your mouth or is that what

10   happened?

11       A    It made a noise on the crib and with it being an

12   old crib it shook.  As a matter of fact that very crib

13   Jennifer had and the crib fell apart when Jennifer was in it

14   down at Jeff and Ray's.

15       Q    So in all of these statements, talking about

16   picking her up too hard and everything else like this you're

17   admitting to breaking many bones in an infant's body?

18       A    I didn't admit to nothing.

19                MR. FINK:  Objection.

20                THE COURT:  I don't believe the question is

21   complete.

22                MR. LEBER: It was not, Your Honor.

23                THE COURT:  Let's hear the question.

24       Q    You're admitting to breaking many bones on an

25   infant's body because you thought if you didn't do so that

A-358

358

1    you would never get out of the police barracks; is that

2    correct?

3         A    Yes, he told me, he come out, he told me his boss

4    wanted to speak to me, it would only take a couple minutes.

5    I was in there for over two, three hours.

6         Q    But that's because you agreed to take polygraph

7    test?

8         A    It was police entrapment is what it was.

9         Q    I see. You did agree during that period of time to

10   take polygraph test?

11        A    He come out to the car and I told him, no, I

12   wasn't going to take it.  He came in and came out and said my

13   boss wanted to talk to me.

14        Q    And you admitted all these things?

15             MR. FINK:  Objection admission it's up to the

16   jury to determine if it's admission or not.

17             THE COURT:  I'm trusting the term is being

18   used colloquial sense not legal.

19             MR. LEBER:  I'm using that rather than

20   confessing.

21        Q    You admitted to all these things you believed you

22   wouldn't get out of the State Police barracks?

23        A    Yes, I was scared.

24        Q    What made you believe if you did admit to breaking

25   at least four bones of an infant you would get out of the

A- 359

359

1    State Police barracks if you didn't?

2                    MR. FINK:  Could I object again.  He has not

3    admitted to breaking four bones of an infant, he has not.

4                    THE COURT:  I will ask counsel to

5    re-characterize the question.

6                    MR. FINK:  Thank you, Your Honor.

7        Q    What made you believe, Mr. Bailey, that if you

8    admitted to possibly breaking four bones on an infant and

9    told the officer how these might have happened, what made you

10   believe that you would get out of the State Police Barracks

11   if you did something like that?

12       A    Because him and his Sergeant both told me if I

13   admitted it I'd only get a fine.

14       Q    Now Mr. Bailey, do you believe in Potter County

15   that we give fines, do you really believe we give fines for

16   people who break the bones of anyone let alone an infant.

17   Did you believe that at that time?

18       A    It was coming from a law officer.  If you can't

19   believe them, who can you believe.

20       Q    So you did believe that?

21       A    Yes, I did.

22       Q    And so because of that you made these statements?

23       A    Yes.

24       Q    Now, during the period of time after you got out

25   of jail you continued to live with Lori were you supervised

A - 360

360

1    was Lori and her children supervised by Children Youth

2    Services?

3        A    Yes, they were.

4        Q    And Beth Sigafoes back here was case worker that

5    was involved; is that correct?

6        A    Yes.

7        Q    And since you've been out of been out of jail you

8    feel that your relationship with Lori's children has been

9    okay, you've had no problems?

10       A    The one time I was with them we didn't have no

11   problems and that was in August of '97.

12       Q    The one time you were with them?

13       A    Yes.

14       Q    I thought you continued to live with Lori up until

15   October of 1997?

16       A    It was after, yeah, I did live with Lori, but I

17   wasn't allowed around the kids, the children were at Tammy's.

18       Q    Alan and Jennifer were at Tammy's?

19       A    Yes.

20       Q    Since September of 1996 have you had occasion to

21   visit with Rebecca at any time?

22       A    I believe I have, I can't remember the dates.

23       Q    Do you remember how it was that Rebecca responded

24   to you?

25       A    She was cranky.

A - 361

361

Q    Did she act like she was afraid of you?

A    She acted like that around me.  She acted like that around her Uncle Mike.  Only ones she would really go to is Tammy and Lori.

Q    Does that mean she would act afraid around you?

A    She acted upset, yes.

THE COURT:  Ladies and gentlemen, I don't mean to cut counsel off I think we cut off the Commonwealth this morning so we will cut off the defense this afternoon. We'll take afternoon recess now for approximately ten minutes.  Again do not discuss the case among yourselves or with anyone else, thank you. Court will stand in recess ten minutes.

(Ten-minute recess).

THE COURT:  Ladies and gentlemen, I've conferred with counsel. It is our present intention to try to get this trial done today.  We only planned on having you here for two days.  We'll do our best to keep the case moving and place it in your hands as soon as we can.  There are of course various steps that we have to go through to make sure that every one has a chance to address the jury and present their case fully. I do appreciate your cooperation and will keep you advised on how our time tables are going. Very well, I believe Mr. Bailey was still on the stand.  There was some cross-examination going on by the Commonwealth, witness

A-362

362

remains under oath.

MR. LEBER:

Q    Mr. Bailey, you mentioned that Trooper Dawson wanted you to go in and talk to his boss, was that boss Sergeant Shirley of the State Police?

A    Yes.

Q    Did you understand he was the officer in charge of the State Police Barracks?

A    Yes.

Q    He's the one that said to you that he would talk to the D A and D A would only give you a fine; is that correct?

A    That's what was said to me.

Q    You indicated that you felt that you wouldn't get out the door if you didn't confess. Did anybody place you in handcuffs?

A    No, at the time they couldn't put me in hand cuffs my arm was in a sling and up by my side.

Q    How about shackles on your feet?

A    No.

Q    Ever lock you in a room?

A    Not that I can recall.

Q    Did they ever threaten you in any manner?

A    Not that I can recall.

Q    Trooper Dawson and Trooper Davis have both

A- 363

363

1  testified that they advised you of your rights, right to have

2  an attorney, right to remain silent, right to have an

3  attorney appointed for you if you couldn't afford one.  Did

4  they do all those things?  Did they advise you of all those

5  rights?

6        A    I believe so, yes.

7        Q    Did anybody at any time prevent you from leaving

8  there?

9        A    I was in the back room. I wasn't sure exactly if I

10  could get back out that door that was locked or not I mean.

11       Q    Wasn't the issue--

12       A    I was scared.

13       Q    The issue that we're talking about with Sargent

14  Shirley was whether or not you were going to take the

15  polygraph test; isn't that correct?

16       A    Ask that again, please.

17       Q    The issue you were talking to Sargent Shirley

18  about was whether or not you were going to take the polygraph

19  test; is that correct?

20       A    I believe so, yes.

21       Q    And that was it, nobody said anything else other

22  than what you said that you would only be given a fine if you

23  admitted your involvement in this thing?

24       A    Correct.

25       Q    And because of that you believed that you had to

A- 364

364

1    make this statement that you made in order to get out of the

2    state police barracks?

3       A    Yes, I was scared.

4            MR. LEBER: I have nothing else.

5            THE COURT:  Any redirect?

6            MR. FINK:  Very brief, Your Honor.

7

8    REDIRECT EXAMINATION BY MR. FINK:

9       Q    You were questioned by the District Attorney on

10   cross-examination concerning custody of your child.  Did you

11   ultimately get ample visitation of your child?

12      A    I got to see him one day and that was on his

13   birthday, his first birthday.

14      Q    Did the Judge in McKean County expand your

15   visitations in October 8th of 1996?

16      A    That's when they were drawn up, yes.

17      Q    And you and the mother were given joint legal

18   custody; is that true?

19      A    I believe so.

20      Q    On this order.

21           MR. FINK:  I have nothing further, Your

22   Honor, thank you.

23           THE COURT:  Anything further from the

24   Commonwealth?

25

A-365

RECROSS EXAMINATION BY MR. LEBER:

Q    You said you saw your son on his birthday?

A    It wasn't on his birthday, it was, I believe it was day before because we worked out a thing.  It was his birthday they were having a big party for him so they figured I could have him the day before that way we could have a party at my mom's for him and that way it wouldn't, the two parties wouldn't clash, one go over and interrupt with the other one.

Q    When was that?

A    That was October, it was October of '96.  It would have to be because he's two so October of '96.

Q    Have you seen the child since then?

A    I saw him just last week for about five minutes.

Q    That's the first time since October of '96?

A    That's the first time since then.  I was actually well, no, I got to take that back.  I did see him when I got out of jail.  I saw him for, I think I saw him a couple times a week for about the first two weeks I was out of jail.  I saw him on a few different occasions when his mother's boyfriend wasn't around because he didn't like the idea of me going down there seeing my son because he wanted to adopt him and I told him, no way.

Q    So you saw your child in October of '96?

MR. FINK:  This has been asked and answered I

A-366

1    object.

2                    THE COURT:  I gather we're getting repetitive

3    here.

4                    MR. LEBER:

5         Q    So other than three times that you've testified

6    you've not seen your child?

7         A    I saw him, I believe, it was last week for about

8    five minutes. I was hanging pizza flyers with my boss and we

9    went down the street that they live on and I told him to

10   prevent any problems, I said you take the side that Jodi

11   lives on I'll take the other side.  I was on the other side

12   of the street she happened to come to the door, she saw me

13   walking down the street, and we went all the way down, come

14   back up.  Me and Kevin where we are going to go next.  She

15   ran from the door, I looked at Kevin, what's that all about.

16   And it was right shortly after she left the door she come

17   back and had my son in her hands and told him there's your

18   dad, do you want to see him, and I went over to see him.

19        Q    Is that all the visitation that you're allowed?

20                   MR. FINK:  Your Honor, I'm going to object on

21   the basis it's been asked and answered three times.

22                   THE COURT:  Let's hear the question.

23        Q    The question, is that all the visitation you are

24   permitted by the Court in McKean County?

25                   MR. FINK:  And I object to it.

A-367

367

1    A    No, I'm suppose to have him every other week, it's

2    in the paper.  I believe it's first third and fourth weekend

3    of every month, every other holiday and like Father's Day and

4    stuff like that I'm suppose to see him.  That Court Order has

5.   been broke since it was wrote up.

6    Q    And the parties of that Court Order are you and

7    this Jodi?

8    A    Correct.

9         MR. LEBER: Nothing else.

10        MR. FINK:  May I, Your Honor.

11        THE COURT:  You may.

12        MR. FINK:

13   Q    I'm going to show you a Court Order of October

14   8th, 1996 which has already been shown to the District

15   Attorney and ask you to read the last paragraph of that as to

16   refresh your recollection.  Don't read it out loud, read it

17   to, use it to refresh your recollection as to the custody

18   granted by the Court, the expanded custody granted by Judge

19   Cleland as of October 8th, 1996.

20   Q    Now what expanded visitations did you get under

21   the Court Order of October 8th, 1996 to your son?

22   A    The only visitation I got was--

23   Q    On that order the expanded?

24   A    I didn't get none of the expanded.  I didn't get

25   none of the overnight visitations.

A-368

368

Q    What does the Order say in that respect?

MR. LEBER: Excuse me, Your Honor.

MR. FINK:  Okay, I agree.  Your Honor, I'm going to have this marked as Defendant's Exhibit.

Q    I show you what has been marked for purposes of identification as Defendant's Exhibit Number 1 and ask you what that is?

A    It's a custody order for my son, Mark.

Q    Where did you get this particular--it's a copy of an Order; is it not?

A    I believe so.  It's one that was sent to me from the Prothonotary in McKean County.

MR. FINK:  Your Honor, I'm going to ask the Court to take judicial notice of the Court Order of a sister court in McKean County dated October 8th, 1996 as it relates to the defendant's visitation of his son as given by the Court.

THE COURT:  Any objection?

MR. LEBER: Limited to that purpose I don't have a problem.

MR. FINK:  The last paragraph of the first page may I have you read it.

THE COURT:  I will take judicial notice as requested.

MR. FINK:  I now seek permission of the Court

A - 369

369

1    to read the last paragraph of the exhibit to the jury.

2                    THE COURT:  Granted.

3                    MR. LEBER: No objection.

4                    MR. FINK: "Beginning the first weekend in

5    April of 1997 father's custody should expand to the following

6    schedule.  Overnight partial custody every other weekend from

7    11 a.m. Saturday until 11 a.m. Monday. Weekend custody should

8    change to every Wednesday, partial custody from 9:00 a.m. to

9    12 p.m.  Parents may adjust times and dates of custody by

10   mutual agreement.

11                   MR. FINK:  I have nothing further, Your

12   Honor. Thank you.

13                   THE COURT:  Thank you, Mr. Bailey, you may

14   step down.

15                   MR. FINK:  Your Honor if I may have a moment

16   I'm anticipating resting.

17                   THE COURT:  Take a moment.

18                   MR. FINK:  Your Honor, I'm glad to report

19   that defense rests.

20                   THE COURT:  Very well.  Is there any further

21   testimony in this matter?

22                   MR. LEBER: One very brief rebuttal witness

23   Amy Tuttle.

24

25   A M Y  T U T T L E, having been duly sworn, was examined and

A-370

370

1    testified as follows:

2

3    DIRECT EXAMINATION BY MR. LEBER:

4        Q    Your name and address, please?

5        A    Amy Tuttle, Coudersport Pennsylvania.

6        Q    What is your occupation?

7        A    I'm director of Social Services at Charles Cole

8    Hospital.

9        Q    And how long have you been so employed?

10       A    I've been in the department for nine and a half

11   years.

12       Q    Were you employed there on September 24th, 1996?

13       A    Yes.

14       Q    And at that time did you have occasion to meet

15   with Lori Moore and Mark Bailey?

16       A    Yes.

17       Q    And what was the the occasion that you happened to

18   meet with them?

19       A    I was called by staff in the emergency department

20   to come down, that we had a suspected child abuse case.  It's

21   routine that I get involved with some of these cases as

22   liaison between patients and their families and doctor and

23   Children Youth Services if they're needed.

24       Q    Mark Bailey you indicated was there.  What was

25   your belief as to his relationship to the child at that time?

A - 371

371

1      A     Initially I thought he was the father, but as the
2  visit went on I realized that he was a paramour.
3      Q     And the particular injury that we were concerned
4  with or you were concerned with at that point was what injury
5  to the child?
6      A     Initially it was the right ankle, but when x-rays
7  were taken other fractures showed up.
8      Q     And the child was who?
9      A     Rebecca Moore.
10      Q     And in your presence or by you directly were the
11  parents asked when this injury occurred to Rebecca Moore?
12      A     Yes, I did ask that question.
13      Q     Who actually asked that?
14      A     I believe Joy Glassmire asked the question from
15  Children Youth Services and I was present.
16      Q     And which of the parties responded to that
17  question?
18      A     I believe the mother did.
19      Q     Where was Mr. Bailey when the mother responded to
20  that?
21      A     In the room with us.
22      Q     Within how great a distance?
23      A     Couple feet, two feet, three feet.
24      Q     And what did Lori Moore tell you at that point?
25      A     She said that she first noticed swelling on the

A-372

372

1    previous Thursday.

2        Q    And what date would that have been?

3        A    The 19th.

4        Q    Did Mr. Bailey respond to that at all?

5        A    He confirmed that also, he agreed with her.

6        Q    And how was it that he expressed his agreement

7    with that?

8        A    Just by saying that, yes, that's what he

9    remembered, that's what his recollection of it was also.

10            MR. LEBER: Thank you, nothing else.

11            THE COURT:  Cross.

12

13   CROSS EXAMINATION BY MR. FINK:

14       Q    Good afternoon to you.  You were called by whom to

15   come down where, for what purpose?

16       A    I was called by staff in the emergency room

17   department to come down there because they had been notified

18   that Dr. Supinski was to see a patient, a baby in the

19   emergency room department that was suspected child abuse.

20       Q    Okay.  What is your capacity?

21       A    Director of Social Services.

22       Q    Directress of social services?

23       A    Hm-hmm.

24       Q    I smile because you smile when I used the word

25   Directrix?

A- 373

373

1    A    I didn't expect that, but that's fine.

2    Q    You recall of the question being asked when did

3    the event occur which gave rise to the condition which was

4    being treated.  Is that what was asked?  Who asked what?

5    A    I believe Mrs. Glassmire asked when they noticed,

6    when the parents noticed that something was wrong with the

7    infant's foot or leg, and the response was that, it was, the

8    swelling was noticed the previous Thursday.

9    Q    And you specifically remember my client saying,

10   confirming that by saying, yeah, that was the date is that

11   what he said?

12   A    He agreed with what she said.  He said, yeah,

13   that's about right.

14   Q    Amy, I ask you to try to remember what it was that

15   he said.  Do you remember exactly what he said?

16   A    Probably not verbatim, but I remember that he

17   concurred with her.

18   Q    By shaking his head?

19   A    No.

20   Q    By saying, you're right?  What did he say?

21   A    He said something like, yeah, it was about that

22   time, it was around that time.

23   Q    About that time?

24   A    Around that time.

25            MR. FINK:  Thank you very much.

A-374

374

1          A      Thursday.

2                        MR. FINK:   Thank you.

3                        THE COURT:   Anything further?

4                        MR. LEBER: Nothing else.   We have no other

5      rebuttal testimony.

6                        MR. FINK:   I guess I'm ready, Judge.

7                        THE COURT:   Ladies and gentlemen, the

8      testimony is now closed.   You've heard Commonwealth

9      case-in-chief, Defense case and some rebuttal. Still three

10     things very important that need to happen next.   I typically

11     give counsel another little break.   They've been kind enough

12     and agreed to proceed without that before they make their

13     closing arguments.   So you will next hear from Attorney Fink

14     on behalf of the Defendant, Mr. Mark Bailey.   You'll next

15     hear from District Attorney, Jeff Leber, behalf of the

16     Commonwealth in terms of closing arguments, and finally you

17     will hear from me on behalf of the court system and the law

18     you are required to apply in a case such as this. Before we

19     begin, gentlemen, we did have a question on the verdict slip

20     if you'll recall.   I don't know if anyone has suggestions as

21     to how that information can be delineated.   I will be working

22     on that little bit here during our closings but.

23                        MR. FINK:   I just ask that it it will be

24     delineated with the Courts, under the Court's direction but

25     how.

A-375

375

1          THE COURT:  I'll work on that little bit

2     here.

3          MR. FINK:  We'll be happy to abide the

4     Court's determination on that.

5          MR. LEBER: Judge, I think if I may, that

6     charges can be delineated consistent with our bill of

7     particulars, which we've charged specifically.

8          THE COURT:  Thank you.

9          THE COURT:  Ladies and gentlemen we'll go

10    into closing argument, Mr. Fink.

11          (Closing argument given by Mr. Fink).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-376

376

1          THE COURT:  Very well, thank you, Mr. Fink.

2     At this time District Attorney Leber may close for the

3     Commonwealth.

4          MR. LEBER:  Thank you, Your Honor.  May it

5     please the Court, Mr. Fink. I appreciate Mr. Fink's offer of

6     jack in a box.  My children are beyond that, I'm beyond that

7     so I'll respectfully decline that offer. I would point out

8     while that's a very generous offer that he made, I appreciate

9     that friendly gesture I have to take great exception in this

10    serious matter with what Mr. Fink has said in his closing

11    statements. I disagree with him on the law as he stated it to

12    you. I disagree with him as to the facts as he stated them to

13    you. On the law best I can tell you I believe you'll have to

14    listen very carefully to Judge Leete as he discusses these

15    various issues, particularly this issue of corpus delecti.

16    Don't believe it's anywhere near what Mr. Fink has made it

17    out to be.  It's a relatively simple concept, and I believe

18    that there was abundance of testimony from all those doctors

19    that were involved before any confession was admitted into

20    evidence, any admission that was made that became a part of

21    the record that there was an instance of child abuse. We do

22    not have to prove beyond a reasonable doubt before that's

23    admitted that this man committed these various crimes all we

24    have to do is proof that somebody has committed a crime.

25          I would also point out to you that while Mr. Fink is

A-377

377

1    correct that this is not a case about child abuse in terms

2    that a specific charge of child abuse is rendered here, there

3    is no such thing as a crime of child abuse under Pennsylvania

4    statutes. What we talk about with child abuse, of course, is

5    the aggregate types of crimes, that could be anything from

6    murder down to harassment that could be child abuse. Anything

7    that is done against the welfare, the health and well being

8    of the child we've talked about that generically as being

9    child abuse. Closest thing we have to that is what Mr. Bailey

10   is here charged with, four counts of it, which is endangering

11   the welfare of children.  That in essence is closest thing we

12   have to a statute that deals specifically with child abuse.

13   But the other charges aggravated assault, which he's charged

14   with and simple assault which he's charged with are the same

15   for a child as they are for anyone of you, anyone who is an

16   adult. Somebody comes up and smacks you in the leg, breaks

17   your shin bone that's aggravated assault if it's considered

18   to be a serious bodily injury or simple assault if it's

19   considered not to be serious bodily injury.  That's

20   indication for you as victim of that.  That's the case if a

21   7-month old child is a victim of that.

22        I agree--I disagree.  I keep saying I agree that's not

23   a Freudian slip because I do disagree when Mr. Fink says Mr.

24   Bailey over here is a very good young man. I suggest to you

25   and submit very strongly that the whole evidence in this case

A-378

378

1    suggests that Mr. Bailey is not a very good young man.

2    Whether you decide that he's guilty of these crimes or not I

3    think everybody has to agree this is not a very good young

4    man. This is either a young man who is very malicious and

5    cruel or it's a young man who is very sick. This is a young

6    man who has acknowledged to you at least on nine occasions

7    because of his anger he smashes windshields out of vehicles.

8    This is a young man who on eight of those occasions

9    apparently has used his fists to do that. I've asked you

10   whether or not you know of anybody you would consider to be a

11   good young man who is so out of control, so little ability to

12   control his temper that you would consider that person to be

13   a very good young man. This also is a young man who in spite

14   of the fact Mr. Fink has read to you, has a court order that

15   allowed him to see his child every how many often times it

16   is, I think it was every other weekend, holidays, so forth.

17   Your recollection of that will have to control that.  In

18   spite of that he hasn't barely seen his own child.  He's had

19   this difficulty all along, and he's trying to convince, come

20   here into court and convince you folks that he cares about

21   and loves Lori Moore's children. I suggest to you that that

22   testimony just does not ring true. I suggest to you that this

23   is a young man that's in trouble, has been in trouble for

24   years.  I'm not saying in trouble with the law I'm saying in

25   trouble with himself.  This is a young man who is out of

A-379

379

1   control, and the evidence shows in this case that he has hurt

2   Rebecca Moore. We are here to determine not whether he's a

3   good young man or bad young man but whether or not he

4   committed the particular crimes with which he's charged, and

5   I suggest to you that character of this young man has been

6   shown to you in this case and circumstantial evidence that

7   this is a man who abuses children and this is a man who did

8   in fact in this case abuse Rebecca Moore.

9        Just to make this very clear Mr. Fink said there were

10  five counts of each, there are four counts of each, four

11  counts of aggravated assault, four counts of simple assault

12  and there are four counts of endangering the welfare of

13  children. That is the official information that is filed by

14  the District Attorney in this particular case. Each one of

15  those counts and each category aggravated assault, simple

16  assault, endangering welfare of children pertain to four

17  distinct issues. The question is, and we're not asking you to

18  determine 12 different, whether 12 different instances

19  occurred we're asking you to determine whether or not four

20  different incidents occurred and first incident is the

21  incident that was reported on September 24th, 1997, that is

22  the incident where Rebecca Moore was taken to the hospital

23  and she has two broken bones in her right ankle, broken tibia

24  and fibula, that is the first incident, and we claim and

25  Commonwealth submits that the evidence has shown that he is

1    guilty of aggravated assault relative to that incident, he's

2    guilty of simple assault relative to that incident and guilty

3    of endangering welfare of children relative to that incident.

4    The next two issues are the broken bones, broken tibia on

5    left leg and broken tibia on the right leg.  We submit the

6    same thing he's guilty of each crime relative to each of

7    those broken bones, and we submit that fourth incident where

8    there were two broken ribs whether those happened same time

9    or different time we have charged one count of aggravated

10   assault, one count of simple assault and one count of

11   endangering welfare of children relative to those broken

12   ribs.

13        I think that throughout your determination of this

14   matter I want to emphasize to you one important point and

15   that is that as the Judge has already charged you and will

16   charge you again in dealing with the concepts of reasonable

17   doubt and dealing with this corpus delecti matter and dealing

18   with the issue of whether or not there is sufficient

19   circumstantial evidence you have to use your common sense in

20   determining those issues. And let me give you an example

21   relative to circumstantial evidence. As I told you before

22   there is no direct evidence in this case, however, that's

23   what I told you whenever I made my opening there is one piece

24   of direct evidence in this case, and that is the eye witness

25   who is Alan Moore who saw the one incident where he described

1    the defendant ripping the child out of the car seat, that's

2    an example of direct evidence. That is what you see there.

3    The circumstantial evidence, however, as I told you at the

4    beginning and I think Judge Leete will charge you,

5    circumstantial evidence is all the circumstances all the

6    surrounding events and that circumstantial evidence alone if

7    you find it credible is sufficient to find a person guilty

8    beyond a reasonable doubt. That's basically what we have in

9    this particular case. Let me give you an example of this you

10   have to use your common sense.  I live out in the country.

11   There's a lot of farms around there and a lot of people have

12   horses out there.  If I'm sitting on my porch and I hear clip

13   clop, clip clop coming down the road and I hear something

14   whinny making a sound like a horse makes my conclusion would

15   be that it's a horse.  Some people might say it could be a

16   camel, camels go clip clop, clip clop too.  Some people say

17   it might be zebra.  I don't know zebras whinny like a horse

18   assuming it does it might be a zebra.  Well, it might be but

19   the over overwhelming evidence because of all the

20   circumstances I live here in the country with alot of

21   horses.  There are no zebras that have been seen in these

22   parts in a long time and no camels been seen in these parts.

23   I'm going to bet and bet beyond a reasonable doubt that's

24   what is coming down the road, not a zebra, not a camel it's a

25   horse and that's what circumstantial evidence is all about

A- 382

382

1    and I submit to you that circumstances in this case prove to

2    you beyond a reasonable doubt beyond, any doubt that the

3    perpetrator of all of these offenses, the perpetrator that

4    caused four, six breaks of the bones of Rebecca Moore is that

5    person right over here, Mark Bailey.  There's no other

6    suggestion that is plausible. All the evidence points to Mark

7    Bailey.

8         One of the items of the law that the Judge is going to

9    tell you about, and this relates to the charge of both

10   aggravated assault and simple assault is the element of

11   recklessness, that a person commits the crime by acting

12   recklessly. Well, let's deal, I want to deal just with that

13   alone just for a second here. Recklessness requires that a

14   person disregards a substantial risk that an injury such as

15   this would occur and he disregards that substantial risk and

16   the result is that an injury does occur. Let's talk about

17   whether or not there was a substantial risk in this case that

18   this child, Rebecca Moore, would be seriously injured, her

19   bones broken, and I suggest to you that the evidence shows

20   that Mr. Bailey over here did ignore a substantial risk.

21        Do you recall the testimony about the medication?  Here

22   by Mr. Bailey's own words he talked about saying that

23   medication was something that helped him deal with his anger.

24   In 1995 he went to the Bradford Hospital, he was prescribed

25   medication in May of 1995 by October of 1995 when he was

A - 383

383

1    starting his relationship with Lori Moore he wasn't taking
2    that any longer he didn't take it any longer until March of
3    1997 whenever he was in jail over here and again went for
4    evaluation. This man knew and while he should know because he
5    was a man that smashed windshields constantly, he knew that
6    he had a problem with his temper he could not hold his
7    temper. This is apparent through this entire record. This is
8    a man who voluntarily decides I'm not going to take my
9    medication any more, and this is a man who since March of
10   1997 now he can hold his temper he can hold his temper here
11   in court because now he's taking his medication again. What
12   about the recklessness in terms of having a child with four,
13   five, six how many ever it is broken bones and not providing
14   any medical attention until the date whenever this one leg
15   became so swollen they had to go to Dr. Asar and subsequently
16   to the hospital. I suggest to you the amount of recklessness
17   that is engaged in by Mr. Bailey and not to mention his
18   girlfriend, Lori Moore, I'll talk more about that, I think
19   clearly establishes the recklessness to show that this man is
20   guilty of the charges of which he faces a requisite of the
21   recklessness.
22        You are the triers of the credibility. You have to
23   examine whether or not who is telling the truth when they
24   come up here on the witness stand. That's your job, that's
25   your duty. Problem in this case is we're kind of short on

A-384

384

1    witnesses, like I said, that give us direct testimony.  Alan

2    Moore is the only one to give us any direct testimony about

3    what happened. You see a great deal more in the eyes of

4    people.  Like in Alan's eyes Mr. Fink asked him whether Mark

5    Bailey was his buddy.  You know.  I don't think if you looked

6    at Alan, you looked at the way he responded I don't think

7    that Alan thinks that he's Mr. Bailey's buddy. Talk about in

8    Mr. Bailey's own testimony how the children reacted to him,

9    that they were scared of him, they were upset that he did not

10   have a good rapport particularly with Rebecca at the end.

11   Same testimony from Tammy Baker, the sister and from Lori

12   Moore Jennifer was afraid for a long period of time. You know

13   coincidentally even though nothing was discovered relative to

14   these problems remember the testimony that Jennifer did not

15   have any problem with her swollen ears and swollen feet until

16   after Mr. Bailey came to live and maybe it's just a

17   coincidence and then maybe not.

18        Mr. Bailey's defense seems to be that everybody else is

19   at fault.  Now, as I told you I would mention Lori again I

20   have to tell you that Commonwealth, nobody believes that Lori

21   Moore is the Good Housekeeping mother of the year. This is a

22   woman who has acted irresponsible, who has acted really

23   admonishable relative to the care and relative to the welfare

24   of her children.  We're not here to try Lori Moore we're here

25   with the trial of Mark Bailey. Everybody else is at fault for

A-385

385

this problem that Mr. Bailey is in.  State Police Trooper
Bill Dawson is here.  He and Sergeant Shirley conspired
against this young man to put in him in a position where he
had to admit to various things otherwise he would have never
gotten out of that State Police barracks. Do you believe
that?  Do you believe that anybody is going to say, well,
you've broken four or five bones on a little baby but I'll
talk to the D A and you'll get off with a fine for breaking
four or five bones of a little baby. Again, that's the
conspiracy that was engaged in by the State Police to harm
this defendant, to get him to testify to make admissions
against himself, and I'm responsible too because I made a
plea agreement with Mr. Setzer even though that plea
agreement had nothing to do with his testimony against Mr.
Bailey in this case.

    And, of course, Lori we can talk a great deal about
Lori's culpability.  She's no angel. Frankly I'm appalled by
this situation where somebody who goes to the hospital with
her child is told by the doctor that this child has been the
victim of child abuse, has had all these things happen to
her, recognizing this person has a serious anger problem,
recognizing that the child is afraid of this person and
continued to live with this person for more than another
year.  I'm really appalled by that and but again that has
nothing to do with this particular case.  We're dealing here

A - 386

386

1    with Mark Bailey. It's a disgusting situation that's

2    occurred.

3        In considering all the issues before us today the Judge

4    again will tell you to use your common sense in applying the

5    concept of reasonable doubt and your life experiences.  You

6    have your life experiences as I have.  How many of you have

7    known children with broken bones before they were 8 months

8    old except those maybe that were injured at birth or injured

9    in some particular type of accident. How many of you have

10   known a child who isn't even 8 months old that didn't have

11   some kind of disease problem that had five or six broken

12   bones by the time that child was 8 months old. You have to

13   consider that in terms of your life experiences whenever

14   you're considering all the facts and who is credible in this

15   case because again the credibility of the defendant and every

16   other witness here is something that's in your hands alone. I

17   think you have cause to question the credibility for instance

18   of Chad Setzer. And I suggest to you that if it might have

19   been real questionable on the part of the district attorney

20   to bring Chad Setzer to bring him in to testify except that

21   what Chad Setzer was essentially consistent with what Mark

22   Bailey said and also consistent with what happened. He wanted

23   to go to Warren. He did go to Warren. Whether it was him that

24   was involved or Mr. Fink that was involved one way or another

25   he went to Warren. He testified that the defendant was

A - 387

1   holding the baby up in his hand and that the baby fell.  Mr.

2   Setzer says he didn't want it to fall to the ground.  Mr.

3   Bailey says he caught the child by the leg and pulled it into

4   his chest. Well, it's for you to determine the credibility of

5   Chad Setzer but keep in mind that what Chad Setzer said

6   doesn't stand alone. Again, it is the creditability of Mr.

7   Bailey that is the key matter in this case.  At this point

8   he's a person who indicates that he cares about children

9   generally, he cares about Rebecca Moore.  He doesn't care

10  enough about his own child to insist that he get his

11  visitation which are ordered by the court. He tells Amy

12  Tuttle back here that this incident occurred on September

13  19th, five days before he goes to the hospital. And when he

14  testifies here he says it occurred that very morning because

15  that's when Jennifer fell on Rebecca's leg.  So did it occur

16  on the 19th or on the 24th?  Are we saying it's the 24th

17  because that's what is convenient when it's time for child.

18  The incident when he held the child up in the air that

19  happened on the 23rd of September according to Mr. Bailey the

20  day before they went to the hospital the child wasn't hurt

21  until next morning whenever Jennifer fell on Rebecca. And the

22  part about the fine there's going to be a fine for breaking

23  this child's limbs and bones four or five times is that

24  believable?  Would Sergeant Shirley and Bill Dawson do such a

25  thing?  Is it believable that this person believed that he

A-388

388

had to confess or he had to make admissions or else he
wouldn't get out of the state police barracks when there was
absolutely nothing that occurred that would prevent him from
leaving the state police barracks?  Is it credible that he
made the statement that Trooper Dawson and Trooper Davis put
words into his mouth. Do you think it was Trooper Dawson who
told him to say that he dragged the child out of the car
seat?  Do you think that it was Trooper Dawson who decided to
have him testify that he pulled the child out of the crib and
the crib vibrated because the child's leg or foot was caught
in the slat of the crib?  I guess you're going to have to
make a decision or you will, you don't have to make a
decision.  Is Mark Bailey is he just a pathetic human being?
Is he someone who is sick that can't control himself and
can't control his anger or is he an evil sadistic person who
enjoys inflicting pain on a child?  You can debate that for
yourselves.  I would suggest to you for the purpose of this
proceeding it doesn't matter. It doesn't matter. His lack of
control is not a defense.

The Judge is going to tell you that a person's mental
instability unless there is a claim of legal insanity or
other claim in a case such as this it doesn't matter. A
person who is not insane is responsible for his or her acts,
and I ask you to hold Mark Bailey responsible for his acts.
You know I would suggest to you that angry people don't

A-389

389

1    belong taking care or having contact even with little

2    children. This man is smashing windshields because he can't

3    control his anger, and he is a man who is an abuser of babies

4    like Rebecca Moore because he can't control his anger. This

5    is an unstable and angry and a violent person. You know

6    there's nothing more defenseless than a human baby. Every

7    other species has some form of defense mechanism when it's an

8    infant other than human babies, and in this case he has taken

9    it out on the most defenseless of human beings, a child less

10   than 8 months old. So I'm asking you at this point, I'm

11   submitting to you all the evidence points to this interest

12   for justice for Rebecca Moore.  I'm asking you to return a

13   verdict of guilty on each count with which Mr. Bailey is

14   charged.

15            MR. FINK:  May I approach, Your Honor?

16            THE COURT:  Thank you, Mr. Leber.  Counsel

17   may approach.

18            MR. FINK:  If Your Honor, please I would like

19   to take exception to the district attorney's comments that he

20   disagrees with the law as I stated it to the jury in that,

21   quote, as I understood him to say, quote he don't have to

22   prove that defendant committed a crime beyond a reasonable

23   doubt.

24            MR. LEBER: For the purpose of corpus delecti

25   rule.

A-390

390

1              MR. FINK:  I did not hear that.  I don't

2   think you said it.  If you did, it's my hearing.  I don't

3   think you said for the purpose of corpus delecti rule.

4              MR. LEBER: Certainly it was in that context.

5              MR. FINK:  Well, I know it's a completely

6   misleading statement.

7              THE COURT:  Well, actually I don't give a

8   damn one way or other what you say I shouldn't say, damn, I

9   don't give a darn.  If anybody is going to screw it up, I get

10   first dibs on screwing it up.

11             MR. FINK:  Okay. I felt I had to take

12   exception to it, and I do take exception to the District

13   Attorney commenting that the jury could consider that

14   Jennifer didn't have a problem until after she came, after

15   the defendant came to live with them. That is extremely

16   prejudicial.  There's been no charge whatsoever concerning

17   Jennifer against the defendant and I just think it's highly

18   improper.

19             THE COURT:  You want to comment?

20             MR. LEBER:  Except that it's part of the

21   evidence in the case that came in.  I think it came in

22   through you.

23             THE COURT:  There were--I could read through

24   this 25 pages of notes, which I'm not going to do now.  There

25   were references to Jennifer's reactions to Mr. Bailey,

A - 391

391

1    however, I do feel a little clarification to the jury is

2    necessary in that we want to emphasize that alleged victim is

3    not Jennifer and whatever, as to any suggestions that she may

4    have been injured at the hands of Mr. Bailey they should be

5    completely disregarded because it's not in the case. Anything

6    else?

7            Here's what I did on the verdict slip I

8    printed it.  I just tried to track the bill of particulars,

9    that's my printing thereafter with regards.

10           MR. FINK:  There is a question about one and

11   two.  The first doctor testified that, as I recall, that

12   there was a total, I think a total of five, I have differing

13   numbers, and Dr. Supinski after looking up in the light, I

14   think, only saw one as opposed to two and the mere fact that

15   there are four charges does not necessarily mean that

16   testimony--

17           THE COURT:  No, what I did.

18           MR. FINK:  I have a problem.

19           THE COURT:  Frankly, there's three doctors

20   they weren't totally consistent on that stuff.  So what I

21   basically did I put the Commonwealth to the test.  I used the

22   bill of particulars, what they alleged in the bill of

23   particulars.  So I think they're stuck with it if it's wrong.

24           MR. LEBER: Yeah, I think, well, I think the

25   testimony of the doctors was more consistent than

A - 392

392

1    inconsistent.

2              THE COURT:  Well, yes, there was a question

3    of hair line or was this recovering.

4              MR. LEBER: For instance, the right ankle

5    injury I don't think Dr. Dalllaire said that.  I think she

6    treated tibia fibula being one fracture, whereas Dr. Supinski

7    was referring to it as two fractures and I don't know.

8    Frankly I don't know.

9              MR. FINK:  But down in the verdict slip

10   that's one incident and then the second one also goes to the

11   right tibia and I have a problem with that.  There's a

12   question of whether or not there was a--now Dr. Supinski did

13   testify that there were different.

14             THE COURT:  There was, I felt there was, that

15   there were.  It was either a conflict or else they were

16   saying that it was inconclusive on this, there was definitely

17   this and maybe this.

18             MR. LEBER:  I think the only thing maybe that

19   existed was the ankle of the left leg if you fared it all

20   out.

21             THE COURT:  Alright why don't we do this.

22             THE COURT:  Ladies and gentlemen of the jury,

23   in the course of closing remarks there was references made to

24   Jennifer Moore, who apparently is Rebecca's older sister. I

25   want to point out to you that Jennifer is not alleged to be a

A-393

393

victim here, and to the extent it has been suggested that she
is in some manner involved or a victim of any criminal acts
attributed to the defendant, to the extent that has been
suggested you should totally and completely disregard it.
This case has allegations of multiple incidents, which I'll
get into, but it has essentially an allegation of one
defendant and one victim.

Ladies and gentlemen, it is now my duty to charge you
on the law as it applies to this case. I know you've been
here for a couple of pretty long days and I genuinely
appreciate the patience that you have shown and the interest
that you have given both to the Commonwealth and the Defense
as well as the Court as we have gone through these several
days.

Very shortly it will become your function to decide
this case solely on the basis of the facts as they have been
presented here in court and in accordance with the
instructions that I give you on matters of law. I want you
to decide this case fairly on the evidence and on the law. I
will not be making a lot of specific references to the
evidence as both counsel did quite properly during the
closings, however, I want you to carefully consider all of
the evidence in the case and if your recollection differs
from mine or from that of either counsel than you correct any
mistakes you think were made on the power of your own

A - 394

394

1    recollection.

2        You are the sole judges of the facts, you are to

3    determine what are the true facts in this case under the

4    evidence, and when you have done so you are to apply those

5    facts to the rules of law that I outline to you and then of

6    course you will deliberate on a verdict. A fundamental

7    principle of our system of criminal justice in this country

8    and in this state is that the defendant comes into court

9    presumed to be innocent. The fact that there was an arrest,

10   we've had various proceedings, we've brought all you in and

11   we've had a trial, none of that process in itself is any

12   evidence against the defendant. The defendant keeps that

13   presumption of innocence throughout the trial and loses it

14   only if you conclude that he has been proven guilty of some

15   or all of the charges beyond a reasonable doubt. Now, if the

16   Commonwealth evidence does arise to the level of proof beyond

17   a reasonable doubt than the presumption of innocence is gone

18   and you may convict. You should however, remember that burden

19   of proof in this criminal case and in all criminal cases is

20   on the Commonwealth and that is to prove guilt beyond a

21   reasonable doubt. Although the Commonwealth has this burden

22   of proof beyond a reasonable doubt I want you to understand

23   that is not absolute, and what I mean by that is that

24   Commonwealth is not required to prove its case beyond all

25   doubt or to a mathmatical certainty. Neither is the

A - 395

1    Commonwealth required to demonstrate for you the complete

2    impossibility of innocence.

3        What is a reasonable doubt?  It is indeed true there's

4    probably been several centuries of legal debate that quantify

5    that what I'm going to give you are fairly basic definitions

6    in a moment. I want you to think about the concept because I

7    think you will find that even though I don't believe any of

8    you have been in law school and perhaps have heard this

9    explanation before I think you'll find that you know the

10   concept because it's likely that you have applied it at other

11   times in your life and situations other than jury duty. I say

12   that because a reasonable doubt is a doubt that would cause a

13   reasonably careful and sensible person to hesitate before

14   acting on a matter of the utmost importance in his or her own

15   affairs. But I caution you, ladies and gentlemen, a

16   reasonable doubt has to be a real doubt. You do not have the

17   luxury as jurors of manufacturing that out of thin air to

18   avoid carrying out a difficult or perhaps even distasteful

19   duty. Again, the test here is not suspicion it's proof beyond

20   a reasonable doubt.

21       As judges of fact you are the judges of the credibility

22   of the witnesses and their testimony. And what I mean by

23   that, picks up on some of what I talked about yesterday

24   morning, that you have to look at each witness and judge the

25   truthfulness and accuracy of each witness' testimony and then

A-396

396

1  of course you've got to decide whether you're going to

2  believe some or all or none of that testimony. There are some

3  factors that are generally recognized as assisting the jury

4  in making determinations of credibility.  In other words, of

5  believability, truthfulness and accuracy.  They're

6  essentially a list of questions that you should ask

7  yourselves relative to the testimony of each witness. And I

8  think you'll find the answers to these questions may help you

9  make those factual determinations on credibility. Those

10 questions that I commend to you are as follows:

11      Was the witness able to see, hear, know and remember

12 those matters about which he or she testified?  How well did

13 the witness describe and remember those matters about which

14 he or she testified?  Is the ability of the witness to see,

15 hear, know and remember affected by youth, by advanced age or

16 by some physical or mental or intellectual problem?  Did a

17 witness testify convincingly?  How did the witness look, act

18 and speak while on the witness stand?  Was the testimony

19 uncertain? Was it confusing?  Was it evasive?  Was it

20 selfcontradictory?  Does the witness have some bias, some

21 prejudice or some other motive in this case that might effect

22 his or her testimony?  How well does the testimony of a

23 witness square with the other evidence in the case, including

24 the testimony of other witnesses?  Is it contradicted?  Is it

25 supported by other testimony and evidence?  Really big

A - 397

397

1    question, ladies and gentlemen, does it make sense?  If you

2    find that some portion of the witness' testimony is

3    inaccurate, than of course you got to decide whether that

4    inaccuracy casts some sort of doubt on the rest of that

5    witnesses testimony. That can depend on whether the witness

6    has been inaccurate on some minor detail and also on a

7    possible explanation for that inaccuracy. For instance, did a

8    witness make an honest mistake as they occasionally do?  Did

9    a witness forget as they occasionally do?  Or did a witness

10   deliberately falsify?  Which also I'm sorry to say does

11   happen sometimes. As judges of credibility and finders of

12   fact you as jurors are responsible for giving the testimony

13   of every witness and for all the other evidence in the case

14   whatever credibility and whatever weight you feel it

15   deserves.

16        In this case the defendant, Mr. Mark Bailey, did take

17   the stand and testify as a witness. In considering his

18   testimony you should use the general instructions, the

19   factors that I've outlined to you for judging credibility of

20   individual witnesses. You are not to disbelieve the defendant

21   because he has a vital interest in the outcome of the trial

22   but on the other hand you can properly consider that vital

23   interest along with all other appropriate facts and

24   circumstances bearing on the defendant's credibility. If you

25   find that there are conflicts in the testimony, then of

A - 398

398

1    course you have the duty of sorting out and deciding which of

2    conflicting testimony to believe and which to reject. But

3    before you reach that stage, ladies and gentlemen, I want you

4    to try and reconcile, or in other words, fit all the

5    testimony together if you can do so.  Those discrepancies and

6    conflicts may or again may not cause you to disbelieve

7    testimony of different witnesses who have given conflicting

8    testimony. Remember, a lesson of human nature is that two or

9    more persons witnessing an incident or recalling an incident

10   can make an innocent mistake in terms of what happened. If

11   you can't fit the testimony together, than of course you've

12   got to decide what to accept and what to reject. Before you

13   do that look at whether the conflict is something minor,

14   something more substantial and whether it arises out of some

15   innocent mistake or unintentional falsehood. Take the same

16   factors that I talked about, which I suggested you use to

17   evaluate the testimony of an individual witness and ask

18   yourself those questions over again if you find that you

19   cannot otherwise reconcile the testimony of conflicting

20   witnesses.

21        The speeches of the attorneys, arguments they make to

22   you are not evidence and I don't want you to consider them as

23   evidence. However, when you are debating the case consider

24   the arguments of counsel carefully. You need to understand

25   that each attorney has a specific duty to come in and argue

A - 399

399

1    and make presentation on behalf of the side of the case he

2    represents. You can be guided by the arguments of counsel if

3    they meet two tests.  First, if they are supported by the

4    evidence, and secondly, if they appeal to your sense of

5    reason and good judgment. Nothing, however, requires you to

6    accept the arguments of either attorney.

7         The defendant here is charged with a total of 12 counts

8    relating to three separate offenses, it being alleged that

9    the defendant committed each offense on four occasions. Some

10   of these relate to what we call assaultive conduct, some of

11   the alleged offenses, and I want to give you a couple

12   definitions here which will hopefully assist you, and I'll be

13   making reference to those in just a moment. One of the

14   definitions is bodily injury. Bodily injury means impairment

15   of physical condition or substantial pain. The second term I

16   want to mention to you is serious bodily injury, which means

17   impairment of physical condition creating a substantial risk

18   of death or which causes serious permanent disfigurement or

19   causes protracted loss of or impairment of the function of

20   the bodily member or organ.

21        Defendant is charged with four counts of aggravated

22   assault relating to an allegation of causing serious bodily

23   injury. In order to find the defendant guilty of aggravated

24   assault you must find that the following elements of the

25   crime have been established beyond a reasonable doubt. There

A - 400

are three elements. First, that the defendant caused serious
bodily injury, as I just defined that term, to the youngster,
Rebecca Moore. Secondly, that the defendant acted
intentionally, knowingly or recklessly under circumstances
manifesting extreme indifference to the value of human life.
A person acts intentionally with respect to serious bodily
injury when it is his conscious object or purpose to cause
such injury. A person acts knowingly with respect to serious
bodily injury when he is aware that it is practically certain
that his conduct will cause such a result. A person acts
recklessly with regard to serious bodily injury when he
consciously disregards a substantial and unjustifiable risk
that serious bodily injury will result from his conduct. The
risk must be of such a nature and degree that considering the
nature and intent of the defendant's conduct and the
circumstances as known to him its disregard involves a gross
deviation from the standard of care that a reasonable person
would observe in the defendant's situation.

The defendant is charged with four counts of simple
assault, and I want you to try to make a distinction here
because simple assault can be proved two different ways for
the purposes of the case. Defendant is charged in Counts 5
through 8 with attempting to cause or intentionally or
knowingly or recklessly causing bodily injury to another.
What that means is that this offense can be proven by

A - 401

1    essentially two different methods, one that bodily injury was

2    attempted and the other that bodily injury was caused.

3    There's a little distinction here I want to go over with you.

4    Defendant is charged with the crime of simple assault bodily

5    injury attempted. In order to find the defendant guilty of

6    that offense you must find the following elements have been

7    proven beyond a reasonable doubt. First, that the defendant

8    engaged in conduct which constituted a substantial step

9    toward causing bodily injury to Rebecca Moore, and secondly,

10   that the defendant's conduct in this regard was intentional

11   or in other words that it was his conscious object or purpose

12   to cause such bodily injury.  And again when I refer to

13   bodily injury I make reference to first definition I gave you

14   a couple minutes ago, that's one way simple assault can be

15   proven.  It also can be proven by the concept of simple

16   assault bodily injury caused. In order to find the defendant

17   guilty of simple assault under this variation the following

18   elements must be proven beyond a reasonable doubt. One, the

19   same as before, that the defendant caused bodily injury to

20   Rebecca Moore. Secondly, that, this is going to sound very

21   familiar, pick up something now from aggravated assault, that

22   the defendant's conduct in causing that bodily injury was

23   either intentional or knowing or reckless.  And again a -

24   person acts intentionally with regard to bodily injury when

25   it is his conscious object or purpose to cause that injury. A

A - 402

402

person acts knowingly with respect to bodily injury when he
is aware that and it is practically certain that his conduct
will cause such a result.  And finally a person acts
recklessly with regard to bodily injury when he consciously
disregards a substantial and unjustifiable risk that bodily
injury will result from his conduct. Again that risk must be
of such a nature and degree that considering the nature and
intent of the defendant's conduct and circumstances as known
to him its disregard involves a gross deviation from a
standard of conduct that a reasonable person would observe in
the defendant's situation.

In Counts 9 through 12 the defendant has been charged
with the offense of Endangering the Welfare of a Child. In
order to find the defendant guilty of that offense you must
find that following elements have been proven beyond a
reasonable doubt. One, that defendant endangered the welfare
of a child by violating the duty of care or protection, of
course, the child in question is again Rebecca Moore.
Secondly, that the defendant endangered the welfare of a
child knowingly, in other words that he was aware that his or
practically certain that his conduct would cause a particular
result.  Next, that defendant was a person supervising the
welfare of a child and finally that the child was under the
age of 18 at the time of the alleged endangerment.

The evidence in this case, ladies and gentlemen, is

A - 403

1    essentially of two different types.  On one hand, there is

2    direct evidence, which is testimony from a witness based on

3    his or her own personal knowledge, such that is something

4    that a person saw or heard himself. The other type is

5    circumstantial evidence, which is testimony about facts which

6    point to the existence of other facts which are ultimately in

7    question. Whether or not circumstantial evidence is proof of

8    the facts ultimately in question depends on the application

9    of common sense, ladies and gentlemen, and human experience.

10   Sometimes just by the virtue of the way crimes can be

11   committed it is necessary to rely on circumstantial evidence.

12   In deciding whether or not to accept circumstantial evidence

13   as proof of the facts in question you must be satisfied first

14   of all that a witness is testifying truthfully and accurately

15   and that secondly that the existence of the facts as

16   testified to by the witness naturally and logically lead to

17   the conclusion that facts ultimately in question also

18   occurred. I will instruct you that circumstantial evidence

19   alone may be sufficient to prove defendant's guilt. If there

20   are various pieces of circumstantial evidence it is not

21   required that each piece by itself prove guilt beyond a

22   reasonable doubt. Instead before you can find the defendant

23   guilty all the pieces of circumstantial evidence considered

24   together must naturally and reasonably lead to the conclusion

25   that the defendant is guilty beyond a reasonable doubt. In

A - 404

404

other words, you can find the defendant guilty solely on the

basis of circumstantial evidence if the amount and quality of

that evidence convince you of guilt beyond a reasonable

doubt.

Now, in this case a number of persons were accepted and

permitted to testify as expert witnesses. I can think of

three I can't remember if some of the other people were

accepted as experts or not.  I'm talking of Dr. Dalllaire,

Dr. Supinski and Dr. Asar.  An expert witness is a person who

has some special skill or knowledge in a science, art or

profession or subject that the witness has acquired by virtue

of training, education and experience. Because an expert has

special knowledge, that is to say somewhat out of the

ordinary that witness may be able to supply jurors with

specialized information, explanations and opinion that would

assist a jury in deciding the case. Regular witnesses have

certain limitations that do not apply to experts. Regular

witnesses can generally testify about things that they see,

personal things that they saw or heard, and secondly, regular

witnesses are limited because they're not allowed to express

opinions on matters that require some special skill or

knowledge. On the contrary an expert witness is allowed to

express opinions on a matter that is within that witness'

area of expertise. Furthermore, an expert witness can base an

opinion on things that are personally perceived or may base

A - 405

1    an opinion on factual information learned from other sources

2    such as other witnesses, photographs or whatever. If an

3    expert witness bases his opinion on things not personally

4    perceived, he can describe the information in which he relies

5    and identify the source by expressing an opinion. You as

6    jurors are, as obviously emphasized to you several times, the

7    judges of credibility and you decide how much weight to give

8    to the testimony. The fact we have accepted certain persons

9    in this courtroom and allowed them to testify as experts does

10   not mean that their testimony and their opinions are always

11   right. When you're considering credibility and weight of

12   expert testimony and opinions consider all the factors

13   relating to credibility that I've already gone over, but

14   consider all other things bearing on credibility and weight

15   including the training, education and experience and ability

16   of each expert, the information upon which an opinion was

17   based, the source and reliability of that information and the

18   reasonableness of any explanation given to support an

19   opinion.

20        Sometimes a witness is asked to answer hypothetical

21   questions and I believe that occurred here.  An expert may be

22   told by counsel to assume certain facts and to express an

23   opinion based on that assumption, that's what we call

24   hypothetical questions. The value of an opinion given in a

25   response to hypothetical question depends on various things

A - 406

406

1    including how close the assumptions made are to the true

2    facts.  One of your tests as jurors is to determine from all

3    the evidence whether or not the testimony assumed for a

4    hypothetical question has been proven to be true. If you find

5    that any of the assumed facts or testimony have not been

6    proven, than you must determine how that affects the weight

7    and value of an expert witness' opinion.

8        Ladies and gentlemen, in a case such as this the mental

9    soundness of the defendant is not a matter for your

10    consideration. The issue of mental soundness of a defendant

11    who is charged with a crime is an offense only if the actor

12    factor is legally insane.  In this case no such claim has

13    been made before you, accordingly the mental soundness of the

14    defendant is not a matter for consideration by this jury.

15    You heard some testimony, I believe, this morning that

16    one of the witnesses, a Chad Setzer had some previous

17    criminal convictions, including one I recall relating to

18    theft or conspiracy to commit theft. That information was

19    provided to you only for the purpose of allowing you to

20    decide whether or not to believe all or part of Mr. Setzer's

21    testimony. In so doing you can consider the type of crime

22    that he acknowledged committing--how long ago it was

23    committed and how likely it is that the, how likely it is

24    that his past crime would effect the truthfulness of his

25    testimony in this case.

A-407

407

1         Now, in this case the Commonwealth has introduced

2    evidence of various statements which they claim were made by

3    the defendant. Before you can consider the statements as

4    evidence against the defendant you must first of all find

5    that the crime was in fact committed and that the defendant

6    did in fact make the statement, otherwise it must be

7    disregarded. You may not consider the statements of the

8    defendant as evidence against the defendant unless you find

9    that the crimes in question were committed. This means that

10   you must disregard the statement attributed to the defendant

11   unless you are satisfied beyond a reasonable doubt by other

12   evidence in the case, that is to say other evidence outside

13   of the alleged statements that a crime was committed, or that

14   an injury was sustained in the process of committing a crime,

15   that crime being committed by someone. The other evidence

16   does not need to show that the crime was in fact committed by

17   the defendant only that crime was committed by someone. The

18   other evidence does not need to rule out all possibilities of

19   accident, justification or excuse or non criminal means. It

20   is enough if you are satisfied beyond a reasonable doubt that

21   the circumstances are more consistent with the injuries

22   having resulted from the crimes that I outline to you than

23   from other means. Again, the evidence does not need to tend

24   to show that the crime was committed by the defendant only

25   that a crime was committed by someone. Other evidence does

A - 408

408

1  not need to rule out the possibility there might be some

2  defense.  There's enough if you are satisfied beyond a

3  reasonable doubt that the circumstances are more consistent

4  with the commission of a crime than with the non commission

5  of a crime or existence of a defense. In other words you have

6  to make that determination beyond a reasonable doubt before

7  you can consider the alleged statements attributed to the

8  defendant. Another way of saying that, is that before the

9  defendant's admissions can be considered as evidence of guilt

10 you as jurors must first be convinced beyond a reasonable

11 doubt that the injuries allegedly suffered here were caused

12 by the crime charged or the crimes I should say in this case.

13 And you have to of course make that determination beyond a

14 reasonable doubt.

15      I promise to stop talking momentarily.  You've listened

16 to a lot of people today, but I do want to give you some

17 brief final guidelines which I hope will help you with your

18 deliberations. I remind you it's my responsibility to decide

19 all questions of law and you are obligated to follow the

20 rulings I have made in court and the instructions I have

21 given you on matters of law. That's because none of us are

22 free to change the law whether we agree or disagree with it.

23 I don't become involved, however, in deciding the facts, that

24 is completely the province of the jury. Again, your function

25 is to consider the evidence, find the facts, apply the facts

A-409

to the law as I have outlined it to you, then to deliberate

on a verdict.

This is a matter of considerable importance, ladies and

gentlemen. As I said we're up here in Coudersport,

Pennsylvania tonight.  Now that it's dark you can probably

shoot a cannon down the street and not hit too many people.

The fact we're up here in God's Country doesn't diminish from

the tremendous importance of this case to the Commonwealth

and to the defense. You have a responsibility to perform your

duties and to reach a verdict based upon the evidence as it

was presented to you during the trial and in accordance with

the law as I have explained it to you. However, in

determining the facts I want you to apply your common sense

and also to draw on your own every day knowledge and

experience in life that each of you has accumulated. You are

required, of course, to keep your deliberations free from any

bias or prejudice. To go back to a point I made yesterday

morning, do not concern yourselves with the future

consequences of your verdict including what might happen to

the defendant in terms of penalty should he be convicted of

any or all of these offenses.  If that were to occur, it is

my function as trial Judge to choose a lawful and appropriate

penalty and you, ladies and gentlemen, are not involved·in

that part of the case or consulted. For that reason the

possibility of a penalty being imposed should have nothing to

A-410

1   do with your decision as to whether or not the defendant has

2   been proven guilty beyond a reasonable doubt.

3       First thing you do when you go upstairs is to select

4   one of your group to act as a foreperson.  That person can

5   start the deliberations going and will also announce the

6   verdict of the jury when you return to the courtroom. This

7   being a criminal court matter your verdict has to be

8   unanimous to be valid. You all have to agree. You have a duty

9   to deliberate with each other and consider each others views

10  with the goal of reaching an agreement if you can do that

11  without doing violence to your own personal judgment.

12  However, nobody is required to surrender an honest and firm

13  conviction as to what the verdict should be. What I mean by

14  that is that when it's all said and done you each have to

15  make up your own minds, but when you do that give full

16  consideration to the views of your fellow jurors.

17      Finally, I want to ask you to extend to each other the

18  same courtesy and respect you've shown through out this two

19  day trial and same courtesy and respect that you extend to

20  other people you encounter in your day to day lives. You are

21  here as an important and constitutional part of the

22  government of the Commonwealth of Pennsylvania and you have a

23  very significant duty about to descend upon you. In

24  performing that duty you have to leave some things behind.

25  All prejudices are out the door, all biases are out the door

A-411

1    and, ladies and gentlemen, your sympathy is out the door too.

2    You are to decide this case solely on the basis of the

3    evidence presented and in accordance with these instructions

4    I have given you on matters of law.

5         You've been a wonderful group to have here these last

6    several days.  You've probably seen more of me and rest of

7    the participants than you wanted to.  It has been a pleasure

8    to work with you thus far. We'll be sending you out with a

9    couple exhibits and a verdict slip and I need to explain the

10    verdict slip because part of it is typed and part of it is

11    not typed.  The part that is not typed is my printing.  I

12    print because if I wrote none of you could read what I wrote.

13    Using the basic allegations made by the Commonwealth I have

14    tried to separate the charges here a little bit.  The verdict

15    slip reads as follows.

16         And now, December 17, 1997, we the jurors impaneled in

17    the above entitled case find the defendant as to 1.

18    Aggravated assault, then I've written in September 1996 right

19    tibia and fibula, 2. Right tibia.  3. Aggravated Assault,

20    left tibia and 4. Aggravated Assault relating to rib injury.

21    I've attempted to label those as best I could in accordance

22    with the assertions made by the Commonwealth as they are the

23    ones who are seeking the verdict of guilty, and of course the

24    defense is seeking a verdict of not guilty. I quantify the

25    four counts of Simple Assault and four counts of Endangering

A-412

412

1    Welfare of Children the same way.  What that means is the

2    foreperson has to write the verdict, the word guilty or words

3    not guilty in whatever combination you deem appropriate

4    twelve times and then the foreperson has to sign at the

5    bottom.

6       Ladies and gentlemen, jurors often wonder here it is

7    5:30 how long does all this take?  And the answer is I'm not

8    sure. Some jurors reach verdicts very quickly, in a matter of

9    few minutes and others take a long, long time.  We take it as

10   we go. I don't keep jurors here all night. We don't starve

11   you into a verdict.  We'll send you upstairs for about five

12   or ten minutes and Mrs. Somogyi is going to tap on the door

13   and come in, ask if you'd like to order dinner.  If so, we

14   have a menu upstairs.  We'll serve you dinner upstairs so you

15   can work and be our guests for dinner.  If it takes you short

16   while, that's fine.  If it takes a you a long time, that's

17   fine.  If it gets later on in the evening, I'll check see how

18   things are going with you. If you need to communicate, please

19   do so by written note, however, at no time should you divulge

20   to me where you stand in terms of numerical divisions on any

21   charges if that is in fact an issue. Anything counsel wishes

22   to place on the record?

23      Ladies and gentlemen, I'm presuming our first 12 jurors

24   are feeling okay and ready to proceed with deliberations.  Is

25   that correct?

A-413

413

1          (Alternate excused).

2          (Jury deliberated).

3          THE COURT:  We'll note the time as being

4    6:10.  District Attorney and Defense counsel are all present.

5    I was handed a note a moment ago.  "Could we have a simple

6    explanation of the main difference between aggravated assault

7    and simple assault." I'll do my best. I want to go back

8    though to a couple points we talked about before, and I want

9    to redefine a couple terms for you because some of the main

10   distinctions are in differences in the terms. Bodily injury

11   is a term and you will hear that with reference to the two

12   subdivisions, if you will, of simple assault.  They involve

13   attempting to cause or intentionally, knowingly or recklessly

14   causing bodily injury, that's simple assault.  It can be

15   proven by attempting to cause or knowingly or intentionally

16   or recklessly causing bodily injury, which brings us to one

17   of those distinctions.  What is bodily injury?  Bodily injury

18   means impairment of physical condition or substantial pain.

19        On the other hand, aggravated assault as it was charged

20   here involves a charge that serious bodily injury was caused

21   by the defendant.  Serious bodily injury means impairment of

22   physical condition which creates a substantial risk of death

23   or which causes serious permanent disfigurement or protracted

24   loss or impairment of the function of any bodily member or

25   organ. And again for aggravated assault the defendant has to

A-414

1    to have acted intentionally, knowingly or recklessly with

2    indifference to human life, and defendant has to have caused

3    bodily injury to Rebecca Moore. So that is the main

4    distinction. You cannot ignore any of the other elements of

5    the offenses but main distinction as it is charged here is

6    bodily injury, which is a component of simple assault under

7    either theory of simple assault or serious bodily injury,

8    which is a component of aggravated assault.

9          Anything further counsel wish to place on the record?

10         MR. FINK:  Your Honor, I would respectfully

11   request, I don't know that it is within the parameter of the

12   question, but I would respectfully request behalf of the

13   defendant his Honor charge once again on the meaning of

14   intentional, knowing and reckless.

15         THE COURT:  I'm happy to do that.

16         MR. LEBER: No objection to that, Your Honor.

17         THE COURT:  For aggravated assault it is

18   necessary that there be serious bodily injury caused to minor

19   victim.  It is also necessary that the defendant acted

20   intentionally, knowingly or recklessly under circumstances

21   manifesting extreme indifference to the value of human life.

22   Now a person acts intentionally with respect to serious

23   bodily injury if it is his conscious object or purpose to

24   cause serious bodily injury. Or a person can act knowingly

25   with respect to serious bodily injury if he is aware that it

A - 415

1    is practically certain that his conduct will cause such a

2    result. A person acts recklessly with regard to serious

3    bodily injury when he consciously disregards a substantial

4    and unjustifiable risk that bodily injury will result from

5    his conduct. The risk must be of such a nature and degree

6    that considering the nature and intent of the defendant's

7    conduct and circumstances as known to him its disregard

8    involves a gross deviation from a standard of care that a

9    reasonable person would observe under the defendant's

10   circumstances. So that's basically the definition of

11   aggravated assault.  Picking up on the specific point you

12   wanted, again, simple assault there are two ways to be

13   proven, proven by bodily injury caused or bodily injury

14   attempted.  If you are looking at from the point of view

15   bodily injury attempted, Commonwealth must prove that

16   defendant engaged in conduct which constituted a substantial

17   step toward causing bodily injury to Rebecca Moore and that

18   he did so intentionally.  In other words it was his conscious

19   object or purpose to cause that bodily injury. Now, that's

20   bodily injury attempted.  The other side of the simple

21   assault coin, if you will, is bodily injury caused, that is

22   first, that defendant caused bodily injury to Rebecca Moore

23   and secondly, that he did so intentionally, knowingly or

24   recklessly as I've just described those terms to you in

25   aggravated assault.  So I hope we have shed some light on the

A - 416

1    darkness not pulled the shade down further. We'll get you

2    folks some dinner.

3         I'll direct the reporter to file the note with the

4    record of these proceedings.  We will adjourn pending hearing

5    more from the jury.

6                        (Jury returned with a verdict).

7                        (Jury polled).

8                        (Court was adjourned).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-417

M 8/13/99

## SUPERIOR COURT OF PENNSYLVANIA

### PITTSBURGH DISTRICT

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | |
| VS | 1451 PITTSBURGH 1998 |
| MARK BAILEY, APPELLANT | |

## J U D G M E N T

ON CONSIDERATION WHEREOF, it is now here ordered and
judged by this Court that the judgment of the Court of Common
Pleas of        POTTER            County be, and the same is
hereby AFFIRMED.


By the Court:

*Eleanor R. Valecko*

DEPUTY PROTHONOTARY


DATED:     AUGUST 10, 1999


Exhibit "A"

J. A16036/99

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| Appellee | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MARK BAILEY, | : | |
| | : | |
| Appellant | : | No. 1451 Pittsburgh 1998 |

Appeal from the Judgment of Sentence February 4, 1998,
In the Court of Common Pleas of Potter County,
Criminal Division at No. 93 of 1997.

BEFORE:   POPOVICH, LALLY-GREEN, JJ. and CIRILLO, P.J.E.

MEMORANDUM:                                    FILED:  AUGUST 10, 1999

Appellant Mark Bailey appeals from the judgment of sentence entered by the Court of Common Pleas of Potter County, which followed appellant's convictions for four counts each of aggravated assault, simple assault and endangering the welfare of a child.[1]  Herein, appellant questions whether counsel was ineffective for:

1)   failing to preserve his challenges to the weight and sufficiency of the evidence for appeal;

2)   failing to object to the trial court's finding that the prosecution had proven corpus delecti by a preponderance of the evidence and its consequent admission of appellant's inculpatory statements to the police into evidence.

---

[1] 18 Pa. C.S.A. §§ 2702, 2701 and 4304, respectively.

j. A16036/99

3) failing to object to the trial court's instruction to the jury with respect to corpus delecti and failing to preserve this issue for appeal;

4) failing to present character testimony;

5) failing to object to the prosecution's introduction of evidence of unrelated bad acts and introducing evidence of appellant's unrelated prior criminal acts;

6) failing to request a curative instruction with respect to the evidence of unrelated bad acts; and

7) failing to object to improper arguments made by the prosecutor during closing argument.

Upon review, we affirm the judgment of sentence.

**Facts and Procedural History**

On September 24, 1996, the staff at Charles Cole Hospital treated Rebecca Moore, a then seventh-month old infant, for fractures to her leg. During the examination, the staff discovered that the infant previously had sustained other fractures to her legs and ribs. The examining physician suspected child abuse and reported the injuries to Children and Youth Services. The State Police interviewed appellant on February 28, 1997. Based upon his statement, the police filed the current charges against appellant.

At trial, the Commonwealth sought to introduce a tape recording of appellant's interview with the police. To establish corpus delecti, the Commonwealth proffered the testimony of three experts, who each testified that Rebecca suffered at least five fractures in an eight-week period and that

- 2 -



J. A16036/99

the circumstances surrounding her injuries were highly consistent with child abuse.

  Dr. Dellaire, a radiologist, and Dr. Supinski, an orthopedic surgeon, both testified to the number and age of the child's fractures. Supinski testified that the victim had sustained at least six separate fractures at various times throughout a time period greater than four weeks. These fractures included two in the child's right ankle which were less than two weeks old. They also included fractures in both the right and left lower leg which were 3 to 6 weeks old and two fractured ribs which were greater than six weeks old. Dellaire testified that the child suffered at least five fractures. These included one in the child's right ankle, which was less than 2 weeks old, and fractures in the left ankle, right lower leg, right rib and left rib, all of which were between one month and two months old in Dellaire's opinion.

  Dellaire and Dr. Asar, a pediatrician, testified that the types of fractures led them to the conclusion that the injuries were consistent with child abuse. Both testified generally about their medical training in child abuse and particularly that the child's "corner" fractures in her ankles and rib fractures are thought to be highly consistent with child abuse unless explained otherwise.

  Supinski testified as to the most likely causes of the injuries. Supinski first dismissed disease and vitamin deficiency as the likely sources of the fractures. He stated that the fractures of the victim's right ankle were most likely caused by traction, possibly by shaking the child. In Supinski's opinion, the remaining four fractures were most likely caused by direct blows each requiring 10 to 20 pounds of force. He testified that because this amount of force is greater than the muscle strength in the 6th to 7th month of age group, the non-ambulatory child was physically unable to injure herself in this manner. Based upon this, Supinski concluded [to] a degree of medical certainty that the child "was undergoing abuse and has had multiple injuries inflicted upon [her] by some other person or persons."

  Finally, all three witnesses testified that the history given to the medical personnel was inconsistent with the child's right ankle fracture that prompted the child's mother to take the child to Asar. The explanation given for the fracture was that a sibling

J, A16036/99

> had fallen on the child's leg.  Supinski testified that this explanation was not consistent with the type of fracture the child sustained.  Asar testified that the child's mother gave her the impression that the injury happened the same day she sought medical assistance and that it later became known that the injuries occurred four days earlier.

Trial Court Opinion, 7/8/98, at 1-2.  Based upon the experts' testimony, the trial court found that the Commonwealth proved, by a preponderance of evidence independent of appellant's statement, that a crime occurred.  It therefore permitted the Commonwealth to introduce the recording of appellant's police interview in its entirety.

When the police questioned appellant about the victim's injuries, appellant admitted that he may have injured the infant accidentally.  In response to Trooper William Dawson's inquiry regarding the infant's most recent injuries, he stated:

> I was holding [her] up above my head in one hand, playing around with her[.]  [S]he started to fall so I grabbed her leg and caught her with my other arm and pulled her into my chest so she wouldn't hit the floor.

Appellant attributed the victim's prior rib fracture to "being upset," "being angry" and "pick[ing] her up too hard."  When discussing the infant's earlier leg fractures, he admitted, "[O]ne of them may have happened when I dragged her out of the car."  Appellant rationalized he "was upset—bad day" and that he was not "of sound mind" at the time of the incident.  Appellant attributed the third fracture in the infant's leg to an occasion when he pulled her out of the crib and caught her leg between the crib rails.  Appellant

J. A16036/99

admitted he was "upset" at the time of the incident, but could not recall why he was angry. Appellant explained, "I get upset over little, tedious things that I shouldn't get upset about. I just fly off the handle over ridiculous things."

During the second portion of the police interview, Trooper Dawson inquired whether appellant had previously received treatment and taken medication for his temper control problem. Appellant admitted he had received in-patient treatment at Bradford Hospital and taken medication to control his anger. When Trooper Dawson questioned whether appellant had problems keeping his temper with other individuals, appellant responded that he had physically abused his ex-girlfriend, Jodi Lynn Murray, as well as his current girlfriend, the victim's mother. Further, he admitted that he may have bruised Allen, the victim's brother, while they were "horsing around." Appellant, however, denied bruising another child in the household, the victim's sister, Jennifer.

The victim's brother Allen also appeared on behalf of the Commonwealth. The victim's brother witnessed one of the incidents appellant admitted to in his police statement. He testified that appellant "was in one of his mad attitudes" and abruptly yanked the infant out of her car seat.

In further support of its case, the Commonwealth presented witness Chad Seltzer, appellant's former cellmate in the Potter County Jail. He

J. A16036/99

testified that while in jail, appellant admitted to him that he had been holding the infant in one hand and dropped her. Appellant informed Mr. Seltzer that the victim was a nuisance and had created problems between him and her mother. Additionally, appellant told Mr. Seltzer that he was attempting to transfer from the jail and into a mental ward.

Appellant's primary defense to the crimes charged was that he did not cause the infant's injuries. Alternatively, the defense argued that even if appellant inflicted the infant's injuries, he did not intend to harm the child. In support of this defense, Appellant presented the testimony of two witnesses and took the stand on his own behalf. The first witness, Michael Hicks, testified that he knew appellant for at least six years, observed appellant interact with the victim and other children and believed appellant interacted well with them. Upon cross-examination, Mr. Hicks admitted that appellant had a temper and took medication to control his anger. Mr. Hicks also had witnessed appellant strike his former girlfriend, Jodi Murray. Appellant's mother, the second defense witness, testified that appellant interacted well with children and that he loved them. Upon cross-examination, she admitted that appellant became agitated when his glucose level rose too high and that on several occasions, appellant, while agitated, had smashed the windshields of various vehicles. When he took the stand, appellant denied harming the infant. Appellant testified that he was a diabetic and became agitated when his blood-sugar level rose too high. He

J. A16036/99

also asserted that he was incapable of harming a child.   Upon cross-examination, appellant admitted that he had bashed automobile windshields on at least nine separate occasions.   For example, appellant shattered the window of his truck with a crowbar after his girlfriend requested that he not drive it.  On other occasions, appellant would use his bare fist to shatter the windshield.

Ultimately, the jury returned verdicts of guilty on each of the charges of aggravated assault, simple assault and endangering the welfare of a child. The trial court then sentenced appellant to an aggregate term of imprisonment of ten to twenty years.   Appellant subsequently filed post-sentence motions, which the trial court denied.  This timely appeal followed.

**Standard of Review**

The standard by which we review appellant's claims is well settled:

> The threshold inquiry in ineffectiveness claims is whether the issue[,] argument [or] tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit; for counsel cannot be considered ineffective for failing to assert a meritless claim.    Once this threshold is met we apply the "reasonable basis" test to determine whether counsel's chosen course was designed to effectuate his [or her] client's interests. If we conclude that the particular course chosen by counsel had some reasonable basis, our inquiry ceases and counsel's assistance is deemed effective. If we determine that there was no reasonable basis for counsel's chosen course then the accused must demonstrate that counsel's ineffectiveness worked to his [or her] prejudice.  The burden of establishing counsel's ineffectiveness is on the Appellant because



J. A16036/99

> counsel's stewardship at trial is presumptively
> effective.
>
> *Commonwealth v. Pierce*, 537 Pa. 514, 524, 645 A.2d 189,
> 194-95 (1994) (citations omitted). Where an appellant presents
> a claim of arguable merit, and there has been no evidentiary
> hearing in the trial court, we ordinarily remand to permit the
> parties to develop the record. *Commonwealth v. Savage*, 695
> A.2d 820 (Pa. Super. 1997). Where, however, the record
> demonstrates the claims lacks arguable merit, or that no
> prejudice resulted, no evidentiary hearing is needed. *See*
> *Commonwealth v. Edmiston*, 535 Pa. 210, 237-38, 634 A.2d
> 1078, 1092 (1993).

*Commonwealth v. Lebo*, 713 A.2d 1158, 1163 (Pa. Super. 1998), *appeal*

*denied*, 1999 Pa. Lexis 391 (Pa. Feb. 18, 1999).

**Discussion**

Appellant first claims trial counsel was ineffective for failing to object

to the Commonwealth's failure to establish corpus delecti. He argues that

the experts who testified that Rebecca was a victim of child abuse espoused

a definition of "child abuse" which encompassed injuries by accidental

means, and, therefore, their testimony was insufficient to establish corpus

delecti. Alternatively, he argues that the expert testimony as to the cause of

Rebecca's injuries was contradictory and, hence, insufficient to establish

corpus delecti. Both arguments lack merit. As the trial court accurately

explained:

> The corpus delecti rule requires the Commonwealth to meet two
> distinct burdens. The first burden requires the Commonwealth
> to convince the Court by a preponderance of the evidence that
> the evidence independent of the defendant's confession shows a
> crime has occurred. *See Commonwealth v. Ahlborn*, 441 Pa.
> Super. 296, 301, 657 A.2d 518, 521 (1995); *Commonwealth*



J. A16036/99

*v. McMullen*, 545 Pa. 361, ___, 681 A.2d 717, 722 (1996); ***Commonwealth v. Byrd***, 490 Pa. 544, 556, 417 A.2d 173, 179 (1980). This is required to admit a defendant's confession into evidence. ***See id***. The second burden requires the Commonwealth to convince the jury beyond a reasonable doubt that the evidence independent of the confession shows that a crime occurred. ***See Ahlborn***, 441 Pa. Super. at 302, 657 A.2d at 521; ***Commonwealth v. Fried***, 382 Pa. Super. 156, ___, 555 A.2d 119, 120 (1989). This is to allow the jury to consider the confession as evidence of the defendant's guilt. ***See id***. The Commonwealth is not required to prove the identity of the personal responsible for the crime and may use circumstantial evidence to prove corpus delecti. ***See Commonwealth v. Persichini***, 444 Pa. Super. 110, ___, 663 A.2d 699, 702 (1995), ***appeal granted in part***, 546 Pa. 595, 687 A.2d 819 (1997).

\*             \*               \*

The corpus delecti requirement for the crime of endangering welfare of children has been met. "A parent, guardian, or other person supervising the welfare of a child under 18 years of age commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa. Cons. Stat. Ann. § 4304(a) (West. Supp. 1998). The doctors' testimony showed that the person responsible for supervising the child either inflicted multiple injuries to the child or neglected the child to the extent that somebody else was able to do so. This is sufficient evidence to convince the court beyond a reasonable doubt that the injuries resulted from a violation of a duty of care or protection. By violating either of these duties, the supervising adult would be practically certain that his or her conduct was endangering the welfare of the child.

The corpus delecti was also established for aggravated assault. A person is guilty of aggravated assault if he. or she "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under conditions manifesting extreme indifference to the value of human life." 18 Pa. Cons. Stat. Ann. § 2702 (a)(1) (West. Supp. 1998). Serious bodily injury is defined as, "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." 18 Pa. Cons. Stat. Ann. § 2301 (West. Supp. 1998). The expert testimony established that the child suffered serious bodily injury. The 4½

J. A16036/99

to 7½ month-old child sustained at least five fractures over the course of more than four weeks. Two of these fractures were in the child's ribcage close to her lungs. This period of repeated injury to the child's fragile body was sufficient for the Court to conclude by a preponderance of the evidence and the jury to conclude beyond a reasonable doubt that the child faced a substantial risk of death.

The independent evidence also supports the Court's ruling by a preponderance of the evidence and the jury's finding beyond a reasonable doubt that someone at least recklessly caused the serious bodily injury to the child. That Dellaire's and Azar's definitions of child abuse did not exclude accidental and non-criminal causes is not determinative. It is not necessary for the Commonwealth to rule out all possibility that the act occurred by accidental or non-criminal means for the jury to find that corpus delecti was established beyond a reasonable doubt. **See Ahlborn**, 441 Pa. Super at 303, 657 A.2d at 522. The detailed testimony relating to the child's injuries, along with the inconsistent explanation given about the source of the most recent injury, was more than sufficient for the jury to be convinced beyond a reasonable doubt that the source of the child's injuries was neither accidental nor non-criminal.

Trial Court Opinion, 7/8/98, at 3-4.

We add only that appellant's alternative argument, which is based upon contradictions in the testimony of the Commonwealth's experts, is also without merit. Granted, Dr. Dellaire testified that he believed that Rebecca's leg injuries were caused by pulling and twisting whereas Dr. Supinski testified that he believed that the fractures were caused not by twisting, but by pulling, traction or a direct blow. Appellant seizes on this alleged inconsistency to argue that the expert testimony did not establish corpus delecti. We find any apparent inconsistency inconsequential, as both doctors agreed that the injuries were purposefully inflicted on the child. Further,

- 10 -

J. A16036/99

they were in consensus that the injuries could have been caused by someone pulling on the child. In sum, appellant's assertions that the Commonwealth failed to demonstrate corpus delecti is without merit, and we will not hold counsel ineffective for failing to raise a meritless claim. **See Commonwealth v. Durst**, 522 Pa. 2, 4, 559 A.2d 504, 505 (1989).[2]

Appellant's second claim is that counsel was ineffective for failing to object to the court's instruction to the jury regarding the Commonwealth's burden of proof for the corpus delecti of the crimes charged. Specifically, appellant claims the instruction 1) "negated the reasonable doubt standard by qualifying the charge with a preponderance of the evidence standard," 2) failed to state it was the Commonwealth's duty to prove, beyond a reasonable doubt, the commission of the crimes charged and 3) improperly

---

[2] For these same reasons, we must reject appellant's challenges to the weight and sufficiency of the evidence. Appellant has failed to develop separately these two claims. Instead, he merely argues that the Commonwealth's failure to establish the corpus delecti of the crimes charged rendered the evidence insufficient to support the verdict and the verdict against the weight of the evidence. For reasons stated *supra*, we find that there was sufficient evidence of corpus delecti to admit appellant's statement to the police.

Likewise, we must reject appellant's challenge to the weight-of-the-evidence. Although appellant did not raise this issue in the court below, he attempts to avoid waiver of the issue by asserting that counsel was ineffective for failing to raise it. We, however, find that even if not waived, this claim would fail for lack of merit. Appellant's challenge to the weight-of-the-evidence depends upon his assumption that the trial court improperly admitted his statement to the police. For reasons stated *supra*, we find that the trial court properly admitted appellant's police statement. Hence, a challenge to the weight of the evidence based upon the erroneous introduction of his statement must fail.

J. A16036/99

included the term "defense" in the context of a more likely than not
standard.

> [I]n reviewing a jury charge for reversible error, the charge
> must be read and considered as a whole. **Commonwealth v.**
> **Woodward**, 483 Pa. 1, 4, 394 A.2d 508, 510 (1978).  If we
> conclude that the charge was erroneous, we will grant a new
> trial unless we determine the error to be harmless.
> **Commonwealth v. Story**, 476 Pa. 391, 405, 383 A.2d 155,
> 162 (1978). ... [T]he trial court's jury instruction will be upheld if
> it adequately and accurately reflects the law and is sufficient to
> guide the jury through its deliberations.  **Commonwealth v.**
> **Early**, 377 Pa. Super. 219, 227, 546 A.2d 1236, 1240 (1988),
> **appeal denied**, 521 Pa. 629, 558 A.2d 531 (1989).

*Ahlborn*, 657 A.2d at 520.

> The trial court instructed the jury as follows:

> Now, in this case the Commonwealth has introduced evidence of
> various statements which they claim were made by the
> defendant.  Before you can consider the statements as evidence
> against the defendant, you must first of all find that the crime
> was in fact committed and that the defendant did in fact make
> the statement, otherwise, it must be disregarded.  You may not
> consider statements of the defendant as evidence against the
> defendant unless you find that the crimes in question were
> committed.

> This means that you must disregard the statement
> attributed to the defendant unless you are satisfied beyond a
> reasonable doubt by other evidence in the case, that is to say
> other evidence outside of the alleged statements that a crime
> was committed, or that an injury was sustained in the process of
> committing a crime, that crime being committed by someone.
> The other evidence does not need to show that crime was in fact
> committed by the defendant, only that the crime was committed
> by someone.  The other evidence does not need to rule out all
> possibilities of accident, justification or excuse or non-criminal
> means.  It is enough if you are satisfied beyond a reasonable
> doubt that the circumstances are more consistent with the
> injuries having resulted from the crimes that I outline to you
> than from other means.

J. A16036/99

Again, the evidence does not need to tend to show that the crime was committed by the defendant, only that a crime was committed by someone. Other evidence does not need to rule out the possibility there might be some defense. There's enough if you are satisfied beyond a reasonable doubt that the circumstances are more consistent with the commission of a crime than with the non-commission of a crime or existence of a defense.

In other words, you have to make that determination beyond a reasonable doubt before you can consider the alleged statements attributed to the defendant. Another way of saying that, is that before the defendant's admissions can be considered as evidence of guilt you as jurors must first be convinced beyond a reasonable doubt that the injuries allegedly suffered here were caused by the crime charged or the crimes, I should say, in this case. And you have to, of course, make that determination beyond a reasonable doubt.

N.T., 12/12/97, at 407-08.

Here, the trial court's instruction adequately explained that a "criminal conviction may not be based upon the extra-judicial confession of the accused unless it is corroborated by independent evidence establishing the corpus delecti." **Ahlborn**, 657 A.2d at 520-21. Further, it informed the jury as to the Commonwealth's burden of proof. The trial court instructed the jury at least four times that the standard was one of "proof beyond a reasonable.doubt." We are unconvinced that the trial court's failure to state separately that it was "the Commonwealth's burden to prove corpus delecti beyond a reasonable doubt," rendered the jury instruction inadequate— especially when the trial court's initial instructions cautioned the jury to "remember that the burden of proof in this criminal case and all criminal

J. A16036/99

cases is on the Commonwealth and that is to prove guilt beyond a reasonable doubt." **See Ahlborn**, 657 A.2d at 522 n. 5.

Also, we are not inclined to vacate the judgment of sentence merely because the trial court stated, "There's enough if you are satisfied beyond a reasonable doubt that the circumstances are more consistent with the commission of a crime than with the non-commission of a crime or existence of a defense." The trial court eliminated the ambiguity, if any, which arose from this statement when it continued with the instruction. The court continued,

> In other words, you have to make that determination beyond a reasonable doubt before you can consider the alleged statements attributed to the defendant. Another way of saying that, is that before the defendant's admissions can be considered as evidence of guilt you as the jurors must first be convinced beyond a reasonable doubt that the injuries allegedly suffered here were caused by the crime charged or the crimes, I should say, in this case. And you of course have to make that determination beyond a reasonable doubt.

N.T., 12/12/97, at 408. We therefore reject appellant's claim that counsel was ineffective in failing to object to the charge. **See Durst**, 552 Pa. at 4, 559 A.2d at 505.

Likewise, we reject appellant's claim that trial counsel was ineffective for failing to present character or reputation testimony. To be entitled to relief on this basis, appellant must demonstrate 1) the existence and availability of the witness; 2) counsel's awareness of, or duty to know of the witness; 3) the witness's willingness and ability to cooperate and appear on

- 14 -

J. A16036/99

behalf of appellant; and 4) the necessity of the proposed testimony in order to avoid prejudice. ***Commonwealth v. Hall***, 549 Pa. 269, 291, 701 A.2d 190, 201 (1997), ***cert. denied, Hall v. Pennsylvania***, ___ U.S. ___, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998). Appellant, however, has failed to identify witnesses that would have proffered testimony on his character and reputation. He also has failed to present affidavits or other documents to demonstrate that witnesses were available to testify at trial and willing to cooperate and appear on his behalf. Thus, appellant's third claim must fail.

Appellant's next ineffectiveness claim relates to the introduction of evidence of specific acts of prior misconduct. Although treated as a single claim in the argument section of appellant's brief, appellant actually raises a multitude of ineffectiveness claims relating to the introduction of evidence of his prior bad acts.[3]

_____

[3] In this section of his brief, appellant also raises a claim entirely unrelated to the introduction of prior bad acts, namely, that counsel was ineffective for failing to object to the testimony of former inmate Chad Setzer. Upon direct examination, Mr. Setzer testified that, while in jail together, appellant informed him that he felt animosity toward the victim and that he had dropped the victim on at least one occasion.

We find no error in counsel's failure to object to the admission of such statements. "[F]alse or contradictory statements by the accused are admissible since the jury may infer therefrom that they were made with an intent to divert suspicion or to mislead the police or other authorities, or to establish [] innocence, and hence are indicatory of [consciousness of] guilt." ***Commonwealth v. Meadows***, 553 A.2d 1006, 1010 (Pa. Super. 1989) (citations omitted). To the extent appellant's statements to Mr. Setzer regarding his hostility towards the victim contradicted his statement to police that the victim's injuries were accidentally inflicted, the statements appellant made to Mr. Setzer were admissible as prior inconsistent

J. A16036/99

As a general rule, evidence of prior bad acts is inadmissible to prove

that the accused committed the crime with which he is presently charged.

*See e.g., **Commonwealth v. Donahue***, 519 Pa. 532, 539-40; 549 A.2d

121, 125 (1988).

> The disfavor for receiving proof of the character of a person as
> evidence that on a particular occasion that he acted in keeping
> with his disposition is strongly felt when the state seeks to show
> that the accused is a bad man and thus more likely to have
> committed the crime. The long-established rule, accordingly,
> forbids the prosecution, unless and until the accused gives
> evidence of his good character, to introduce initially evidence of
> the bad character of the accused. It is not irrelevant, but in the
> setting of jury trial the danger of prejudice outweighs the
> probative value.
>
> This danger is at its highest when character is shown by
> other criminal acts, and the rule about the proof of other crimes
> is but an application of the wider prohibition against the initial
> introduction by the prosecutor of evidence of bad character. The
> rule is that the prosecution may not introduce evidence of other
> criminal acts of the accused unless the evidence is substantially
> relevant for some other purpose than to show a probability that
> he committed the crime on trial because he is a man of criminal
> character. There are numerous other purposes for which
> evidence of other criminal acts may be offered, and when so
> offered the rule of exclusion is simply inapplicable.

McCormick, *On Evidence*, § 190, pp. 447-48 (2d Ed., 1972) (quoted in

***Donahue***, 519 Pa. at 540-43, 549 A.2d at 125).

We first consider appellant's allegations that defense counsel's

introduction of prior criminal acts when he cross-examined two

---

statements. ***See id***. Further, appellant's statements to Mr. Setzer bolstered
the credibility of appellant's admission in his police statement that he had
caused the victim's injuries.

- 16 -

J. A16036/99

Commonwealth witnesses amounted to ineffectiveness. Appellant claims that trial counsel was ineffective for introducing evidence that appellant abused the victim's sister when he cross-examined the victim's mother and for eliciting testimony from the victim's aunt, Tammy Baker, that the victim's sister feared appellant. Appellant argues that because evidence of prior criminal activity is inadmissible, *see, e.g., **Donahue**,* 519 Pa. at 539-40; 549 A.2d at 125, it was improper for defense counsel to question these two witnesses about appellant's "unrelated criminal conduct."

Contrary to appellant's contentions, defense counsel never elicited testimony from the victim's mother or aunt regarding appellant's prior criminal activity or prior misconduct. Defense counsel did not speak of crimes, nor did he suggest that appellant may have caused the injuries of the victim's sister. Rather, defense counsel asked mother why she did not take the victim to the hospital immediately after she noticed the swelling and bruising of the infant's leg. Defense counsel's question never made mention of appellant's prior bad acts, nor did they suggest or imply that appellant inflicted these injuries. Mother responded that her other daughter had had similar bruises on her body in the past, and defense counsel questioned mother as to those similarities. Likewise, the questions defense counsel posed to the victim's aunt exploited the similarities between the injuries of the victim and the victim's sister but again, did not make mention of appellant's prior bad acts or unrelated criminal conduct. Hence, we find

J. A16036/99

appellant's reliance upon the body of case law that prohibits the introduction

of evidence of a defendant's prior criminal activity to be misplaced and,

accordingly, reject this claim.[4]

The second set of allegations concern the prosecutor's redirect of these

same witnesses.  Appellant contends counsel was ineffective for

1)    failing to object when the prosecutor asked the victim's
      mother whether Jennifer and the victim's bruises were
      similar; whether these bruises appeared on Jennifer only
      after appellant began to reside in the household; whether
      appellant had physically injured Jennifer; and whether
      Jennifer feared appellant; and

2)    for failing to object when, on redirect, the prosecutor
      asked the victim's aunt whether Jennifer's bruises were
      similar to those of the victim.

Here, appellant opened the door to the area of the Commonwealth's

inquiry on cross-examination, and the Commonwealth's questions were

designed to dispel inferences raised by the defense.  The defense's cross-

examination of the victim's mother and aunt raised two inferences: One,

that the victim was not a victim of abuse, but merely bruised easily; and

two, that perhaps mother or another member of the household other than

appellant inflicted the victim's injuries.  Since appellant raised these issues

---

[4] Appellant later asserts in this section of his brief that defense counsel improperly questioned the victim's mother about bruises she discovered on the victim's then infant sister Jennifer and about the similarity between their bruises.  However, he cites no case law, other than the general rule that evidence of prior criminal acts is inadmissible, to support his assertions. Accordingly, we deem this claim waived. *See* Pa. R.A.P. 2119 (b); *see also* ***Commonwealth v. Chandler***, 554 Pa. 401, ___, 721 A.2d 1040, 1044 (1998).

J. A16036/99

on cross-examination, the prosecution was entitled to conduct "redirect on th[ose] issue[s] in order to dispel any unfair inferences." ***Commonwealth v. Dreibelbis***, 493 Pa. 466, 479; 426 A.2d 1111, 1117 (1981) (***quoting Commonwealth v. Lewis***, 472 Pa. 235, 372 A.2d 399 (1977)); ***see also Commonwealth v. Truesdale***, 502 Pa. 94, 98, 465 A.2d 606, 608 (1983); ***Commonwealth v. Billa***, 521 Pa. 168, ___, 555 A.2d 835, 841 (1989). As the Commonwealth's questions were properly within the scope of redirect examination, counsel had no basis to enter an objection. ***See Commonwealth v. Webb***, 491 Pa. 329, ___, 421 A.2d 161, 165 (1980) (holding that counsel will not be deemed ineffective for failing to make baseless or fruitless objections).

The third set of allegations concern the Commonwealth's cross-examination of witnesses for the defense. Appellant contends that trial counsel was ineffective for:

1)  failing to object when the prosecution questioned defense witness Michael Hicks as to appellant's violent temper, an occasion when appellant struck his former girlfriend and an occasion when Mr. Hicks counseled appellant about his physical abuse of others; and

2)  failing to object when the prosecution elicited testimony from appellant's mother that appellant had struck his former girlfriend, been institutionalized, taken medication for his temper control problem and smashed the windshields of automobiles on nine separate occasions.

In ***Commonwealth v. Adams***, 626 A.2d 1231 (Pa. Super. 1993), ***appeal denied***, 535 Pa. 672, 636 A.2d 631 (1993), this court explained:

J. A16036/99

> A distinction is drawn between cases where it is sought to prove particular acts of misconduct and those where the purpose of the examination is to test the accuracy of the testimony by showing either that the witness is not familiar with the reputation concerning which he has testified or that his standard of what constitutes good repute is unsound. ***Commonwealth v. Becker***, 326 Pa. 105, 114, 191 A. 351, 356 (1937). Evidence of the former is inadmissible. Evidence of the latter may be shown, provided the actual purpose of the cross-examination is not to show commission by the defendant of a specific crime of which he or she is not now accused, but to test only the credibility of the character witness. ***Commonwealth v. Hurt***, 163 Pa. Super. 232, 235, 60 A.2d 828, 829 (1948).

***Adams***, 626 A.2d at 1233.

At trial, defense counsel questioned the two witnesses as to whether appellant intended to harm any children, and each testified on direct examination that appellant was incapable of formulating the intent to harm a child. This testimony related both to appellant's character and to his state of mind. The Commonwealth did not introduce evidence of appellant's prior misconduct merely to demonstrate appellant's propensity to commit similar acts. To the contrary, the evidence of prior instances of violence and domestic abuse rebutted the witnesses' testimony that appellant had a nonviolent nature, would not harm another individual and was unable to form the intent to hurt a child. The Commonwealth's line of cross-examination was permissible to impeach the witnesses with respect to their veracity and capacity to testify as to appellant's state of mind. ***See Albrecht***, ____ Pa. at ____, 720 A.2d at 703 (finding prosecution's cross-examination on defendant's prior bad acts admissible to attack the character

J. A16036/99

witness's credibility and to demonstrate that the witness's standard of what constitutes good repute for sobriety was unsound); ***Commonwealth v. Jones***, 341 Pa. 541, \_\_\_, 19 A.2d 393-94 (1941) (drawing distinction between cases where it is sought to prove particular acts of misconduct and those where purpose of examination is to test accuracy of testimony by showing that witness is not familiar with reputation or that standard of what constitutes good repute is unsound); ***Commonwealth v. Butts***, 204 A.2d 481, 486 (Pa. Super. 1964) (same); ***Commonwealth v. Peterkin*** , 511 Pa. 299, \_\_\_, 513 A.2d 373, 383 (1986) (noting that character witness may be cross-examined regarding his knowledge of particular acts of misconduct by defendant to test accuracy of testimony and standard by which he measures reputation), ***cert. denied***, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987).

Moreover, since appellant called these witnesses to support his defense that he never intended to harm the infant, the Commonwealth could properly cross-examine these witnesses regarding prior instances of violent conduct to demonstrate intent, malice or absence of accident.    ***See Commonwealth v. Odum***, 584 A.2d 953, 955 (Pa. Super. 1990) (citing ***Commonwealth v. Potts***, 566 A.2d 287, 294 (Pa. Super. 1989)) (finding evidence of prior abusive acts relevant and admissible for the purpose of proving ill will, motive or malice); ***Commonwealth v. Smith*** 544 Pa. 219, \_\_\_, 675 A.2d 1221, 1229 (1996) (same), ***cert. denied***, 519 U.S. 1153,

J. A16036/99

137 L.Ed.2d 223, 117 U.S. 1090 (1997).   After the defense witnesses testified that appellant was incapable of forming the intent to harm a child, the Commonwealth posed questions to support its theory of the case.  With respect to the element of intent, the Commonwealth contended that appellant, either knowingly or recklessly, disregarded the risk that if he ceased taking his medication to control his temper he was capable of causing harm to individuals when enraged.

Each of the questions posed to the defense witnesses directly supported this theory.  The fact that appellant had taken medication to curb his violent outbursts and had been institutionalized evidenced that appellant was aware of his temper control problem.   Appellant decided, without consulting a medical expert, that such medication was no longer necessary to control his temper.  After appellant ceased taking his medication, he physically abused his girlfriend and shattered several automobile windshields.  These events demonstrated that appellant was aware of his inability to control his temper without medication; however, he disregarded the risk and did not resume his medical treatment.  We conclude that the Commonwealth's questions with respect to appellant's prior violent episodes, institutionalization and medical history were relevant to demonstrate that appellant acted intentionally.  Therefore, trial counsel's failure to object to the admission of such testimony did not infringe upon appellant's right to effective assistance of counsel.

J. A16036/99

The fourth set of claims relate to the Commonwealth's introduction of appellant's prior bad acts when it cross-examined appellant. In this respect, appellant claims counsel was ineffective for failing to object when the prosecution cross-examined appellant as to:

1)  whether he was an angry individual who took medication to control his tempter;

2)  whether he had been institutionalized for this problem;

3)  whether he had struck his former or current girlfriend;

4)  whether he had smashed windshields on prior occasions; and

5)  whether he had visited his son only three times in the past nine months.

When he took the stand, appellant testified on direct examination that he had problems with temper control but would never purposefully harm another individual. He admitted that he had broken several automobile windshields while enraged. Appellant explained that he had been hospitalized due to his temper-control problem and that he had taken medication to control his tendency toward violent outbursts. Appellant also testified that part of the frustration he felt towards the victim stemmed from the fact the he was prohibited from visiting with his son from a prior relationship.

We find that defense counsel had no basis upon which to object to the Commonwealth's cross-examination. Appellant testified on direct as to each of the subjects broached, and his testimony opened the door to the

- 23 -

J. A16036/99

Commonwealth's cross-examination on these issues. ***See Commonwealth v. Hawthorne***, 527 A.2d 559, 561 (Pa. Super. 1987) (finding that where accused testified that former husband struck her, door was open for prosecution to ask whether appellant stabbed husband during time he struck her), ***appeal denied***, 517 Pa. 592, 535 A.2d 81 (1987); ***see also Commonwealth v. Craft***, 455 Pa. 616, ___, 317 A.2d 213, 215 (1974). We find no impropriety in the Commonwealth's cross-examination of appellant regarding the many windshields he had shattered.  The defense placed both his character and his ability to formulate the intent to commit the crimes charged at issue.  Appellant elected to present evidence and to testify as to this element of the crimes charged.  Therefore, the Commonwealth was entitled to rebut his defense by demonstrating appellant's awareness of his inability to control his temper without medical treatment and his choice to disregard this risk by foregoing treatment.

Furthermore, the Commonwealth could impeach appellant's credibility through his prior inconsistent statement, despite the fact that it referred to other bad acts. ***See Meadows***, 553 A.2d at 1010; ***Commonwealth v. Jones***, 341 Pa. at ___, 19 A.2d at 393.  Appellant's statement to the police was admissible in its entirety, ***see id.***, and in this statement, appellant indicated that he may have caused the infant's injuries, but that any physical harm he caused was accidental.  He also admitted that he had struck his former girlfriend, been institutionalized for his temper problem and taken

- 24 -

J. A16036/99

medication to control his anger. At trial, appellant completely repudiated his admission that he may have caused the victim's injuries and asserted that his statement had been procured by fear and a promise that if he admitted that he caused the victim's injuries, the authorities would not prosecute him. The prosecutor was entitled to confront appellant as to the inconsistencies between his trial testimony and his statement to the police. *See Meadows*, 553 A.2d at 1010 (observing that false and contradictory statements by the accused are admissible since the jury may infer they were made with intent to divert suspicion or mislead authorities, or to establish alibi or innocence, and hence indicate consciousness of guilt); *accord, Jones*, 341 Pa. at ___, 19 A.2d at 393. Thus, there is no just cause for complaint.[5]

Next, appellant claims that even if evidence of his prior bad acts had been properly admitted into evidence, he nonetheless is entitled to a new trial due to counsel's failure to request a cautionary instruction which explained the limited purpose for which such evidence had been admitted.

---

[5] Appellant avers in his brief that appellate counsel was also ineffective for failing to object when the prosecutor introduced his statement to the police in its entirety. This claim is waived for failure to cite to relevant legal authorities. *See* Pa. R.A.P. 2119 (b).

Further, it lacks merit. "[I]f a voluntary confession is made to police officers, the whole is admissible in evidence, even though it may contain admissions of other offenses unrelated to the one for the commission of which the defendant is on trial." *Commonwealth v. Wood*, 16 A.2d 319, 320 (Pa. Super. 1940); *accord Commonwealth v. Hipple*, 333 Pa. 33, ___, 3 A.2d 353, 356 (1939). Hence, counsel was not ineffective for failing to object to the admission of appellant's confession in its entirety. *See Durst, supra.*

J. A16036/99

*See*, *e.g.*, *Billa*, 521 Pa. at \_\_\_, 555 A.2d at 841; *Commonwealth v. Claypool*, 508 Pa. 198, 1205-06, 495 A.2d 176, 179. In *Commonwealth v. Sam*, 535 Pa. 350, 635 A.2d 603 (1993), and in *Commonwealth v. Rollins*, 525 Pa. 335, 580 A.2d 744 (1990), our supreme court clarified *Billa*, and held that counsel's failure to request a cautionary instruction regarding prior bad acts does not constitute ineffectiveness per se. *See Commonwealth v. Buehl*, 540 Pa. 493, 506, 658 A.2d 771, 778 (1995). To obtain relief, a defendant must still demonstrate each of the three prongs of the test for ineffective assistance of counsel. *See id*. Appellant has failed to meet this burden.

Here, as in *Rollins*, the jury had heard evidence as to appellant's prior acts of misconduct *before* the Commonwealth cross-examined appellant and his witnesses as to those acts. Appellant admitted in his police statement that he took medication to control his tempter, entered an institution due to this problem and struck his girlfriends, and that statement was admissible in its entirety. Furthermore, Mr. Hicks testified on direct examination that appellant had broken several windows, and the record was replete with evidence that appellant had a problem controlling his temper and was prone to outbursts. N.T., 12/12/97, at 287. Thus, the jury had heard evidence of these prior acts before the Commonwealth cross-examined appellant and his

J. A16036/99

witnesses about them.  We conclude no prejudice accrued from counsel's omission. **See Rollins**, 525 Pa. at ___, 635 A.2d at 749.[6]

Likewise, we must reject appellant's claim to the extent it is based upon counsel's failure to request a cautionary instruction regarding evidence that appellant failed to exercise his visitation privileges with his son as established via court order.  Appellant's failure to visit his son was not an act which so resembled the crimes for which appellant was being tried as to suggest a propensity to assault or endanger the welfare of an infant. **Compare Sam**, 535 Pa. at ___, 580 A.2d at 608 (finding no prejudice resulted from failure to request limiting instruction regarding prior criminal activity; defendant's prior beatings of two-year-old son on day of murders did not so resemble murders as to suggest propensity to shoot to death three relatives); **and Young**, 1999 Pa. Lexis 139, *27 (finding no prejudice resulted from failure to request limiting instruction regarding prior criminal activity; fraudulent credit card scheme was not so similar to evidence pertaining to murder that jury's verdict could be considered unreliable); **with Billa**, 521 Pa. at ___, 535 A.2d at 842-843 (finding curative instruction necessary in murder case where appellant allegedly killed woman who spurned his romantic overtures; evidence defendant previously raped

---

[6] Alternatively, we find that the evidence that appellant had previously shattered several windows was not so similar to the crimes charged as to render the jury's verdict unreliable. **See Sam**, 535 Pa. at ___, 580 A.2d at 608; **Commonwealth v. Young**, ___ Pa. ___, ___, ___ A.2d ___, ___, 1999 Pa. Lexis 139, *28-*29 (Pa. 2/4/98) **and** discussion thereof, **infra**.

- 27 -

J. A16036/99

another woman and tried to strangle her after she spurned him was so similar to crime charged as to necessitate limiting instruction). In the case *sub judice*, as in **Sam** and **Young**, "we are certain that the jury would have returned the same verdict,' regardless of the presence or absence of a limiting instruction" as to evidence of appellant's failure to see his son. **Young**, 1999 Pa. Lexis 139, *27 (quoting **Sam**, 535 Pa. at ___, 580 A.2d at 608). Hence, appellant has failed to demonstrate the type of prejudice necessary to sustain his claim.

Appellant's sixth claim is that counsel was ineffective in failing to object to the prosecutor's closing remarks, which he asserts amounted to prosecutorial misconduct because they made reference to appellant's prior bad acts and included an expression of personal opinion as to appellant's guilt.

> [A] prosecutor's arguments to the jury are not a basis for the granting of a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict." **Commonwealth v. Gorby**, 527 Pa. 98, 112-114, 588 A.2d 902, 909 (1991). Moreover, the prosecution and the defense alike are afforded wide latitude and may employ oratorical flair in arguing to the jury. **Commonwealth v. Zettlemoyer**, 500 Pa. 16, 52-55, 454 A.2d 937, 956-957 (1982). The arguments advanced must, however, be based upon matters in evidence and/or upon any legitimate inferences that may be drawn from the evidence. **Commonwealth v. Chester**, 526 Pa. 578, 597-599, 587 A.2d 1367, 1377 (1991). Finally, any allegedly improper prosecutorial comments must also be examined within the context of the conduct of defense counsel. **Commonwealth v. Morales**, 549 Pa. 400, 423-425, 701 A.2d 516, 528 (1997). If a challenged remark is made in

J. A16036/99

> response to the defense's closing argument, it will generally be deemed fair response and hence permissible comment. **See, e.g., Commonwealth v. Williams**, 539 Pa. 61, 76 n.13, 650 A.2d 420, 428 n. 13 (1994), citing **Commonwealth v. Floyd**, 506 Pa. 85, 484 A.2d 365 (1984).

**Commonwealth v. Abu-Jamal**, 553 Pa. 485, ___, 720 A.2d 79, 110 (1998), **petition for cert. filed**, April 23, 1999.

While portions of the prosecutor's comments did, indeed, make reference to appellant's prior behavior, these comments were not outside the bounds of permissible oratorical flair. Appellant has taken the prosecutor's statements out of context in an effort to strengthen his argument. When viewed in the proper context, it is clear that the points expressed by the prosecutor were proper. The record reveals that the prosecutor's closing argument contained repeated references to appellant's prior bad acts, violent nature and failure to exercise visitation rights to see his child. However, we do not find these references rose to the level of prosecutorial misconduct.

For example, appellant claims that the prosecutor encouraged the jury to convict appellant because he was a man of poor character. The defense, however, had placed appellant's character at issue at trial and in its closing, and the prosecutor's comments were a fair response to its assertions that appellant was a "fine young man." We note that when the prosecutor commented on appellant's character, he prefaced his remarks by cautioning that the question before the jury was not whether appellant was a good or

J. A16036/99

bad man, but whether appellant had committed the crimes charged. Then, the prosecutor acknowledged that the credibility of appellant was the key to the case and urged the jury to discredit his testimony because appellant lied about the circumstances surrounding his failure to visit his son. The prosecution suggested that appellant's failure to visit his own son when a court order expressly permitted him to do so undermined appellant's assertions that he deeply cared for children. The prosecution also argued that the instances of violent outbursts directly undermined the testimony of appellant and defense witnesses that appellant was a nonviolent man who would never abuse a child. Later, the prosecutor relied upon inconsistencies between appellant's statements to the police, his jail cellmate and the hospital staff to discredit appellant's recantation of his police statement.

In addition, the prosecutor used the testimony elicited from various witnesses regarding prior misconduct to refute appellant's claims of accident and establish intent. The prosecutor argued that the testimony of the victim's brother Allen, who witnessed appellant, in a fit of anger, yank the victim from her car seat, combined with circumstantial evidence demonstrated that appellant committed the crimes charged. Later, the prosecution returned to the issue of Allen's credibility, observed that the victim's brother was the one individual who witnessed appellant injure the victim and encouraged the jury to accept his testimony as credible. The prosecutor also argued that the victim's brother feared appellant. To

- 30 -

J. A16036/99

support this assertion, the prosecutor recalled the reaction of the victim's brother when the defense asked him whether appellant was his friend. The prosecutor asserted that it was reasonable for the jury to infer from the brother's body language and eyes when he answered this question that he feared appellant. The prosecutor buttressed this argument with the testimony of the victim's mother and aunt, who stated that the victim's sister also was afraid of appellant.

Additionally, the prosecutor contended that appellant was aware that he needed medication to help control his anger and knew or had reason to know he posed a serious risk to others once he ceased taking his medication. This, the prosecution suggested, was evident from the fact that appellant had shattered windshields on nine occasions subsequent to the time he ceased taking his medication yet prior to inflicting the infant's injuries. Building upon this premise, the prosecution argued that appellant made a conscious decision not to take this medication, that his failure to take his medication amounted to at least recklessness and that the victim's injuries were a direct result of appellant's decision. The prosecutor concluded his argument by stating that appellant's mental instability did not excuse his behavior and requesting that the jury hold appellant responsible for his actions. He emphasized that appellant was aware of his uncontrollable violent outbursts and therefore had a duty to avoid caring for small children.

J. A16036/99

Upon review, we find that, although he discussed appellant's prior bad acts during closing, the prosecutor did not refer to the prior misconduct to demonstrate that appellant was a bad man and therefore guilty of the crimes charged. Some of the prosecutor's references were fair responses to the closing argument of the defense. The remainder either undermined appellant's credibility, bolstered the credibility of the witnesses for the Commonwealth or negated the defense's assertions that appellant lacked mens rea. We are unconvinced that the prosecution exceeded the bounds of permissible conduct with his closing argument. *See Abu-Jabal*, 553 Pa. at ____ & n. 38, 720 A.2d at 110-111 & n. 38.[7]

---

[7] In further support of his claim, appellant places emphasis on the prosecutor's remarks as to the bruises on the victim's sister and the fact that those bruises did not appear until after appellant began to reside in the household. These remarks provide little support for appellant's ineffectiveness claim because counsel did object to the remarks, and the trial court cured any prejudice from the remarks when it instructed the jury:

> Ladies and gentleman of the jury, in the course of closing remarks there [were] references made to Jennifer Moore, who apparently is [the victim's] older sister. I want to point out to you that Jennifer is not alleged to be a victim here, and to the extent it has been suggested that she is in some manner involved or a victim of any criminal acts attributed to the defendant, to the extent that has been suggested you should totally and completely disregard it. This case has allegations of multiple incidents, which I'll get into, but it has essentially an allegation of one defendant and one victim.

N.T., 12/12/97, 392-93. We find this instruction sufficient to cure any prejudice that may have accrued to appellant in this respect. *See Commonwealth v. Washington*, 549 Pa. 12, ____, 700 A.2d 400, 409 (1997) (cautionary instruction by trial court cured any undo prejudice suffered by appellant), *cert. denied*, ____ U.S. ____, 118 S.Ct. 2375, 141

J. A16036/99

Finally, we reject appellant's claim that the prosecutor impermissibly expressed his belief as to appellant's guilt and the credibility of evidence. Again, appellant has taken the prosecutor's remarks out of context and presented a distorted view of the prosecutor's closing argument. Nearly all of the prosecutor's references to his beliefs and thoughts were attempts to recall the testimony and evidence presented at trial—not expressions as to appellant's guilt or the credibility of evidence. We also note that the prosecutor repeatedly emphasized in his closing that it was for the jury to assess the credibility of witnesses and the other evidence presented. More importantly, the trial court instructed the jury to this effect Thus, we again conclude that appellant has failed to demonstrate prejudice.

**Conclusion**

For these reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

---

L.Ed.2d 742 (1998); ***Commonwealth v. Simmons***, 548 A.2d 284, 288-89 (Pa. Super. 1988) (same).

COMMONWEALTH OF PENNSYLVANIA    : IN THE COURT OF COMMON PLEAS
                                : OF POTTER COUNTY, PA

                          VS.   : NO. 93 OF 1997

MARK BAILEY,                    : CRIMINAL DIVISION
                    Defendant


     TRANSCRIPT OF THE DEFENSE'S CLOSING ARGUMENT AT THE
JURY TRIAL, held before the Honorable John B. Leete,
President Judge, in the Courthouse, Coudersport, PA, on
December 16-17, 1997.



A P P E A R A N C E S:


OFFICE OF THE DISTRICT ATTORNEY
OF POTTER COUNTY
East Second Street
Coudersport, PA 16915
BY: JEFF LEBER, D.A.
For the Commonwealth


FINK & FINK LAW OFFICE
Main Street
Port Allegany, PA 16743
BY: HAROLD B. FINK, ESQ.
For the Defendant

'98 DEC 7 AM 8 53

PROTHONOTARY OF COURTS
POTTER COUNTY

FILED

            Ann Marie Jusko
            Potter County Court Reporter
            Potter County Courthouse
            Coudersport, Pa 16915



A 418

376

1              MR. FINK:  May it please the Court, Mr.

2      Leber.  Now that I got a new hearing aid I'm going to get

3      these hips fixed as well so next time I won't be limping

4      around and I'll be listening to everything you members of the

5      jury have.  It has been a long two days for you. I don't

6      think that closing argument is as dumb as I thought the

7      opening arguments were.  I think closing arguments are

8      important because it gives an opportunity to each counsel to

9      kind of point out to you as the jurors, and you folks are

10     going to have the real hard work here, the ultimate

11     determination, of whether or not the Commonwealth has proven

12     the defendant's guilt of the charges which he faces beyond a

13     reasonable doubt. That's the tough job in every case. In this

14     case unlike most others there is a principle of law about

15     which his Honor will charge you and I know that because we've

16     discussed it, the District Attorney and I've discussed it.

17     The Judge has given us an opportunity to do that, and it's

18     not up to me to tell you the law so if I misquote it in any

19     way what his Honor says the law is is what it is and that's

20     what you are to follow.

21              There is a principle called, and don't let the term

22     scare you, called corpus delecti which means the body of the

23     crime, and it has a special use in this type of case and it

24     is essential to us that you understand it and what we're

25     doing is taking 13 not 12, but 13 people off the street who

A 419

377

1    some of you have never been involved in any kind of judicial

2    proceeding and it's all kind of new to you.  You've seen, as

3    the Court mentioned, you've seen television references and

4    court cases on television but when you get right down to it

5    and what is essential for you to understand is it's a tough

6    tough job. And so it is that in an attempt to try to explain

7    corpus delecti to you I went shopping this noon and I bought

8    two things.  One of the things is I bought a roll of tape and

9    I asked my client to put a little piece of tape, I got

10   permission from the Judge before, a little piece of tape

11   along the floor here.  I got something else in the toy

12   department of one of our local stores.  Now just because this

13   is a toy please don't believe that I think that this is not a

14   very very serious matter.  This is without doubt a very very

15   serious matter and I don't mean to minimize it by using a toy

16   to explain the principle of corpus delecti. The principle is

17   that where there is a purported confession where the, or

18   admission that is where the testimony of the Commonwealth

19   says the defendant confessed to the crime.  He said to the

20   officer that he did certain things which amount to a

21   confession.  Now I don't happen to agree that what he said is

22   a confession, but there's no question that it promotes or

23   brings out the corpus delecti ruling, and the rule is that

24   until you have determined beyond a reasonable doubt that

25   Commonwealth has proven that the particular crimes were

A 420

1   committed and that the victim was injured by those crimes you

2   cannot consider the confessions. Boy, is that a tough

3   concept.

4       My daughter and I were involved in a corpus delecti

5   case.  My daugther has been out of law school for three or

6   four years from Temple I can't remember she reported that the

7   criminal law professor of Temple said it's not a practical

8   thing because the jury has already heard the confession.  Are

9   they suppose to forget it?  And the answer is, yes, if yeah,

10  you're suppose to forget it you can't use it if you find that

11  Commonwealth has not proven to you beyond a reasonable doubt

12  that the crimes charged against the defendant occurred. It's

13  not a question of whether he did it it's a question of

14  whether anybody committed the crimes. Have they proven to you

15  that the crimes were committed?

16      Let me demonstrate this if I can.  This little white

17  line appears to be division line right here, division line

18  between all the testimony of the Commonwealth other than the

19  confession and over there is the confession testimony on the

20  right side my right side of the line.  Now, the rule is that

21  until the Commonwealth proves beyond a reasonable doubt,

22  beyond a reasonable doubt that crimes, the five crimes of

23  aggravated assault, five crimes of simple assault and five

24  crimes of--forget what the other charge is.  I don't even

25  have it.  The Court will tell you what it is.  I'll get it in

just a minute.  I'll have to go over here and get it--until
they prove beyond a reasonable doubt that those crimes were
committed you can't go over here, and if you were to go over
here, assume for the moment that they have proven it then and
only then can you go up and so that you can see just play
with this little man here.  In the Jack-in-the-Box are the
confessions.  This represents all the confessions.  You can't
even look at the confessions, you can't even look in this box
to see the confessions until the Commonwealth has proven
beyond a reasonable doubt to you that these crimes were
committed by somebody. That's the rule, tough concept. And
when I referenced the criminal law professor in Temple saying
that's a dumb rule he says, how can the jury forget the
confessions that they've heard. Well, I don't know how but
you are required before you consider, before you look in this
box and you have to turn it so that there is a little safety
mechanism, time elapses, something has to happen before you
see what's in the box. Are you going to be able to look in
that box to see the confessions?  I say, no way, you can't. I
say, respectfully submit that you can't consider the
confessions, any testimony, and we're talking about the
testimony of two police officers, and I think there is one
other lay witness who may have testified, given some
testimony about a confession. I say you can consider none of
the testimony of the arresting officer because that all is

A 422

380

talk about the confession and you can't consider any of the
testimony of the polygraph operator same thing. Let's see
why.

The next concept, you've heard about it for a long
period of time, beyond a reasonable doubt. Let me use this
line again and that line is the reasonable doubt line. And
until the Commonwealth advances the proof such that it goes
up to and beyond that reasonable doubt they have not proven,
they have not carried their burden.  So that if you have a
reasonable doubt, if you have a reasonable doubt as to
whether they have proven without the confession that crimes
have been, the crimes have been committed you only can't
consider that but you've got to find the defendant not
guilty. Again, a reasonable doubt is not that easy a concept.
In his opening remarks the District Attorney said, oh, my
it's not beyond any doubt it's beyond reasonable doubt.
We'll go ahead and prove there will be no doubt in your mind.
There is great doubt, great, great, great doubt. There's no
doubt in my mind that Commonwealth has not carried its
burden, has not carried its burden. Serious offenses serious
offenses.

Let me talk about the five counts of aggravated
assault. And I think that the elements are the same as simple
assault except as it relates to the seriousness of the
injury, the assault on a victim.  The defendant cannot be

A 423

381

1  found guilty unless you find that the Commonwealth has proven

2  beyond a reasonable doubt that the defendant intentionally,

3  knowingly, or recklessly caused bodily injury to another. Now

4  those three terms are what we call words of art, words of

5  art.  They have specific definite meaning as it relates to

6  the crimes of assault. The Judge will charge you about the

7  meaning.

8      First, let's do it without what's in that box.  What's

9  in that box are the confessions right now.  Your first duty

10  is to find if they have proven that this crime was committed

11  by anybody. What do they have without the confessions to

12  prove the crime that the child was intentionally, knowingly,

13  or recklessly injured by that type of conduct of another?

14  Anybody?  Did you hear the quote, "child abuse", testimony of

15  the three medical witnesses, and this is not a child abuse

16  case, it is not. The defendant is not charged with child

17  abuse. The defendant is charged with five counts of

18  aggravated assault, five counts of simple assault and five

19  counts of the third offense I'll talk about when I go over

20  and look at it.

21      What do you have without looking at that box?  You have

22  the testimony of the doctors, right, all of whom essentially

23  testified that within a reasonable degree of medical

24  certainty this child suffered three or four breaks in the

25  lower extremities and two fractures of the ribs due to child

A 424

382

1  abuse. Crucial they didn't say by the intentional act of

2  another; did they?  No. They said by a child abuse.  What,

3  doctor, what do you mean child abuse?  How do you define

4  child abuse?  Well, any action where any action or inaction

5  of the custodian or anybody else which results in injury to a

6  child. Question.  Well, would that include a sibling injuring

7  his brother, his or her brother or sister?  Well, yeah if it

8  involved lack of supervision. Now, bear in mind the

9  Commonwealth must prove beyond a reasonable doubt.  Does that

10 prove to you beyond a reasonable doubt?  You can't see what's

11 in there.  Don't forget you're talking only about beyond a

12 reasonable doubt that the crimes of Aggravated Assault,

13 Simple Assault, five counts each occurred. How did they

14 occur?  What was used to prove to you beyond a reasonable

15 doubt as to the occurrence of aggravated or simple assault?

16     Boy, I wish I could talk to you.  I can't.  I wish I

17 could get some feed back.  I can't, it's not proper. I would

18 suspect that if I could enter into discourse with you now

19 you'd say, H.B., I don't think--I can't think of anything

20 that they have if I can't look into that box.  I can't think

21 of anything that where they've even come close to proving

22 beyond a reasonable doubt that those crimes occurred. And it

23 is not a crime of aggravated assault if a sibling falls on

24 another.

25     At this juncture I guess I want to talk to you about

A 425

383

1    those magic words of intentionally, knowingly or recklessly

2    and his Honor will do that. Knowingly, knowingly means the

3    actor is practically certain by what he does, practically

4    certain that what he does will result in injury to the

5    victim. Please keep a watchful ear, if you will, when the

6    Judge talks about the meaning of intentionally, knowingly or

7    recklessly. Recklessly means with respect to bodily injury a

8    conscious disregard concerning a substantial and

9    unjustifiable risk that bodily injury will result.

10          Do you know this case and other things lately now that

11    I've reached 71 years of age throw me back to many years ago.

12    This case--I remember Debbie, she's our oldest of six when

13    she was just an infant child I'd pick her up, spread her

14    legs, put them around my shoulder and go like this, hey look

15    folks, Debbie Fink, the famous circus performer and then I

16    would kind of bend and bring her around like this and put her

17    down. Is there a difference between that and what it is said

18    my client did by confession when he held a child up with one

19    hand?  Does that make it criminal because he does one

20    hand. ?  I held her on my back with one hand.  I couldn't

21    help but think, Lord, for the grace of God there go I.  We're

22    playing with our kids. Is that aggravated assault?  Is that

23    the knowing element with respect to bodily injury when the

24    actor is aware that a that this type of activity is

25    practically certain to cause injury?  No, we're not even

A 426

384

1    thinking of injury we're thinking about giving our kids,

2    playing with our kids, having fun. Oh, but this man gets

3    upset.  Do you want to know how upset I got when the kids

4    were fighting in the back seat over who was to sit in front

5    and one of them threw up all over the back seat because she

6    said she got sick, car sick and the other one did too and

7    they're fighting.  Well, the district attorney thinks that

8    makes it some kind of by him getting upset like that that

9    puts the actor in such a frame that frame of mind that he

10    will commit aggravated assault or simple assault.  No,

11    members of the jury, we just get upset.

12        Well, wait a minute, H.B., how about the defendant who

13    smashed nine windshields or something like that I mean that's

14    got to be very unusual. Did you?  That's why I put him on the

15    stand.  Did you?  Yes, sir, I not only smashed one I smashed

16    nine.  I was surprised to hear him say nine windshields, but

17    you know what did he say with equal candor.  Did you ever hit

18    a child?  No.

19        What have they proven to you beyond a reasonable

20    doubt?  Nothing except my man, my client fine young man is

21    the victim of sugar Diabetes which has to be regulated and

22    the symptoms are when his sugar is up he gets nervous, edgy,

23    and emotional and when he gets down he gets passive to the

24    point where he almost passes out and has on occasion.

25        Assume for a moment that somehow you would get to the

A 427

385

1    point where you could step over this line and open this box.

2    You're going to have to take a big step to do that, but you

3    finally are able to look at the confessions.  Now, you're

4    considering those confessions.  Do those confessions prove to

5    you beyond a reasonable doubt that my client committed

6    aggravated assault?  Very very serious crimes no question

7    about it. No question. I don't think so.

8         You know why our law of Pennsylvania has adopted the

9    Corpus Delecti Rule and that's clear because the framers of

10   our legal network here in Pennsylvania have acknowledged that

11   confessions are gained in many ways and cannot be totally

12   relied on, that's why the Corpus Delecti Rule. Incidentally,

13   you heard that Commonwealth had an opportunity to rebut

14   what we put on.  Interesting Sergeant Shirley, who I assume

15   is up there right now, I don't know that he is.  No

16   explanation has been made as to why he wasn't here, didn't

17   come in to negate the defendant's testimony that he and the

18   arresting officer said you'll probably only get a fine, isn't

19   that interesting. See officers have various, and I'm sorry

20   but I got to say this, devious, because I believe it devious

21   methods of investigation. Oh, you probably only get a fine

22   tell what happened.  And you heard me ask him, well, did

23   these things happen?  No, some of them did some of them

24   didn't.  But what did he tell you?  Does that tell you that

25   he has confessed to aggravated assault and simple assault?

A 428

386

1      If I were to take a vote of the 26 people in this room,
2   however many are here as to how many of us are against child
3   abuse, I hope that everyone raises your hand, everyone out
4   there raise your hand and I would raise mine.  I mean child
5   abuse is a terrible thing and don't you see how they wove
6   these charges around the term child abuse, and I wonder it's
7   interesting you heard the testimony concerning the
8   complaintant of the baby Rebecca. Mother finally saw a leg
9   that was swollen and then went down little bit by the time
10  she was taken up there and sensitive, but interesting she was
11  asleep on and off when she went to the hospital with this
12  horrendous injury.  Now I'm not saying, I'm not minimizing
13  breaks of bones, but what I'm saying to you is I wonder how
14  many bones I broke of Debbie, Dawny, Brian and Bruce and
15  Robin and Christopher maybe some, I don't know, but if they
16  don't react any worse than that maybe I did, and I remember
17  bruises and black and blue marks, and I guess I could
18  remember pulling them out of cars when I was upset because
19  they threw up, because they were fighting or whatever.  See
20  the Commonwealth has woven, woven a web of circumstantial
21  evidence pointing to that very good young man over there and
22  I don't appreciate it. I'm not pointing my finger to anyone
23  person at all I'm just saying that is a terrible thing.
24      Let me make a couple comments about a couple of the
25  other witnesses, the doctors' testimony.  First doctor,

A 429

1    lovely lady, talks about the first injury ankle injury, it

2    could either come from a pull or a twist. I think a pull is

3    just almost the opposite from a twist.  Now that's the kind

4    of testimony that Commonwealth relies on to persuade to you

5    that they've proven to you beyond a reasonable doubt that

6    there's been assault.  There's been a crime committed by

7    somebody. Beyond a reasonable doubt well, could it have

8    occurred by a sibling falling directly?  Well, Dr. Supinski

9    said no, but then when he further tried to go into the type

10    of force I thought he said traction or a direct blow.  I

11    thought that's what he said traction or a direct blow. A

12    direct blow like a karate chop or hammer?  No, a direct blow.

13    I don't know what a direct blow is if it ain't a karate chop

14    or hammer I don't know. What else?  Please ask yourself when

15    you go into the jury room for deliberations what did the

16    Commonwealth prove to you to persuade you beyond a reasonable

17    doubt that the crimes charged had been committed?

18        What I'm looking for now is the complaint because I

19    want to go into this, excuse me, for going over here because

20    as a matter of fact I can't be over there I like to lean on

21    that, but the Commonwealth did not prove beyond a reasonable

22    doubt that these crimes were committed so I can't go over

23    there.

24        Aggravated Assault Endangering the Welfare of Children.

25    The defendant--this is the charge the defendant, that's my

A 430

388

1    client, did, "On or about from 2/3/96 to 9/23/96 being a

2    parent, guardian or other person supervising the welfare of

3    the child." Well, stop right there.  Stop.  Time.  My client

4    was a parent but not of the child injured so that's out.

5    Guardian, he was no guardian.  Who made him guardian of

6    Rebecca?  Nobody.  He's not a guardian or other person

7    supervising the welfare of a child under the age of 18.  All

8    the testimony shows who was the supervisor, Momma, back

9    there, God bless her. She was the supervisor admittedly in

10   charge of supervising the welfare and well being of Rebecca.

11   So I think you can stop right there but let me go

12   on. "Knowingly endanger the welfare of a child by violating a

13   duty of care."  Did he have a duty of care?  Did mother's

14   paramour have a duty of care of Rebecca, protection or

15   support to wit on three occasions while living at the

16   residence of Tammy Baker?  One might say, well, maybe Tammy

17   Baker had a duty of care it was her house I don't know. But

18   certainly not my client.  "The accused endangered the welfare

19   by causing her to suffer three broken bones and in Roulette

20   Township accused again endangered the welfare by causing her

21   to suffer another broken bone." Oh, I guess that was--this

22   was the criminal complaint.  It was amended to include--the

23   last included two broken bones, namely two ribs.

24        Endangering the welfare of children is a very very

25   serious offense.  It was not met. Ladies and gentlemen of the

A 431

389

jury, it was not meant to cover situations like this. But what was proven to you you can't look at that box beyond a reasonable doubt to prove that those crimes were committed? Well, let's talk about that a minute in reference to endangering the welfare of children maybe somebody did, maybe that crime was committed. Now is it committed just because the child suffered broken bones?  You heard the doctor testify that there are some injuries children are born with, some conditions that bones just break easily, easily. I thought he testified, and I'd like to have heard that testimony read back I'd love to ask but I can't, I thought the doctor testified that it doesn't take much trauma in children of tender years to break a bone.  I don't know the answer to the question.  Merely because the child has broken bones does that mean that endangering the welfare of children the crime has occurred?  I don't think so, but if you find over here that they have proven beyond a reasonable doubt as to that crime then let's go over and look at this confession as it relates to that charge.

Members of the jury, he is not a parent, he is not a guardian and he was not a person supervising the welfare of the child.  Nobody ever said he was baby sitting that I remember. There were baby sisters, weren't there?  Not my client.

Members of the jury, I'm not going to work myself up

A 432

1    any more over this.  I guess I have.  What I'm sure you

2    gathered was true a typed statement of the recorded supposed

3    confession elicited through the questioning of the arresting

4    officer and I was going over that, but I'm not going over

5    that.  It's simply my contention, and I don't know maybe I'm

6    going to ask the Judge to allow you to take this out with

7    you.  It's probably too late now I'm just thinking about it

8    as I'm standing here talking at you.  He probably won't grant

9    it. What was said there?  What was said that constitutes the

10   crime of--that constitutes confession?  Well, maybe this

11   caused it.  I remember of taking the child out, yeah, I was

12   upset, I was upset at the child, mother or whatever, but I

13   took her out of the car seat. And I do remember that her leg

14   got stuck the wrong way when I was taking her out or

15   something.  Wait a minute.  Did you confess that you reached

16   over to take the baby out of a crib and that her leg got

17   stuck in one of the rungs, and it made the crib quiver?

18       I remember of seeing the kids into the car, I was

19   supervising them no question about it.  I was there and one

20   of them slammed the door on the other's finger almost cut the

21   fingers off I remember that because I was right there.  Was I

22   supervising?  Yes, I was a parent.  Am I guilty of the very

23   serious crime of endangering welfare of children?  Please

24   answer that.  You can't say anything and I'll bet you dollars

25   to donuts that every one of you who is a parent *can think of*

A 433

391

1   specific situations where you as parent were there and the

2   child got injured.

3       See, I'm going to be three more minutes I promise.  A

4   weaving of a web, weaving of a web of circumstantial evidence

5   which ensnares the defendant such that the jury can have no

6   alternative other than to find that he is guilty because of

7   the number of breaks and the period of time and that he had a

8   terrible temper and that he did not allow that temper to

9   spill over onto young children. He just didn't.  I give

10  Brother Mike a lot of credit for a lot of insight.  I don't

11  know if you do or not. I give him credit for being totally

12  honest. He told us essentially this young man did not at any

13  time intentionally or recklessly or knowingly harm this child

14  or any children.

15      Members of the jury, I'm going to take my Jack-in-the-

16  Box and return to my table unless the District Attorney wants

17  to have it he can have it too, but I ask you on behalf of my

18  client to find that Commonwealth failed in its burden.

19  Please listen closely to his Honor's definition of what a

20  reasonable doubt is.  I've been in this profession for 42

21  years and I have a hard time with this seemingly easy

22  concept.  It's not an easy concept to me. It's not an easy

23  concept reasonable doubt. All that I can tell you is that if

24  the Commonwealth--if you have a reasonable doubt, a

25  reasonable doubt after the presentation by the Commonwealth

A 434

392

1    of the defendant's guilt, than you must find him not guilty.

2    Members of the jury, thank you for your attention.

3                    (End).

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A 435

# C E R T I F I C A T E

I, Ann Marie Jusko, do hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the hearing of the above cause, and that this copy is a correct transcript of the same.

You are hereby notified that the evidence in the above-entitled case has been this day lodged by me with the Prothonotary/Clerk of Courts of Potter County, Coudersport, Pennsylvania, and that the same will be duly certified and filed so as to become part of the Record if no objection be made thereto within five (5) days from this date.

Dated: _13 - 7 - 98_

_Ann Marie Jusko_
Ann Marie Jusko, Court Reporter

The foregoing Record of the proceedings upon the hearing of the above cause is hereby approved and directed to be filed.

_John B. Leete_
JOHN B. LEETE, PRESIDENT JUDGE
55TH JUDICIAL DISTRICT