# ORIGINAL ●

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARK BAILEY, PETITIONER     :   NO. : CV-01-0327

       vs.               : *J. Caldwell*

WARDEN EDWARD BRENNAN OF   :
SCI-ALBION and D. MICHAEL     :
FISHER, ATTORNEY GENERAL     :
OF PENNSYLVANIA             :

**FILED**
**HARRISBURG**

JUN 0 7 2001

MARY E. D'ANDREA, CLERK
Per_____
       DEPUTY CLERK

## REPLY BRIEF OF THE PETITIONER, MARK BAILEY

The Petitioner, Mark Bailey, filed his Petition for Writ of Habeas Corpus with the United States District Court for the Middle District of Pennsylvania on or about February 21, 2001. On or about June 1, 2001, the Respondents filed an Answer and Brief to the Petitioner's Habeas Corpus Petition.

The Petitioner is now filing his Reply Brief in support of his position that his Write of Habeas Corpus should be granted.

## I. ISSUES PRESENT IN THE HABEAS CORPUS PETITION

1. Was trial counsel ineffective for not objecting or bringing out and did the District Attorney err in bringing out unrelated bad acts and/or criminal conduct of Mr. Bailey, thereby tainting Mr. Bailey and denying him his right to due process and a fair trial?

2. Was trial counsel ineffective for not requesting a limiting instruction or curative instruction concerning the

1

unrelated bad acts and/or criminal conduct of Mr. Bailey and did the trial Judge err in not instructing the jury, thereby denying Mr. Bailey his right to due process and a fair trial?

3.  Did the District Attorney make improper closing arguments to the jury by giving statements of personal opinion regarding Mr. Bailey's guilt, by arguing Mr. Bailey was a bad person and therefore guilty, by referencing repeatedly unrelated bad acts and/or unrelated criminal conduct and by arguing in a highly inflammatory manner, thereby denying Mr. Bailey his right to due process and a fair trial?  Was trial counsel ineffective for not properly objecting to these comments?

4.  Was trial counsel ineffective for not presenting character testimony on behalf of Mr. Bailey, thereby denying him his right to due process and a fair trial?

5.  Did the trial Judge err in finding a corpus delicti was made out to allow the introduction of Mr. Bailey's statements and, further, did the trial Judge err and give an improper instruction to the jury on the issue of corpus delicti and statements and defense?  Was trial counsel ineffective for not properly objecting or preserving the issue for appeal?

6.   Was the verdict against the weight of the evidence and was the evidence insufficient to support the verdict? Was trial counsel ineffective for not properly preserving this issue?

7.   Did the prosecutor err in bringing out and was trial counsel ineffective for not objecting in allowing the medical experts to give opinions that the child victim was the subject of child abuse since there was no set definition, the testimony did not meet the requirement for battered child syndrome and the testimony went beyond medical testimony to a factual and legal issue for the jury and presented prejudicial and confusing testimony?  Did the improper testimony of the experts on abuse deny Mr. Bailey his right to due process and a fair trial?  Should their testimony be stricken due to the contradictory expert testimony?

## II.   FACTUAL AND PROCEDURAL SUMMARY

The Petitioner, Mark Bailey, was charged with four counts of aggravated assault, four counts of simple assault and four counts of endangering the welfare of a child arising out of allegations that he caused injuries to the ankle, legs and ribs of the minor child, Rebecca Moore, on or about February 3, 1996 through September 23, 1996 in Coudersport, Pennsylvania and Roulette Township,

Pennsylvania in the County of Potter.  Mr. Bailey testified
during his trial and vigorously denied that he had any
intention of hurting the child and denied that he was
guilty of the criminal charges.

Mr. Bailey was represented at the trial by Attorney
H.B. Fink.  The Commonwealth was represented by the
District Attorney of Potter County, Jeffrey Leber.  The
trial Judge was President Judge John B. Leete.  Mr. Fink
filed Omnibus Pre-Trial Motions attempting to suppress the
statement of Mr. Bailey and Judge Leete denied the
suppression request.

A trial with a jury was held before Judge Leete
beginning on December 12, 1997 and concluding on December
17, 1997.  Mr. Bailey was convicted of all charges by the
jury.

On February 4, 1998, Judge Leete sentenced Mr. Bailey
on all charges (A-14).

        a.  Count One - aggravated assault - 5 to 10
    years of incarceration

        b.  Count Two - aggravated assault - 5 to 10
    years of incarceration to be consecutive to Count One.
    Counts Three and Four also charging aggravated assault
    had sentences of 5 to 10 years concurrent.

4

c. As to the four counts of endangering the

welfare of children, the Defendant was sentenced on

each to 6 months to 24 months of prison concurrent

with the assault (A-14).

Post Sentence Motions were filed by Mr. Fink (A-12). By

Order dated July 7, 1998, Judge Leete denied the Post

Sentence Motions (A-16). Judge Leete, on July 8, 1998,

issued an Opinion on the denial of the Post Sentence

Motions (A-17). A timely appeal was filed to the Superior

Court by Mr. Fink on August 5, 1998 (A-1).

Subsequently, Mark Bailey, at the recommendation of

Mr. Fink, retained the services of present counsel, Samuel

C. Stretton, Esquire in September of 1998. On or about

September 16, 1998, Samuel C. Stretton, Esquire entered his

appearance (A-22).

A timely Brief was filed by Mr. Stretton on behalf of

Mr. Bailey to the Superior Court of Pennsylvania. An

agreement was made with the Commonwealth to submit the case

on briefs. By Memorandum Opinion dated August 10, 1999,

the Superior Court of Pennsylvania affirmed the Judgment of

Sentence. The Superior Court Judges were Popovich, Lally-

Green and Cirillo. A timely Petition for Allowance of

Appeal was presented to the Pennsylvania Supreme Court.

Subsequently, the Pennsylvania Supreme Court denied the

Petition for Allowance of Appeal by Order dated March 23,
2000.  The present Petition for Writ of Habeas Corpus was
filed on February 21, 2001.

A review of the pertinent trial testimony is now
necessary.

The first Commonwealth witness was Maryl Storey (N.T.
33; A-34).  She took the x-rays of the child, Rebecca Moore
on September 24, 1996 (N.T. 33; A-34).  She indicated the
date of birth of the child was February 3, 1996 (N.T. 33;
A-34).

The Commonwealth then called Janie Murphy, an x-ray
technician of 18 years (N.T. 35, 36; A-36, A-37).  She
identified the x-rays taken of Rebecca Moore (N.T. 36-39;
A-37 - A-40).

Dr. Louise Dellaire, a radiologist, testified (N.T.
39; A-40).  She stated that the fractures at the lower end
of the right leg were bucket handle fractures or corner
fractures and they were considered fairly specific for
child abuse (N.T. 43; A-44).  She indicated these fractures
were relatively new within two weeks (N.T. 44; A-45).  She
testified she observed five fractures in the 7 1/2 month
old baby (N.T. 49; A-50).  She indicated there were two rib
fractures, a new fracture on the right ankle, an older

6

fracture of the right lower leg and an older fracture of the left leg (N.T. 49; A-50).

She testified that the most recent fracture, which was shown in Commonwealth Exhibits 1 and 2 could have just as easily occurred by criminal means as non-criminal means (N.T. 56, 57; A-57, A-58). As to Exhibit 3 which is of the left lower leg, she noted at least one, if not two, fractures (N.T. 57; A-58). As to Commonwealth Exhibit 5, which was of the rib cage, she noted two fractures on the sixth and seventh rib (N.T. 61; A-62).

On re-direct examination, she testified it was her opinion that the fractures were highly consistent with child abuse (N.T. 67; A-68).

On re-cross examination, she admitted she could not tell the circumstances of how the fractures occurred (N.T. 69; A-70). But, she indicated the fractures were suspicious of child abuse (N.T. 69; A-70). She admitted that, with each fracture taken individually, she could not say whether it was by criminal or non-criminal means but she indicated the pattern and nature of the fractures was consistent with child abuse (N.T. 70; A-71).

She defined child abuse as physical and mental harming of a child (N.T. 72; A-73). She indicated intentional or unintentional could mean abuse (N.T. 72; A-73). She

concluded by indicating more likely than not the injuries
were from child abuse and then she again defined abuse as
injury to a child, mental or physical, coming from
intentional or unintentional acts (N.T. 73; A-74).

Dr. Robert Supinski, a Board Certified Orthopedic
surgeon, testified (N.T. 74, 75; A-75, A-76).  He stated on
September 24, 1996 he was called into the emergency room to
see the child, Rebecca Moore (N.T. 85; A-86).  He stated
the mother and the person that he thought was the father
were present although that person was Mr. Bailey (N.T. 85,
86; A-86, A-87).  He stated Mr. Bailey was very upset that
the child had been injured and tearful and didn't know how
that could have happened (N.T. 88; A-89).  He stated he
diagnosed the child as having an acute fracture of her
ankle and multiple other fractures which were of varying
ages and in various stages of healing (N.T. 88; A-89).

He identified Commonwealth Exhibits 1 and 2 as the
exhibits of the ankle and leg, Commonwealth Exhibit 3 as
the lower left leg and Commonwealth Exhibits 4 and 5 as the
rib fractures (N.T. 96, 97; A-97, A-98).

He stated he treated the child with a cast for her
injury to her leg and the child healed without difficulty
(N.T. 98; A-99).  He then gave his opinion with reasonable
medical certainty that there were multiple fractures which

were in various stages of healing (N.T. 99; A-100).  He
stated the ankle injury was caused by shaking or traction,
the tibia injury was from direct trauma and the rib injury
was from a direct blow or compression (N.T. 99; A-100).

He then gave his opinion the child had undergone abuse
and had multiple injuries inflicted upon her by some other
person (N.T. 100; A-101).  He then gave his opinion that
the injuries were caused only by child abuse (N.T. 102; A-
103).

On cross examination, he indicated the mother of the
child gave an explanation but the explanation was not
consistent with the injury (N.T. 105, 106; A-106, A-107).
He stated he did not agree with the previous expert about
pulling or twisting (N.T. 109; A-110).  He estimated the
rib fracture to be four to six weeks of age (N.T. 119; A-
120).

He then defined child abuse as any activity or
inactivity that would cause mental or physical injury to a
child or lessen the child's wellbeing (N.T. 120; A-121).
He admitted his definition could include a lack of
criminality (N.T. 120; A-121).  He stated his definition
also included neglect such as lack of proper parenting
(N.T. 121; A-122).  On redirect examination, he again
stated there was abuse of this child in repeated instances

(N.T. 122, 123; A-123, A-124). He finally stated the rib injuries were consistent with a direct blow as opposed to compression (N.T. 124; A-125).

Dr. Mariam Asar, a pediatrician, testified (N.T. 125; A-126). She testified she is a Board certified pediatrician since 1996 (N.T. 126; A-127). She stated she was the treating physician of Rebecca Moore essentially since birth (N.T. 127; A-128). She defined abuse as maltreatment of a child which could be physical, emotional or sexual (N.T. 128; A-129). She stated she saw the child six days after the child's birth for jaundice, four and a half months after the child's birth and then on September 24, 1996 (N.T. 128; A-129).

When the child came in on September 24, 1996, she indicated the mother stated another child fell on the baby and she sent them to the hospital for x-rays as a result (N.T. 129; A-130). She stated the child's ankle appeared to be bent and bruised and the child was about seven and a half months old on September 24, 1996 (N.T. 130; A-131). She stated the child had been healthy when she saw the child at the age of four and a half months old (N.T. 129, 130; A-130, A-131). She stated she called Children and Youth Service (N.T. 131; A-132). She stated she last saw the child on October 13, 1997 (N.T. 132; A-133). She

10

indicated the child was then twenty months of age and she observed no other fractures at that point (N.T. 132; A-133). She stated she had been told the injury occurred on the morning of the visit to her office when, in reality, it occurred four days before (N.T. 134; A-135).

She then gave her professional opinion that the child was abused (N.T. 135; A-136).

On cross examination, it was brought out that the child had been brought to her on several other occasions including two weeks after the birth for a regular physical, six weeks after birth for a cold, two months after birth for a shot, three and a half months after birth for an ear infection and four and a half months for a regular physical exam and immunization (N.T. 138; A-139). She indicated she saw no trauma at those time periods (N.T. 139; A-140).

After the testimony of the experts, Judge Leete ruled that the corpus delicti had been presented and, therefore, the statements of Mr. Bailey could be used (N.T. 150-154; A-152 - A-156).

Trooper Kenneth Davis of the Pennsylvania State Police testified he interviewed Mr. Bailey on February 28, 1997 (N.T. 155; A-157). He stated he read Mr. Bailey his Miranda rights and Mr. Bailey then confessed to being

involved with four different broken bones of the right leg,
left leg and ribs (N.T. 155; A-157).

The Commonwealth then called Alan Moore, the 9 year
old child of Lori Moore (N.T. 178, 179; A-180, A-181).  He
stated he was now living with his aunt (N.T. 179; A-181).
He stated when his sister, Rebecca Moore, was a baby, his
other sister Jennifer lived with them (N.T. 180; A-182).
He stated while the family was living in Roulette, he saw
Mr. Bailey do something to Rebecca (N.T. 181; A-183).  He
stated Mr. Bailey was in one of "mad attitudes" (N.T. 181;
A-183).  He saw Mr. Bailey yank the child Rebecca out of
the car seat and Rebecca cried because her leg got stuck
(N.T. 181; A-183).  On cross examination, he indicated he
was not sure if Mr. Bailey was a good guy but he sort of
got along with him (N.T. 183; A-185).  He admitted that he
did speak to the District Attorney in advance of his
testimony (N.T. 183; A-185).

The next Commonwealth witness was Lori Moore, the
girlfriend of Mr. Bailey and the mother of the child,
Rebecca Moore (N.T. 184; A-186).  She indicated she was the
mother of four children; Alan who was 9 years old, Anthony
who was 6 years old, Jennifer who was 2 years old and
Rebecca who was 1 year old (N.T. 185; A-187).  She
confirmed that Rebecca was born on February 2, 1996 (N.T.

12

185; A-187). She stated after Rebecca was born she lived

in Coudersport with her sister, Tammy Baker (N.T. 185; A-

187). She stated Mr. Bailey was her boyfriend at the time

(N.T. 185;

A-187). She said he moved out of the household of her

sister in March of 1996 and went to live in Bradford (N.T.

185, 186; A-187, A-188). She indicated Mr. Bailey then

moved back with her at her sister's house in May or June of

1996 when he began working in Emporium Specialties (N.T.

186; A-188).

Ms. Moore indicated she continued to live with her

sister until September of 1996 when she and Mr. Bailey

moved to Roulette (N.T. 186; A-188). She stated she lived

in Roulette with Mr. Bailey, her brother Mike and the

children, Rebecca, Alan and Jennifer (N.T. 186; A-188).

She stated she took the child to Dr. Asar on September

24, 1996 because of the swollen leg and Dr. Asar sent her

to the hospital for x-rays (N.T. 187; A-189). She stated

she noted the child's leg was black and blue and looked

funny and she noticed that on the Saturday before (N.T.

188; A-190). She went to Dr. Asar on September 24, 1996

which was a Tuesday (N.T. 188; A-190). At the hospital,

she told Dr. Supinski that she thought her other daughter

had fallen on the baby Rebecca when Rebecca had her leg

over the car seat (N.T. 189; A-191).  She stated Children and Youth Services then took Rebecca Moore into custody and the child has remained there ever since (N.T. 190; A-192).

She stated she went with Mr. Bailey to the State Police headquarters on February 28, 1997.  She indicated Mr. Bailey told her that he told the police he did it (N.T. 191; A-193).  She stated Mr. Bailey told her he couldn't handle the crying and the child reminded him of his son (N.T. 191; A-193).  She stated Mr. Bailey was not allowed to see his son (N.T. 191; A-193).

On cross examination, she admitted she was the primary caretaker of the child Rebecca (N.T. 193; A-195).  She indicated after the birth of the child Mr. Bailey held and played with the child (N.T. 193; A-195).

She stated she could not remember Mr. Bailey ever being alone with Rebecca except when he got up in the middle of the night (N.T. 195; A-197).

In Roulette, she noticed swelling and discoloration in the lower leg of the child and admitted she did not go to the hospital right away (N.T. 199; A-201).  She stated she knew that Jennifer had fallen on the child and Jennifer was heavy for his age although only one year older (N.T. 199, 200; A-201, A-202).  She admitted she never saw Mr. Bailey do anything improper to Rebecca (N.T. 202; A-204).

14

She admitted that the bruises on the face of Rebecca occurred when the child Rebecca hit her face on the bars of the crib because she had taken the bumper pads away (N.T. 208; A-210).

Alice Carr, a registered nurse from the Charles Cole Hospital, testified as to her observations of the child Rebecca on September 24, 1996. She stated that Lori Moore told her that Rebecca's 18 month old sister, Jennifer, had fallen on her four or five days before (N.T. 211; A-213).

Tammy Baker, the sister of Lori Moore, testified (N.T. 215; A-217). She confirmed the living arrangements in Coudersport at her home with her sister's family (N.T. 216; A-218). She confirmed that Lori Moore was the primary caretaker of Rebecca and that Ms. Moore did not want Rebecca to get too attached to her sister (N.T. 218; A-220). She stated on September 21, 1996 Lori Moore told her about Rebecca's leg being hurt and she observed the bruises in the ankle area (N.T. 219; A-221). She stated she told Lori Moore to see her doctor but Lori Moore did not do so immediately (N.T. 219, 220; A-221, A-222). She confirmed her brother Michael was 23 years old and lived in the house also (N.T. 224; A-226). She said the rib injury occurred when Rebecca's brother was wrestling with her and fell on her and hurt the rib areas of Rebecca (N.T. 225; A-227).

She indicated the rib areas were black and blue and tender
to touch (N.T. 225; A-227).

Chad Setzer, a former inmate in Potter County Jail,
testified (N.T. 234; A-236).  He stated while he and Mr.
Bailey were in the Potter County Jail, Mr. Bailey told him
that he was holding the baby in one hand and he dropped the
baby (N.T. 235; A-237).  He also said Mr. Bailey told him
he would get out of jail and try to get into a mental ward
(N.T. 235; A-237).  He stated Mr. Bailey told him that the
baby had come between himself and his girlfriend and the
baby was a nuisance (N.T. 235, 236; A-237, A-238).

Mr. Setzer admitted he was in jail for selling drugs
and had previously been on probation for conspiracy to
commit the theft (N.T. 236, 237; A-238, A-239).  He
admitted Mr. Bailey had a broken arm in jail, a problem
with blood sugar and a tough time emotionally dealing with
jail (N.T. 238; A-239, A-240, A-241). Mr. Setzer denied
receiving any benefit for testifying but he did admit that
certain felony charges were dropped although he also did
plead to other felonies (N.T. 241-247; A-243 - A-249).

Trooper William Dawson, a State Trooper for 25 years,
testified and indicated he arrested Mr. Bailey on March 19,
1997 (N.T. 250; A-252).  He stated Mr. Bailey came for the
polygraph examination on February 28, 1997 (N.T. 252; A-

254).   He indicated Mr. Bailey ultimately gave a taped

statement concerning the incident.   The tape was then

played to the jury (N.T. 257; A-259).   The transcript of

the tape was introduced and is found at A-24.   The

transcript indicated as to the ankle injury that Mr. Bailey

stated he was holding the child above his head and, when

she started to fall, he grabbed her leg and he caught her

(A-24).  Mr. Bailey said the child could have been injured

then (A-25).   He stated that occurred just before he was

leaving to go to work on September 23, 1996 (A-25).   When

asked about the rib injuries, Mr. Bailey said in his

statement that he was upset and perhaps picked her up too

hard (A-26).   He stated the child was crying in her crib

when he picked her up (A-26).   He said, "I probably

squeezed just a little too tight." (A-27).   He said it was

possible that could have caused the injury to the ribs A-

27).   As to the other injuries to the leg, Mr. Bailey

stated he dragged the child out of the car when he was

upset one day (A-27).   He stated the child's leg was

against the car seat and he grabbed it and pulled the car

seat out of the car (A-27).   He said the child Jennifer had

been sick in the car and that made him upset (A-27).    As

to the other leg injury, Mr. Bailey said one time when he

picked the child up her leg got caught or struck the crib

(A-28).  He stated apparently that caused another fracture (A-28).  In the statement, he indicated he had been treated for temper control (A-28).  He stated he had been hospitalized for that Bradford Hospital (A-28).  He stated he has been given medication for his temper problems (A-29).  He stated he took the medication for five months and then stopped taking it (A-29).  He stated recently he was getting help again for his temper problems (A-29).

In the statement, he indicated he also had problems with his temper with his former girlfriend, Jodi Murray (A-30).  He stated he hit her once at her house (A-30).  He stated he got angry at the other children also (A-30).  He stated he was familiar with the black and blue marks on the ears of the child Jennifer (A-30).  He stated that could have been caused by the car seat since she was too big for it and the seat belts were hitting her ears (A-30).  He denied causing those injuries (A-31).  He stated he also grabbed the ears of the child Alan in horseplay (A-31).  He stated he was sorry for what happened to Rebecca (A-31).  The police officer indicated in the statement that they would attempt to get Mr. Bailey help (A-31).

Trooper Dawson admitted that the child Alan Moore told the Trooper he did not see Mr. Bailey hurt the child Rebecca (N.T. 258, 259; A-260, A-261).  On cross

18

examination, Trooper Dawson admitted that February 28, 1997
Mr. Bailey came and then decided he was not going to take
the polygraph exam and left (N.T. 281; A-282).  He stated
Mr. Bailey returned and then agreed to take the test (N.T.
282; A-283).

After Trooper Dawson, the Commonwealth rested.

The first defense witness was Michael Hicks who was a
member of the religious order of the Society of St. Gabriel
(N.T. 284; A-285).  He knew Mr. Bailey and his family and,
in fact, Mr. Bailey had lived with him for five or six
years before he moved in with Ms. Moore (N.T. 285; A-286).
Brother Michael indicated he observed Mr. Bailey
interacting with Rebecca and he thought there was good
rapport and a real concern for the wellbeing of the child
(N.T. 287; A-288).  He stated he also saw good interaction
between Mr. Bailey and the other children (N.T. 287; A-
288).

He admitted that Mr. Bailey had a strong temper and
was aware that Mr. Bailey was taking medication to control
his anger (N.T. 293, 294; A-294, A-295).  He stated Mr.
Bailey told him that he had struck the girlfriend, Jodi
Murray (N.T. 295; A-296).

Martha Bailey, the mother of Mark Bailey, testified
(N.T. 296; A-297).  She stated he interacted well with all

the children and had a good relationship with them and loved children (N.T. 297, 298; A-298, A-299). She told of one circumstance where the child Jennifer hit her head and only Mr. Bailey comforted her while the mother, Lori, ignored the child (N.T. 299; A-300). She stated she never saw Mr. Bailey hit any children (N.T. 300; A-301).

Ms. Bailey had to admit that Mr. Bailey was a diabetic and, if his sugar got too high, he became very agitated (N.T. 301; A-302). She admitted Mr. Bailey was in a psychiatric unit at Bradford Hospital in 1995 (N.T. 302, 303; A-303, A-304). She also testified Mr. Bailey smashed a number of windshields on cars (N.T. 305; A-306).

Mark Bailey, the Petitioner, testified (N.T. 306; A-307). He indicated he was 27 years of age with a 10th grade education (N.T. 307; A-308). He confirmed at times he was living with his girlfriend, Lori Moore (N.T. 309, 310; A-310, A-311). He admitted he had a serious diabetic problem and agreed that he would get agitated if his blood sugar got too high (N.T. 311, 312; A-312, A-313).

He stated that Lori Moore was the primary caregiver for the child Rebecca but he did change diapers sometimes and fed the child and played with her (N.T. 316; A-317). He stated he was not aware of any injuries to the child Rebecca before he moved to Roulette (N.T. 317, 318; A-318,

A-319).  He stated he got along fine with the child Alan but the child Jennifer was shy with him (N.T. 319; A-320). He told a story about he and the child Alan using C.B.'s in the truck (N.T. 319, 320; A-320, A-321).  He stated he was first aware of the injury to Rebecca's foot when Lori Moore woke him up on the morning in question and said that Jennifer fell on Rebecca (N.T. 320; A-321).  He indicated they then went to the hospital (N.T. 321; A-322).

Mr. Bailey indicated when he went to take the polygraph examination he told the police officer that he would not take it since he was advised by the Public Defender not to do so without the presence of a lawyer (N.T. 326; A-327).  He said he spoke subsequently to Trooper Dawson and Trooper Shirley and both of them told him if he would admit hurting the child he would only get a fine (N.T. 328, 329; A-329, A-330).  He stated after that he then made his statement (N.T. 328-340; A-329 - A-341). He denied speaking to Mr. Setzer other than telling him of the charges (N.T. 336; A-337).  He stated while in jail he was out of control with his blood sugar level and his arm injury and that affected his thought process (N.T. 335; A-336).  On cross examination, he admitted he became more angry than the average person and had been taking medicine (N.T. 341, 342; A-342, A-343).  He admitted he smashed car

21

windows more than nine times (N.T. 342; A-343). He also

admitted smashing his truck because his girlfriend was not

paying for it (N.T. 343; A-344). He used a crow bar (N.T.

343; A-344). He indicated he would use his fist to smash

car windows (N.T. 343; A-344).

On rebuttal, the Commonwealth called Amy Tuttle (N.T.

369; A-370). She was the Director of Social Services at

the hospital (N.T. 369; A-370). She indicated Lori Moore

said that the swelling occurred the Thursday before and Mr.

Bailey agreed to that (N.T. 372; A-373). After her

testimony, the closing speeches were given.

### III.  ARGUMENT

A)  <u>Trial counsel was ineffective for not properly

objecting or bringing out and the District Attorney erred

in bringing out unrelated bad acts and/or criminal conduct

of Mr. Bailey, thereby tainting Mr. Bailey and denying him

his right to due process and a fair trial.</u>

A review of the trial testimony and trial record in

this case reveals repeated instances of the District

Attorney and sometimes even defense counsel bringing out

unrelated criminal conduct of Mr. Bailey. Mr. Bailey was

labeled repeatedly as someone with a temper out of control,

someone who was in a mental institution for temper, someone

who broke numerous windshields with his fist, someone who

broke his truck windows with a crow bar in a dispute with a girlfriend, someone who hit prior girlfriends, someone who may have battered the older baby sister, Jennifer, and someone who may have been precluded from seeing his own child due to alleged misconduct. There were no timely objections or motions for mistrial from trial counsel. There were no limiting instructions as to the purpose of this testimony. As will be seen in the third argument section of this Petition, the District Attorney then argued for Mr. Bailey's conviction because of the unrelated bad conduct. The trial record, when reviewed, is so blatant with references to the unrelated bad acts that it is clear the jury verdict was tainted and it would be impossible to determine whether Mr. Bailey was convicted on the evidence or on the fact that the jury was told he was a very bad person and, therefore, guilty because he was a bad person.

A review of the Superior Court Opinion is very disappointing since the Superior Court's Opinion never directed itself to the overall picture of prosecutorial abuse and counsel's ineffectiveness. The Superior Court's Opinion went out of its way to minimize or justify the references to prior bad acts. But, a fair reading of the transcripts clearly reveals the unfairness of the conclusions reached by the Superior Court. This case is an

23

extreme case where the entire record is polluted with what should be inadmissible bad acts.

Initially, trial counsel, Mr. Fink, was ineffective for bringing out prior injuries to the older daughter, Jennifer.  During his cross examination of Lori Moore, Mr. Fink brought out that Jennifer had the same symptoms on her legs as the baby Rebecca and Dr. Asar did not know what caused them (A-199, A-200).  Certainly, Mr. Fink would have been aware of that issue because, in the statement of Mr. Bailey to the police, Mr. Bailey had mentioned Jennifer had black and blue marks and similar injuries (A-30).  Mr. Fink not only brought out those matters but continued to question on those issues (A-199, A-200).

The problem was compounded when the District Attorney, without objection, brought out that the child Jennifer had become afraid of Mr. Bailey (A-206).  The impression was clearly left with the jury, through the ineffectiveness of Mr. Fink and the redirect examination by the District Attorney, that the child Jennifer had also been beaten or injured by Mr. Bailey.

The District Attorney then further compounded that when, without objection, he brought out on his redirect again that the child Jennifer had similar bruises to the child Rebecca and those bruises did not appear until Mr.

24

Bailey began living with the family (A-209, A-210).
Although objection was made, no limiting instruction was
requested.

During the cross examination of the sister, Tammy
Baker, Mr. Fink again brought out that the child Jennifer
had similar looking injuries to the child Rebecca (A-230).

The reference to unrelated criminal conduct became
compounded during the playing of the videotape statement
made by Mr. Bailey to State Police Officer William Dawson
(A-259). The transcript of the tape was introduced as an
exhibit and is found at pages A-24 through A-31 of the
Reproduced Record.

It should be noted there was no objection to the
playing of the tape or request to redact portions (A-259).
But, the tape itself contained reference to other bad acts
and bad temper. On the tape, there were discussions about
how Mr. Bailey has a very bad temper and flies off the
handle (A-28). Mr. Bailey, on the tape, mentions that he
had to be admitted to Bradford Hospital for bad temper and
was taking medication for it (A-28, A-29). Mr. Bailey, on
the tape, indicated he hit his prior girlfriend, Jodi
Murray, and also struck Lori Moore (A-30). Again, there
was no attempt to redact these comments although there was
no relevance to the current charges. There were references

to the child Jennifer having black and blue marks on her
ear in the statement of Mr. Bailey (A-30).  There was also
reference to him picking up the child Alan by his ears (A-
31).

During the cross examination by the District Attorney
of the defense witness, Michael Hicks, the District
Attorney had Mr. Hicks admit that Mr. Bailey had a strong
temper (A-294).  The District Attorney then referenced the
aforementioned taped confession in which Mr. Bailey stated
he had to go to Bradford Hospital for his anger and the
District Attorney cross examined Mr. Hicks on those
comments (A-294, A-295).

The District Attorney then cross examined Mr. Hicks
about Mr. Bailey's relationship with his prior girlfriend,
using the tape and the reference to the striking of the
girlfriend on the tape (A-296).  The District Attorney also
referenced Mr. Bailey's indication on the tape that he had
struck the girlfriend, Lori Moore (A-296).  Mr. Hicks was
then cross examined about counseling Mr. Bailey against
hitting people (A-296).  Again, there was no objection by
Mr. Fink.

During the cross examination of Mr. Bailey's mother,
Martha Bailey, the District Attorney asked Mrs. Bailey
whether or not her son struck his girlfriend and she

indicated she did not know (A-302, A-303).  He asked her if he hit his girlfriend Lori (A-303).  She was questioned about Mr. Bailey being placed in a psychiatric unit (A-303).  The District Attorney asked her why he was in a psychiatric unit and the mother answered that it was due to the problems between the two different girlfriends (A-304).

The District Attorney then brought out that Mr. Bailey would regularly smash windshields (A-305, A-306).  The District Attorney brought out that the mother did not know whether Mr. Bailey smashed his own windshields or those of other people (A-306).

Mark Bailey then testified in his own defense and a great portion of the cross examination was on unrelated prior bad acts.  The District Attorney started out by referencing that Mr. Bailey was taking medication to control his temper (A-342).  The District Attorney elicited that the temper of Mr. Bailey at times caused him to go overboard (A-343).  He elicited that Mr. Bailey was, "more angry than the other person gets angry." (A-343).  The District Attorney then asked him how many times he broke windshields and Mr. Bailey's answer was, "a lot more than nine." (A-343, A-344).  There were absolutely no objections by defense counsel.  The District Attorney then asked about the various instances of smashing windshields.  Mr. Bailey,

27

without any objection by his counsel, then spoke of a time
when he grabbed a t-bar out of the back of his truck and
smashed all the windows because of an argument with his ex-
girlfriend over not taking the truck out of the woods (A-
344).  Mr. Bailey then stated he had to replace nine
windshields in the last five to six years (A-344).  The
District Attorney questioned Mr. Bailey on how easy it was
to break windshields with his fist (A-344).

The District Attorney then brought out that Mr. Bailey
went to Warren State Hospital, which was a mental
institution (A-348).  The District Attorney then cross
examined Mr. Bailey about his statement and going to the
psychiatric institute at Bradford Hospital (A-351).

On re-cross examination, the District Attorney brought
out that Mr. Bailey had only seen his own son three times
in a nine month period (A-366, A-367).  At that time, Mr.
Fink finally objected but the objection was overruled (A-
367, A-368).  The suggestion clearly was that he was not
fit to see his own child and/or was a bad father.

The unrelated bad acts were then used by the District
Attorney in his closing speech to state that Mr. Bailey was
a very bad person and, therefore, guilty.

> "<u>I suggest to you and submit very strongly that
> the whole evidence in this case suggests that Mr.
> Bailey is not a very good young man.  Whether you</u>

<u>believe he is guilty of these crimes or not, I think</u>
<u>everyone has to agree that this is not a very good</u>
<u>young man.  This is either a young man who is very</u>
<u>malicious and cruel or it's a young man who is very</u>
<u>sick.</u>  It's a young man who has acknowledged to you at
least on nine occasions because of his anger he
smashes windshields out of vehicles.  It's a young man
who on eight of those occasions apparently used his
fists to do that.  I've asked you whether or not you
know anyone you would consider to be a good young man
who is so out of control, so little ability to control
his temper that you would consider that person to be a
very good young man.  This is also a young man who in
spite of the fact Mr. Fink has read to you, has a
Court Order that allowed him to see his child every
how many often times it is, I think it was every other
weekend, holidays, and so forth.  Your recollection of
that will have to control that.  In spite of that he
hasn't barely seen his own child....  I suggest to you
that this is a young man who is in trouble, has been
in trouble for years....   I suggest to you that
character of this young man has been shown to you in
this case and circumstantial evidence that this is a
young man who abuses children and this is a man who
did in fact in this case abuse Rebecca Moore."  (A-
378, A-379, A-380)(emphasis added).

The unfairness of the Superior Court's Memorandum

Opinion is seen on page 32 where the Superior Court stated,

"Although he discussed appellant's prior bad acts during

closing, the prosecutor did not refer to the prior

misconduct to demonstrate that appellant was a bad man and,

therefore, guilty of the crimes charged."  As seen from the

above highlighted quote, the Superior Court was wrong.

The District Attorney, in his closing speech,

reemphasized the temper of Mr. Bailey and how it caused him

to do bad acts (A-384).  Then, in his closing speech, the

District Attorney referenced the child Jennifer's injuries
and suggested that Mr. Bailey may have done that.

> "You know coincidentally even though nothing was
> discovered relative to these problems remember the
> testimony that Jennifer did not have any problems with
> swollen ears and swollen feet until Mr. Bailey came to
> live and maybe it's just a coincidence and then maybe
> not." (A-385).

Mr. Fink did object finally to the argument regarding
Jennifer (A-391). Finally, the Judge gave a curative
instruction that Jennifer was not alleged to be the victim
and the jury should disregard the comment. (A-393, A-394).
This was the only curative instruction given. The Superior
Court, on page 32 of the Memorandum, found this curative
instruction to be sufficient, totally ignoring the
unobjected to and lack of curative instruction for repeated
reference to bad acts.

The use of bad acts or unrelated criminal conduct has
been the basis of a reversal of a criminal conviction for
many years.

In Commonwealth vs. Bouldon, 116 A.2d 867, 874 (Pa.
Super., 1955), the Superior Court noted the following
concerning other unrelated bad acts.

> "Nor is there any reason to contort the
> exceptions to the general rule of inadmissibility of
> other offenses in order to permit the admission of
> evidence of a former offense when, in fact, the only
> purpose is to show depravity or propensity." Id 874.

The prejudicial aspects of unrelated or prior criminal activity or bad acts was discussed in the case of Commonwealth vs. Laughman, 452 A.2d 548 (Pa. Super., 1982). In that case, the Superior Court discussed the prejudicial effect of prior criminal activity and how it essentially stripped a person of his presumption of innocence and deprived the criminal defendant of a fair trial.

In the case of Commonwealth vs. Martinez, 447 A.2d 272 (Pa. Super., 1982), a conviction of a defendant for delivery of a controlled substance was reversed because reference to another alleged sale 17 days later was offered into evidence.

> "It is well established that evidence of other criminal activity is inadmissible against the defendant at his trial on another charge.... The Commonwealth must prove beyond a reasonable doubt that a defendant has committed the particular crime for which he is accused and it may not strip him of his presumption of innocence by proving that he has committed other crimes." Id 273.

The Superior Court of Pennsylvania then noted the devastating effect of unrelated criminal activity.

> "The subsequent sale only served to create an impermissible inference that the appellant is a bad person and, hence, probably committed the crime." Id 275.

The rationale applies to the present case.  The Commonwealth did everything it could without objection from trial counsel, Mr. Fink, to show that Mr. Bailey was a very

bad and dangerous person.  He beat up girlfriends, smashed

windows, he used his fists, he used crow bars, and the

other child had similar injuries, etc.  No curative

instructions were given.  The Commonwealth did not try to

attempt to fit the bad acts into any exception such as

motive, intent or common plan, scheme or design.  In fact,

the Commonwealth's argument essentially said he was a very

bad person with the inference he should be convicted.

Surprisingly and shockingly, the Superior Court

condoned and/or excused this unfair type of argument as

"permissible oratorical flair." (Memorandum, page 29).  If

that is the case, the entire nature of trying criminal

cases ought to be changed since the statements of the

prosecutor are in total contradiction to established case

law.

Mr. Bailey contends his trial counsel, Mr. Fink, was

ineffective for not objecting or preserving, for

interjecting instances of unrelated prior conduct and for

not asking for limiting or curative instructions.

> "In order to prevail on a claim of
> ineffectiveness of counsel, Appellant must
> demonstrate: that the underlying claim has arguable
> merit; that the particular course chosen by counsel
> did not have some reasonable basis designed to effect
> appellant's interest; and that he was prejudiced by
> counsel's action or inaction."   Commonwealth vs.
> Smith, 650 A.2d 863, 866 (Pa., 1994).

Clearly, Mr. Bailey was prejudiced by the testimony of unrelated bad acts, the prosecutor's use of the bad acts in argument and by his counsel's ineffectiveness.

Mr. Bailey respectfully requests his Petition for Writ of Habeas Corpus be granted.

B) <u>Trial counsel was ineffective for not requesting and the trial Judge erred in not giving limiting instructions or curative instructions concerning unrelated bad acts and/or criminal conduct of Mr. Bailey.</u>

The first argument section of this Brief sets forth in detail, with citation to the record, references in the trial record to prior criminal and/or bad acts of Mr. Bailey both during the trial testimony and in the closing argument of the District Attorney. A review of the record indicates there were no curative or limiting instructions given except at the very end of the closing argument when, finally, Mr. Fink raised the issue about the reference in the argument to the child Jennifer. Only then did the Judge say the following.

> "I want to point out to you that Jennifer is not alleged to be a victim here, and to the extent it has been suggested she is in some manner involved or a victim of any criminal acts attributed to the Defendant, to that extent that has been suggested, you should totally and completely disregard it. This case has allegations of multiple incidents, which I will go into, but it has essentially an allegation of one Defendant and one victim." (A-393, A-394).

33

There were no curative or limiting instructions as to the striking of the former girlfriend, the striking of the present girlfriend, the numerous breaking of windshields, the very bad temper of the Defendant, the psychiatric treatment for bad temper, etc.

Trial counsel did nothing to request limiting or curative instructions. The law is quite clear that there has to be such limiting instructions if there is going to be use of prior bad acts.

In the case of Commonwealth vs. Claypool, 495 A.2d 176 (Pa., 1985), the Pennsylvania Supreme Court discussed the need for a limiting instruction where there is evidence of unrelated or other criminal activity.

> "Although we have determined that evidence of prior criminal acts which the defendant himself made relevant to prove the crimes with which he is charged is admissible, we are still mindful of the potential for misunderstanding on the part of the jury when there is evidence admitted. Therefore, such evidence must be accompanied by a curative instruction which fully and carefully explains to the jury the limited purpose for which the evidence has been admitted." Id 179.

In Claypool, the Court concluded there was such a limiting instruction.

In the case of Commonwealth vs. Billa, 555 A.2d 835 (Pa., 1989), the Pennsylvania Supreme Court again discussed the need for a limiting instruction. The Court reversed

34

the conviction because a limiting instruction was not given. In that case, there was a description of a prior rape victim presented to the jury without the appropriate limiting instruction.

> "Without such instruction, the jury was left without guidance as to the use it could legitimately make of the inflammatory evidence and may have been more inclined, therefore, to convict the appellant of first degree murder because he assaulted and intended to kill his prior victim." Id 842.

In the present case, a similar argument can be made. Mr. Bailey was presented to the jury as a bad person in almost every aspect of his life.

Such testimony screamed out for a limiting instruction, if there was going to be one. None was given and, of course, maybe none could be given because there was no reason other than to smear Mr. Bailey.

In the case of Commonwealth vs. Rollins, 580 A.2d 744 (Pa., 1990), the Pennsylvania Supreme Court found that although a limiting instruction should have been given there was no prejudice. In Rollins, there was a prior drug sale and a prior robbery. The Pennsylvania Supreme Court noted that since all the witnesses were involved with drugs the admission resulted in no prejudice (see also Commonwealth vs. Sam, 635 A.2d 603 (Pa., 1993)). Of course, the situation is far different in the present case.

Mr. Bailey's case, the totally unrelated instances of bad temper and the totally unrelated acts and violence were admitted without any explanation as to their limited purpose and the District Attorney argued that they could be used to convict.

The trial Judge had an obligation in this case to use a limiting instruction if, in fact, there was any limiting purpose and, if there wasn't, then the material should not have been admitted in the first place.  Trial counsel had an obligation to request a limiting instruction but he did not do so.  The standard for ineffectiveness has been previously quoted in this Brief and is incorporated by reference.

Again, the Superior Court's Memorandum decision discussing this issue is particularly disappointing.  The Superior Court, despite a record filled with unrelated bad acts, found no prejudice (Memorandum, Pgs. 25, 26, 27).  The Superior Court found no prejudice since the defense, through trial counsel, brought out bad acts and problems.  But, the Superior Court seemingly ignores that this was part of the claim for ineffective assistance.

Further, a limiting instruction had to be given since the jury would not know how to use the bad acts in evaluating guilt or innocence.

Mr. Bailey respectfully requests that his Petition for Writ of Habeas Corpus be granted.

C)  <u>The District Attorney made an improper closing speech to the jury by giving statements of personal opinion regarding Mr. Bailey's guilt, by arguing that Mr. Bailey was a bad person and therefore guilty, by referencing repeatedly unrelated bad acts and by arguing in a highly inflammatory manner</u>.

A review of the District Attorney's closing argument clearly reveals a classic example of what not to say in a closing speech.  The District Attorney spent a great deal of time arguing and discussing the prior unrelated bad acts in the context of suggesting that Mr. Bailey was a bad person, a very bad person and, therefore, guilty.  Portions of the prosecutor's speech has been referenced in the first argument section of this Brief.

> "I suggest to you and submit very strongly that
> the whole evidence in this case suggests that Mr.
> Bailey is not a very good young man.  <u>Whether you
> believe he is guilty of these crimes or not, I think
> everyone has to agree that this is not a very good
> young man.  This is either a young man who is very
> malicious and cruel or it's a young man who is very
> sick.</u>  It's a young man who has acknowledged to you at
> least on nine occasions because of his anger he
> smashes windshields out of vehicles.  It's a young man
> who on eight of those occasions apparently used his
> fists to do that.  I've asked you whether or not you
> know anyone you would consider to be a good young man
> who is so out of control, so little ability to control
> his temper that you would consider that person to be a

very good young man.  This is also a young man who in
spite of the fact Mr. Fink has read to you, has a
Court Order that allowed him to see his child every
how many often times it is, I think it was every other
weekend, holidays, and so forth.  Your recollection of
that will have to control that.  In spite of that he
hasn't barely seen his own child....  <u>I suggest to you
that this is a young man who is in trouble, has been
in trouble for years.... I suggest to you that
character of this young man has been shown to you in
this case and circumstantial evidence that this is a
young man who abuses children and this is a man who
did in fact in this case abuse Rebecca Moore</u>."  (A-
378, A-379,
A-380) (emphasis added).

"You know coincidentally even though nothing was
discovered relative to these problems remember the
testimony that Jennifer did not have any problems with
swollen ears and swollen feet until Mr. Bailey <u>came to
live and maybe it's just a coincidence and then maybe
not</u>." (A-385) (emphasis added).

These passages in the testimony stand in stark contrast to

the Superior Court's statements and mistaken comments that

"The prosecutor did not refer to the prior misconduct to

demonstrate the appellant was a bad man...." (Memorandum of

the Superior Court, pgs. 31, 32).  As noted previously, the

only objection was to the reference and argument by the

District Attorney to the child Jennifer's injuries and

ultimately an instruction was given to disregard that.

This was done at the end of the speech and not at the time

the statement was made.

The District Attorney, in his closing speech, beside
referencing the bad acts, gave his statement of personal
opinion.

> "It is a relatively simple concept, and I believe
> that there was an abundance of testimony from all
> these doctors that were involved before any confession
> was admitted into evidence, any admission that was
> made that became a part of the record that there was
> an instance of child abuse."
> (A-377).

The Superior Court, in its Memorandum, p. 33, dismissed
this blatant statement of personal opinion as a "distorted
view of the prosecutorial closing argument."

The District Attorney referenced that Mr. Bailey
hardly ever saw his own child, again suggesting that there
was something wrong with Mr. Bailey (A-379). As noted
previously, he talked about Mr. Bailey not being a good
person but being a malicious person due to his other
unrelated bad acts (A-378, A-379). He talked about how Mr.
Bailey has been in trouble for years, again trying to
prejudice and inflame the jury (A-378, A-379).

He then argued to the jury that Mr. Bailey's
character, as shaped by these bad acts, is one of someone
who abuses children.

> "I suggest to you that the character of this
> young man has been shown to you in this case and
> circumstantial evidence that this is a man who abuses
> children and this is a man who did in fact in this
> case abuse Rebecca Moore." (A-380).

39

It is hard to imagine anything more prejudicial than the District Attorney stating that Mr. Bailey abuses other children. There was not one scintilla of evidence of that and only a suggestion regarding the child Jennifer. Unfortunately, the Superior Court ignored these comments.

The District Attorney continued to inflame the jury with prior bad acts, which had no relevancy to this case, by telling the jury that Mr. Bailey had been in trouble for years (A-379).

The District Attorney then talked about the bad temper of Mr. Bailey and how that was relevant. He talked about a man who smashed windshields constantly who had a problem with his temper and could not hold his temper (A-384). He talked about this being recklessness in terms there being a child with broken bones (A-384). In essence, he was trying to convict Mr. Bailey because of his bad temper and was trying to divert the jurors from viewing the evidence.

The District Attorney then improperly gave his personal opinion after talking about the injuries and the bad temper.

> "... I think clearly established the recklessness to
> show that this man is guilty of the charges of which
> he faces a requisite of the recklessness." (A-384).

As noted in the earlier argument, he referenced the child Jennifer with the suggestion that this might not be a coincidence, thereby directly telling the jury that he was guilty of that also (A-385).

The District Attorney then, to inflame the jury and again referring to alleged prior instances of bad conduct, made the following statement.

> "Again, it is the credibility of Mr. Bailey that is the key in this case. At this point, he is a person who indicates he cares about children generally, he cares about Rebecca Moore. He doesn't care enough about his own child to insist that he get visitation which are ordered by the Court." (A-388).

The above statement is extremely unfair and prejudicial. There were other reasons regarding the visitation as suggested during the trial by Judge Fink. The fact Mr. Bailey was unable to see his own child except on a few occasions had nothing to do with whether or not he cared about children. The District Attorney knew that but used that to suggest guilt, which was highly inflammatory and improper.

The District Attorney then, to inflame the jury, started name calling.

> "Is Mark Bailey, is he just a pathetic human being? Is he someone who is sick that can't control himself and can't control his anger or is he an evil sadistic person who enjoys inflicting pain on a child. You can debate that for yourselves. I suggest to you for the purpose of this proceeding it doesn't matter.

It doesn't matter.  His lack of control is not a defense." (A-389).

The District Attorney then again refers to prior bad acts as evidence of guilt.

> "You know I would suggest to you that angry people don't belong taking care or having contact with little children.  This man is smashing windshields because he can't control his anger and he is a man who is an abuser of babies.  Like Rebecca Moore because he can't control his anger.  This is an unstable and angry and violent person.  You know there is nothing more defenseless than a human baby.  Every other species has some form of defense mechanism when it is an infant other than human babies and in this case he has taken it out on the most defenseless of human beings, a child less than eight months old." (A-389, A-390).

The above quoted statement is absolutely an outrageous statement by a prosecutor.  He has asked the jury to convict him due to unrelated acts.  He has called him an abuser of babies when there was no evidence that there are any other babies he has abused.

What is particularly upsetting to the writer of this Brief who has tried many jury trials is why the Superior Court found nothing wrong.  The argument of this District Attorney is not acceptable argument under plain case law and past custom and practice.  One starts to lose faith if the Superior Court is going to engage in contorted reasoning to justify what was plainly wrong by the prosecutor.

42

Trial counsel was ineffective for not objecting and not moving for a mistrial and not asking for curative instructions.  His client was essentially painted as a very evil person in a very inflammatory way.  The verdict clearly was tainted by this improper argument.

In the case of Commonwealth vs. Toney, 378 A.2d 310 (Pa. 1977), the Pennsylvania Supreme Court quoted with support the American Bar Association's Standard for the Prosecution and noted as follows.

> "A prosecutor should not use arguments calculated to inflame the passions and prejudices of the jury." Id 312.

In fact, the Pennsylvania Supreme Court mentioned in the same case that it approved of the following of the American Bar Association's Standard.

> "It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth of or falsity of any testimony or evidence or the guilt of the defendant." Id 312.

The importance of what a prosecutor says and the effect that it has on a jury has been noted by the Pennsylvania Supreme Court in the case of Commonwealth vs. Johnson, 533 A.2d 994 (Pa., 1987).

> "On the other hand, we have decided with equal clarity that there are lines of permissible conduct which cannot be crossed in the interest of basic fairness and justice.  Because a jury tends to attach special importance to the Commonwealth's arguments, we

are compelled to guard against other instances which
unduly inflame and prejudice those members." Id 996.

The standard for reversing due to prosecutorial
misconduct is set forth in Commonwealth vs. Bronshtein, 691
A.2d 907 (Pa., 1997).

> "Comments by a prosecutor do not constitute
> reversible error unless the unavoidable effect of such
> comments would be to prejudice the jury, forming in
> their minds a fixed bias and hostility toward the
> defendant such that they could not weigh the evidence
> objectively and render a true verdict." Id 917.

In this case, a fair reading of the prosecutor's argument
demonstrates that his whole argument was geared to fixing a
bias and hostility against Mr. Bailey in the jury's mind.
In the case of Commonwealth vs. Brown, 414 A.2d 70 (Pa.,
1980), the Pennsylvania Supreme Court noted as follows.

> "When the remark is of a nature that would
> seriously threaten the jury's objectivity and is
> likely to deprive an accused of a fair trial, curative
> instructions are inadequate and a trial before another
> Judge is required." Id 76.

In that case, there were curative instructions.  In the
present case, there were none except on the one issue
regarding the child Jennifer.

Finally, in evaluating the prosecutor's misconduct,
the pattern of his misconduct should also be considered.

> "... The prosecutor engaged in a pattern of
> misconduct throughout the trial... repeated instances
> of misconduct permeated the entire trial proceeding so
> as to effectively deny him a fair trial.  We hold in
> Collins that the prosecution has the burden to

establish that its misconduct was harmless beyond a
reasonable doubt.  This burden is not met in the
instant case in view of the repeated prejudicial
remarks." Commonwealth vs. Bricker, 487 A.2d 346, 354
(Pa., 1985).

The Superior Court, in its Memorandum, totally ignored the

cumulative effect of the improper comments.

Mr. Bailey respectfully requests this Honorable Court

grant his Petition for Writ of Habeas Corpus.

D)  Trial counsel was ineffective for not presenting

character testimony on behalf of Mr. Bailey.

During the trial, no character or reputation testimony

was presented on behalf of Mr. Bailey.  Mr. Fink was

ineffective for not doing so.

In the case of Commonwealth vs. Gillespie, 620 A.2d

1143 (Pa. Super., 1993), the defendant was convicted of

simple assault involving his girlfriend.  The Pennsylvania

Superior Court granted a new trial due to the failure of

trial counsel to call character witnesses.

"... that character evidence is vital to a jury's
determination of credibility and, that by creating a
reasonable doubt, that evidence may produce acquittal.
Thus, a lack of character evidence undoubtedly
prejudiced appellant and the ineffective assistance of
appellant's trial counsel undermined the fairness of
the proceeding." Id 1146.
[see also Commonwealth vs. Weiss, 606 A.2d 439 (Pa., 1992)]

Mr. Bailey respectfully contends that trial counsel,

Mr. Fink, had every reason to use character testimony and

failed to do so.  Character testimony is substantive
testimony which would have aided the jury in its
determination.  The Superior Court stated present counsel
did not give the names of potential character witnesses
(Superior Court Memorandum, p. 15).  But, no hearing was
held since present counsel was retained only for appellate
purposes.  The Superior Court should have remanded the case
so this issue could have been further developed.  Trial
counsel was ineffective for not calling character witnesses
and Mr. Bailey respectfully requests this Honorable Court
grant his Petition for Writ of Habeas Corpus.

E)  The trial Judge erred and did not give the correct
charge to the jury on the issue of corpus delicti and trial
counsel was ineffective for not properly objecting or
preserving this issue.  Further, the trial Judge erred in
finding corpus delicti was made out, thereby allowing the
admission of the statement of Mr. Bailey.

Judge Leete, in his instruction to the jury on the
issue of corpus delicti, charged the jury without objection
as follows:

"Now, in this case the Commonwealth has
introduced evidence of various statements which they
claim were made by the Defendant.  Before you can
consider the statements as evidence against the
Defendant you must first of all find that the crime
was in fact committed and that the Defendant did in
fact make the statement, otherwise it must be

disregarded. You may not consider the statements of
the Defendant as evidence against the Defendant unless
you find that the crimes in question were committed.
This means that you must disregard the statement
attributed to the Defendant unless you are satisfied
beyond a reasonable doubt by other evidence in the
case, that is to say other evidence outside of the
alleged statements that a crime was committed, or that
an injury was sustained in the process of committing a
crime, that crime being committed by someone. The
other evidence does not need to show that the crime
was in fact committed by the Defendant only that the
crime was committed by someone. The other evidence
does not need to rule out all possibilities of
accident, justification or excuse or non criminal
means. It is enough if you are satisfied beyond a
reasonable doubt that the circumstances are more
consistent with the injuries having resulted from the
crimes that I outline to you than from other means.
Again, the evidence does not need to tend to show that
the crime was committed by the Defendant only that a
crime was committed by someone. Other evidence does
not need to rule out the possibility there might be
some defense. There's enough if you are satisfied
beyond a reasonable doubt that the circumstances are
more consistent with the commission of a crime than
with the non commission of a crime or existence of a
defense. In other words you have to make that
determination beyond a reasonable doubt before you can
consider the alleged statements attributed to the
Defendant. Another way of saying that, is that before
the Defendant's admissions can be considered as
evidence of guilt you as jurors must first be
convinced beyond a reasonable doubt that the injuries
allegedly suffered here were caused by the crime
charged or the crimes I should say in this case. And
you have to of course make that determination beyond a
reasonable doubt." (A-408, A-409)(emphasis added).

Unfortunately, the instruction does not appear to be a

correct statement of the law since Judge Leete confused the

two tier approach to a corpus delicti charge. Instead, he

commingled the standard for the first tier with the

47

standard for the second tier as the above highlighted

portions suggest.

The standard for a corpus delicti charge is set forth

by the Superior Court in <u>Commonwealth vs. Ahlborn</u>, 657 A.2d

518 (Pa. Super., 1995).

> "Under Pennsylvania law, the application of the
> corpus delicti rule occurs in two distinct phases.
> The first phase involves the Court's application of a
> rule of evidence governing the threshold question of
> the admissibility of the confession.  In this first
> phase of the rule's application, the Court must
> determine whether the Commonwealth has proven the
> corpus delicti of the crimes charged by a mere
> preponderance of the evidence.  If the Court is
> satisfied that, on the evidence presented, it is more
> likely that not that a wrong has occurred through
> criminal agency, than the confession and/or admissions
> of the defendant are admissible.... The second phase
> of the rule's application occurs after a confession
> has already been admitted into evidence.  After the
> Court has made its initial determination that the
> Commonwealth has proved the corpus delicti by a
> preponderance of the evidence and has ruled the
> confession to be admissible, the corpus delicti rule
> additionally requires that the Commonwealth prove to
> the jury's satisfaction beyond a reasonable doubt, the
> corpus delicti of the crimes charged.... Nevertheless,
> the law of Pennsylvania continues to require that the
> Commonwealth prove the existence of the corpus delicti
> beyond a reasonable doubt before the jury may consider
> the defendant's confession.  A jury instruction to
> that effect is, therefore, crucial, since the
> confession may be admitted into evidence upon a
> presentation of the corpus delicti by a mere
> preponderance." <u>Id</u> 521.

Judge Leete, in his charge, essentially negated the

reasonable doubt standard by qualifying the charge with a

preponderance of the evidence standard.

> "There's enough if you are satisfied beyond a
> reasonable doubt that the circumstances are more
> consistent with the commission of a crime than with
> the non commission of a crime or existence of a
> defense." (A-409).

Further, Judge Leete, in his charge, never stated it was

the Commonwealth's duty to prove beyond a reasonable doubt,

he only stated it must be proven beyond a reasonable doubt

and then he negated reasonable doubt with his more

consistent or preponderance of the evidence language.

Further, he improperly added "defense" in the context of a

more likely than not standard.  The Superior Court

dismissed this issue by noting the Superior Court was

unconvinced the jury would be confused since the Judge had

properly instructed on the general burden of proof

(Superior Court Memorandum, pgs. 13, 14).  But, a fair

reading of the charge clearly raises serious questions that

the jury was misled.

    Mr. Fink, the trial counsel, did not object to this

improper charge and was ineffective for not doing so.  As a

result, the jury was given the improper instruction as to

when Mr. Bailey's statement could be utilized and, further,

in terms of evaluating any defense he might offer.

    Mr. Bailey further contends Judge Leete erred in

admitting testimony on the issue of corpus delicti.  The

expert testimony all gave definitions of abuse that

contained non criminal but negligent elements.  The
radiologist, Dr. Dellaire, defined abuse as intentional or
unintentional means (A-73).

> Question:  "You've also said that it is more likely
> than not that it comes from child abuse,
> which you have defined as injury to a
> child mental or physical coming from an
> intentional or unintentional act.  Have I
> summarized that correctly?"

> Answer:  "Yes." (A-74).

The orthopedic surgeon, Dr. Supinski, said the
injuries were caused by child abuse (A-103).  Yet, he
admitted his definition of abuse included neglect (A-122).
He also said his definition included the lack of proper
parenting (A-122).

Dr. Asar, the pediatrician, gave an opinion as to
abuse but also appeared to qualify her opinion to encompass
neglect (A-135, A-147).

A summary with citation to the record of all the
medical testimony is contained in the Statement of the Case
section of this Brief and is incorporated by reference.

Mr. Bailey contends Judge Leete erred since the three
experts, in their somewhat conflicting and confusing
testimony, did not demonstrate that the injuries more
likely than not occurred through criminal agency since the

doctors all suggested non criminal and neglect issues. Therefore, the corpus delicti was not made out.

Mr. Bailey respectfully requests that his Petition for Writ of Habeas Corpus be granted since the jury was improperly charged on the corpus delicti issue and his counsel was ineffective for not correcting the charge.  He also contends his conviction should be reversed and his case dismissed since Judge Leete erred in admitting his confessions since the corpus delicti was not demonstrated.

F)   <u>The verdict was against the weight of the evidence and the evidence was insufficient to support the verdict</u>.

Mr. Bailey respectfully contends the verdict convicting him of aggravated assault and endangering the welfare of children was against the weight of the evidence and the evidence was insufficient to support the verdict. The scope and standard of review for sufficiency of the evidence is set forth in <u>Commonwealth vs. Whiteman</u>, 485 A.2d 459 (Pa. Super., 1984).

> "... In reviewing the sufficiency of the evidence, we must view the evidence presented and all reasonable inferences taken therefrom in the light most favorable to the Commonwealth as verdict winner. The test is whether the evidence thus viewed is sufficient to prove guilt beyond a reasonable doubt...." <u>Id</u> 461.

The test for the weight of the evidence is as follows:

"The test is not whether the Court would have decided the case in the same way but whether the verdict is so contrary to the evidence as to make the award of a new trial imperative so that right may be given another opportunity to prevail." Id 462.

A detailed review of the testimony presented during the trial is contained in the Statement of the Case section of this Brief and will be incorporated by reference and not reiterated.

The essence of the argument for sufficiency of evidence and weight of the evidence focuses on the expert testimony which has been summarized in the preceding section. That also is incorporated by reference. As noted in the preceding section, each of the three experts gave their opinion as to child abuse but each of their definitions included aspects of non-criminal conduct. Mr. Bailey respectfully contends these opinions did not meet the corpus delicti and, therefore, his statement should not have been admitted. In Commonwealth vs. McMullen, 681 A.2d 717, 722 (Pa., 1996), the Pennsylvania Supreme Court clearly held a statement could not be admitted unless the evidence was more consistent with a crime rather than an accident. The evidence should not have been admitted and, further, the evidence, even giving the Commonwealth all its inferences, did not demonstrate beyond a reasonable doubt

that the corpus delicti of the crimes existed (<u>Commonwealth</u>
<u>vs. Ahlborn</u>, 657 A.2d 518, 521 (Pa. Super., 1995)).

Further, the Commonwealth, in its own case, presented
specific evidence that demonstrated the rib injuries were
not caused by Mr. Bailey or by any criminal conduct through
the testimony of its own witness, Tammy Baker, the aunt of
the minor child.  Ms. Baker clearly testified that she
observed how the injury happened and it had nothing to do
with Mr. Bailey but rather with a wrestling incident
involving the older brother with the baby (A-227).

<u>Question</u>:  "Now, what was the first time that you
noticed about any injury or apparent
injury to Rebecca?"

<u>Answer</u>:  "When she was real little, her older brother
had been wrestling around and fell on her.
She was just a few months old and she had
hurt her rib area."

<u>Question</u>:  "How do you know that?"

<u>Answer</u>:  "That he hurt her rib area because there was
a small black and blue mark.  She was tender
to touch, we had to be careful how we
carried her." (A-227).

The direct eyewitness testimony reveals the clear
weakness of the "abuse opinion" of the three experts.

The statement of Mr. Bailey which was admitted, if
read closely, does not indicate that he said he hurt the
child but only that he is speculating that some activities
of his may have caused the injuries (A-24 - A-31).  For

53

instance, Mr. Bailey, in his statement, apparently trying
to come up with some explanation as to how the child
injured her ribs, said as follows.

> "Well, I picked her up - I picked her up like you
> would normally pick up a child, but with me being
> angry, I probably squeezed just a little too tight."
> (A-27).

Clearly, this answer, which is similar to his other answers
where he was speculating as to the other injuries in his
statement, is nothing more than a guess.  Fortunately for
Mr. Bailey, Tammy Baker told the truth at least as to the
rib injury.

The evidence was undisputed that Mr. Bailey was not
the primary caretaker and, in fact, was hardly ever alone
with the child.  The mother, Lori Moore, was the primary
caretaker (A-195).  The mother, Lori Moore, could not
remember any time when Mr. Bailey was ever alone with the
child (A-197).  There were also a number of other people
who had access to the child during pertinent times
including Tammy Baker, the brother Michael and the other
siblings of varying ages (A-187, A-200, A-218, A-223, A-
226).

There was no direct testimony about Mr. Bailey doing
anything improper to the child other than the testimony of
the child, Alan Moore, who saw Mr. Bailey pull the child

54

out of the car seat (A-183, A-184). The police said the
child previously had not stated that (A-260, A-261). There
were others who had equal access to the child and who were
with the child far more than Mr. Bailey.

Mr. Bailey respectfully requests this Honorable Court
grant his Petition for Writ of Habeas Corpus.

G) The testimony of the expert doctor witnesses was
improper when each one gave their opinion that there was
abuse. Further, the expert testimony was improper due to
contradictory expert opinions. Trial counsel was
ineffective for not properly objecting or preserving these
issues.

As set forth in earlier sections of this Brief, each
of the three doctors who testified as Commonwealth experts
gave their professional opinion that there was child abuse
and then defined child abuse to include both criminal and
negligent acts. There was no objection to that testimony.

The expert testimony will be incorporated by reference
and not reiterated as set forth in the Statement of the
Case section of this Petition and the earlier sections on
why an appeal should be granted.

The testimony of the doctors was highly unusual. The
jury heard each doctor give his or her opinion with
reasonable medical certainty that there was child abuse but

then heard definitions of abuse that included aspects which were non-criminal in nature, as previously noted.

In the case of Commonwealth vs. Rodgers, 528 A.2d 610 (Pa. Super., 1987), the Superior Court, for the first time in Pennsylvania, allowed expert testimony regarding battered child syndrome.  The Superior Court noted the very specific nature of such testimony.

> "When a qualified expert witness testifies that a particular child suffered from the syndrome, he or she is giving an opinion as to the means used to inflict the particular injuries based on his or her deduction from the appearance of the injuries... the type of injuries, their size, number, location and severity. The battered child syndrome simply indicates that a child found with the type of injuries described above has not suffered these injuries by accidental means.... The expert's testimony on the syndrome is not an opinion regarding the culpability of any particular defendant.  Such testimony is not accusatory but, as previously stated, the testimony merely tends to show the child was intentionally, rather than accidentally injured." Id 614 (emphasis added).

The problem with the testimony of the three doctors in the present case is that their definitions of abuse also encompassed injuries by accidental means.  The doctors did not give their opinion on battered child syndrome but gave a far broader opinion.  There is no case law that allows such a broad statement of abuse.

Unlike the aforementioned Rodgers case regarding the battered child syndrome, the abuse definition severely

56

prejudiced Mr. Bailey because the jury heard opinions that the child suffered from child abuse when, in fact, the child abuse definition was not necessarily criminal in nature.  Unfortunately, trial counsel never objected or moved for a mistrial or cited the aforementioned Rodgers case.

A careful review of the Rodgers case clearly indicates that battered child syndrome is a fact specific syndrome. In the Rodgers case, the Court noted that the expert's opinion was very helpful to the jury's understanding of the nature of the injuries. Id 616.  In the present case, the experts' opinions were very confusing because their definitions of abuse had non criminal components.

Further, the problem was compounded by the fact that the prosecution's experts gave conflicting and contradictory expert testimony.  The radiologist, Dr. Dellaire testified the leg injuries were by pulling and twisting (A-56).  The orthopedic surgeon, Dr. Supinski, absolutely disagreed that was the cause of the injuries (A-110).

In the case of Mundano vs. Philadelphia Rapid Transit Company, 137 A 104 (Pa., 1927), the Pennsylvania Supreme Court held where a plaintiff called two expert witnesses (in that case they were medical experts) and both gave

contradictory opinions on direct examination concerning the issue of causation, then the testimony of both experts should be stricken. It would appear that the same standard should be applied in the present case, particularly since in the present case the burden of proof is beyond a reasonable doubt while, in the civil case, it was only by a preponderance of the evidence.

Trial counsel was ineffective for not objecting or raising either of these issues. Mr. Bailey respectfully requests that this Honorable Court grant his Petition for Writ of Habeas Corpus.

Respectfully submitted,

Samuel C. Stretton, Esquire
Attorney for Petitioner
Mark Bailey
301 S. High St.; P.O. Box 3231
West Chester, PA  19381
(610) 696-4243
Attorney I.D. No. 18491

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARK BAILEY, PETITIONER    :  NO. CV-01-0327
                      :

       VS.             :
                      :

WARDEN EDWARD BRENNAN OF  :
SCI-ALBION and D. MICHAEL  :
FISHER, ATTORNEY GENERAL   :
OF PENNSYLVANIA          :

## CERTIFICATE OF SERVICE

I hereby certify I am this date serving a copy of the Petitioner's Reply Brief in the captioned matter upon the following persons in the manner indicated below, which service satisfies the requirements of Pa. R.A.P. 121.

Service by First Class Mail addressed as follows:

1.  Francis R. Filipi, Esquire
    Senior Deputy Attorney General
    Office of the Attorney General
    15th Floor, Strawberry Square
    Harrisburg, PA  17120

2.  Jeffrey Leber, Esquire
    Office of the District Attorney
    P.O. Box 123
    Coudersport, PA  16915
    (Attorney for the Commonwealth of Pennsylvania)

3.  Mark Bailey
    DN-0370
    10745 Route 18
    Albion, PA  16475-0002

4.  Martha Bailey
    161 North Bennett Street
    2nd Floor
    Bradford, PA  16701

                                   Respectfully submitted,


_____                _____
            Date                   Samuel C. Stretton, Esquire
                                   Attorney for Petitioner,
                                   Mark Bailey
                                   301 South High Street
                                   P.O. Box 3231
                                   West Chester, PA  19381-3231
                                   (610) 696-4243
                                   Attorney I.D. No. 18491